**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHASE WILLIAMS and WILLIAM ZHANG, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>HDR GLOBAL TRADING LIMITED, ABS GLOBAL TRADING LIMITED, ARTHUR HAYES, BEN DELO, and SAMUEL REED,<br><br>                    Defendants. | No. _____<br><br><br>**JURY DEMANDED** |

## <u>CLASS ACTION COMPLAINT</u>

Individually and on behalf of all others similarly situated, Plaintiffs Chase Williams and William Zhang bring this action against Defendants HDR Global Trading Limited, ABS Global Trading Limited (together with HDR Global Trading Limited, "BitMEX"), Arthur Hayes, Ben Delo, and Samuel Reed.  Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of press releases, media reports, whitepapers of the digital tokens addressed herein, and other publicly disclosed reports and information about Defendants.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery.  Plaintiffs hereby allege as follows:

## I.   **INTRODUCTION**

1.      On behalf of (a) a class of investors who purchased securities and commodities futures that BitMEX sold through its exchange since July 1, 2017 (the "Class"), and (b) a subclass of investors who purchased digital-tokens futures that, without registering under applicable federal and state securities laws as an exchange or broker-dealer and without a registration statement in effect, BitMEX sold through its exchange since July 1, 2017 (the "Subclass"), Plaintiffs and members of the Class and Subclass seek to recover the damages suffered from Defendants' unlawful actions, the consideration paid for the products, and the fees they paid to BitMEX in connection with their purchases.

2.      BitMEX is one of the largest cryptocurrency exchanges in the world, with a daily trading volume that regularly surpassed $3 billion in January 2020.  BitMEX exclusively trades derivative products based on cryptocurrencies, in particular bitcoin and ether.  In doing so,

however, BitMEX acts like a casino with loaded dice, manipulating both its systems and the market its customers use for its own substantial financial gain.

### A.  Market Manipulation

3.      At its inception, as Defendant Arthur Hayes described it, BitMEX was to serve Wall Street institutional investors "who were going to want the same type of products" they were used to trading at sophisticated multinational banks.  Yet for the first six months after BitMEX went live in late 2014, "no one came" to the trading platform.  And Wall Street never came to BitMEX.  So, in the words of its co-founder and CEO, BitMEX changed its business model to "focus[] on degenerate gamblers; [also known as] retail investors" and by offering "100X leverage" trades.

4.      In allowing customers to leverage at the extraordinary ratio of 100:1—about twenty times higher than the common ratio in trading—BitMEX positioned itself to benefit consistently, significantly, and predictably from the combination of attracting overly hopeful investors and small price fluctuations on other exchanges.  This structure creates substantial incentives for BitMEX to surreptitiously cause such fluctuations.

5.      Implementing its business approach, BitMEX deliberately based the price of its futures on spot-market exchanges that have limited liquidity and are thus relatively easy to manipulate.  BitMEX would then engage in manipulative trading on those exchanges to change the price of bitcoin or ether.  Even if only temporary, these price changes would then affect the prices of the futures offered on BitMEX in a way that benefitted BitMEX by allowing it to make margin calls and liquidate its highly leveraged traders.

6.      Automatically liquidating contracts that were out of the money, BitMEX would cover the investor's losses but would also take all of the investor's collateral.  By setting the

3

liquidation point higher than necessary to protect against the risk of a loss greater than the investor's collateral, BitMEX generally profited from these liquidations. BitMEX would place these profits in its "Insurance Fund," marketed as a way to ensure that BitMEX has cash on hand for the rare occasions where the losses exceeded the collateral. Despite its name, the Insurance Fund is almost never drawn upon and instead has grown consistently such that it now contains assets worth hundreds of millions of dollars.

7.      BitMEX also acted on similar financial incentives by trading against its customers, a secret BitMEX kept as long as it could. BitMEX employed an undisclosed trading desk with special privileges and insights that allowed BitMEX to take favorable positions opposite its own customers. BitMEX only revealed the existence of the desk in 2018, under pressure from an independent analyst armed with trade data reflecting its existence. As a desk with access to otherwise-hidden information, it was in a perfect position to enhance BitMEX's manipulation.

8.      BitMEX has compounded the effect of these manipulative schemes by routinely freezing its servers—which BitMEX blames on technical glitches and limitations—to profit during moments of high volatility. During these freezes, customers are unable to change their positions, but the market continues to operate and BitMEX trades. BitMEX would thus prevent its customers from escaping positions until they fell to a level at which BitMEX could liquidate those positions at a profit to itself.

9.      BitMEX's operations on March 12, 2020, are a recent and good example. During a period in the day with high market volatility and crashing bitcoin prices (from nearly $8,000 to $4,000 per bitcoin), resulting in a substantial sell-off, BitMEX's trading platform went offline for twenty-five minutes. As a result of the outage, BitMEX did not dip into its Insurance Fund, but rather liquated $800 million of its customers' highly leveraged positions for its own profit. This

server outage, in short, effectively protected BitMEX and the Insurance Fund from the cascading effects of sell-offs of BitMEX's highly leveraged and volatile products.

10.     BitMEX and its founders have thus manipulated the price of bitcoin and ether, harming Plaintiffs and the Class who had their positions liquidated, in violation of the Commodity Exchanges Act, 7 U.S.C. §§ 9, 25.

### B. Securities Violations

11.     In addition to offering derivative products on commodities such as bitcoin and ether, BitMEX also operates as an unregistered securities exchange that offers security futures products on certain digital tokens, including derivative products that reference the tokens EOS and SNT (together, the "Tokens").

12.     A digital token is a type of digital asset that exists on a "blockchain," which is essentially a decentralized digital ledger that records transactions. Various digital assets can reside on blockchains, including cryptocurrencies as well as so-called "smart contracts" that operate under a set of predetermined conditions agreed on by users. When those conditions are met, the terms of the contract are automatically carried out by the software underlying the digital tokens (which, as relevant here, are referred to as "ERC-20 tokens" and exist on the Ethereum blockchain).

13.     Certain of these digital tokens are sometimes classified as "utility tokens." Their primary purpose is to allow the holder to use or access a particular project. For example, one private-jet company issues utility tokens to participants in its membership program, who can then use them to charter flights on the company's planes. A utility token presumes a functional network on which the token can be used.

14.     Other tokens are more speculative and are referred to as "security tokens," and, like a traditional security, essentially represent one's investment in a project.  Although the tokens take value from the startup behind the project, they do not give the holder actual ownership in that startup.  Rather, investors purchase these tokens with the idea that their value will appreciate as the network in which the token can be used is expanded based upon the managerial efforts of the issuer and those developing the project.  Because such "security tokens" are properly classified as securities under federal and state law, the issuers of these Tokens (the "Issuers") were required to file registration statements with the U.S. Securities and Exchange Commission ("SEC"), and BitMEX was required to register itself as an exchange with the SEC.  Neither the Issuers nor BitMEX filed any such registration statements.  Instead, BitMEX and the Issuers entered into contracts to list these Tokens for sale on the BitMEX exchange in violation of federal and state law.  As a result, BitMEX and the Issuers reaped billions of dollars in profits.

15.     The scheme worked as follows:  working to capitalize on the enthusiasm for cryptocurrencies like bitcoin, an Issuer would announce a revolutionary digital token.  This token would typically be billed as "better," "faster," "cheaper," "more connected," "more trustworthy," and "more secure."  The Issuer would then sell some of its tokens in an initial coin offering ("ICO") to a small group of investors and then turn to exchanges to list the new token, at which point these exchanges would undertake its own efforts to promote sales, and to solicit and encourage purchases, by a wide universe of investors.  The Issuers would thereby raise hundreds of millions, even billions, of dollars from purchasers of the tokens.

16.     The Issuers were generally careful to describe these tokens both as providing some specific utility and as something other than "securities."  But the vast majority of these new tokens turned out to be empty promises.  They were not "better," "faster," "cheaper," "more connected,"

"more trustworthy," or "more secure" than what existed in the marketplace.  In reality, they often had no utility at all.  The promises of new products and markets went unfulfilled, with the networks never fully developed, while investors were left holding the bag when these tokens crashed. Indeed, most of these tokens are now trading at a tiny fraction of their 2017-2018 highs.

17.     Investors were provided with scant information when deciding whether to purchase a token.  In fact, the only offering materials available to investors were "whitepapers" that would describe, in highly technical terms, the supposed utility of a token.  These whitepapers would omit, however, the robust disclosures that the securities laws and the SEC have long codified as essential to investor protections in initial public offerings, including use of "plain English" to describe the offering; a required list of key risk factors; a description of key information and incentives concerning management; warnings about relying on forward-looking statements; an explanation of how the proceeds from the offering would be used; and a standardized format that investors could readily follow.  Instead, these ICOs were the "Wild West"—with investors left to fend for themselves.  Without the mandatory disclosures that would have been required had these ICOs been registered with the SEC, investors could not reliably assess the representations made or the risks of their investments.

18.     In 2017 and 2018, at the height of this frenzy of activity, hundreds of ICOs raised over $20 billion with virtually no regulatory oversight or guidance to investors.  Issuers and exchanges, preying on the public's lack of familiarity with the technology underpinning these tokens, characterized these tokens as "utility tokens," even though they were in effect bets that a particular project would develop into a successful venture.  In truth, these tokens were securities under federal and state securities laws.

19.     On April 3, 2019, in a "Framework for 'Investment Contract' Analysis of Digital Assets" (the "Framework"), the SEC clarified that the Tokens are "investment contracts" and therefore securities under Section 2 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77b(a)(1), and Section 3 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 77c(a)(10).[1]  Prior to that time, a reasonable investor would not have believed that these Tokens were securities that should have been registered with the SEC.  But the Tokens are securities.  For example, on September 30, 2019—nearly six months after releasing its Framework, and more than two years after the relevant ICO began—the SEC completed an investigation and found that Block.one had violated the Securities Act by selling the digital token EOS, an unregistered security, to the public.  As a result of this SEC enforcement action, Block.one was required to pay a $24 million fine.[2]  The SEC's determination that EOS was an unregistered security applies with equal force to other tokens, such as SNT.

20.     BitMEX wrongfully engaged in millions of transactions—including the solicitation, offer, and sale of securities—by selling its derivative products.  Because the Tokens were unregistered securities, the derivatives BitMEX sold referencing the Tokens were themselves securities that needed to be registered.  BitMEX did not register these derivatives as securities, and did not itself register with the SEC as an exchange or broker-dealer.  As a result, investors were not informed of the significant risks inherent in these investments, as federal and state securities laws require.

---

[1] *Framework for "Investment Contract" Analysis of Digital Assets*, SEC (April 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets#_ednref1.

[2] Press Release, *SEC Orders Blockchain Company to Pay $24 Million Penalty for Unregistered ICO* (Sept. 30, 2019), https://www.sec.gov/news/press-release/2019-202; Block.one, Exchange Act Release No. 10714, 2019 WL 4793292 (Sept. 30, 2019).

21.     BitMEX participated in illegal solicitation and sales of security futures products referencing these Tokens for which no registration statement was in effect, and as to which no exemption was available.  BitMEX offered these security futures products using statements posted on the Internet and distributed throughout the world, including throughout the United States, and the security futures products were offered and sold to Plaintiffs and the general public in the United States.  Because these sales violated both the Securities Act and the Exchange Act, Plaintiffs and the Subclass are entitled to recover the consideration paid for these futures with interest thereon at the legal rate, or the equivalent in monetary damages plus interest at the legal rate from the date of purchase, as well as the fees they paid BitMEX on such purchases.

22.     In addition, numerous Subclass members resided, and were present at the time they traded in the Tokens, in States that provide their own "Blue Sky" protections for investors, including New Jersey and Texas.[3]  These States generally provide that the investors in these States who purchased these unregistered tokens are entitled to rescission or damages, as well as interest thereon, attorneys' fees, and costs.

---

[3] These "Blue Sky" statutes are so named because they are designed to protect investors from "speculative schemes which have no more basis than so many feet of blue sky."  *Hall v. Geiger-Jones Co.*, 242 U.S. 539, 550 (1917) (internal citations omitted).  Like the federal securities laws, each of the state statutes pursuant to which Plaintiffs bring causes of action defines "securities" to include "investment contracts," and the term "investment contracts" in each statute has been interpreted at least as broadly as the standard set forth by the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

II.  **PARTIES**

A.  **Plaintiffs**

23.     Plaintiff Chase Williams is a resident of Houston, Texas.  Williams and members of the Class purchased EOS and ADA derivative products on BitMEX and pursuant to contracts with BitMEX, from Texas during the period between July 1, 2017 and the present (the "Class Period").

24.     Plaintiff William Zhang is a resident of New York, New York.  Zhang and members of the Class purchased EOS and TRX derivative products on BitMEX and pursuant to contracts with BitMEX, from New Jersey during the Class Period.

25.     Plaintiffs and the members of the Subclass purchased the derivative products based on the Tokens on BitMEX and pursuant to contracts with BitMEX.

B.  **Defendants**

26.     Defendant HDR Global Trading Limited launched in 2014 ("HDR").  By January 2017, it had become, and remains, the largest cryptocurrency derivatives exchange in the world, with the highest trading volume of any such futures exchange.  HDR Global Trading Limited is incorporated in Seychelles, with its principal office located at Global Gateway 8, Rue de la Perle, Providence Mahé, Seychelles.  HDR Global Trading Limited is the owner of the trading platform called BitMEX and operated BitMEX out of an office in Manhattan.

27.     ABS Global Trading Limited is Delaware corporation created in 2017 and entirely owned by HDR Global Trading Limited.  According to New York public records, it is headquartered at 31 Conduit Road, Flat 17B, The Morgan, Hong Kong, Hong Kong.  ABS Global Trading Limited is responsible for technical aspects of the BitMEX platform, including security services and implementing the user interface traders use to buy and sell products.

10

28.     Defendant Arthur Hayes is the founder and CEO of both HDR Global Trading Limited and ABS Global Trading Limited.  On information and belief, he resides in Hong Kong.

29.     Defendant Samuel Reed is the Chief Technical Officer ("CTO") of both HDR Global Trading Limited and ABS Global Trading Limited and co-founded them along with Hayes. On information and belief, he resides in Hong Kong.

30.     Defendant Ben Delo co-founded both HDR Global Trading Limited and ABS Global Trading Limited with Hayes and Reed.  On information and belief, he resides in Hong Kong.

## III.     <u>JURISDICTION AND VENUE</u>

31.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1331 because the Complaint asserts claims under Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25.

32.     Jurisdiction of this Court is also founded upon 28 U.S.C. § 1331 because the Complaint asserts claims under Sections 5, 12(a)(1), and 15 of the Securities Act, 15 U.S.C. §§ 77e, 77*l*(a)(1), 77o.  This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

33.     Jurisdiction of this Court is also founded upon Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a), which provides that federal courts have exclusive jurisdiction over violations of the Exchange Act, including Sections 5, 15(a)(1), 20, and 29(b), 15 U.S.C. §§ 77e, 78o(a)(1), 78t, 78cc(b).

34.     This Court has jurisdiction over the statutory claims of violations under N.J. Stat. Ann. § 49:3-71 and Tex. Rev. Civ. Stat. art. 581 pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

35.     This Court has personal jurisdiction over Defendants as a result of acts of Defendants occurring in or aimed at the State of New York in connection with Defendants' manipulation of its secondary market, offer or sale of unregistered securities, and failure to register with the SEC as an exchange or broker-dealer.

36.     Venue is proper pursuant to each of 15 U.S.C. § 77v(a) and 15 U.S.C. § 78aa(a) in that this is a district wherein one or more defendants is found or is an inhabitant or transacts business, or in which the offer or sale took place.  Venue is similarly proper pursuant to 7 U.S.C. §25(c) in that this is a district wherein a defendant is found, resides, or transacts business, or wherein any act or transaction constituting the violation occurred.  Throughout most, if not all, of the Class Period, BitMEX maintained an office in Midtown Manhattan, and was actively recruiting individuals for this office on websites such as angel.co and builtinnyc.com.  According to public profiles on LinkedIn, at least some employees in the greater New York City area claim to work for BitMEX.   In addition, BitMEX employees regularly speak and solicit business at large cryptography and blockchain conferences hosted in New York.  For example, Defendant Hayes spoke at CoinDesk's annual Consensus: Invest conference in New York in 2017 and 2018, and other business development employees solicited business during the 2016 event in New York.

37.     Moreover, a plethora of circumstantial evidence suggests other strong connections between BitMEX and New York and the United States as a whole.  Beyond clear evidence of New York-based social media users interacting with BitMEX, "[s]everal sources close to the company" have disclosed to media sources that nearly 15 percent of the BitMEX's 2019 trading volume—or about $138 billion worth—is attributable to traders located in the United States.  This trading from the United States is possible because, as Defendant Hayes concedes and journalists and other commentators have explained, and BitMEX's marketing of itself in the United States

12

demonstrates, accessing BitMEX is trivially easy from the United States using virtual private networks that mask a trader's location.

## IV.   FACTUAL ALLEGATIONS – BACKGROUND

### A. The First Cryptocurrency: Bitcoin

38.     A cryptocurrency is a digital asset designed to work as a medium of exchange, a store of value, or both.  Cryptocurrencies leverage a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

39.     Bitcoin was the world's first decentralized cryptocurrency.  It is also the largest and most popular cryptocurrency, with a market capitalization of approximately $126 billion.  Bitcoin spawned a market of other cryptocurrencies that, together with bitcoin, have a current market capitalization of $192 billion.  (The term "bitcoin" can refer to both a computer protocol and a unit of exchange.  Accepted practice is to use the term "Bitcoin" to label the protocol and software, and the term "bitcoin" to label the units of exchange.)

40.     At its core, Bitcoin is a ledger that tracks the ownership and transfer of every bitcoin in existence.  This ledger is called the blockchain.

41.     Blockchains act as the central technical commonality across most cryptocurrencies.  While each blockchain may be subject to different technical rules and permissions based on the preferences of its creators, they are typically designed to achieve the similar goal of decentralization.

42.     Accordingly, blockchains are generally designed as a framework of incentives that encourages some people to do the work of validating transactions while allowing others to take advantage of the network.  In order to ensure successful validation, those completing the validation

are also required to solve a "Proof of Work" problem by expending computational resources, which has the effect of making the blockchain more accurate and secure.  For Bitcoin, those who validate the blockchain transactions and solve the "Proof of Work" program are rewarded with newly minted bitcoin.  This process is colloquially referred to as "mining."

43.    Mining is one method by which an individual can acquire cryptocurrencies like Bitcoin.  A second and more common manner is to obtain cryptocurrencies from someone else. This is often accomplished by acquiring it through an online "cryptocurrency exchange."

44.    Online cryptocurrency exchanges are one place to purchase Bitcoin and other cryptocurrencies.  These exchanges are similar to traditional exchanges in that they provide a convenient marketplace to match buyers and sellers of virtual currencies.

45.    In April 2013, there were only seven cryptocurrencies listed on coinmartketcap.com, a popular website that tracks the cryptocurrency markets.  As of this filing, the site monitors more than 2,000 cryptocurrencies.

46.    For a time, Bitcoin was the only cryptocurrency available on exchanges.  As cryptocurrencies grew in popularity, exchanges began listing other cryptocurrencies as well, and trading volumes expanded.  In early 2013, daily Bitcoin trading volumes hovered between $1 million and $25 million.  By the end of 2017, daily Bitcoin trading volumes ranged between $200 million and $3.8 billion.

47.    In September 2015, the Commodity Futures Trading Commission ("CFTC") designated Bitcoin a commodity.

**B.  Ethereum As A Commodity**

48.    Ethereum is the second-most popular cryptocurrency, with a market capitalization of approximately $16 billion.  The Ethereum blockchain functions similarly to the Bitcoin

14

blockchain insofar as its miners act as the validators of the network.  Miners of the Ethereum blockchain are paid for their services in the form of newly minted ether.  (The term "Ethereum" refers to the open software platform built on top of the Ethereum blockchain, while the term "ether" is the unit of account used to exchange value within the Ethereum "ecosystem," i.e., the overall network of individuals using Ethereum or participating in the development of its network.  This distinction is thus similar to the "Bitcoin" versus "bitcoin" distinction noted above.)  Like bitcoin, ether has been designated a commodity by the CFTC.

### C.  Ethereum As A Tool For Creating Securities

49.     Unlike Bitcoin's blockchain, Ethereum was designed to enable "smart contract" functionality.  A smart contract is a program that verifies and enforces the negotiation or performance of a contract.  Smart contracts can be self-executing and self-enforcing, which theoretically reduces the transaction costs associated with traditional contracting.

50.     As an example of how a smart contract works, consider a situation where two people want to execute a hedging contract.  They each put up $1,000 worth of ether.  They agree that, after a month, one of them will receive back $1,000 worth of ether at the dollar exchange rate at that time, while the other receives the rest of the ether.  The rest of the ether may or may not be worth more than it was at the beginning of the month.

51.     A smart contract enables these two people to submit the ether to a secure destination and automatically distribute the ether at the end of the month without any third-party action.  The smart contract self-executes with instructions written in its code which get executed when the specified conditions are met.

52.     In order to enable widespread adoption and standardized protocols for smart contracts, the Ethereum community has created certain out-of-the box smart contracts called Ethereum Request for Comments ("ERCs").

53.     An ERC is an application standard for a smart contract.  Anyone can create an ERC and then seek support for that standard.  Once an ERC is accepted by the Ethereum community, it benefits Ethereum users because it provides for uniform transactions, reduced risk, and efficient processes.  This is because it allows individuals who are less technically proficient to make use of smart contract functionality.  The most widespread use of ERCs is to allow individuals to easily launch and create new digital tokens.

**D.  ERC-20 Tokens**

54.     ERC-20 is an application standard that the creator of Ethereum, Vitalik Buterin, first proposed in 2015.  ERC-20 is a standard that allows for the creation of smart-contract tokens on the Ethereum blockchain.  These tokens are known as "ERC-20 tokens."

55.     ERC-20 tokens are built on the Ethereum blockchain, and therefore they must be exchanged on it.  Accordingly, ERC-20 tokens are functionally different than cryptocurrencies like Bitcoin and Ethereum because they do not operate on an independent blockchain.

56.     ERC-20 tokens all function similarly by design—that is, they are compliant with the ERC-20 application standard.  Some properties related to ERC-20 tokens are customizable, such as the total supply of tokens, the token's ticker symbol, and the token's name.  All ERC-20 tokens transactions, however, occur over the Ethereum blockchain; none of them operates over its own blockchain.

57.     ERC-20 tokens are simple and easy to deploy.  Anyone with a basic understanding of Ethereum can use the ERC-20 protocol to create her own ERC-20 tokens, which she can then

16

distribute and make available for purchase.  Even people without any technical expertise can have their own ERC-20 token created for them, which can then be marketed to investors.

### E.  The Advent Of The "ICO"

58.     Between 2014 and 2016, bitcoin's price fluctuated between $200 and $800.  During this same time frame, ether's price fluctuated between roughly $1 and $10.

59.     By the end of 2016, interest in cryptocurrencies began to accelerate, with prices growing at a rate historically unprecedented for any asset class.  Over the course of 2017 alone, bitcoin's price increased from approximately $1,000 to approximately $20,000.  Ethereum's growth was even more startling.  On January 1, 2017, Ethereum was trading at approximately $8 per ether.  Approximately one year later, it was trading at over $1,400 per ether—a return of approximately 17,000 percent over that period.

60.     Seeking to capitalize on the growing enthusiasm for cryptocurrencies, many entrepreneurs sought to raise funds through initial coin offerings, or ICOs, including ICOs for newly created ERC-20 tokens, such as the Tokens.  Many of these issuers improperly chose not to register their securities offerings with the SEC in order to save money and not "open their books" to the SEC, even though investors thereby were denied access to critical information they would have received from an SEC-registered offering.  As a result, investors, including investors in digital tokens, were denied access to critical information before making their investment decision.

61.     Potential purchasers were reached through various cryptocurrency exchanges and social media sites that published active and upcoming ICOs.

62.     Between 2017 and 2018, nearly $20 billion dollars was raised through ICOs.  None of these ICOs was registered with the SEC.  Of the approximately 800 ICOs launched between 2017 and 2018, the vast majority were issued using the ERC-20 protocol.

63.     ERC-20 ICOs were typically announced and promoted through public online channels.  Issuers typically released a "whitepaper" describing the project and terms of the ICO and promoted the sale of the tokens.  They typically advertised the creation of a "new blockchain architecture."

64.     The whitepapers contained vastly less information than would have been included in an SEC registration statement.  For example, whitepapers typically did not include a "plain English" description of the offering; a list of key risk factors; a description of important information and incentives concerning management; warnings about relying on forward-looking statements; an explanation of how the proceeds from the offering would be used; or a standardized format that investors could readily follow.

65.     As a result of the lack of information, trading of token futures on exchanges such as BitMEX was rife for manipulation.  In fact, as Aries Wanlin Wang, the founder of a rival exchange admitted, "the secondary market [for digital assets] can be rigged by manipulators.  If you put major currencies such as Bitcoin and Ethereum aside, many of the tokens you'll find issued through ICOs are there to be manipulated.  These tokens are similar to penny stocks.  And everyone wants to believe they've discovered the next Bitcoin and Ethereum."  Mr. Wang further conceded that "[t]he problems facing the secondary market in crypto are similar to the problems that were faced by American stock exchanges 100 years ago.  When a market lacks certain regulations and oversights, predictable things happen.  Pump and dumps are very common in the secondary market of cryptocurrency, just as they were on the US stock exchange so many years ago."

66.     The Issuers declined to register the Tokens with the SEC, and BitMEX declined to register itself as an exchange or broker-dealer, which registrations would have provided crucial risk disclosure to investors, including members of the Class.

## V.   FACTUAL ALLEGATIONS – EXCHANGE MANIPULATION

### A.  The Origins Of BitMEX

67.     BitMEX does not sell bitcoin, ether, or any ERC-20 tokens.  Instead, BitMEX offers future and swap products, which are tied to the future performance of these assets without requiring their direct ownership.  To use the platform, traders must first deposit bitcoin they have obtained from another source.  Then they can use that bitcoin as collateral to trade contracts that reference bitcoin or other cryptocurrencies.

68.     BitMEX began offering derivative products for bitcoin in 2014 as one of the first players in the cryptocurrency derivative space.  Early on, struggling to make money, the founders chose to, as they put it, "focus[] on degenerate gamblers; [also known as] retail investors."  Since then, its first-mover advantage has paid off:  it is consistently among the largest cryptocurrency futures traders by volume and has been for years.  It now frequently trades over $3 billion worth of transaction in a single day.

69.     Its founder and CEO, Defendant Hayes, is cryptocurrency's P.T. Barnum. Describing trading on cryptocurrency as "the entertainment business," he has embraced a role as showman and promotor for the "degenerate gamblers" he solicits, and encourages speculative trading by flaunting his lavish lifestyle and making bold predictions designed to elicit responses and move the market in a way that is profitable for BitMEX.

70.     Hayes repeatedly flaunts his wealth like this to followers of the BitMEX platform, while also sharing his positions and profits he makes by betting on the price of bitcoin and other cryptocurrencies.   The implication of these types of promotion is clear:  you too could live like this, if you trade on my platform.



71.    For example, when promoting BitMEX at a large conference in New York, Hayes flaunted his arrival in an exotic car:



72.    Like many promoters, Hayes will take extreme positions and use aggressive language to make his points and spur conversation.  For example, in July 2018, after the price of bitcoin crashed from $19,000 to below $6,000, Hayes predicted it would reach $50,000 before the

end of the year.  While the price of bitcoin rose in the days following his pronouncement to over $8,000, by January 1, 2019, the price was below $4,000.

73.     Similarly, Hayes has denigrated the digital tokens his own platform "proudly" lists, referring to them with terms like "dogshit" and "shitcoins":



74.     The BitMEX platform also has casino features built in.  It promotes "winners" with a leaderboard of successful traders:

| Rank | Name | Profit | Is Real Name |
|---|---|---|---|
| 1 | Quick-Grove-Mind | 8,047.8158 XBT | ✘ |
| 2 | Mercury-Wood-Sprite | 7,731.0973 XBT | ✘ |
| 3 | Heavy-Autumn-Wolf | 7,544.8921 XBT | ✘ |
| 4 | Alameda Research | 5,244.6841 XBT | ✔ |
| 5 | Hot-Relic-Fancier | 4,216.5159 XBT | ✘ |
| 6 | coincidentcapitalltd | 2,610.2783 XBT | ✔ |
| 7 | Jelly-Mint-Flier | 2,525.3227 XBT | ✘ |
| 8 | Skitter-Peridot-Raven | 2,343.9594 XBT | ✘ |
| 9 | Wheat-Storm-Speaker | 2,028.0849 XBT | ✘ |
| 10 | Honeysuckle-South-Rib | 2,011.3699 XBT | ✘ |

*Top 25 Traders by Notional*

75.     BitMEX also runs promotions for its products to promote gambling, providing prizes to "[t]he trader who continuously quotes the largest two-sided volume within a 0.5 percent spread" or "[t]he trader who has the largest profit (in XBT) from trading the NEO (NEOG18) contract gets the third prize."

76.     These promotions attract numerous retail investors and distract them from the fact that BitMEX created an exchange that facilitates its own manipulative and fraudulent behavior.

### B.  Operations Of BitMEX And Its Derivatives Products

77.     Since its inception, BitMEX has flouted financial regulators worldwide for operating as an unregistered exchange, hiding behind its offshore status.

78.     In 2018, the financial regulator for the province of Quebec, Canada, ordered BitMEX to close accounts linked to customers in Quebec because it was operating as an unregistered exchange.

79.     In July 2019, according to reports, the CFTC opened an investigation to determine whether the exchange is targeting and allowing U.S. traders to use the platform, after numerous press reports detailed the lack of any "know your customer" practices at BitMEX and the ease with which users can access the site from the United States—indeed one New York journalist has detailed his use of BitMEX.

80.     Most recently, on March 3, 2020, the United Kingdom's Financial Conduct Authority (FCA) issued a notice that BitMEX "is not authorised by us and is targeting people in the UK.  Based upon information we hold, we believe it is carrying on regulated activities which require authorisation."

81.     BitMEX's flouting of financial regulators is consistent with the attitude of its founders, as Defendant Hayes has freely admitted to falsifying banking documentation in China in order to take advantage of arbitrage opportunities in the price of bitcoin.

82.     BitMEX is not the only entity that offers swaps and futures products on bitcoin. BitMEX, however, structures its products and operations with features more akin to a casino, focusing on products that expose customers to greater volatility and an increased risk of loss.

83.     One of BitMEX's earliest and still most popular products is the XBTUSD Perpetual Contract.  This product, with features that resemble both a future and swap, allows traders to buy

or sell a contract that tracks the price of the exchange rate between bitcoin and the U.S. Dollar.  If you buy the contract, you will make a profit if the price of bitcoin goes up in U.S. Dollars.  Conversely, if you sell the contract, you will make a profit if the price of bitcoin goes down in U.S. Dollars—effectively a short sale on the price of bitcoin.

84.     Unlike a typical futures contract, XBTUSD has no set expiry date.  Further, unlike a traditional futures product, the XBTUSD Perpetual Contract price closely tracks the price of the underlying asset, bitcoin.  Put differently, in a traditional futures market, there are separate prices for the futures product and for the underlying asset.  If ACME Corp. is trading at $100 a share today, the contract to buy one share of ACME Corp. at $120 in three months might trade for $5.  Instead, XBTUSD tracks the price of bitcoin by exchanging among contract holders that are long (or short) a "funding rate" every eight hours if the price of bitcoin is higher (or lower) than what the contract is trading for on BitMEX.  These mechanics incentivize buying the contract when the price of the contract is lower than the price of bitcoin, thus raising the contract's price, and vice-versa.  The "funding rate" amount depends on the spread between the XBTUSD contract price and the referenced exchange rate.  The funding rate is exchanged directly peer-to-peer among contract holders.  BitMEX does not charge a fee for it.

85.     Because BitMEX does not list bitcoin itself, it must look to other exchanges that do trade bitcoin to determine the price of bitcoin for products like XBTUSD.  For BitMEX to function properly, the data from the other exchanges must be trustworthy.  If the spot market for the underlying cryptocurrencies listed on those exchanges is thinly traded and illiquid, then the price of the cryptocurrency becomes susceptible to price manipulation, which in turn could affect the price of the products on BitMEX.  BitMEX knows this.

86.     BitMEX's products are particularly sensitive to price manipulation because BitMEX allows traders to operate on substantial amounts of leverage.  BitMEX allows traders to leverage their position up to 100 times the amount of collateral, or "margin," they post.  Put differently, traders can buy or sell 100 bitcoin worth of XBTUSD contracts for only 1 bitcoin of collateral.  This leverage magnifies both gains and losses:  if the price of the XBTUSD goes up, a buyer who is 100x leveraged will experience 100 times the profit, but if the price declines even 1 percent, the buyer will have lost all his collateral.  In this way, BitMEX structures its products to offer the allure of large, lottery-ticket payoffs for very limited money.

87.     BitMEX's fees, however, are calculated based on the leveraged position, not on the underlying collateral.  Thus, where BitMEX advertises a fee of 0.075 percent for bitcoin future perpetual contracts, that percentage refers to the amount of the unleveraged position.  For a 100x leveraged future, BitMEX is effectively charging a fee of 7.5 percent.

88.     In a leveraged trade, BitMEX limits a trader's loss to solely the posted margin.  In contrast, major derivatives exchanges, such as the Chicago Mercantile Exchange, expose traders to unlimited risk.  When the unrealized loss of their position exceeds the posted margins, those exchanges will ask traders to post additional collateral to supplement their margin.  This is known as a margin call.  For example, if you had a $10,000 position supported by $100 of margin, and the position fell 1 percent to $9,900, it would trigger a margin call.

89.     To limit traders' losses to the posted margin, BitMEX uses a liquidation engine to close positions with unrealized losses close to the amount of the posted collateral and prevent losses greater than the collateral posted by the trader while ensuring that the winner receives their full profits.  While the promise that a trader can only lose the minimal margin put up for a highly leveraged bet may be alluring to retail investors, in reality BitMEX uses this promise to lure them

into a false sense of security.  BitMEX's system encourages traders to place highly leveraged bets under this pseudo-protection but takes their money in liquidations.  Put differently, when BitMEX liquidates a position, there is going to be a winning trader and a losing trader, but even beyond receiving the transaction fees, BitMEX almost always takes a large part of one trader's collateral, allowing it to profit from the liquidation.

### C.  BitMEX's Automatic Liquidations Are Used To Profit Through The So-Called "Insurance Fund"

90.   BitMEX's model of encouraging its users to experience volatility disproportionate to their collateral through substantial leveraging requires a mechanism that prevents those users from experiencing losses greater than they can handle—there is, after all, someone on the other end of the transaction that expects to get paid.  BitMEX achieves this through the use of an automatic liquidation system.  This system, however, does more than liquidate positions with insufficient collateral—it also creates substantial profits for BitMEX at the expense of its customers.

91.   Because BitMEX allows traders to make purchases with large amounts of leverage, there is a risk that that a trader may not be able to pay the winner for his position.  In order to prevent winners from being adversely affected by the lack of a counterparty's collateral, BitMEX agrees to cover their winnings.  In exchange, it automatically takes the loser's collateral.  It then seeks to sell the position on the market at the best price available, with the purchaser stepping into the shoes of the liquidated party with responsibility for covering the counterparty's profits after sale.[4]  This process of taking the loser's collateral in exchange for covering the winner's profits until a counterparty is found is the automatic-liquidation system.

---

[4] If it is possible to make such a sale, the purchaser steps into the shoes of the liquidated party, such that the counterparty is in no way affected by (or even aware of) the liquidation of the other

92.     BitMEX, however, does not wait to liquidate until the collateral can no longer cover the losses.  Instead, it liquidates when the collateral is worth approximately twice the losses incurred, even though the trader has half of the initial collateral remaining.  Even if the system is able to find a price for the position after the liquidation that would have allowed the trader to recoup some his losses, however, the trader receives nothing.  Instead, BitMEX keeps that recovery for itself and puts it into its "Insurance Fund."

93.     To use an example from BitMEX's own website,[5] consider a trader who has taken a long position on 100 ether using only 1 bitcoin as collateral while bitcoin and ether are each trading at $4,000.  This trader is 100x leveraged, such that a rise in the price of ether by $10 will cause the trader to gain $1,000.  Because of this level of leverage, the trader runs a substantial risk of not being able to pay off an unsuccessful contract; his collateral can absorb only a $40 decrease in the price of ether.  The price at which the trader's collateral can no longer cover the losses on the position is the "bankruptcy price."   In this example, the bankruptcy price is slightly over $3,960, as ether falling to that price would mean that the 1 bitcoin used as collateral would exactly cover the losses.  Rather than using this bankruptcy price as the liquidation point, BitMEX imposes a 0.5 percent "maintenance margin," such that the position will automatically be liquidated if the price of ether falls to $3,980.  This maintenance margin is remarkable relative to the amount of leverage in the position, as a change of less than 1 percent in the price of bitcoin can result in an automatic liquidation.

---

side.  The new purchaser can be leveraged and is in turn subject to potential liquidation as well. Only if no such trade is possible are both of the original positions liquidated.

[5] This example has been modified from the one on the BitMEX website only in that the position in question is tied to ether rather than bitcoin—this change simplifies the mathematics by preventing price movements from affecting the value of the collateral but does not materially affect the outcome.

94.     If the price hits $3,980 and this liquidation occurs, BitMEX will seize the collateral

and then seek to sell the 100-bitcoin position to another customer, while covering the gains of and

without terminating the contract of the original counterparty.   If this sale occurs at a price of

$3,978, reflecting a $2 bid-ask spread, the purchase as a whole will have incurred a loss of $2,200

against the initial $4,000 wagered—a $22 loss multiplied by the 100x leverage.   BitMEX, which

takes the full collateral, has accordingly profited $1,800 from the liquidation of its customers'

position and places this profit in the Insurance Fund.   The trader, meanwhile, loses the full $4,000.

This scenario is summarized in the chart below:

| Scenario 1 | Customer | Counterparty | BitMEX |
|---|---|---|---|
| ether price decreases $22 before a purchaser is found | $0 | $22x100=$2,200 | -$22x100=-$2,200 |
| BitMEX seizes 1 bitcoin of collateral | -1 bitcoin (value: $4,000) | $0 | +1 bitcoin (value: $4,000) |
| Net gain/loss | -$4,000 | +$2,200 | +$1,800 |

95.     It is possible for BitMEX to lose money in a liquidation if the market lacks

sufficient liquidity to allow BitMEX to sell the liquidated position at the bankruptcy price.   If, for

example, the price of ether hits $3,980 but BitMEX is not able to find a purchaser to take over

future at a price above $3,920, the 1 bitcoin used as collateral will not cover BitMEX's losses.

Hypothetically, the Insurance Fund would be used to cover BitMEX's losses in this scenario.   That

possibility is reflected in the chart below:

| Scenario 2 | Customer | Counterparty | BitMEX |
|---|---|---|---|
| ether price decreases $80 before a purchaser is found | $0 | $80x100=$8,000 | -$80x100=-$8,000 |
| BitMEX seizes 1 bitcoin of collateral | -1 bitcoin (value: $4,000) | $0 | +1 bitcoin (value: $4,000) |
| Net gain/loss | -$4,000 | +$8,000 | -4,000 |

96.     The profitability of the Insurance Fund is thus tied to the liquidity of the market—as BitMEX itself has stated, the Insurance Fund will profit from each liquidation as long as the bid-ask is smaller than the maintenance margin.

97.     Despite being described as a mechanism intended "to help ensure winners receive their expected profits, while still limiting the downside liability for losing traders" by making sure that BitMEX always has cash on hand to pay off losing trades, BitMEX's Insurance Fund shows substantial overall profit from these liquidations.  As their own data shows, the Insurance Fund has grown every year, as BitMEX takes in far more from liquidating its customers' positions than it pays out to cover contracts it cannot close quickly enough.  Despite its role as an insurance backstop, it grows in value nearly every day:  over the last 100 (volatile) days, it has begun only five of them with a balance less than it began with the day before.  Its largest posted one-day loss in the last 100 days has been around 20 bitcoin.  In fact, at the end of 2019, the Insurance Fund contained 33,491 bitcoin, representing 0.19 percent of the total bitcoin in circulation.  Moreover, BitMEX partitions the fund by contract type, and, when no more contracts of a given type remain (because, for example, the contract was tied to a time period that expired) the portion of the Insurance Fund for that contract type is given to BitMEX as profit.

98.     BitMEX has thus profited from the vast majority of the automatic liquidations it conducts on behalf of its customers.  Even independent of how these automatic liquidations can be used with market manipulation, the structure of BitMEX's automatic liquidations creates an incentive for BitMEX to induce liquidations as long as there is sufficient liquidity in the market that the bid-ask spread is smaller than the maintenance margin.  As long as this liquidity is present, BitMEX profits when it causes its customers' positions to automatically liquidate.

**D.  Defendants Weaponize The Deficiencies In Their Servers.**

99.    Defendants' ability to manipulate the prices on BitMEX for their own profit and at the expense of the Class members was protected and enhanced by persistent issues BitMEX maintained in its server that locked out users at crucial times that enabled BitMEX to profit.

100.    BitMEX's risk-management process, which performs the system's automatic liquidations, must check the entire system whenever the price of a future changes.  This process, although sometimes completed quickly, supposedly causes BitMEX's servers to freeze on average between two and three times a day.  During these server freezes, customers lose the ability to trade until the servers unfreeze.

101.    These server issues are not present in other exchanges that regularly handle far more transactions per second.  While BitMEX has purposefully not made all of the data about its server capacity public, it has indicated that, as of May 2019, it was processing around 200,000,000 trades a week, purportedly taxing its system and leading to server shutdowns.  This works out to an average load of around 330 trades a second.  BitMEX has indicated that its peak transactions can reach 30 times the average,  for a peak of just under 10,000 trades a second.  ByBit, which also transacts primarily in futures and derivatives, can process 100,000 transactions a second.  Binance, another large exchange, can process 1.4 million transactions a second, more than 100 times the peaks that purportedly cause BitMEX's servers to freeze.

102.    When BitMEX's servers are frozen, preventing customers from executing any trades, the prices of the futures contracts are *not* frozen.  Instead, they continue to move, processing some transactions while refusing to accept transactions from others.  This means that a Class member can be prevented from executing a trade by a server freeze only to find, once the server

reopens, that the price at which they wished to transact is no longer available. They can also find that an offer they had made before the freeze but wished to retract during it has since been accepted.

103.    Any trader with the ability to have its transactions prioritized over others during this period could reap substantial profits. The digital assets on which the BitMEX futures are based, such as bitcoin or the Tokens, continued to trade on other exchanges with functioning servers while BitMEX's remained frozen to most users. A privileged trader—such as those that operate BitMEX's internal trading desk—could see that the price of bitcoin had risen during a freeze and arbitrage on that information before the regular traders had the ability to react. Additionally, because most traders are unable to operate during these freezes, a trader who is able to act could survey all of the items on offer during the freeze and cherry-pick whichever seemed most appealing in light of the market's movements.

104.    The limitations of BitMEX's server also helps enable profitable automatic liquidations, because these liquidations continue to occur during the freeze. A customer who has a 100x leveraged position on one bitcoin that will liquidate if the price of bitcoin falls from $4,000 to $3,980, for example, would be heavily incentivized to sell when the price hits $3,985, accepting a loss of $1,500 but retaining the capital. If the frozen servers prevent this sale from transpiring, however, the customer will lose all of their capital when the price hits $3,980. Such a scenario profits BitMEX, which collects the capital.

105.    The timing of these freezes is not random. The most important and profitable time for BitMEX to freeze is during a period of high volatility. BitMEX's automatic liquidations exacerbate the volatility of the derivatives that BitMEX markets, particularly in periods of high volatility. Specifically, by automatically executing sell orders in response to a market decline, BitMEX pushes prices even lower. This response could result in catastrophically cascading sell

orders during a period of a rapid decline—that is, a "flash crash."  BitMEX does not disclose those risks to retail investors and, instead, uses server freezes to protect its Insurance Fund and its derivatives market as a form of undisclosed "circuit breaker."[6]

106.    Moreover, high volatility and rapidly changing prices allow more customers to be liquidated.  Indeed, an expert statistical analysis conducted of freeze periods reported on BitMEX's website has revealed that these server freezes occur 80 percent more often during periods of high volatility in bitcoin prices.  This result is statistically significant at a 95 percent confidence level. Moreover, the statistical analysis reveals that compared to periods without a server incident, the volatility is 130 percent higher when there is a server incident.  This result is also statistically significant at 95 percent confidence level.

107.    The relationship between periods when BitMEX freezes its servers and when high volatility enables mass liquidations is shown by the below chart prepared by the below expert analysis.  The red lines indicate periods when servers were frozen, while the height of the black bars indicate the volatility of bitcoin during each period.  As the chart displays, the freezes (indicated by the red stripes) most often occurred during the highest periods of volatility when BitMEX could effectively liquidate positions:

---

[6] Circuit breakers are commonly required in regulated trading markets to pause trading during periods of substantial loss and prevent panic-selling.



108.    These server freezes are not justifiably caused by transaction volume, which would

approximate server load.  For example, on May 12, 2019, BitMEX announced a new record of

over $10 billion in transaction volume, with no server incidents reported that day.

109.    The interaction between BitMEX's server problems and its liquidation policy was

recently demonstrated on March 12, 2020, when the price of bitcoin fell from $7,200 to a 10-month

low of $5,678 in just 15 minutes.  This sort of event is precisely why BitMEX claims to maintain

the Insurance Fund—a series of cascading liquidations in the face of such a rapid fall could prevent

BitMEX from selling the liquidated positions above their bankruptcy price, causing losses that are

designed to be covered by the Insurance Fund.  Yet BitMEX's servers shut down in the middle of

the crash.  BitMEX first blamed the server shut down on "a hardware issue with our cloud service

provider," before later claiming, without any support, that the server failure was the result of an attack by a "botnet."

110.    When the servers were restored, bitcoin's price had stabilized, preventing the need for BitMEX to dip into its Insurance Fund.  The traders who had hit their margins during the crash, however, were liquidated nonetheless.  In short, a conveniently timed server outage turned a potentially catastrophic loss for BitMEX's Insurance Fund into a profit-item.

111.    BitMEX could remove the potential for these manipulative actions and prevent users from suffering from periods of denied access to a moving market by prohibiting its system from accepting any transactions during these freezes.  Instead, BitMEX profits from the system it employs, either by having its for-profit trading desk manipulate the markets in such freezes, by selling the right to do so, or by profiting from liquidations that occur while customers are unable to escape increasingly unfavorable positions.

## VI.    **BITMEX TRADES AGAINST ITS CUSTOMERS**

112.    On April 28, 2018, an independent researcher requested comment from BitMEX regarding "information on record about insider accounts (possibly friends / acquittances of Bitmex staff) having special advantages over other Bitmex users."  BitMEX responded the same day, denying that it gave "preferential treatment" to any "customers."  This proved to be false, and that its prior statements had been materially misleading.

113.    On April 30, 2018, BitMEX updated its terms of service and for the first time revealed that "BitMEX has a for-profit trading business that, among other things, transacts in products traded on the BitMEX platform."  BitMEX also revealed that its trading desk had the monopoly on making a market in its bitcoin options product.  BitMEX hid the role of its trading desk by labeling the employee in charge of the desk as part of "Risk Management."  Prior to April

30, 2018, BitMEX had never disclosed that it played a role on its exchange that extended beyond the management and administration of the exchange itself.

114.    BitMEX had never indicated that it took direct positions on the assets it was trading. Members of the Class, when they traded on the BitMEX platform, had done so on the belief that the other participants were on similar footing to them.   If Class members knew that their counterparty could be BitMEX itself, equipped with proprietary knowledge, they would have recognized the possibility that they were participating in an unfair game.

115.    As an inside entity trading against its own customers, the BitMEX trading desk enjoys a number of advantages.   First, an internal BitMEX desk could have a higher trade priority than other traders, allowing its trades to be processed first when the total number of trades exceeds BitMEX's server capacity.   Second, an internal BitMEX trading desk could potentially view the leverage amounts for previously created positions and the price at which its liquidation will be triggered.   This information would make it easy to profitably manipulate the market.   If, for example, the trading desk sees that a number of short bitcoin futures are near their liquidation point, it could enter a large buy order.   This order would cause the price of bitcoin on the BitMEX exchange to rise, triggering the liquidation of these futures.   The liquidation would create a buy order for the liquidated contract, further increasing the price.   Once this chain of liquidations had caused the price to rise far beyond the price at which the internal desk made its initial purchase, it could sell bitcoin at this higher price to fulfill the forced buy orders.   Because these trades are automatic, an inside desk could execute this trade very quickly and with a high confidence of success.

116.    Even without placing trades that cause cascading liquidations, however, the BitMEX desk helps create the liquidity that keeps the forced liquidations profitable, including

those that occur during server freezes.  As BitMEX has admitted, it profits from each liquidation as long as the bid-ask is smaller than the maintenance margin.  By creating liquidity through market-making, and freed from the possibility of being liquidated itself, BitMEX's desk helps maintain an environment that keeps the liquidations profitable.

117.    The interaction between the Insurance Fund and the trading desk creates a pernicious result when the desk serves as the purchaser of a liquidated position.  When a customer stakes $4,000 on a position only to have BitMEX liquidate it, sell it to its own desk at a price that recovers $3,500 of that $4,000, and then keep the $3,500, the customer has essentially been robbed. BitMEX has walked away with both the position and the initial capital, leaving the customer with nothing.

118.    Nor is the trading desk the only inside entity trading on BitMEX.  Defendant Hayes has admitted that he himself trades on the platform, against BitMEX's customers.  The customers on the other side of Hayes's contracts have no way of knowing that they are trading against an insider with access to non-public information about their trades, including their liquidation limits. Hayes has even gloated about the possibility of such misconduct, stating that "[t]he digital token trading markets like traditional forex markets are not regulated, and will struggle to be.  Therefore, if you can't stomach insider trading, then don't take on short-term positions."

### E.  Defendants Manipulated The Prices Of The Digital Assets Underlying Its Derivative Products To Force Liquidations

119.    On information and belief, BitMEX has manipulated the price of the assets underlying the derivatives on the exchange in order to force liquidations into its Insurance Fund.

120.    Through 2019, BitMEX looked to a relatively limited number of exchanges to price bitcoin and ether for its derivative products.  This made the exchange susceptible to price

manipulation.  In part of mid-2019, for example, BitMEX determined the price of ether by referring to just three exchanges:  BitStamp, Coinbase, and Kraken.

121.    Any futures trader would have an incentive to manipulate the price of bitcoin or ether on those exchanges to cash in on their leverage trade.  For example, a trader who was short bitcoin on BitMEX would be incentivized to go to BitStamp and suddenly drive down the price of bitcoin by selling it, making the future position more valuable.  The trader's profitability would depend on the liquidity available at BitStamp for bitcoin and the details of the future positions on BitMEX.  Lower liquidity in bitcoin trading would make it easy for the trader to move the price on BitStamp quickly and cheaply.  A large, highly leveraged position at BitMEX would justify a large selloff of bitcoin below prevailing market prices.  Moreover, this could be an ongoing process:  as the price of bitcoin falls and the future positions become profitable, the trader could cash out some existing futures positions for more bitcoin and then continue to sell that new bitcoin on Bitstamp while opening additional futures short positions.

122.    Structurally, however, this kind of manipulation is more likely to succeed on short positions rather than long, because BitMEX settles all of its futures in bitcoin.  If the trader attempts to manipulate the price of bitcoin up because of outstanding long positions, she would be unable to continue the process after the initial "pump" because her futures contracts are all paid out in bitcoin.  She would have no way to buy additional bitcoin with those proceeds without selling the proceeds—thus defeating the purpose of the pump.  Thus, to pull off a manipulation scheme when long on bitcoin, the trader would need a large reservoir of traditional currency with which to buy bitcoin, and could not use any proceeds from the manipulation itself to continue driving up the price of bitcoin.

123.     Nonetheless, throughout 2019, BitStamp was subject to numerous pumps *and* dumps of bitcoin and ether including on days when Kraken was down for maintenance and unavailable for pricing derivatives on BitMEX.  For example, on April 2, 2019, there was a massive pump on BitStamp's bitcoin price by nearly 20 percent.  Then on May 17, 2019, bitcoin lost 20 percent of its value on Bitstamp for about thirty minutes before recovering.  Later, on July 14, 2019 when Kraken was down for maintenance—thus increasing the weight of Bitstamp on BitMEX's futures' products—the price of ether dropped dramatically due to the sell order on Bitstamp by a single user that accounted for over 15 percent of Bitstamp's entire volume for the day, causing $164 million worth of liquidations on BitMEX.

124.     Of the possible manipulators, BitMEX is the best-positioned to take advantage of the consequences of these schemes.  First, BitMEX operates its own proprietary trading desk that can take long and short positions and engage in a pump and dump scheme, like the hypothetical trader described above.  Second, beyond profiting from any positions it takes, BitMEX alone profits greatly from liquidations, even during severe price movements.  Third, BitMEX alone knows the trading positions of its users and can precisely tailor its manipulation to generate mass liquidations with minimal effort and risk.  Fourth, as a large institution, BitMEX would be one of the entities with sufficient resources to engage in pump schemes that require a lot of capital in traditional currency to buy the underlying commodity.

125.     Unsurprisingly, for these reasons numerous commentators, including a tenured professor at NYU's Stern Business School, point to BitMEX as the culprit behind these price movements.

### F. The Class Has Suffered Substantial Damages

126.    As a direct result of Defendants' manipulation of the market for their derivative products, including through the use of the server freezes and a (formerly concealed) internal trading desk to create profitable liquidations, Plaintiffs and members of the Class have suffered significant damages in an amount to be proven at trial.

127.    While the precise measurement of the harm caused to the Class by Defendants' actions is not calculable at this stage, an approximation can be found in the value of the Insurance Fund, which is filled with the profits of Defendants' liquidations.  As of March 28, 2020, the Insurance Fund contained 35,114.7047 XBT, valued at over $200 million.

## VII.    FACTUAL ALLEGATIONS – SECURITIES VIOLATIONS

### A. The Security Futures Products BitMEX Solicited And Sold Reference And Derive Their Value From Securities And Are Therefore Securities Themselves

128.    BitMEX has offered for sale security futures products that reference and derive their value from each of the Tokens.  On June 7, 2017, BitMEX first offered a derivatives product referencing Status (SNT).   On June 23, 2017, BitMEX first offered a derivatives product referencing EOS.

129.    Under 15 U.S.C. § 77b(1), "[t]he term 'security' means any note, stock, treasury stock, security future, security-based swap . . . ."  Because the products BitMEX sold are futures, they are securities given that the assets they reference and from which they derive their value— the Tokens—are securities.  Alternatively, the products BitMEX sold are securities because they are security-based swaps that reference and derive their value from the Tokens, which are also securities.

130.    BitMEX charged a transaction fee for each of the trades involving the security future products referencing the Tokens.

131.    BitMEX did not register any of its offerings as securities under federal or state law.

132.    Accordingly, BitMEX was engaged in the sale of unregistered securities.

**B.  Investors Would Not Reasonably Have Understood Prior To April 3, 2019, At The Earliest, That The Tokens Were Securities, And Therefore That The Future Contracts On Them Were Also Securities**

133.    In connection with the ICOs for the Tokens, from 2017 until early 2019 the Issuers and BitMEX made statements that would not have reasonably led Plaintiffs and Subclass members to conclude that the Tokens or the futures contracts on them were securities.

134.    Issuers.  Issuers of ERC-20 tokens repeatedly took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  With promises that their tokens would be better than other cryptocurrencies, many individuals were unaware that such tokens had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all ERC-20 tokens were generally all issued at creation at very little economic cost—and enormous potential upside— to their founders.

135.    The creation of many of these tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum.  This would not have been apparent at issuance, however, to a reasonable investor.  Rather, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success in allowing decentralization to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that the token they acquired was more like Bitcoin or Ethereum, when it *was* a security.  Likewise, the purchasers on BitMEX of futures contracts referencing such tokens incorrectly believed that their future contracts referenced something more akin to a commodity, such as Bitcoin or Ethereum, than a security.

136.   <u>BitMEX</u>.   BitMEX routinely touted that the Tokens underlying its derivative products were compliant with securities laws.  For example, in August 2017, Hayes published article on BitMEX's website explaining that the tokens "Tezos, Eos, and Bancor are the top three ICOs of 2017 in terms of money raised.  All of them are protocols to perform a set of tasks.  None of these tokens are collective investment schemes, or provide the owner with rights in a privately listed company." In a longer article entitled "In Defense of ICOs," Hayes also explained that tokens were not securities because "[i]nstead of selling equity in the company producing a piece of technology, the ICO sells an interest in the usage of the product itself." Hayes continued that teams "structure their tokens so they will not be construed as a security" and the tokens are not securities "because it derives its value strictly from usage natively in an application(s) or protocol.  Without properly functioning technology, the token is fairy dust.  There is no ownership in the company producing the token, nor any income stream."

137.   <u>SEC</u>.  Prior to its April 2019 pronouncement, the SEC too left uncertain whether tokens, such as the Tokens at issue in the Complaint, are securities.  In fact, it was not until six months after the Framework issued in April 2019, and more than two years after the relevant ICO began, that the SEC entered into a settlement with Block.one (the issuer of ERC-20 token EOS), concluding in September 2019 that EOS's $4.1 billion issuance constituted an unlawful unregistered offering.[7]

138.   Prior to that time, the SEC had not determined that ERC-20 tokens were securities. On June 14, 2018, the Director of the Corporation Finance Division, William H. Hinman, explained that "the ICOs I am seeing, strictly speaking, the token—or coin or whatever the digital

---

[7] SEC, *SEC Orders Blockchain Company to Pay $24 Million Penalty for Unregistered ICO* (Sept. 30, 2019) https://www.sec.gov/news/press-release/2019-202.

information packet is called—all by itself is not a security."  On May 2, 2018, Commissioner Hester Peirce similarly expressed her view that not "all ICOs must be deemed securities offerings." Critically, Commissioner Peirce identified numerous open questions that Issuers emphasized when arguing ERC-20 tokens are not securities, such as the utility of the token in an incomplete or partially complete network.

139.    Other Commentary.   Other thought leaders in the space, such as the lawfully registered broker-dealer Coinbase, opined in late 2016 that "we have considered the question of whether issuance of a Blockchain Token prior to the existence of a system would constitute a security.  We have not found conclusive law on the subject, but believe that the better view is that a non-security Blockchain Token does not become a security merely because the system as to which it has rights has not yet been created or completed."

140.    In sum, before the SEC issued its Framework in April 2019, a reasonable investor would not have concluded that ERC-20 tokens or the future contracts referencing them were securities subject to the securities laws.  On the contrary, they were confronted with representations both from issuers and from cryptocurrency discussions that would have led them reasonably to believe they were not investing in securities.

## C.  BitMEX Solicited And Sold Security Futures Products Referencing ERC-20 Tokens

141.    BitMEX does not list ERC-20 tokens themselves for sale.  Rather, in exchange for a fee, BitMEX facilitates traders' access to crypto financial derivatives markets by creating derivatives contracts, with terms such as expiry, margin requirements, and risk limits, that traders can trade with one another.  Because all margin on the platform is posted in bitcoin, traders can gain exposure to various ERC-20 Tokens without ever purchasing the underlying securities.

BitMEX also allows traders to leverage their trades—up to 100 times in some instances—by trading on margin.

142.    BitMEX solicited the buying and selling of security futures products referencing ERC-20 tokens on its unregistered exchange and reaped extraordinary profits as a result.

143.    In fact, BitMEX recently boasted on its website that it averaged more than $3.1 billion in daily trading volume in January 2020.  Based on an average of 0.05 percent fee for every trade, BitMEX is collecting over $1.5 million in fees a day.  Unsurprisingly, Defendant Delo was profiled and verified in 2018 as England's youngest billionaire.

144.    After BitMEX creates a contract and lists it for sale, it would advertise that contract to its user base, such as per the below:

## EOS and Tezos Futures Contracts Now Live

**Arthur Hayes**   23 Jun 2017

Behold the clash of the Titans! We believe that the EOS and Tezos token sales will be the largest of 2017.

**EOS Futures**

BitMEX is proud to announce the launch of EOS Futures contracts, expiry 28 July 12:00 UTC with symbol EOSN17. Each contract is worth 1 EOS and the contract offers 2x leverage.

Since the EOS platform is still under development, the following rules will apply:

- If no EOS auction is completed before the expiry date, EOSN17 will settle at 0.
- EOSN17 will have 25% Up and Down Limit against the previous session close price to prevent price manipulation. Each session is 2 hours long, and session closes occur every even numbered hour.
- Settlement will occur either at the most recent EOS auction price (if EOS/XBT trading has not begun) or at the .EOSXBT30M Index Price if EOS/XBT has begun trading prior to 27 July 12:00 UTC.

Further details about this contract can be read in the EOS Series Guide.

145.    BitMEX only sold and offered derivative contracts that it created and listed on its platform.

146.    Both of the Tokens were referenced by a derivative contract listed on BitMEX, and each was traded by members of the Class.

**D.  The Tokens Are Securities**

147.    Within the last year, the SEC has clarified, with the benefit of labor-intensive research and investigations, that the Tokens were securities.  On April 3, 2019, the SEC published its "Framework for 'Investment Contract' Analysis of Digital Assets," in which it "provided a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."

148.    Among the most significant statements in the Framework is its description of how to analyze the various facts surrounding ICOs in making the determination of whether a given digital asset (including an ERC-20 token) is a security.  Under application of the Framework, the Tokens were securities at issuance.

149.    In the Framework, the SEC cautioned potential issuers:  "If you are considering an Initial Coin Offering, sometimes referred to as an 'ICO,' or otherwise engaging in the offer, sale, or distribution of a digital asset, you need to consider whether the U.S. federal securities laws apply."  The SEC explained the fundamentals of the *Howey* test:

> The U.S. Supreme Court's Howey case and subsequent case law have found that an "investment contract" exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.  The so-called "Howey test" applies to any contract, scheme, or transaction, regardless of whether it has any of the characteristics of typical securities.  The focus of the Howey analysis is not only on the form and terms of the instrument itself (in this case, the digital asset) but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary market sales).  Therefore, issuers and other persons and entities engaged in the marketing, offer, sale, resale, or distribution of any digital asset will need to analyze the relevant transactions to determine if the federal securities laws apply.

Investors who bought the Tokens invested money or other valuable consideration, such as bitcoin and ether, in a common enterprise—the Issuers.  Investors had a reasonable expectation of profit based upon the efforts of the Issuers, including, among other things, the Issuers obtaining listing of their ERC-20 tokens on cryptocurrency exchanges.

### 1.   Under the SEC's April 2019 Framework, the Tokens Were Securities

#### a.   ERC-20 Investors Invested Money

150.   Investors in ERC-20 tokens made an investment of money or other valuable consideration for purposes of *Howey*.  The SEC Framework states:  "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of real (or fiat) currency, another digital asset, or other type of consideration."

151.   Investors invested traditional and other digital currencies, such as bitcoin and ether, to purchase the Tokens.

#### b.   ERC-20 Investors Participated In A Common Enterprise

152.   The SEC Framework states:  "In evaluating digital assets, we have found that a 'common enterprise' typically exists."  This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

153.   The Tokens are no different.  Investors were passive participants in the Tokens' ICOs, and the profits of each investor were intertwined with those of the Issuers and of other investors.  Issuers typically conceded in their whitepapers that they sold Tokens in order to fund their operations and promote their networks and thereby increase the value of the issued ERC-20 tokens.  Issuers typically were responsible for supporting the Tokens, pooled investors' assets, and

controlled those assets.  Issuers would also typically hold a significant stake in the Tokens and thus shared in the profits and risk of the project.

154.    For example, promoters of the EOS token described the proceeds of their ICO as "revenue" they would use to "offer[] developers and entrepreneurs the funding they need to create community driven business leveraging EOSIO software."  That money, in return, "will be returned value for the network."

155.    Similarly, Status asserted that its governance structure "empower[ed] stakeholders in the Status Network" by giving them rights akin to holders of voting stock in a corporation.  The whitepaper asserted that "[a] core part of the Status Network Token is giving stakeholders the ability to choose the direction that the software is developed.  The token is used to make decisions on proposals, which can be made by any Stakeholder. . . .  The amount of tokens you hold at that time becomes your voting power for that decision."

156.    Accordingly, investors in the Tokens participated in a common enterprise by purchasing the Tokens.

### c.   Investors Purchased The Tokens With A Reasonable Expectation Of Profit From Owning Them

157.    As to "reasonable expectation of profits," the SEC Framework states: "A purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."

158.    Investors in the Tokens made their investment with a reasonable expectation of profits.  The Token holders stood to gain from the potential increase in value of the underlying project that the Issuers outlined in their various whitepapers.  A reasonable investor thus would have been motivated, at least in part, by the prospect of profits on their investment in the Tokens. The Tokens were sold to investors prior to a network or "ecosystem" being fully developed on

which they could be used.  For pre-functional tokens, such as the Tokens at issue in the Complaint, the primary purpose for purchasing such Tokens was to make a profit, rather than to utilize the Tokens themselves for a task.

159.    Alluding to the "AP" (the "Active Participant"), which is the promoter, sponsor, or other third party that "provides essential managerial efforts that affect the success of the enterprise"), the Framework identifies a series of factually intense questions underscoring both the time the SEC had spent considering these issues and the challenges a layperson would face in analyzing whether a digital asset constitutes a security.  In particular, the Framework lays out a number of characteristics to assess whether the "reasonable expectation of profits" element is met with respect to whether digital assets thereby satisfy the *Howey* test:

> The more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit:
>
> - The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset.
>
>   - The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network, particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.
>
>   - This also can be the case where the digital asset gives the holder rights to dividends or distributions.
>
> - The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future.
>
> - Purchasers reasonably would expect that an AP's efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.
>
> - The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network.

- o The digital asset is offered and purchased in quantities indicative of investment intent instead of quantities indicative of a user of the network. For example, it is offered and purchased in quantities significantly greater than any likely user would reasonably need, or so small as to make actual use of the asset in the network impractical.

- There is little apparent correlation between the purchase/offering price of the digital asset and the market price of the particular goods or services that can be acquired in exchange for the digital asset.

- There is little apparent correlation between quantities the digital asset typically trades in (or the amounts that purchasers typically purchase) and the amount of the underlying goods or services a typical consumer would purchase for use or consumption.

- The AP has raised an amount of funds in excess of what may be needed to establish a functional network or digital asset.

- The AP is able to benefit from its efforts as a result of holding the same class of digital assets as those being distributed to the public.

- The AP continues to expend funds from proceeds or operations to enhance the functionality or value of the network or digital asset.

- The digital asset is marketed, directly or indirectly, using any of the following:

  - o The expertise of an AP or its ability to build or grow the value of the network or digital asset.

  - o The digital asset is marketed in terms that indicate it is an investment or that the solicited holders are investors.

  - o The intended use of the proceeds from the sale of the digital asset is to develop the network or digital asset.

  - o The future (and not present) functionality of the network or digital asset, and the prospect that an AP will deliver that functionality.

  - o The promise (implied or explicit) to build a business or operation as opposed to delivering currently available goods or services for use on an existing network.

  - o The ready transferability of the digital asset is a key selling feature.

48

o   The potential profitability of the operations of the network, or the potential appreciation in the value of the digital asset, is emphasized in marketing or other promotional materials.

o   The availability of a market for the trading of the digital asset, particularly where the AP implicitly or explicitly promises to create or otherwise support a trading market for the digital asset.

160.   The SEC Framework clarifies that investors purchased the Tokens with a reasonable expectation of profits.

161.   For example, the "ready transferability of the" Tokens was promoted by Issuers as a "key selling feature."  The Status Network, for instance, told investors the SNT tokens "will be transferrable 7 days after the end of the Contribution Period."

162.   The Tokens also "emphasized" the "potential appreciation in the value of the digital asset" in their marketing materials.  The Status Network, for example, Status to highly successful enterprises such as Facebook and the Line messaging app, and asserted that it could "design mechanisms for growth that have been tried and tested . . . ."  The issuer of EOS tokens, also touted the potential for EOS tokens to increase in value:

> A blockchain using EOS.IO software also awards block producers tokens every time they produce a block.  The value of the tokens will impact the amount of bandwidth, storage, and computation a producer can afford to purchase; *this model naturally leverages rising token values to increase network performance.*

163.   ERC-20 tokens were also not described as "delivering currently available goods or services for use on an existing network," but rather explained as raising capital necessary "to build a business or operation."  As an example, the Status whitepaper asserted that "the Status mobile Ethereum client" was "well suited for mass adoption," and that the "core team and the Status community are committed to ensuring that the SNT token adds value to the platform and drives network effects."  Under the SEC's Framework, the Tokens were securities under federal and state securities laws.

### d. Investors Expected Profits From The Tokens To Be Derived From The Managerial Efforts Of Issuers

164.    The SEC Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues:  Does the purchaser reasonably expect to rely on the efforts of an [Active Participant]?  Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?"

165.    Investors' profits in the Tokens were to be derived from the managerial efforts of others—the Issuers, their co-founders, and their development teams.  ERC-20 investors relied on the managerial and entrepreneurial efforts of the Issuers and their executive and development teams to manage and develop the projects funded by the Tokens' ICOs.

166.    Issuers' executive teams typically held themselves out to investors as experts in the blockchain and crypto field.  Investors in the Tokens reasonably expected the Issuers' development teams to provide significant managerial efforts after the Tokens' launch.

167.    The SEC explained in its April 2019 Framework, further underlining the depth of study the agency had devoted to the matter over the years and the complexity of such legal analysis from the perspective of a reasonable investor, that the more of the following characteristics that are present, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others'":

- An AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

  o Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset

(directly or indirectly).   This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.

- There are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a "decentralized" network).

- An AP creates or supports a market for, or the price of, the digital asset. This can include, for example, an AP that: (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities.

- An AP has a lead or central role in the direction of the ongoing development of the network or the digital asset.   In particular, an AP plays a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

- An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents including, for example:

    o  Determining whether and how to compensate persons providing services to the network or to the entity or entities charged with oversight of the network.

    o  Determining whether and where the digital asset will trade.  For example, purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform.

    o  Determining who will receive additional digital assets and under what conditions.

    o  Making or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset.

    o  Playing a leading role in the validation or confirmation of transactions on the network, or in some other way having responsibility for the ongoing security of the network.

    o  Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

- Purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, such as where:

  o The AP has the ability to realize capital appreciation from the value of the digital asset.  This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset. In these instances, purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset.

  o The AP distributes the digital asset as compensation to management or the AP's compensation is tied to the price of the digital asset in the secondary market.  To the extent these facts are present, the compensated individuals can be expected to take steps to build the value of the digital asset.

  o The AP owns or controls ownership of intellectual property rights of the network or digital asset, directly or indirectly.

  o The AP monetizes the value of the digital asset, especially where the digital asset has limited functionality.

168.     Shifting its focus to the numerous facts bearing on the nature of the digital asset at issue, the SEC explained still further:

Although no one of the following characteristics of use or consumption is necessarily determinative, the stronger their presence, the less likely the *Howey* test is met:

- The distributed ledger network and digital asset are fully developed and operational.

- Holders of the digital asset are immediately able to use it for its intended functionality on the network, particularly where there are built-in incentives to encourage such use.

- The digital assets' creation and structure is designed and implemented to meet the needs of its users, rather than to feed speculation as to its value or development of its network.  For example, the digital asset can only be used on the network and generally can be held or transferred only in amounts that correspond to a purchaser's expected use.

- Prospects for appreciation in the value of the digital asset are limited. For example, the design of the digital asset provides that its value will remain constant or even degrade over time, and, therefore, a reasonable purchaser would not be expected to hold the digital asset for extended periods as an investment.

- With respect to a digital asset referred to as a virtual currency, it can immediately be used to make payments in a wide variety of contexts, or acts as a substitute for real (or fiat) currency.

  o This means that it is possible to pay for goods or services with the digital asset without first having to convert it to another digital asset or real currency.

  o If it is characterized as a virtual currency, the digital asset actually operates as a store of value that can be saved, retrieved, and exchanged for something of value at a later time.

- With respect to a digital asset that represents rights to a good or service, it currently can be redeemed within a developed network or platform to acquire or otherwise use those goods or services.  Relevant factors may include:

  o There is a correlation between the purchase price of the digital asset and a market price of the particular good or service for which it may be redeemed or exchanged.

  o The digital asset is available in increments that correlate with a consumptive intent versus an investment or speculative purpose.

  o An intent to consume the digital asset may also be more evident if the good or service underlying the digital asset can only be acquired, or more efficiently acquired, through the use of the digital asset on the network.

- Any economic benefit that may be derived from appreciation in the value of the digital asset is incidental to obtaining the right to use it for its intended functionality.

- The digital asset is marketed in a manner that emphasizes the functionality of the digital asset, and not the potential for the increase in market value of the digital asset.

- Potential purchasers have the ability to use the network and use (or have used) the digital asset for its intended functionality.

- Restrictions on the transferability of the digital asset are consistent with the asset's use and not facilitating a speculative market.

- If the AP facilitates the creation of a secondary market, transfers of the digital asset may only be made by and among users of the platform.

169.    Purchasers of pre-functional tokens, such as the Tokens, necessarily rely on the managerial efforts of others to realize value from their investments.  The success of these managerial efforts in developing the networks on which these tokens will operate is the primary factor in their price, that is, until such tokens transition into being functional utility tokens.  Each of the Tokens was a security at issuance because profit from the Tokens would be derived primarily from the managerial efforts of the Issuer teams developing the associated networks on which the Tokens would function, rather than having their profit derived from market forces of supply and demand, such as might affect the price of a commodity such as gold (or Bitcoin).

170.    This dependency, however, on the managerial efforts of the Issuer was not apparent at issuance to a reasonable investor.  Considering the limited available information about how these Tokens were designed and intended to operate, if such an investor were even able to interpret the relevant law at the time, a reasonable investor lacked sufficient bases to conclude whether the Tokens were securities until the platform at issue, and its relevant "ecosystem," had been given time to develop.  In the interim, the investor lacked the facts necessary to conclude—let alone formally allege in court—that the tokens she had acquired were securities.  It was only after the passage of some significant amount of time, and only with more information about the Issuer's intent, process of management, and lack of success in allowing decentralization to arise, that an investor could reasonably determine that a token that was advertised as something other than a security was a security all along.

171.    The EOS Token is a prime example.  At the time of the EOS ICO, EOS had no functional software product available—instead, EOS told its investors it would use the proceeds

of the ICO to develop the promised software, which would in turn make the Tokens more valuable to investors.

172.    The Issuers of the Status SNT Tokens likewise wrote in its whitepaper it had only an "alpha" build of its product, but with the funds raised through its ICO, it hoped its technology would "reach[] widespread mobile use."  The whitepaper continued:  "Funds raised during the Contribution Period will be used solely for the development and benefit of the Status Network."

173.    However complex the resolution of the issue would strike a reasonable investor, the Tokens satisfy most if not all of the factors the SEC described in the Framework as relevant to its determination that a digital asset is a security.  Accordingly, futures contracts sold by BitMEX that reference and derive their value from the Tokens are likewise securities.

**2.      Each Token Is A Security**

**a.   EOS**

174.    The EOS ICO has been widely reported as the largest ICO to date, having raised over $4 billion assets from the sale of unregistered EOS tokens from June 2017 through July 2018. EOS derivatives were listed on BitMEX as early as June 23, 2017.

175.    EOS tokens were advertised as being an improvement on Bitcoin, Ethereum, and other cryptocurrencies.   In addition to claiming EOS's technical superiority over other cryptocurrencies, EOS's issuer, Block.one, publicly stated that it would use the funds raised through the ICO to continue to enhance the EOS software and support the growth of the platform.

176.    In the EOS Token Purchase Agreement, the issuers of EOS tokens made the following representations concerning the development of EOSIO:

- MATTERS RELATING TO EOS.IO SOFTWARE AND EOS PLATFORM:

  1. block.one is developing the EOS.IO software (the "EOS.IO Software") as further described in the EOS.IO Technical White Paper (as it may be amended from time to time) (the "White Paper");

  2. at the end of its development stage, block.one will be releasing the EOS.IO Software it has developed under an open source software license;

177.    At the time of the EOS ICO, Block.one took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  With promises that EOS would be better than other cryptocurrencies, many individuals were unaware that EOS tokens had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all EOS tokens were issued by Block.one at creation at very little economic cost—and enormous potential upside—to the Block.one founders.

178.    The creation of EOS tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum.  This would not have been apparent at issuance, however, to a reasonable investor.  Rather, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success in allowing decentralization to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that EOS was something other than a security, when it *was* a security.

179.    Investors purchased EOS tokens with the reasonable expectation that they would make a profit.

180.    EOS token holders stood to share in potential profits from the successful launch of the EOS token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the EOS ecosystem.

181.    EOS tokens were described as a technologically superior version of the Bitcoin and Ethereum blockchains.   The issuers' statements fueled speculation that EOS was the next "Ethereum or Bitcoin," with one commentator referring to EOS as "The Ethereum Killer."

182.    Investors' profits were to be derived from the managerial efforts of others—Block.one, its co-founders, and the Block.one development team.  Investors in EOS relied on the managerial and entrepreneurial efforts of Block.one and its executive and development team to manage and develop the EOS software.

183.    Investors in EOS reasonably expected Block.one and Block.one's development team to provide significant managerial efforts after EOS's launch.

184.    The expertise of the issuers was critical in monitoring the operation of EOS, promoting EOS, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The EOS protocol and governance structure were predetermined before the ICO was launched.

185.    Accordingly, under the SEC's Framework, the EOS token was a security.

186.    Indeed, on September 30, 2019, the SEC found that Block.one had violated the Securities Act through its unregistered sale of EOS to U.S. investors.  Among the SEC's conclusions were the following:

- "A number of US investors participated in Block.one's ICO."

- "Companies that offer or sell securities to US investors must comply with the securities laws, irrespective of the industry they operate in or the labels they place on the investment products they offer."

- "Block.one did not provide ICO investors the information they were entitled to as participants in a securities offering."

- "[EOS] Tokens were securities under the federal securities laws."

- "A purchaser in the offering of [EOS] Tokens would have had a reasonable expectation of obtaining a future profit based upon Block.one's efforts, including its development of the EOSIO software and its promotion of the adoption and success of EOSIO and the launch of the anticipated EOSIO blockchains."

- "Block.one violated Sections 5(a) and 5(c) of the Securities Act by offering and selling these securities without having a registration statement filed or in effect with the Commission or qualifying for an exemption from registration."

Block.one consented to a settlement whereby it would pay $24 million to the SEC. The SEC enforcement action occurred over two years after Block.one began selling EOS to the public, further underscoring the complexity of these issues for lay investors.

187. The SEC's September 30, 2019, settlement with Block.one reflected the SEC's "Framework" for analyzing whether digital assets, and in particular ERC-20 tokens, constitute securities. Consistent with that Framework, the SEC determined that EOS tokens are securities and that Block.one had violated the Securities Act by failing to register them. Accordingly, the derivatives of EOS offered by BitMEX are also securities.

### b. Status (SNT)

188. Status Network's ("Status") SNT token ICO has been widely reported as one of the largest ICOs to date, having raised over $100 million in assets from the sale of unregistered SNT tokens over a 24-hour period from June 20 to June 21, 2017.

189. Derivatives of SNT tokens were listed on BitMEX since as early as June 7, 2017.

190. Status made statements suggesting that SNT tokens were similar to Bitcoin, Ethereum, and other cryptocurrencies. For example, the SNT whitepaper asserted that SNT was "[i]nspired by one of Satoshi Nakamoto's original suggested use cases for Bitcoin"; "organized around smart contracts running on Ethereum"; "the first ever mobile Ethereum client," which "connects directly to the Ethereum network"; and that "Status and Ethereum provide the

foundation necessary to give all stakeholders in a socioeconomic network equal footing."   In addition, the SNT whitepaper asserted that "the Status mobile Ethereum client" was "well suited for mass adoption," and that the "core team and the Status community are committed to ensuring that the SNT token adds value to the platform and drives network effects."

191.    At the time of the SNT ICO, Status took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  With representations that SNT would be similar to other cryptocurrencies, many individuals were unaware that SNT tokens had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all SNT tokens were issued by Status at creation at very little economic cost—and enormous potential upside—to the Status founders, Jarrad Hope and Carl Bennetts.

192.    The creation of SNT tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which SNT tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that SNT was something other than a security, when it *was* a security.

193.    Investors purchased SNT tokens with the reasonable expectation that they would make a profit.

194.    SNT token holders stood to share in potential profits from the successful launch of the SNT token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the SNT ecosystem.

195.    Investors' profits were to be derived from the managerial efforts of others—Status, its co-founders, Hope and Bennetts, and the Status development team.  Investors in SNT relied on the managerial and entrepreneurial efforts of Status and its executive and development team to manage and develop the SNT software.  Indeed, both Hope's and Bennett's biographies were featured in the Status whitepaper and were held out to be integral parts of the success of SNT.  The whitepaper emphasized that "Carl and Jarrad, the co-founders of Status, have had a working relationship for 6 years on various projects, and 3 of those years were spent operating a software distribution network, driving over 20 million installs to various software offerings, the profits of which were used to fund Status and our team of 10 until this point.  During the operation of this business we were uniquely positioned to see firsthand how personal data on the internet is bought and sold and how users are acquired and retained."

196.    Investors in SNT thus reasonably expected Status, co-founders Hope and Bennetts, and Status's development team to provide significant managerial efforts after SNT's launch.

197.    The expertise of the issuers was critical in monitoring the operation of SNT, promoting SNT, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The SNT protocol and governance structure were predetermined before the ICO was launched.

198.    Accordingly, under the SEC's Framework, the SNT token—and thus BitMEX's derivatives referencing it—was and is a security.

### E.  The Subclass Has Suffered Significant Damages From Defendants' Actions

199.    As a direct result of Defendants' operation of an unregistered exchange selling derivatives of unregistered securities, Plaintiffs and the Subclass—many of whom are retail investors who lack the technical and financial sophistication necessary to have evaluated the risks associated with their investments in the derivatives from the Tokens—have suffered significant damages in an amount to be proven at trial.

200.    Many of these derivative positions lost value after they were purchased or were entirely liquidated under BitMEX's liquidation process.  Plaintiffs are entitled to rescission of the transactions in which they purchased these unregistered securities.

201.    To the extent Plaintiffs still hold any Tokens, they hereby demand rescission and make any necessary tender of the Tokens.

## VIII.    <u>CLASS ALLEGATIONS</u>

202.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 and seek certification of the following Class:  All persons who purchased any derivative products on BitMEX, between April 1, 2017 and the present.  Accordingly, the Class Period is April 1, 2017 through the present.

203.    Plaintiffs further seek to certify a Subclass of those members of the Class who purchased securities futures products tied to EOS or SNT between April 1, 2017 and the present.

204.    Excluded from the Class and the Subclass are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

205.    Plaintiffs reserve the right to amend the Class or Subclass definition if investigation or discovery indicate that the definition should be narrowed, expanded, or otherwise modified.

206.    The members of the Class and the Subclass are so numerous that joinder of all members is impracticable.  The precise number of Class and Subclass members is unknown to Plaintiffs at this time, but it is believed to be in the tens of thousands.

207.    Members of the Class and Subclass are readily ascertainable and identifiable Members of the Class and the Subclass may be identified by publicly accessible blockchain ledger information and records maintained by Defendants or its agents.  They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in securities class actions.

208.    Plaintiffs' claims are typical of the claims of the Class and Subclass members as all Class and Subclass members are similarly affected by Defendants' respective wrongful conduct in violation of the laws complained of herein.  Plaintiffs do not have any interest that is in conflict with the interests of the members of the Class and Subclass.

209.    Plaintiffs and members of the Class and of the Subclass sustained damages from Defendants' common course of unlawful conduct.

210.    Plaintiffs have fairly and adequately protected, and will continue to fairly and adequately protect, the interests of the members of the Class and Subclass and have retained counsel competent and experienced in class actions and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class and Subclass.

211.    Plaintiffs seek declaratory relief for themselves and the Class and Subclass, asking the Court to declare their purchase agreements with BitMEX void, such that prosecuting separate actions by or against individual members of the Class and Subclass would create a risk of inconsistent or varying adjudications with respect to individual members of the Class and Subclass that would establish incompatible standards of conduct for BitMEX; and BitMEX has acted on

grounds that apply generally to the Class and Subclass, so that the declaratory relief is appropriate respecting the Class and Subclass as a whole.

212.    Common questions and answers of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class and Subclass, including but not limited to the following:

- Whether BitMEX manipulated the prices of the assets underlying the derivatives it sold;

- Whether BitMEX intentionally triggered liquidations of its customers; and

- Whether BitMEX caused server freezes in order to enable its market manipulation.

213.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by some of the individual Class and Subclass members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class and Subclass to individually redress the wrongs done to them.

214.    There will be no difficulty in the management of this action as a class action.

**FIRST CAUSE OF ACTION**
**Market Manipulation**
**Sections 6 and 22 of the Commodities Exchange Act**
**(All Defendants)**

215.    Plaintiffs reallege the allegations in paragraphs 1-10, 23-127, and 202-214 above.

216.    The crypto-assets referenced by the derivatives sold by BitMEX within its platform are commodities within the definition of 7 U.S.C. § 1a(9).

217.    Defendants intended to and did cause unlawful and artificial prices of their crypto-derivative assets related to commodities like bitcoin and ether, in violation of the CEA.

218.    Defendants, individually and collectively, had the ability to cause, and did cause, artificial prices.

219.    Sections 6(c)(1) and 22 of the CEA, 7 U.S.C. §§ 9, 25, make it unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the CFTC shall promulgate not later than one year after July 21, 2010, the date Dodd-Frank was enacted.

220.    The CFTC timely promulgated Rule 180.1, 17 C.F.R. § 180.1, which makes it

> unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; or,
> (4) Deliver or cause to be delivered, or attempt to deliver or cause to be delivered, for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

221.    Defendants' triggering automatic liquidations of positions through the use of its trading desk, the strategic deployment of server freezes, and the manipulation of prices on other exchanges constitute market manipulation of prices of BitMEX-traded futures and derivatives in violation of Sections 6(c)(1), and 22(a) of the CEA, 7 U.S.C. §§ 9(3),  and 25(a), and Rule 180.2.

222. Defendants' manipulation deprived Plaintiffs and the Class of a lawfully operating market during the Class Period.

223. Plaintiffs and others who transacted in BitMEX-traded crypto-derivatives during the Class Period transacted at artificial and unlawful prices resulting from Defendants' and co-conspirators' manipulations in violation of the CE and Rule 180.2, were subject to liquidations because of these artificial prices, and as a direct result thereof were injured and suffered damages. Plaintiffs each sustained actual damages for these violations of the CEA.

<div align="center">

**SECOND CAUSE OF ACTION**
**Principal Agent Liability**
**Commodities Exchange Act**
**(All Defendants)**

</div>

224. Plaintiffs reallege the allegations in paragraphs 1-10, 23-127, and 202-223 above.

225. Each Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

226. Plaintiffs each sustained and are entitled to actual damages for the violations of the CEA alleged herein.

<div align="center">

**THIRD CAUSE OF ACTION**
**Aiding and Abetting**
**Commodities Exchange Act**
**(Arthur Hayes, Ben Delo, and Samuel Reed)**

</div>

227. Plaintiffs reallege the allegations in paragraphs 1-10, 23-127, and 202-226 above.

228. Arthur Hayes, Ben Delo, and Samuel Reed ("the Individual Defendants") knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein. The Individual Defendants did so knowing of each other's, and their co-conspirators', manipulation of the prices of digital assets and their BitMEX derivatives, and willfully intended

to assist these manipulations, which resulted in pricing for these BitMEX derivatives becoming artificial during the Class Period in violation of Sections 13 and 22(a)(1) of the CEA, 7 U.S.C. §§ 13c(a), 25(a)(1).

229.     Plaintiffs each sustained actual damages for these violations of the CEA.

**FOURTH CAUSE OF ACTION**
**Unregistered Offer and Sale of Securities**
**Sections 5 and 12(a)(1) of the Securities Act**
**(BitMEX)**

230.     Plaintiffs reallege the allegations in paragraphs 1-2, 11-66, and 128-214 above.

231.     Section 5(a) of the Securities Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."  15 U.S.C. § 77e(a).

232.     Section 5(c) of the Securities Act states:  "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." *Id.* § 77e(c).

233.     When issued, the Tokens are securities within the meaning of Section 2(a)(1) of the Securities Act, *id.* § 77b(a)(1).  The security futures products that reference the Tokens are also

securities as defined by section 77b(1). BitMEX promoted, solicited or sold purchases of the security futures products referencing the Tokens from Plaintiffs and members of the Subclass. BitMEX thus directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell security futures products, or to carry or cause such security futures products to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale. No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

234.    Section 12(a)(1) of the Securities Act provides in relevant part: "Any person who offers or sells a security in violation of section 77e of this title . . . shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id.* § 77*l*(a)(1).

235.    Accordingly, BitMEX has violated Sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§ 77e(a), 77e(c), and 77*l*(a)(1).

236.    Plaintiffs and the Subclass seek rescissory damages with respect to purchases of any security future products that reference any of the Tokens on BitMEX within the last three years and within one year from when an investor could adequately plead that a Token is a security. *Id.* § 77m.

**FIFTH CAUSE OF ACTION**
**Contracts With an Unregistered Exchange**
**Sections 5, 6, and 29(b) of the Exchange Act**
**(BitMEX)**

237.   Plaintiffs reallege the allegations in paragraphs 1-2, 11-66, 128-214, and 230-236 above.

238.   In relevant part, section 5 of the Exchange Act makes it unlawful "for any . . . exchange, directly or indirectly, to make use of . . . any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security . . . unless such exchange (1) is registered as national securities exchange under section 78f of this title, or (2) is exempted from such registration."  15 U.S.C. § 78e.  An "exchange" is any entity that "constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities."  17 C.F.R. § 240.3b-16.

239.   BitMEX has made use of means and instrumentalities of interstate commerce for the purpose of using a facility of an exchange within and subject to the jurisdiction of the United States throughout the Class Period, including because BitMEX has operated as an exchange throughout the Class Period through the utilization of the Internet within, and multiple servers throughout, the United States.

240.   BitMEX has thus made use of such means and instrumentality without being registered as national securities exchange under section 78f and without any exemption from such registration requirement.

241.   In the course of operating as an unregistered exchange within and subject to the jurisdiction of the United States, BitMEX has entered into contracts with the members of the Subclass pursuant to which the members purchased security futures products linked to digital

tokens through BitMEX and paid BitMEX fees for the use of its exchange.  The parties to these contracts thus reached an agreement whereby and pursuant to which BitMEX was operating in violation of section 5 of the Exchange Act, and whereby and pursuant to which these parties were continuing a practice in violation of section 5 of the Exchange Act.

242.    The foregoing contracts were made in violation of section 5 of the Exchange Act, and their performance involves the violation of section 5, and the continuation of a practice in violation of section 5, because BitMEX entered into them for the purpose of operating, and as operating, as an unlicensed exchange in violation of section 5; and because the parties to the contracts reached agreements whereby and pursuant to which BitMEX would be and was operating in violation of section 5.

243.    Additionally, Section 6 of the Exchange Act states, "It shall be unlawful for any person to effect transactions in security futures products that are not listed on a national securities exchange or a national securities association registered pursuant to section 78o-3(a) of this title." 15 U.S.C. § 78f (h)(1).  None of the assets on which BitMEX's futures products were based were listed on a national securities exchange or a national securities association.  Defendants accordingly violated Section 6 in effecting these transactions.

244.    Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter . . . and every contract (including any contract for listing a security on an exchange) . . . the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, . . . shall have made or engaged in the performance of such contract."  *Id.* § 78cc.

245.     Section 29(b) affords Plaintiffs and the Subclass the right, which they hereby pursue, to void their purchase agreements with BitMEX and to recover, as rescissory damages, the fees they have paid under those contracts.

246.     Plaintiffs and the Subclass seek to void contracts and recover damages with respect to purchases of security future products that referenced the Tokens on BitMEX within the last three years and within one year from when an investor could adequately plead that a Token is a security.  *Id.* § 78cc(b).

<div align="center">

**SIXTH CAUSE OF ACTION**
**Unregistered Broker and Dealer**
**Sections 15(a)(1) and 29(b) of the Exchange Act**
**(BitMEX)**

</div>

247.     Plaintiffs reallege the allegations in paragraphs 1-2, 11-66, 128-214, and 230-246 above.

248.     In relevant part, with respect to a broker or dealer who is engaged in interstate commerce in using the facility of an exchange, section 15(a)(1) of the Exchange Act makes it unlawful "for any broker or dealer . . . to make use of . . . any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance with subsection (b) of this section."  15 U.S.C. § 78o(a)(1).

249.     As a broker-dealer engaged in interstate commerce using the facility of an exchange, and without being registered in accordance with subsection (b) of section 15 of the Exchange Act, throughout the Class Period, BitMEX has made use of means and instrumentalities of interstate commerce to effect transactions in, and to induce or attempt to induce the purchase or sale of, securities.

250.    A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others." *Id.* § 78(a)(4)(A).  In addition, an entity is a broker if it assists issuers with structuring a securities offering, identifies potential purchasers, or advertises a securities offering.  BitMEX has operated as a broker during the Class Period by facilitating the sale of derivatives referencing digital assets, including by marketing the derivatives, creating derivatives contracts, and making margin calls and liquidating positions for traders.

251.    In the course of operating as an unregistered broker-dealer BitMEX has entered into contracts with the members of the Subclass pursuant to which the members purchased security futures products through BitMEX and paid BitMEX fees for the use of its exchange.  The parties to these contracts thus reached an agreement whereby and pursuant to which BitMEX was operating in violation of section 15(a)(1) of the Exchange Act.

252.    The foregoing contracts were made in violation of section 5 of the Exchange Act, and their performance involves the violation of section 5, and the continuation of a practice in violation of section 5, because BitMEX entered into them for the purpose of operating, and as operating, as an unlicensed exchange in violation of section 5; and because the parties to the contracts reached agreements whereby and pursuant to which BitMEX would be and was operating in violation of section 5.

253.    Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter . . . and every contract (including any contract for listing a security on an exchange) . . . the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, . . . shall have made or engaged in the performance of such contract." *Id.* § 78cc.

254.    Section 29(b) affords Plaintiffs and the Subclass the right, which they hereby pursue, to void their purchase agreements with BitMEX and to recover, as rescissory damages, the fees they have paid under those contracts.

255.    Plaintiffs and the Subclass seek to void contracts and recover damages with respect to purchases of security future products that referenced the Tokens on BitMEX within the last three years and within one year from when an investor could adequately plead that a Token is a security. *Id.* § 78cc(b).

<div align="center">

**SEVENTH CAUSE OF ACTION**
**Control Person Liability for Violations of**
**Section 20 of the Exchange Act**
**(Arthur Hayes, Ben Delo, and Samuel Reed)**

</div>

256.    Plaintiffs reallege the allegations in paragraphs 1-2, 11-66, 128-214, and 230-255 above.

257.    This Count is asserted against Arthur Hayes, Ben Delo, and Samuel Reed ("the Individual Defendants") for violations of Section 20 of the Exchange Act, 15 U.S.C. § 78t(a).

258.    Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint, and further alleges as follows:

259.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, had the power and authority to direct the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein.  Each Individual Defendant had and exercised the power and influence to cause the unlawful sales of securities on an unregistered exchange as described herein.

260.     The Individual Defendants have the power to direct or cause the direction of the management and policies of BitMEX.

261.     The Individual Defendants, separately or together, have sufficient influence to have either caused BitMEX to register as an exchange or prevented BitMEX from effecting transactions of securities as an unregistered exchange.

262.     The Individual Defendants, separately or together, jointly participated in, and/or aided and abetted, BitMEX's failure to register as an exchange and BitMEX's offer of securities on an unregistered exchange.

263.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages suffered.

<div align="center">

**EIGHTH CAUSE OF ACTION**
**Control Person Liability for Violations of**
**Sections 5 and 12(a)(1) of the Securities Act**
**(Arthur Hayes, Ben Delo, and Samuel Reed)**

</div>

264.     Plaintiffs reallege the allegations in paragraphs 1-2, 11-66, 128-214, and 230-263 above.

265.     This Count is asserted against BitMEX and the Individual Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o.

266.     Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint, and further alleges as follows:

267.     Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, had the power and authority to direct the management and activities of

<div align="center">

73

</div>

BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein.  Each Individual Defendant had and exercised the power and influence to cause the unlawful solicitation of various ERC-20 tokens as described herein.

268.    The Individual Defendants have the power to direct or cause the direction of the management and policies of BitMEX.

269.    The Individual Defendants, separately or together, have sufficient influence to have caused BitMEX to solicit transactions of securities.

270.    The Individual Defendants, separately or together, jointly participated in, and/or aided and abetted, BitMEX's solicitation of securities.

271.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Subclass for rescission and/or damages suffered.

<div align="center">

**NINTH CAUSE OF ACTION**
**Unregistered Offer and Sale of Securities**
**N.J. Stat. Ann. § 49:3-71**
**(BitMEX)**

</div>

272.    Plaintiffs reallege the allegations in paragraphs 1-2, 11-66, 128-214, and 230-271 above.

273.    The New Jersey Uniform Securities Law forbids the offer or sale of unregistered securities.  N.J. Stat. Ann. § 49:3-60.  Any person who unlawfully offers or sells an unregistered security is liable to the purchaser for "the consideration paid for the security . . ., together with interest set at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey from the date of payment of the consideration for the . . . security, and costs, less the amount of any income received on the security, upon the tender

of the security and any income received from . . . the security, or for damages if he no longer owns the security." *Id.* § 49:3-71(a)(1), (c).

274.    When issued, the BitMEX Token futures were securities within the meaning of N.J. Stat. Ann. § 49:3-49(m).   BitMEX sold or solicited purchases of the BitMEX Token futures to Plaintiffs and members of the Subclass.   The BitMEX Token futures were neither registered as required under the New Jersey Uniform Securities Law nor subject to any exemption from registration.

275.    The BitMEX Token futures were offered or sold in the State of New Jersey, including without limitation through solicitations directed by BitMEX to New Jersey and received in New Jersey.

276.    Accordingly, BitMEX has violated the New Jersey Uniform Securities Law through BitMEX's sale of unregistered securities.

277.    Neither Plaintiffs nor any Subclass member received, at a time when they owned any Tokens, a written offer to refund the consideration paid, together with interest at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey at the time the offer was made, from the date of payment, less the amount of any income received on the security, and failed to accept the offer within 30 days of its receipt. Neither Plaintiffs nor any Subclass member received such an offer at a time when they did not own the security and failed to reject the offer in writing within 30 days of its receipt.

278.    Plaintiffs and Subclass members who own BitMEX Token futures hereby make any necessary tender and seek the consideration paid for any BitMEX Token futures purchased on BitMEX in the last two years, together with interest set at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey from

the date of payment of the consideration for the BitMEX Token futures, and costs, less the amount

of any income received on the security; together with all other remedies available to them.

279.   Plaintiffs and Subclass members who no longer own BitMEX Token futures seek

damages for purchases of BitMEX Token futures on BitMEX within the last two years, in the

amount that would be recoverable upon a tender less the value of the security when the buyer

disposed of it, together with interest at the rate established for interest on judgments for the same

period by the Rules Governing the Courts of the State of New Jersey from the date of disposition,

and costs, and all other remedies available to them.

### TENTH CAUSE OF ACTION
**Control Person Liability for Unregistered Offer and Sale of Securities**
**N.J. Stat. Ann. § 49:3-71**
**(Arthur Hayes, Ben Delo, and Samuel Reed)**

280.   Plaintiffs reallege the allegations in paragraphs 1-2, 11-66, 128-214, and 230-279

above.

281.   Every person who directly or indirectly controls a seller liable under the New Jersey

Uniform Securities Law for unlawfully selling unregistered securities, as well as "every partner,

officer, or director of such a seller, . . . every person occupying a similar status or performing

similar functions, every employee of such a seller . . . who materially aids in the sale or in the

conduct giving rise to the liability, and every broker-dealer, investment adviser, investment adviser

representative or agent who materially aids in the sale or conduct" is jointly and severally liable

with and to the same extent as the seller, "unless the nonseller who is so liable sustains the burden

of proof that he did not know, and in the exercise of reasonable care could not have known, of the

existence of the facts . . . which give rise to liability."  N.J. Stat. Ann. § 49:3-71(d).

282.   When issued, the BitMEX Token futures were securities within the meaning of N.J.

Stat. Ann. § 49:3-49(m).  BitMEX sold or solicited purchases of the BitMEX Token futures to

Plaintiffs and members of the Subclass.  The BitMEX Token futures were neither registered as required under the New Jersey Uniform Securities Law nor subject to any exemption from registration.

283.    The BitMEX Token futures were offered or sold in the State of New Jersey, including without limitation through solicitations directed by BitMEX to New Jersey and received in New Jersey.

284.    Each of the Individual Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein.  Each Individual Defendant had and exercised the power and influence to cause the unlawful sales of unregistered securities as described herein.

285.    Accordingly, the Individual Defendants, as persons who indirectly or directly controlled BitMEX, have violated the New Jersey Uniform Securities Law through BitMEX's sale of unregistered securities.

286.    Neither Plaintiffs nor any Class member received, at a time when they owned any BitMEX Token futures, a written offer to refund the consideration paid, together with interest at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey at the time the offer was made, from the date of payment, less the amount of any income received on the security, and failed to accept the offer within 30 days of its receipt.  Neither Plaintiffs nor any Subclass member received such an offer at a time when they did not own the security and failed to reject the offer in writing within 30 days of its receipt.

287.    Plaintiffs and Subclass members who own BitMEX Token futures hereby make any necessary tender and seek the consideration paid for any BitMEX Token futures purchased on BitMEX in the last two years, together with interest set at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey from the date of payment of the consideration for the BitMEX Token futures, and costs, less the amount of any income received on the security; together with all other remedies available to them.

288.    Plaintiffs and Subclass members who no longer own BitMEX Token futures seek damages for purchases of BitMEX Token futures on BitMEX within the last two years, in the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it, together with interest at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey from the date of disposition, and costs, and all other remedies available to them.

### ELEVENTH CAUSE OF ACTION
**Unregistered Offer and Sale of Securities**
**Tex. Rev. Civ. Stat. art. 581-33**
**(BitMEX)**

289.    Plaintiffs reallege the allegations in paragraphs 1-2, 11-66, 128-214, and 230-288 above.

290.    The Texas Securities Act forbids the offer or sale of unregistered securities.  Tex. Rev. Civ. Stat. art. 581-7(A)(1).  Any person who unlawfully offers or sells an unregistered security "is liable to the person buying the security from him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security."  *Id.* art. 581-33(A)(1).

291.    When issued, the BitMEX Token futures were securities within the meaning of Tex. Rev. Civ. Stat. art. 581-4(A).  BitMEX sold or solicited purchases of the Tokens to Plaintiffs and

members of the Subclass. The BitMEX Token futures were neither registered as required under the Texas Securities Act nor subject to any exemption from registration.

292. The BitMEX Token futures were offered or sold in the State of Texas, including without limitation through solicitations directed by BitMEX to Texas and received in Texas.

293. Accordingly, BitMEX has violated the Texas Securities Act through BitMEX's sale of unregistered securities.

294. Neither Plaintiffs nor any Subclass members have received a rescission offer to refund the consideration paid for the Tokens that also meets the requirements of Tex. Rev. Civ. Stat. Ann. art. 581-33(I).

295. Plaintiffs and Subclass members who own BitMEX Token futures hereby make any necessary tender and seek the consideration paid for any BitMEX Token futures purchased on BitMEX in the last three years plus interest thereon at the legal rate from the date of payment, less the amount of any income received on the BitMEX Token futures, costs, and reasonable attorneys' fees if the court finds that the recovery would be equitable in the circumstances; together with all other remedies available to them.

296. Plaintiffs and Subclass members who no longer own BitMEX Token futures seek damages for purchases of BitMEX Token futures on BitMEX within the last three years, in the amount of the consideration the buyer paid for the Tokens plus interest thereon at the legal rate from the date of payment by the buyer, less the greater of: (i) the value of the BitMEX Token futures at the time the buyer disposed of them plus the amount of any income the buyer received on the BitMEX Token futures; or (ii) the actual consideration received for the BitMEX Token futures at the time the buyer disposed of them plus the amount of any income the buyer received

on the Tokens; together with costs, reasonable attorneys' fees if the court finds that the recovery would be equitable in the circumstances, and all other remedies available to them.

### TWELFTH CAUSE OF ACTION
**Control Person Liability for Unregistered Offer and Sale of Securities**
**Tex. Rev. Civ. Stat. art. 581-33**
**(Arthur Hayes, Ben Delo, and Samuel Reed)**

297.   Plaintiffs reallege the allegations in paragraphs 1-2, 11-66, 128-214, and 230-296 above.

298.   Every person who directly or indirectly controls a seller liable under the Texas Securities Act for unlawfully selling unregistered securities is jointly and severally liable with and to the same extent as the seller, unless the controlling person "sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Tex. Rev. Civ. Stat. art. 581-33(F).

299.   When issued, the BitMEX Token futures were securities within the meaning of Tex. Rev. Civ. Stat. art. 581-4(A). BitMEX sold or solicited purchases of the BitMEX Token futures to Plaintiffs and members of the Subclass. The BitMEX Token futures were neither registered as required under the Texas Securities Act nor subject to any exemption from registration.

300.   The BitMEX Token futures were offered or sold in the State of Texas, including without limitation through solicitations directed by BitMEX to Texas and received in Texas.

301.   Each of the Individual Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant had and exercised the power and influence to cause the unlawful sales of unregistered securities as described herein.

302.     Accordingly, the Individual Defendants, as persons who indirectly or directly controlled BitMEX, have violated the Texas Securities Act through BitMEX's sale of unregistered securities.

303.     Neither Plaintiffs nor any Subclass members have received a rescission offer to refund the consideration paid for the BitMEX Token futures that also meets the requirements of Tex. Rev. Civ. Stat. Ann. art. 581-33(I).

304.     Plaintiffs and Subclass members who own BitMEX Token futures hereby make any necessary tender and seek the consideration paid for any BitMEX Token futures purchased on BitMEX in the last three years plus interest thereon at the legal rate from the date of payment, less the amount of any income received on the BitMEX Token futures, costs, and reasonable attorneys' fees if the Court finds that the recovery would be equitable in the circumstances; together with all other remedies available to them.

305.     Plaintiffs and Subclass members who no longer own BitMEX Token futures seek damages for purchases of BitMEX Token futures on BitMEX within the last three years, in the amount of the consideration the buyer paid for the BitMEX Token futures plus interest thereon at the legal rate from the date of payment by the buyer, less the greater of:  (i) the value of the BitMEX Token futures at the time the buyer disposed of them plus the amount of any income the buyer received on the BitMEX Token futures; or (ii) the actual consideration received for the BitMEX Token futures at the time the buyer disposed of them plus the amount of any income the buyer received on the BitMEX Token futures; together with costs, reasonable attorneys' fees if the Court finds that the recovery would be equitable in the circumstances, and all other remedies available to them.

## PRAYER FOR RELIEF

306.    On behalf of themselves, the Class, and the Subclass, Plaintiffs request relief as follows:

(a) That the Court determines that this action may be maintained as a class action, that Plaintiffs be named as Class Representatives of the Class and Subclass, that the undersigned be named as Lead Class Counsel of the Class and Subclass, and directs that notice of this action be given to Class and Subclass members;

(b) That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal and state laws set forth above;

(c) That the Court award Plaintiffs, the Class, and the Subclass damages in an amount to be determined at trial;

(d) That the Court issue appropriate equitable and any other relief against Defendants to which Plaintiffs, the Class, and the Subclass are entitled, including a declaration that the purchase agreements between each member of the Class and BitMEX are void;

(e) That the Court award Plaintiffs, the Class, and the Subclass pre- and post-judgment interest (including pursuant to statutory rates of interest set under State law);

(f) That the Court award Plaintiffs, the Class, and the Subclass their reasonable attorneys' fees and costs of suit; and

(g) That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

## **JURY TRIAL**

307.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a

trial by jury for all claims.


Dated:      April 3, 2020
               New York, New York

                                        Respectfully submitted,

<div style="display:flex">

/s/ Philippe Z. Selendy
Philippe Z. Selendy
Jordan A. Goldstein
Joshua Margolin
Mitchell Nobel
SELENDY & GAY, PLLC
1290 Sixth Avenue, 17th Floor
New York, NY 10104
pselendy@selendygay.com
jgoldstein@selendygay.com
jmargolin@selendygay.com
mnobel@selendygay.com

/s/ Kyle W. Roche
Kyle W. Roche
Edward Normand
Velvel (Devin) Freedman (*pro hac pending*)
Joseph M. Delich
Richard R. Cipolla (*admission pending*)
ROCHE CYRULNIK
     FREEDMAN LLP
99 Park Avenue, 19th Floor
New York, NY 10016
kyle@rcfllp.com
tnormand@rcfllp.com
vel@rcfllp.com
jdelich@rcfllp.com
rcipolla@rcfllp.com

</div>

### CERTIFICATION OF
### SECURITIES CLASS ACTION COMPLAINT

I, Chase Williams, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.     I have reviewed the complaint filed herein (the "Complaint"), and have authorized the filing of a similar complaint and a lead plaintiff motion on my behalf.

2.     I did not purchase the securities at issue in the Complaint at the direction of my counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

3.     I am willing to serve as a representative party on behalf of the class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial, if necessary.

4.     During the Class Period (as defined in the Complaint), I purchased and/or sold the unregistered securities on BitMEX: EOS ("EOS").

5.     During the three-year period preceding the date of this Certification, I have not sought to serve as a representative party on behalf of a class in any private action arising under the Securities Act or the Exchange Act.

6.     I will not accept any payment for serving as a representative party on behalf of the Class beyond my *pro rata* share of any possible recovery, except for an award, as ordered by the court, for reasonable costs and expenses (including lost wages) directly relating to my representation of the Class.

7.     I understand that executing this Certification is not a prerequisite to participation in this Class Action as members of the Class.

Chase Williams
Houston, Texas

CERTIFICATION OF
SECURITIES CLASS ACTION COMPLAINT

I, William Zhang, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.      I have reviewed the complaint filed herein (the "Complaint"), and have authorized the filing of a similar complaint and a lead plaintiff motion on my behalf.

2.      I did not purchase the securities at issue in the Complaint at the direction of my counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

3.      I am willing to serve as a representative party on behalf of the class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial, if necessary.

4.      During the Class Period (as defined in the Complaint), I purchased and/or sold the unregistered securities on BitMEX: EOS ("EOS")

5.      During the three-year period preceding the date of this Certification, I have not sought to serve as a representative party on behalf of a class in any private action arising under the Securities Act or the Exchange Act.

6.      I will not accept any payment for serving as a representative party on behalf of the Class beyond my *pro rata* share of any possible recovery, except for an award, as ordered by the court, for reasonable costs and expenses (including lost wages) directly relating to my representation of the Class.

7.      I understand that executing this Certification is not a prerequisite to participation in this Class Action as members of the Class.

Will Zhang (Apr 2, 2020)
_____
William Zhang
Hoboken, New Jersey