**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHASE WILLIAMS and WILLIAM ZHANG, individually and on behalf of all others similarly situated,<br><br>                 Plaintiffs,<br><br>           v.<br><br>HDR GLOBAL TRADING LIMITED, ABS GLOBAL TRADING LIMITED, ARTHUR HAYES, BEN DELO, and SAMUEL REED,<br><br>                Defendants. | No. 1:20-cv-02805-ALC<br><br>**JURY DEMANDED** |

<u>**AMENDED CLASS ACTION COMPLAINT**</u>

Individually and on behalf of all others similarly situated, Plaintiffs Chase Williams and William Zhang bring this action against Defendants HDR Global Trading Limited, ABS Global Trading Limited (together with HDR Global Trading Limited, "BitMEX"), Arthur Hayes, Ben Delo, and Samuel Reed.   Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of press releases, media reports, whitepapers of the digital tokens addressed herein, and other publicly disclosed reports and information about Defendants.   Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein and can be discovered after a reasonable opportunity for discovery.   Plaintiffs hereby allege as follows:

I.   **INTRODUCTION**

1.      On behalf of a class of investors (the "Class") who purchased futures on digital tokens, including the tokens EOS and SNT (together, the "Tokens"), that BitMEX, without registering under applicable federal and state securities laws as an exchange or broker-dealer and without a registration statement in effect as to the underlying securities, sold in domestic U.S. transactions through its exchange since June 8, 2017 (the "Class Period"), Plaintiffs and members of the Class seek to recover the consideration they paid for these future products and the fees they paid to BitMEX in connection with their purchases.

2.      BitMEX is one of the largest crypto-asset exchanges in the world, with a daily trading volume that regularly surpassed $3 billion in January 2020.   BitMEX operates as an unregistered securities exchange that offers derivatives and security futures products on certain digital tokens, including products that reference the Tokens (the "Token Futures").

2

3.      A digital token is a type of digital asset that exists on a "blockchain," which is essentially a decentralized digital ledger that records transactions.  Various digital assets can reside on blockchains, including cryptocurrencies and so-called "smart contracts" that operate under a set of predetermined conditions agreed on by users.  When those conditions are met, the terms of the contract are automatically carried out by the software underlying the digital tokens (which, as relevant here, are referred to as "ERC-20 tokens" and exist on the Ethereum blockchain).

4.      Certain of these digital tokens are sometimes classified as "utility tokens."  Their primary purpose is to allow the holder to use or access a particular project.  For example, one private-jet company issues utility tokens to participants in its membership program, who can then use them to charter flights on the company's planes.  A utility token presumes a functional network on which the token can be used.

5.      Other digital tokens are more speculative and are referred to as "security tokens," and, like a traditional security, essentially represent one's investment in a project.  Although the tokens take value from the startup behind the project, they do not give the holder actual ownership in that startup.  Rather, investors purchase these tokens with the idea that their value will appreciate as the network in which the token can be used is expanded based upon the managerial efforts of the issuer and those developing the project.  Because such "security tokens," including the Tokens, are properly classified as securities under federal and state law, the issuers of the Tokens (the "Issuers") were required to file registration statements with the U.S. Securities and Exchange Commission ("SEC").  As an exchange offering Token Futures, BitMEX was required to register itself with the SEC.  BitMEX never registered as a national exchange, nor filed any registration statements for its Token Futures.  Instead, BitMEX sold Token Futures in violation of federal and

state law.  As a result, BitMEX and the Issuers who sold the underlying unregistered securities reaped billions of dollars in profits.

6.      The scheme worked as follows:  working to capitalize on the enthusiasm for cryptocurrencies like bitcoin, an Issuer would announce a revolutionary digital token.  This Token would typically be billed as "better," "faster," "cheaper," "more connected," "more trustworthy," and "more secure."  The Issuer would then sell some of its tokens in an initial coin offering ("ICO") to a small group of investors and turn to exchanges to list the new Token, at which point these exchanges would undertake their own efforts to promote sales, and to solicit and encourage purchases by a wide universe of investors.  The Issuers would thereby raise hundreds of millions, even billions, of dollars from purchasers of the Tokens.

7.      The Issuers were generally careful to describe these Tokens both as providing some specific utility and as something other than "securities."  But the vast majority of these new Tokens turned out to be empty promises.  They were not "better," "faster," "cheaper," "more connected," "more trustworthy," or "more secure" than what existed in the marketplace.  In reality, they often had no utility at all.  The promises of new products and markets went unfulfilled, with the networks never fully developed, while investors were left holding the bag when these Tokens crashed. Indeed, most of the ERC-20 tokens created in this period are now trading at a tiny fraction of their 2017–2018 highs.

8.      Investors were provided with scant information when deciding whether to purchase a Token or Token Future.  In fact, the only offering materials available to investors were "whitepapers" that would describe, in highly technical terms, the supposed utility of a Token. These whitepapers would omit, however, the robust disclosures that the securities laws and the SEC have long codified as essential to investor protections in initial public offerings, including

use of "plain English" to describe the offering; a required list of key risk factors; a description of key information and incentives concerning management; warnings about relying on forward-looking statements; an explanation of how the proceeds from the offering would be used; and a standardized format that investors could readily follow.  Instead, these ICOs were the "Wild West"—with investors left to fend for themselves.  Without the mandatory disclosures that would have been required had these ICOs been registered with the SEC, investors could not reliably assess the representations made or the risks of their investments.

9.     In 2017 and 2018, at the height of this frenzy of activity, hundreds of ICOs raised over $20 billion with virtually no regulatory oversight or guidance to investors.  Issuers and exchanges, preying on the public's lack of familiarity with the technology underpinning these tokens, characterized them as "utility tokens," even though they were in effect bets that a particular project would develop into a successful venture.  In truth, the Tokens were securities under federal and state securities laws.

10.    On April 3, 2019, in a "Framework for 'Investment Contract' Analysis of Digital Assets" (the "Framework"), the SEC clarified that the Tokens are "investment contracts" and therefore securities under Section 2 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77b(a)(1), and Section 3 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 77c(a)(10).[1]  Prior to that time, a reasonable investor would not have concluded that these Tokens (or Token Futures) were securities that should have been registered with the SEC.  But the Tokens and Token Futures are securities.  For example, on September 30, 2019—nearly six months after releasing its Framework, and more than two years after the relevant ICO began—the SEC

---

[1] *Framework for "Investment Contract" Analysis of Digital Assets*, SEC (April 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets#_ednref1.

completed an investigation and found that Block.one had violated the Securities Act by selling the digital token EOS, an unregistered security, to the public.  As a result of this SEC enforcement action, Block.one was required to pay a $24 million fine.[2] The SEC's determination that EOS was an unregistered security applies with equal force to other tokens, including SNT.

11.     BitMEX engaged in millions of transactions—including the solicitation, offer, and sale of securities—by selling the Token Futures.  Because the Tokens were securities, the Token Futures BitMEX sold were themselves securities that needed to be registered.  BitMEX did not itself register with the SEC as an exchange or broker-dealer, nor did it register the Token Futures as securities.  As a result, investors were not informed of the significant risks inherent in these investments, as federal and state securities laws require.

12.     BitMEX participated in illegal solicitation and sales of Token Futures for which no registration statement was in effect, and as to which no exemption was available.  BitMEX offered these Token Futures using statements posted on the Internet and distributed throughout the world, including throughout the United States, and the Token Futures were offered and sold to Plaintiffs and the general public in the United States.  Because these sales violated both the Securities Act and the Exchange Act, Plaintiffs and the Class are entitled to recover the consideration paid for these Token Futures with interest thereon at the legal rate, or the equivalent in monetary damages plus interest at the legal rate from the date of purchase, as well as the fees they paid BitMEX on such purchases.

13.     In addition, numerous Class members resided, and were present at the time they traded in the Token Futures, in States that provide their own "Blue Sky" protections for investors,

---

[2] Press Release, *SEC Orders Blockchain Company to Pay $24 Million Penalty for Unregistered ICO* (Sept. 30, 2019), https://www.sec.gov/news/press-release/2019-202; Block.one, Exchange Act Release No. 10714, 2019 WL 4793292 (Sept. 30, 2019).

including New Jersey and Texas.[3]  These States generally provide that the investors in these States who purchased these unregistered Token Futures are entitled to rescission or damages, as well as interest thereon, attorneys' fees, and costs.

## II.   PARTIES

### A.   Plaintiffs

14.   Plaintiff Chase Williams is a resident of Houston, Texas.  Williams and members of the Class purchased the Token Futures on BitMEX and pursuant to contracts with BitMEX from Texas during the Class Period.

15.   Plaintiff William Zhang is a resident of New York, New York.  Zhang and members of the Class purchased the Token Futures on BitMEX and pursuant to contracts with BitMEX from New Jersey during the Class Period.

### B.   Defendants

16.   Defendant HDR Global Trading Limited ("HDR") launched in 2014.  By January 2017, it had become, and remains, the largest crypto-asset derivatives exchange in the world, with the highest trading volume of any such futures exchange.  HDR is incorporated in the Seychelles, with its principal office located at Global Gateway 8, Rue de la Perle, Providence Mahé, Seychelles.  HDR is the owner of the trading platform called BitMEX and operated BitMEX out of an office in Manhattan.

---

[3] These "Blue Sky" statutes are so named because they are designed to protect investors from "speculative schemes which have no more basis than so many feet of blue sky." *Hall v. Geiger-Jones Co.*, 242 U.S. 539, 550 (1917) (internal citations omitted).  Like the federal securities laws, each of the state statutes pursuant to which Plaintiffs bring causes of action defines "securities" to include "investment contracts," and the term "investment contracts" in each statute has been interpreted at least as broadly as the standard set forth by the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

17.     ABS Global Trading Limited ("ABS") is a Delaware corporation created in 2017 and entirely owned by HDR.  ABS is registered to do business in New York.  According to public records, it is headquartered at 31 Conduit Road, Flat 17B, The Morgan, Hong Kong.  ABS is responsible for technical aspects of the BitMEX platform, including security services and implementing the user interface traders use to buy and sell products.  ABS and HDR refer to themselves collectively as "BitMEX."  They make job postings that do not differentiate between the companies, and their employees identify themselves as working for BitMEX.  Both entities engage in sufficient marketing and technical work that necessarily touches upon every facet of BitMEX's operations.

18.     Defendant Arthur Hayes is the founder and CEO of both HDR and ABS.  Hayes is a United States citizen who grew up in New York and went to graduate school at the Wharton School of the University of Pennsylvania.  On information and belief, he resides in Hong Kong and frequently traveled to New York to manage BitMEX's local office, to obtain investments, and to promote BitMEX, including by speaking at conferences in New York City such as the 2017 and 2018 Consensus Invest conferences.

19.     Defendant Samuel Reed is the Chief Technical Officer ("CTO") of both HDR and ABS and co-founded them with Hayes.  On information and belief, he resides in Hong Kong.  As the chief "front-end" designer of BitMEX's platform, responsible for its appearance, upon information and belief Defendant Reed directs key operations of ABS.

20.     Defendant Ben Delo co-founded both HDR and ABS with Hayes and Reed.  As a mathematician, Defendant Delo is responsible for designing key trading systems implemented on the BitMEX platform.  On information and belief, he resides in Hong Kong.

III.    **JURISDICTION AND VENUE**

21.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1331 because the Amended

Complaint asserts claims under Sections 5, 12(a)(1), and 15 of the Securities Act, 15 U.S.C.

§§ 77e, 77*l*(a)(1), 77o.  This Court further has jurisdiction over the Securities Act claims pursuant

to Section 22 of the Securities Act, 15 U.S.C. § 77v.

22.     Jurisdiction of this Court is also founded upon Section 27 of the Exchange Act, 15

U.S.C. § 78aa(a), which provides that federal courts have exclusive jurisdiction over violations of

the Exchange Act, including Sections 5, 15(a)(1), 20, and 29(b), 15 U.S.C. §§ 78e, 78o(a)(1), 78t,

78cc(b).

23.     This Court has jurisdiction over the statutory claims of violations under N.J. Stat.

Ann. § 49:3-71 and Tex. Rev. Civ. Stat. art. 581 pursuant to this Court's supplemental jurisdiction

under 28 U.S.C. § 1367(a).

24.     This Court has personal jurisdiction over Defendants as a result of acts of

Defendants occurring in or aimed at the State of New York in connection with Defendants' offer

or sale of unregistered securities and securities futures and failure to register with the SEC as an

exchange or broker-dealer.

25.     Venue is proper pursuant to each of 15 U.S.C. § 77v(a) and 15 U.S.C. § 78aa(a) in

that this is a district wherein one or more defendants is found or is an inhabitant or transacts

business, or in which the offer or sale took place.  Throughout most, if not all, of the Class Period,

BitMEX maintained an office in Midtown Manhattan and was recruiting individuals for this office

on websites such as Linkedin.com, angel.co, and builtinnyc.com.  According to public profiles on

LinkedIn, BitMEX has employees in the greater New York City area.  BitMEX also regularly

solicited employees for positions in the New York City area, including Vice President of

Marketing and Digital Marketing manager, illustrating a clear intent to maintain a presence in, and operate from, New York in marketing itself to United States and New York residents.  In addition, BitMEX retained in September 2019 the New York office of a public relations firm to popularize its platform.   In addition, BitMEX employees regularly speak and solicit business at large cryptography and blockchain conferences hosted in New York.  For example, Defendant Hayes spoke at CoinDesk's annual Consensus: Invest conference in New York in 2017 and 2018 to promote BitMEX products, and other business development employees solicited business during the 2016 event in New York.

26.     Beyond clear evidence of New York-based social media users regularly interacting with BitMEX, "[s]everal sources close to the company" have publicly disclosed that nearly 15 percent of BitMEX's 2019 trading volume—or about $138 billion—is attributable to traders located in the United States.  Although BitMEX claims not to allow users located within the United States to trade on its platform, this trading from the United States is in fact both possible and common because, as Defendant Hayes concedes, as journalists and other commentators have explained, and as BitMEX's marketing of itself in the United States demonstrates, accessing BitMEX is trivially easy from the United States using virtual private networks that purport to mask a trader's location.  BitMEX was well aware and promoted this behavior.  For example, one popular New York-based trader earned referral fees for generating 900 customer sign-ups for BitMEX using his public Twitter account.

IV.   **FACTUAL ALLEGATIONS**

   A.    **The First Crypto-Asset: Bitcoin**

27.     This case involves the sale of crypto-assets, *i.e.*, digital assets designed to work as a medium of exchange, a store of value, or both.  Crypto-assets leverage a variety of cryptographic

principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

28.     Bitcoin was the world's first decentralized crypto-asset.  It is also the largest and most popular crypto-asset, with a market capitalization of approximately $132 billion as of 10:00 a.m. EDT on April 23, 2020.  Bitcoin spawned a number of other crypto-assets that, together with bitcoin, have a current market capitalization of $208 billion as of 10:00 a.m. EDT on April 23, 2020.  (The term "bitcoin" can refer to both a computer protocol and a unit of exchange.  Accepted practice is to use the term "Bitcoin" to label the protocol and software, and the term "bitcoin" to label the units of exchange.)

29.     At its core, Bitcoin is a ledger that tracks the ownership and transfer of every bitcoin in existence.  This ledger is called the blockchain.

30.     Blockchains act as the central technical commonality across most crypto-assets. While each blockchain may be subject to different technical rules and permissions based on the preferences of its creators, they are typically designed to achieve the similar goal of decentralization.

31.     Accordingly, blockchains are generally designed as a framework of incentives that encourages some people to do the work of validating transactions while allowing others to take advantage of the network.  In order to ensure successful validation, those completing the validation are also required to solve a "Proof of Work" problem by expending computational resources, which has the effect of making the blockchain more accurate and secure.  For Bitcoin, those who validate the blockchain transactions and solve the "Proof of Work" program are rewarded with newly minted bitcoin.  This process is colloquially referred to as "mining."

32.     Mining is one method by which an individual can acquire crypto-assets like bitcoin. A second and more common manner is to obtain crypto-assets from someone else.  This is often accomplished by purchasing it through an online "crypto-asset exchange."  These exchanges are similar to traditional exchanges in that they provide a convenient marketplace to match buyers and sellers of crypto-assets.

33.     In April 2013, there were only seven crypto-assets listed on coinmartketcap.com, a popular website that tracks the crypto-asset markets.  As of this filing, the site monitors more than 2,000 crypto-assets.

34.     For a time, bitcoin was the only crypto-asset available on exchanges.  As crypto-assets grew in popularity, exchanges began listing other crypto-assets as well, and trading volumes expanded.  In early 2013, daily bitcoin trading volumes hovered between $1 million and $25 million.  By the end of 2017, daily bitcoin trading volumes ranged between $200 million and $3.8 billion.

**B.     Ethereum**

35.     Ethereum is the second-most popular crypto-asset, with a market capitalization of approximately $20.5 billion as of billion as of 10:00 a.m. EDT on April 23, 2020. The Ethereum blockchain functions similarly to the Bitcoin blockchain insofar as its miners act as the validators of the network.  Miners of the Ethereum blockchain are paid for their services in the form of newly minted ether.  (The term "Ethereum" refers to the open software platform built on top of the Ethereum blockchain, while the term "ether" is the unit of account used to exchange value within the Ethereum "ecosystem," *i.e.*, the overall network of individuals using Ethereum or participating in the development of its network.  This distinction is thus similar to the "Bitcoin" versus "bitcoin" distinction noted above.)  Like bitcoin, ether has been designated a commodity by the CFTC.

36.     Unlike Bitcoin's blockchain, Ethereum was designed to enable "smart contract" functionality.  A smart contract is a program that verifies and enforces the negotiation or performance of a contract.  Smart contracts can be self-executing and self-enforcing, which theoretically reduces the transaction costs associated with traditional contracting.

37.     As an example of how a smart contract works, consider a situation where two people want to execute a hedging contract.  They each put up $1,000 worth of ether.  They agree that, after a month, one of them will receive back $1,000 worth of ether at the dollar exchange rate at that time, while the other receives the rest of the ether.  The rest of the ether may or may not be worth more than it was at the beginning of the month.

38.     A smart contract enables these two people to submit the ether to a secure destination and automatically distribute the ether at the end of the month without any third-party action.  The smart contract self-executes with instructions written in its code that get executed when the specified conditions are met.

39.     In order to enable widespread adoption and standardized protocols for smart contracts, the Ethereum community has created certain out-of-the-box smart contracts called Ethereum Request for Comments ("ERCs").

40.     An ERC is an application standard for a smart contract.  Anyone can create an ERC and then seek support for that standard.  Once an ERC is accepted by the Ethereum community, it benefits Ethereum users because it provides for uniform transactions, reduced risk, and efficient processes.  This is because it allows individuals who are less technically proficient to make use of smart-contract functionality.  The most widespread use of ERCs is to allow individuals to easily launch and create new digital tokens.

### C.    ERC-20 Tokens

41.    ERC-20 is an application standard that the creator of Ethereum, Vitalik Buterin, first proposed in 2015.  ERC-20 is a standard that allows for the creation of smart-contract tokens on the Ethereum blockchain.  These tokens are known as "ERC-20 tokens."

42.    ERC-20 tokens are built on the Ethereum blockchain, and therefore they must be exchanged on it.  Accordingly, ERC-20 tokens are functionally different than cryptocurrencies like Bitcoin and Ethereum because they do not operate on an independent blockchain.

43.    ERC-20 tokens all function similarly by design—that is, they are compliant with the ERC-20 application standard.  Some properties related to ERC-20 tokens are customizable, such as the total supply of tokens, the token's ticker symbol, and the token's name.  All ERC-20 tokens transactions, however, occur over the Ethereum blockchain; none of them operates over its own blockchain.

44.    ERC-20 tokens are simple and easy to deploy.  Anyone with a basic understanding of Ethereum can use the ERC-20 protocol to create her own ERC-20 tokens, which she can then distribute and make available for purchase.  Even people without any technical expertise can have their own ERC-20 token created for them, which can then be marketed to investors.

### D.    The Advent Of The "ICO"

45.    Between 2014 and 2016, bitcoin's price fluctuated between $200 and $800.  During this same time frame, ether's price fluctuated between roughly $1 and $10.

46.    By the end of 2016, interest in crypto-assets began to accelerate, with prices growing at a rate historically unprecedented for any asset class.  Over the course of 2017 alone, bitcoin's price increased from approximately $1,000 to approximately $20,000.  Ethereum's growth was even more startling.  On January 1, 2017, Ethereum was trading at approximately

14

$8 per ether.  Approximately one year later, it was trading at over $1,400 per ether—a return of approximately 17,000 percent over that period.

47.    Seeking to capitalize on the growing enthusiasm for crypto-assets, many entrepreneurs sought to raise funds through initial coin offerings, or ICOs, including ICOs for newly created ERC-20 tokens, such as the Tokens.  Many of these issuers improperly chose not to register their securities offerings with the SEC in order to save money and not "open their books" to the SEC, even though investors thereby were denied access to critical information they would have received from an SEC-registered offering.  As a result, investors, including investors in digital tokens, were denied access to important information before making their investment decision.

48.    Potential purchasers were reached through various crypto-asset exchanges and social media sites that published active and upcoming ICOs.

49.    Between 2017 and 2018, nearly $20 billion was raised through ICOs.  None of these ICOs was registered with the SEC.  Of the approximately 800 ICOs launched between 2017 and 2018, the vast majority were issued using the ERC-20 protocol.

50.    ERC-20 ICOs were typically announced and promoted through public online channels.  Issuers typically released a "whitepaper" describing the project and terms of the ICO and promoted the sale of the tokens.  They typically advertised the creation of a "new blockchain architecture."

51.    The whitepapers contained vastly less information than would have been included in an SEC registration statement.  For example, whitepapers typically did not include a "plain English" description of the offering; a list of key risk factors; a description of important information and incentives concerning management; warnings about relying on forward-looking

statements; an explanation of how the proceeds from the offering would be used; or a standardized format that investors could readily follow.

52.     As a result of the lack of information, trading of tokens, and Token Futures on exchanges such as BitMEX, was rife for manipulation.  In fact, as Aries Wanlin Wang, the founder of a rival exchange, admitted, "the secondary market [for digital assets] can be rigged by manipulators.  If you put major currencies such as Bitcoin and Ethereum aside, many of the tokens you'll find issued through ICOs are there to be manipulated.  These tokens are similar to penny stocks.  And everyone wants to believe they've discovered the next Bitcoin and Ethereum."  Mr. Wang further conceded that "[t]he problems facing the secondary market in crypto are similar to the problems that were faced by American stock exchanges 100 years ago.  When a market lacks certain regulations and oversights, predictable things happen.  Pump and dumps are very common in the secondary market of crypto-assets, just as they were on the US stock exchange so many years ago."

53.     The Issuers declined to register the Tokens with the SEC, BitMEX declined to register Token Futures with the SEC, and BitMEX declined to register itself as an exchange or broker-dealer, which registrations would have provided crucial risk disclosure to investors, including members of the Class.

### E.  The Token Futures BitMEX Offered And Sold Reference And Derive Their Value From Securities And Are Therefore Securities Themselves

54.     BitMEX has offered and sold Token Futures that reference and derive their value from each of the Tokens.  On June 8, 2017, BitMEX first offered a derivatives product referencing Status (SNT).  On June 23, 2017, BitMEX first offered a derivatives product referencing EOS.

55.     Under 15 U.S.C. § 77b(1), a "security" includes any "security future" or "security-based swap."  Because the products BitMEX sold are futures, they are securities given that the

assets they reference and from which they derive their value, the Tokens, are securities. Alternatively, the products BitMEX sold are securities because they are security-based swaps that reference and derive their value from the Tokens, which are securities.

56.     BitMEX charged a transaction fee for each of the trades involving the Token Futures.

57.     BitMEX did not register any of its offerings of Token Futures as securities under federal or state law.

58.     Accordingly, BitMEX was engaged in the offer and sale of unregistered securities.

**F.  BitMEX Solicited And Sold Token Futures Referencing ERC-20 Tokens**

59.     BitMEX does not list ERC-20 tokens themselves for sale.  Rather, in exchange for a fee, BitMEX facilitates traders' access to crypto financial derivatives markets by creating derivatives contracts, with terms such as expiry, margin requirements, and risk limits, that traders can trade with one another.  Because all margin on the platform is posted in bitcoin, traders can gain exposure to various ERC-20 Tokens without ever purchasing the underlying securities. BitMEX also allows traders to leverage their trades—up to 100 times in some instances—by trading on margin.

60.     BitMEX solicited the buying and selling of Token Futures referencing ERC-20 tokens on its unregistered exchange and reaped extraordinary profits as a result.

61.     In fact, BitMEX recently boasted on its website that it averaged more than $3.1 billion in daily trading volume in January 2020.  Based on an average of a 0.05 percent fee for every trade, BitMEX is collecting over $1.5 million in fees a day.  Unsurprisingly, Defendant Delo was profiled and verified in 2018 as England's youngest billionaire.

62.     After BitMEX created a contract and listed it for sale, it would advertise that contract to its user base, such as per the below:

63.     BitMEX only sold and offered derivative contracts that it created and listed on its platform.

64.     Both of the Tokens were referenced by a derivative contract listed on BitMEX, and each was traded by members of the Class.

**G. Investors Would Not Reasonably Have Concluded Prior To April 3, 2019, At The Earliest, That The Tokens Were Securities, And Therefore That The Token Futures Were Also Securities**

65.     In connection with the ICOs for the Tokens, from 2017 until early 2019, the Issuers and BitMEX made statements that would not have reasonably led Plaintiffs and Class members to conclude that the Tokens or the Token Futures were securities.

66.     <u>Issuers</u>.  Issuers of ERC-20 tokens repeatedly asserted that their tokens were "utility tokens," rather than "security tokens" (which would be securities that would have to be registered with the SEC).  As an initial matter, Issuers refused to register the Tokens with the SEC, thus signaling to investors that these were not securities.

67.     Issuers in fact declared that the Tokens were not securities.  For example, the EOS Purchase Agreement stated:

> As mentioned above, the EOS Tokens do not have any rights, uses, purpose, attributes, functionalities or features, expressed or implied. Although EOS Tokens may be tradable, they are not an investment, currency, security, commodity, a swap on a currency, security, or commodity or any kind of financial instrument.

68.     The EOS whitepaper also misleadingly compared EOS to Bitcoin, which is a commodity and is not required to be registered as securities.  For example, the EOS whitepaper argued that EOS would replace Bitcoin and Ethereum.

69.     Accordingly, it was not apparent to a reasonable investor, at issuance, that the Tokens were securities under the law, and a reasonable investor would not have concluded they were securities.  Likewise, it was not apparent to a reasonable purchaser of futures contracts referencing such tokens on BitMEX that their futures contracts referenced securities.

70.     <u>BitMEX</u>.  BitMEX routinely touted that the Tokens underlying its derivative products were compliant with securities laws.  For example, in August 2017, Hayes published an article on BitMEX's website explaining that the tokens "Tezos, Eos, and Bancor are the top three

19

ICOs of 2017 in terms of money raised.  All of them are protocols to perform a set of tasks.  None of these tokens are collective investment schemes, or provide the owner with rights in a privately listed company."  In a longer article titled "In Defense of ICOs," Hayes also explained that digital tokens were not securities because "[i]nstead of selling equity in the company producing a piece of technology, the ICO sells an interest in the usage of the product itself."  Hayes continued that teams "structure their tokens so they will not be construed as a security" and the tokens are not securities "because it derives its value strictly from usage natively in an application(s) or protocol.  Without properly functioning technology, the token is fairy dust.  There is no ownership in the company producing the token, nor any income stream."

71.    SEC.  Prior to its April 2019 pronouncement, the SEC too left uncertain whether tokens, such as the Tokens, are securities.  In fact, it was not until six months after the Framework issued in April 2019, and more than two years after the relevant ICO began, that the SEC entered into a settlement with Block.one (the issuer of ERC-20 token EOS), concluding in September 2019 that EOS's $4.1 billion issuance constituted an unlawful unregistered offering.

72.    Prior to April 2019, the SEC had not determined that ERC-20 tokens were securities.  On June 14, 2018, the Director of the SEC's Corporation Finance Division, William H. Hinman, explained that "the ICOs I am seeing, strictly speaking, the token—or coin or whatever the digital information packet is called—all by itself is not a security."  On May 2, 2018, SEC Commissioner Hester Peirce similarly expressed her view that not "all ICOs must be deemed securities offerings."  Critically, Commissioner Peirce identified numerous open questions that Issuers emphasized when arguing ERC-20 tokens are not securities, such as the utility of the token in an incomplete or partially complete network.

73.     <u>Other Commentary</u>.   Other thought leaders in the space, such as the lawfully registered broker-dealer Coinbase, opined in late 2016 that "we have considered the question of whether issuance of a Blockchain Token prior to the existence of a system would constitute a security.   We have not found conclusive law on the subject, but believe that the better view is that a non-security Blockchain Token does not become a security merely because the system as to which it has rights has not yet been created or completed."

74.     In sum, before the SEC issued its Framework in April 2019, a reasonable investor would not have concluded that ERC-20 tokens or the Token Futures were securities subject to the securities laws.   On the contrary, investors were confronted with representations both from issuers and from crypto-asset discussions that would have led them reasonably to conclude that they were not investing in securities.

**H.     The Tokens Are Securities**

75.     Within the last year, the SEC has clarified, with the benefit of labor-intensive research and investigations, that the Tokens were securities.   On April 3, 2019, the SEC published its "Framework for 'Investment Contract' Analysis of Digital Assets," in which it "provided a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."

76.     Among the most significant statements in the Framework is its description of how to analyze the various facts surrounding ICOs in making the determination of whether a given digital asset (including an ERC-20 token) is a security.   Under application of the Framework, the Tokens were securities at issuance.

77.     In the Framework, the SEC cautioned potential issuers:   "If you are considering an Initial Coin Offering, sometimes referred to as an 'ICO,' or otherwise engaging in the offer, sale,

or distribution of a digital asset, you need to consider whether the U.S. federal securities laws apply." The SEC explained the fundamentals of the *Howey* test:

> The U.S. Supreme Court's *Howey* case and subsequent case law have found that an "investment contract" exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. The so-called "*Howey* test" applies to any contract, scheme, or transaction, regardless of whether it has any of the characteristics of typical securities. The focus of the *Howey* analysis is not only on the form and terms of the instrument itself (in this case, the digital asset) but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary market sales). Therefore, issuers and other persons and entities engaged in the marketing, offer, sale, resale, or distribution of any digital asset will need to analyze the relevant transactions to determine if the federal securities laws apply.

Investors who bought the Tokens invested money or other valuable consideration, such as bitcoin and ether, in a common enterprise—the Issuers. Investors had a reasonable expectation of profit based upon the efforts of the Issuers, including, among other things, the Issuers obtaining listing of their ERC-20 tokens on crypto-asset exchanges.

### a.   ERC-20 Investors Invested Money

78.   Investors in ERC-20 tokens made an investment of money or other valuable consideration for purposes of *Howey*. The SEC Framework states: "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of real (or fiat) currency, another digital asset, or other type of consideration."

79.   Investors invested traditional and other digital currencies, such as bitcoin and ether, to purchase the Tokens.

b.      **ERC-20 Investors Participated In A Common Enterprise**

80.      The SEC Framework states:  "In evaluating digital assets, we have found that a 'common enterprise' typically exists."  This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

81.      The Tokens are no different.  Investors were passive participants in the Tokens' ICOs, and the profits of each investor were intertwined with those of the Issuers and of other investors.  Issuers typically conceded in their whitepapers that they sold Tokens in order to fund their operations and promote their networks and thereby increase the value of the issued ERC-20 tokens.  Issuers typically were responsible for supporting the Tokens, pooled investors' assets, and controlled those assets.  Issuers would also typically hold a significant stake in the Tokens, and thus shared in the profits and risk of the project.

82.      For example, promoters of the EOS token described the proceeds of their ICO as "revenue" they would use to "offer[] developers and entrepreneurs the funding they need to create community driven business leveraging EOSIO software."  That money, in return, "will be returned value for the network."

83.      Similarly, the Status Network ("Status") asserted that its governance structure "empower[ed] stakeholders in the Status Network" by giving them rights akin to holders of voting stock in a corporation.  The whitepaper asserted that "[a] core part of the Status Network Token is giving stakeholders the ability to choose the direction that the software is developed.  The token is used to make decisions on proposals, which can be made by any Stakeholder. . . .  The amount of tokens you hold at that time becomes your voting power for that decision."

84.      Accordingly, investors in the Tokens participated in a common enterprise by purchasing the Tokens.

c.      **Investors Purchased The Tokens With A Reasonable Expectation Of Profit From Owning Them**

85.      As to "reasonable expectation of profits," the SEC Framework states:  "A purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."

86.      Investors in the Tokens, including Plaintiffs and the Class, made their investment with a reasonable expectation of profits.  The Tokens were sold to investors prior to a network or "ecosystem" being fully developed on which they could be used.  For pre-functional tokens, such as the Tokens at issue in the Amended Complaint, the primary purpose for purchasing such tokens was to make a profit, rather than to utilize the tokens themselves for a task.

87.      Alluding to the "AP" (the "Active Participant"), which is the promoter, sponsor, or other third party that "provides essential managerial efforts that affect the success of the enterprise"), the Framework identifies a series of intensely factual questions underscoring both the time the SEC had spent considering these issues and the challenges a layperson would face in analyzing whether a digital asset constitutes a security.  In particular, the Framework lays out a number of characteristics to assess whether the "reasonable expectation of profits" element is met with respect to whether digital assets, thereby satisfy the *Howey* test:

88.      The more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit:

- The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset.

  o  The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network, particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.

- o This also can be the case where the digital asset gives the holder rights to dividends or distributions.

- The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future.

- Purchasers reasonably would expect that an AP's efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.

- The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network.

- o The digital asset is offered and purchased in quantities indicative of investment intent instead of quantities indicative of a user of the network. For example, it is offered and purchased in quantities significantly greater than any likely user would reasonably need, or so small as to make actual use of the asset in the network impractical.

- There is little apparent correlation between the purchase/offering price of the digital asset and the market price of the particular goods or services that can be acquired in exchange for the digital asset.

- There is little apparent correlation between quantities the digital asset typically trades in (or the amounts that purchasers typically purchase) and the amount of the underlying goods or services a typical consumer would purchase for use or consumption.

- The AP has raised an amount of funds in excess of what may be needed to establish a functional network or digital asset.

- The AP is able to benefit from its efforts as a result of holding the same class of digital assets as those being distributed to the public.

- The AP continues to expend funds from proceeds or operations to enhance the functionality or value of the network or digital asset.

- The digital asset is marketed, directly or indirectly, using any of the following:

- o The expertise of an AP or its ability to build or grow the value of the network or digital asset.

- o The digital asset is marketed in terms that indicate it is an investment or that the solicited holders are investors.

25

    o   The intended use of the proceeds from the sale of the digital asset is to develop the network or digital asset.

    o   The future (and not present) functionality of the network or digital asset, and the prospect that an AP will deliver that functionality.

    o   The promise (implied or explicit) to build a business or operation as opposed to delivering currently available goods or services for use on an existing network.

    o   The ready transferability of the digital asset is a key selling feature.

    o   The potential profitability of the operations of the network, or the potential appreciation in the value of the digital asset, is emphasized in marketing or other promotional materials.

    o   The availability of a market for the trading of the digital asset, particularly where the AP implicitly or explicitly promises to create or otherwise support a trading market for the digital asset.

89. The SEC Framework clarifies that investors purchased the Tokens with a reasonable expectation of profits.

90. For example, the "ready transferability of the" Tokens was promoted by Issuers as a "key selling feature."  Status, for instance, told investors the SNT tokens "will be transferrable 7 days after the end of the Contribution Period."

91. The Tokens also "emphasized" the "potential appreciation in the value of the digital asset" in their marketing materials.  Status, for example, compared itself to highly successful enterprises such as Facebook and the Line messaging app, and asserted that it could "design mechanisms for growth that have been tried and tested."  The issuer of EOS tokens, also touted the potential for EOS tokens to increase in value:

> A blockchain using EOS.IO software also awards block producers tokens every time they produce a block.  The value of the tokens will impact the amount of bandwidth, storage, and computation a producer can afford to purchase; *this model naturally leverages rising token values to increase network performance.*

92.     ERC-20 tokens were also not described as "delivering currently available goods or services for use on an existing network," but rather explained as raising capital necessary "to build a business or operation."  As an example, the Status whitepaper asserted that "the Status mobile Ethereum client" was "well suited for mass adoption," and that the "core team and the Status community are committed to ensuring that the SNT token adds value to the platform and drives network effects."  Under the SEC's Framework, the Tokens were securities under federal and state securities laws.

### d.      Investors Expected Profits From The Tokens To Be Derived From The Managerial Efforts Of Issuers

93.     The SEC Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues:  Does the purchaser reasonably expect to rely on the efforts of an [Active Participant]?  Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?"

94.     Investors' profits in the Tokens were to be derived from the managerial efforts of others—specifically the Issuers, their co-founders, and their development teams.  ERC-20 investors relied on the managerial and entrepreneurial efforts of the Issuers and their executive and development teams to manage and develop the projects funded by the Tokens' ICOs.

95.     Issuers' executive teams typically held themselves out to investors as experts in the blockchain and crypto field.  Investors in the Tokens reasonably expected the Issuers' development teams to provide significant managerial efforts after the Tokens' launch.

96.     The SEC explained in its Framework, further underlining the depth of study the agency had devoted to the matter over the years and the complexity of such legal analysis from

27

the perspective of a reasonable investor, that the more of the following characteristics that are present, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others'":

- An AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

  o Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly). This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.

- There are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a "decentralized" network).

- An AP creates or supports a market for, or the price of, the digital asset. This can include, for example, an AP that: (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities.

- An AP has a lead or central role in the direction of the ongoing development of the network or the digital asset. In particular, an AP plays a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

- An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents including, for example:

  o Determining whether and how to compensate persons providing services to the network or to the entity or entities charged with oversight of the network.

  o Determining whether and where the digital asset will trade. For example, purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform.

  o Determining who will receive additional digital assets and under what conditions.

  o Making or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset.

- o Playing a leading role in the validation or confirmation of transactions on the network, or in some other way having responsibility for the ongoing security of the network.

- o Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

- Purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, such as where:

  - o The AP has the ability to realize capital appreciation from the value of the digital asset. This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset. In these instances, purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset.

  - o The AP distributes the digital asset as compensation to management or the AP's compensation is tied to the price of the digital asset in the secondary market. To the extent these facts are present, the compensated individuals can be expected to take steps to build the value of the digital asset.

  - o The AP owns or controls ownership of intellectual property rights of the network or digital asset, directly or indirectly.

  - o The AP monetizes the value of the digital asset, especially where the digital asset has limited functionality.

97.     Shifting its focus to the numerous facts bearing on the nature of the digital asset at

issue, the SEC explained still further:

> Although no one of the following characteristics of use or consumption is necessarily determinative, the stronger their presence, the less likely the *Howey* test is met:

- The distributed ledger network and digital asset are fully developed and operational.

- Holders of the digital asset are immediately able to use it for its intended functionality on the network, particularly where there are built-in incentives to encourage such use.

- The digital assets' creation and structure is designed and implemented to meet the needs of its users, rather than to feed speculation as to its value or development of its network. For example, the digital asset can

only be used on the network and generally can be held or transferred only in amounts that correspond to a purchaser's expected use.

- Prospects for appreciation in the value of the digital asset are limited. For example, the design of the digital asset provides that its value will remain constant or even degrade over time, and, therefore, a reasonable purchaser would not be expected to hold the digital asset for extended periods as an investment.

- With respect to a digital asset referred to as a virtual currency, it can immediately be used to make payments in a wide variety of contexts, or acts as a substitute for real (or fiat) currency.

  o This means that it is possible to pay for goods or services with the digital asset without first having to convert it to another digital asset or real currency.

  o If it is characterized as a virtual currency, the digital asset actually operates as a store of value that can be saved, retrieved, and exchanged for something of value at a later time.

- With respect to a digital asset that represents rights to a good or service, it currently can be redeemed within a developed network or platform to acquire or otherwise use those goods or services.  Relevant factors may include:

  o There is a correlation between the purchase price of the digital asset and a market price of the particular good or service for which it may be redeemed or exchanged.

  o The digital asset is available in increments that correlate with a consumptive intent versus an investment or speculative purpose.

  o An intent to consume the digital asset may also be more evident if the good or service underlying the digital asset can only be acquired, or more efficiently acquired, through the use of the digital asset on the network.

- Any economic benefit that may be derived from appreciation in the value of the digital asset is incidental to obtaining the right to use it for its intended functionality.

- The digital asset is marketed in a manner that emphasizes the functionality of the digital asset, and not the potential for the increase in market value of the digital asset.

- Potential purchasers have the ability to use the network and use (or have used) the digital asset for its intended functionality.

- Restrictions on the transferability of the digital asset are consistent with the asset's use and not facilitating a speculative market.

- If the AP facilitates the creation of a secondary market, transfers of the digital asset may only be made by and among users of the platform.

98.     Purchasers of pre-functional tokens necessarily rely on the managerial efforts of others to realize value from their investments.  The success of these managerial efforts in developing the networks on which these tokens will operate is the primary factor in their price, that is, until such tokens transition into being functional utility tokens.  Each of the Tokens was a security at issuance because profit from the Tokens would be derived primarily from the managerial efforts of the Issuer teams developing the associated networks on which the Tokens would function, rather than having their profit derived from market forces of supply and demand, such as might affect the price of a commodity such as gold (or Bitcoin).

99.     This dependency on the managerial efforts of the Issuer, however, was not apparent at issuance to a reasonable investor.  Considering the limited available information about how these Tokens were designed and intended to operate, if such an investor were even able to interpret the relevant law at the time, a reasonable investor lacked sufficient bases to conclude whether the Tokens were securities until the platform at issue, and its relevant "ecosystem," had been given time to develop.  In the interim, the investor lacked the facts necessary to conclude—let alone formally allege in court—that the Tokens she had acquired were securities.  It was only after the passage of some significant amount of time, and only with more information about the Issuer's intent, process of management, and lack of success in allowing decentralization to arise, that an investor could reasonably determine that a Token that was advertised as something other than a security was a security all along.

100.    The EOS Token is a prime example.  At the time of the EOS ICO, EOS had no functional software product available—instead, EOS told its investors it would use the proceeds of the ICO to develop the promised software, which would in turn make the Tokens more valuable to investors.

101.    The Issuers of the Status SNT Tokens likewise wrote in its whitepaper it had only an "alpha" build of its product, but with the funds raised through its ICO, it hoped its technology would "reach[] widespread mobile use."  The whitepaper continued:  "Funds raised during the Contribution Period will be used solely for the development and benefit of the Status Network."

102.    However complex the resolution of the issue would strike a reasonable investor, the Tokens satisfy most if not all of the factors the SEC described in the Framework as relevant to its determination that a digital asset is a security.

## I.      Each Token Is A Security

### a.      EOS

103.    The EOS ICO has been widely reported as the largest ICO to date, having raised over $4 billion assets from the sale of unregistered EOS tokens from June 2017 through July 2018. EOS derivatives were listed on BitMEX as early as June 23, 2017.

104.    EOS tokens were advertised as being an improvement on Bitcoin, Ethereum, and other crypto-assets.  In addition to claiming EOS's technical superiority over other crypto-assets, EOS's issuer, Block.one, publicly stated that it would use the funds raised through the ICO to continue to enhance the EOS software and support the growth of the platform.

105.    In the EOS Token Purchase Agreement, the issuers of EOS tokens made the following representations concerning the development of EOSIO:

- MATTERS RELATING TO EOS.IO SOFTWARE AND EOS PLATFORM:

  1. block.one is developing the EOS.IO software (the "EOS.IO Software") as further described in the EOS.IO Technical White Paper (as it may be amended from time to time) (the "White Paper");

  2. at the end of its development stage, block.one will be releasing the EOS.IO Software it has developed under an open source software license;

106.    At the time of the EOS ICO, Block.one took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked.  With promises that EOS would be better than other crypto-assets, many individuals were unaware that EOS tokens had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all EOS tokens were issued by Block.one at creation at very little economic cost—and enormous potential upside—to the Block.one founders.

107.    The creation of EOS tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum.  This would not have been apparent at issuance, however, to a reasonable investor.  Rather, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success in allowing decentralization to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that EOS was something other than a security, when it was a security.

108.    Investors purchased EOS tokens with the reasonable expectation that they would make a profit.

109.    EOS token holders stood to share in potential profits from the successful launch of the EOS token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the EOS ecosystem.

110.    EOS tokens were described as a technologically superior version of the Bitcoin and Ethereum blockchains.   The issuers' statements fueled speculation that EOS was the next "Ethereum or Bitcoin," with one commentator referring to EOS as "The Ethereum Killer."

111.    Investors' profits were to be derived from the managerial efforts of others— Block.one, its co-founders, and the Block.one development team.  Investors in EOS relied on the managerial and entrepreneurial efforts of Block.one and its executive and development team to manage and develop the EOS software.

112.    Investors in EOS reasonably expected Block.one and Block.one's development team to provide significant managerial efforts after EOS's launch.

113.    The expertise of the issuers was critical in monitoring the operation of EOS, promoting EOS, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The EOS protocol and governance structure were predetermined before the ICO was launched.

114.    Accordingly, under the SEC's Framework, the EOS token was a security.

115.    Indeed, on September 30, 2019, the SEC found that Block.one had violated the Securities Act through its unregistered sale of EOS to U.S. investors.   Among the SEC's conclusions were the following:

- "A number of US investors participated in Block.one's ICO."

- "Companies that offer or sell securities to US investors must comply with the securities laws, irrespective of the industry they operate in or the labels they place on the investment products they offer."

- "Block.one did not provide ICO investors the information they were entitled to as participants in a securities offering."

- "[EOS] Tokens were securities under the federal securities laws."

- "A purchaser in the offering of [EOS] Tokens would have had a reasonable expectation of obtaining a future profit based upon Block.one's efforts, including its development of the EOSIO software and its promotion of the adoption and success of EOSIO and the launch of the anticipated EOSIO blockchains."

- "Block.one violated Sections 5(a) and 5(c) of the Securities Act by offering and selling these securities without having a registration statement filed or in effect with the Commission or qualifying for an exemption from registration."

Block.one consented to a settlement whereby it would pay $24 million to the SEC. The SEC enforcement action occurred over two years after Block.one began selling EOS to the public, further underscoring the complexity of these issues for lay investors.

116.    The SEC's September 30, 2019 settlement with Block.one reflected the SEC's "Framework" for analyzing whether digital assets, and in particular ERC-20 tokens, constitute securities. Consistent with that Framework, the SEC determined that EOS tokens are securities and that Block.one had violated the Securities Act by failing to register them. Accordingly, the derivatives of EOS offered and sold by BitMEX are also securities.

**b.    Status (SNT)**

117.    Status's SNT token ICO has been widely reported as one of the largest ICOs to date, having raised over $100 million in assets from the sale of unregistered SNT tokens over a 24-hour period from June 20 to June 21, 2017.

118.    Derivatives of SNT tokens were listed on BitMEX since as early as June 8, 2017.

119.    Status made statements suggesting that SNT tokens were similar to Bitcoin, Ethereum, and other cryptocurrencies. For example, the SNT whitepaper asserted that SNT was "[i]nspired by one of Satoshi Nakamoto's original suggested use cases for Bitcoin"; "organized

around smart contracts running on Ethereum"; "the first ever mobile Ethereum client," which "connects directly to the Ethereum network"; and that "Status and Ethereum provide the foundation necessary to give all stakeholders in a socioeconomic network equal footing."  In addition, the SNT whitepaper asserted that "the Status mobile Ethereum client" was "well suited for mass adoption," and that the "core team and the Status community are committed to ensuring that the SNT token adds value to the platform and drives network effects."

120.    At the time of the SNT ICO, Status took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked.  With representations that SNT would be similar to other crypto-assets, many individuals were unaware that SNT tokens had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all SNT tokens were issued by Status at creation at very little economic cost—and enormous potential upside—to the Status founders, Jarrad Hope and Carl Bennetts.

121.    The creation of SNT tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which SNT tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that SNT was something other than a security, when it was a security.

122.    Investors purchased SNT tokens with the reasonable expectation that they would make a profit.

123.    SNT token holders stood to share in potential profits from the successful launch of the SNT token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the SNT ecosystem.

124.    Investors' profits were to be derived from the managerial efforts of others—Status, its co-founders, Hope and Bennetts, and the Status development team.  Investors in SNT relied on the managerial and entrepreneurial efforts of Status and its executive and development team to manage and develop the SNT software.  Indeed, both Hope's and Bennett's biographies were featured in the Status whitepaper and were held out to be integral parts of the success of SNT.  The whitepaper emphasized that "Carl and Jarrad, the co-founders of Status, have had a working relationship for 6 years on various projects, and 3 of those years were spent operating a software distribution network, driving over 20 million installs to various software offerings, the profits of which were used to fund Status and our team of 10 until this point.  During the operation of this business we were uniquely positioned to see firsthand how personal data on the internet is bought and sold and how users are acquired and retained."

125.    Investors in SNT thus reasonably expected Status, co-founders Hope and Bennetts, and Status's development team to provide significant managerial efforts after SNT's launch.

126.    The expertise of the issuers was critical in monitoring the operation of SNT, promoting SNT, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The SNT protocol and governance structure were predetermined before the ICO was launched.

127.    Accordingly, under the SEC's Framework, the SNT token, and thus BitMEX's derivatives referencing it, were and are securities.

**J.   The Class Has Suffered Substantial Damages**

128.   As a direct result of Defendants' operation of an unregistered exchange selling derivatives of unregistered securities, Plaintiffs and members of the Class—many of whom are retail investors who lack the technical and financial sophistication necessary to have evaluated the risks associated with their investments in the Token Futures—have suffered significant damages in an amount to be proven at trial.

129.   Many of these derivative positions lost value after they were purchased.  Plaintiffs are entitled to rescission of the transactions in which they purchased these unregistered securities.

130.   To the extent Plaintiffs still hold any Token Futures on BitMEX, they hereby demand rescission and make any necessary tender of the Token Futures.

**V.   CLASS ALLEGATIONS**

131.   Plaintiffs bring this action as a class action pursuant to Federal Rule Civil Procedure 23 and seek certification of the following Class:  All persons who purchased securities futures products tied to EOS or SNT on BitMEX in domestic U.S. transactions between June 8, 2017 and the present.  Accordingly, the Class Period is June 8, 2017 through the present.

132.   Excluded from the Class are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

133.   Plaintiffs reserve the right to amend the Class definition if investigation or discovery indicate that the definition should be narrowed, expanded, or otherwise modified.

134.   The members of the Class are so numerous that joinder of all members is impracticable.  The precise number of Class members is unknown to Plaintiffs at this time, but it is believed to be in the tens of thousands.

135.     Members of the Class are readily ascertainable and identifiable members of the Class may be identified by publicly accessible blockchain ledger information and records maintained by Defendants or its agents.  They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in securities class actions.

136.     Plaintiffs' claims are typical of the claims of the Class members as all members are similarly affected by Defendants' respective wrongful conduct in violation of the laws complained of herein.  Plaintiffs do not have any interest that is in conflict with the interests of the members of the Class.

137.     Plaintiffs and members of the Class sustained damages from Defendants' common course of unlawful conduct.

138.     Plaintiffs have fairly and adequately protected, and will continue to fairly and adequately protect, the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

139.     Plaintiffs seek declaratory relief for themselves and the Class, asking the Court to declare their purchase agreements with BitMEX void, such that prosecuting separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for BitMEX; and BitMEX has acted on grounds that apply generally to the Class, so that the declaratory relief is appropriate respecting the Class as a whole.

140.     Common questions and answers of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including but not limited to the following:

- Whether the Tokens, and BitMEX's Token Futures, are securities under federal and state law;

- Whether BitMEX operated as an unregistered exchange;

- Whether BitMEX operated as an unregistered broker-dealer;

- Whether BitMEX offered or sold Token Futures to members of the Class;

- Whether the members of the Class suffered damages as a result of Defendants' conduct in violation of federal and state law; and

- Whether the Class members are entitled to void their purchase agreements with BitMEX and to recover the monies they paid thereunder.

141.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by some of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

142.   There will be no difficulty in the management of this action as a class action.

**<u>FIRST CAUSE OF ACTION</u>**
**Unregistered Offer and Sale of Securities**
**Sections 5 and 12(a)(1) of the Securities Act**
**(BitMEX)**

143.   Plaintiffs reallege the allegations above.

144.   Section 5(a) of the Securities Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of

transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

145.    Section 5(c) of the Securities Act states:  "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title."  *Id.* § 77e(c).

146.    When issued, the Tokens were and are securities within the meaning of Section 2(a)(1) of the Securities Act, *id.* § 77b(a)(1).  BitMEX's Token Futures also were and are securities as defined by Section 77b(1).  BitMEX promoted, solicited, or sold purchases of Token Futures from Plaintiffs and members of the Class.  BitMEX thus directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities derivative products, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.  No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

147.    Section 12(a)(1) of the Securities Act provides in relevant part:  "Any person who offers or sells a security in violation of Section 77e of this title . . . shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security

with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id.* § 77*l*(a)(1).

148.    Accordingly, BitMEX has violated Sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§ 77e(a), 77e(c), and 77*l*(a)(1).

149.    Plaintiffs and the Class seek rescissory damages on purchases of any Token Futures through BitMEX in domestic U.S. transactions within the last three years and within one year from when an investor could adequately plead that a Token Future is a security. *Id.* § 77m.

**SECOND CAUSE OF ACTION**
**Contracts With an Unregistered Exchange**
**Sections 5, 6, and 29(b) of the Exchange Act**
**(BitMEX)**

150.    Plaintiffs reallege the allegations above.

151.    In relevant part, Section 5 of the Exchange Act makes it unlawful "for any . . . exchange, directly or indirectly, to make use of . . . any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security . . . unless such exchange (1) is registered as national securities exchange under Section 78f of this title, or (2) is exempted from such registration."  15 U.S.C. § 78e.  An "exchange" is any entity that "constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities."  17 C.F.R. § 240.3b-16.

152.    BitMEX has made use of means and instrumentalities of interstate commerce for the purpose of using a facility of an exchange within and subject to the jurisdiction of the United States throughout the Class Period, including because BitMEX has operated as an exchange throughout the Class Period through the utilization of the Internet within, and multiple servers throughout, the United States.

42

153.    BitMEX has thus made use of such means and instrumentality without being registered as national securities exchange under Section 78f and without any exemption from such registration requirement.

154.    In the course of operating as an unregistered exchange within and subject to the jurisdiction of the United States, BitMEX has entered into contracts with the members of the Class pursuant to which the members purchased Token Futures through BitMEX and paid BitMEX fees for the use of its exchange.  The parties to these contracts thus reached an agreement whereby and pursuant to which BitMEX was operating in violation of Section 5 of the Exchange Act, and whereby and pursuant to which these parties were continuing a practice in violation of Section 5 of the Exchange Act.

155.    The foregoing contracts were made in violation of Section 5 of the Exchange Act, and their performance involves the violation of Section 5, and the continuation of a practice in violation of Section 5, because BitMEX entered into them for the purpose of operating, and as operating, as an unlicensed exchange in violation of Section 5; and because the parties to the contracts reached agreements whereby and pursuant to which BitMEX would be and was operating in violation of Section 5.

156.    Additionally, Section 6 of the Exchange Act states, "It shall be unlawful for any person to effect transactions in security futures products that are not listed on a national securities exchange or a national securities association registered pursuant to Section 78o-3(a) of this title." 15 U.S.C. § 78f (h)(1).  None of the assets on which the Token Futures were based were listed on a national securities exchange or a national securities association.  Defendants accordingly violated Section 6 in effecting these transactions.

157.     Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter . . . and every contract (including any contract for listing a security on an exchange) . . . the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, . . . shall have made or engaged in the performance of such contract." *Id.* § 78cc.

158.     Section 29(b) affords Plaintiffs and the Class the right, which they hereby pursue, to void their purchase agreements with BitMEX and to recover, as rescissory damages, the fees they have paid under those contracts.

159.     Plaintiffs and the Class seek to void contracts and recover damages for purchases of Token Futures through BitMEX in domestic U.S. transactions within the last three years and within one year from when an investor could adequately plead that a Token Future is a security. *Id.* § 78cc(b).

**THIRD CAUSE OF ACTION**
**Unregistered Broker and Dealer**
**Sections 15(a)(1) and 29(b) of the Exchange Act**
**(BitMEX)**

160.     Plaintiffs reallege the allegations above.

161.     In relevant part, with respect to a broker or dealer who is engaged in interstate commerce in using the facility of an exchange, Section 15(a)(1) of the Exchange Act makes it unlawful "for any broker or dealer . . . to make use of . . . any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance with subsection (b) of this section."  15 U.S.C. § 78o(a)(1).

162.    As a broker-dealer engaged in interstate commerce using the facility of an exchange, and without being registered in accordance with subsection (b) of Section 15 of the Exchange Act, throughout the Class Period, BitMEX has made use of means and instrumentalities of interstate commerce to effect transactions in, and to induce or attempt to induce the purchase or sale of, securities.

163.    A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others." *Id.* § 78(a)(4)(A).  In addition, an entity is a broker if it assists issuers with structuring a securities offering, identifies potential purchasers, or advertises a securities offering.  BitMEX has operated as a broker during the Class Period by facilitating the sale of derivatives referencing digital assets, including by marketing the derivatives, creating derivatives contracts, and making margin calls and liquidating positions for traders.

164.    In the course of operating as an unregistered broker-dealer BitMEX has entered into contracts with the members of the Class pursuant to which the members purchased Token Futures through BitMEX and paid BitMEX fees for the use of its exchange.  The parties to these contracts thus reached an agreement whereby and pursuant to which BitMEX was operating in violation of Section 15(a)(1) of the Exchange Act.

165.    The foregoing contracts were made in violation of Section 5 of the Exchange Act, and their performance involves the violation of Section 5, and the continuation of a practice in violation of Section 5, because BitMEX entered into them for the purpose of operating, and as operating, as an unlicensed exchange in violation of Section 5; and because the parties to the contracts reached agreements whereby and pursuant to which BitMEX would be and was operating in violation of Section 5.

166.    Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter … and every contract (including any contract for listing a security on an exchange) … the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, . . . shall have made or engaged in the performance of such contract." *Id.* § 78cc.

167.    Section 29(b) affords Plaintiffs and the Class the right, which they hereby pursue, to void their purchase agreements with BitMEX and to recover, as rescissory damages, the fees they have paid under those contracts.

168.    Plaintiffs and the Class seek to void contracts and recover damages for purchases of Token Futures through BitMEX in domestic U.S. transactions within the last three years and within one year from when an investor could adequately plead that a Token Future is a security. *Id.* § 78cc(b).

**FOURTH CAUSE OF ACTION**
**Control Person Liability for Violations of**
**Sections 5 and 12(a)(1) of the Securities Act**
**(Arthur Hayes, Ben Delo, and Samuel Reed)**

169.    Plaintiffs reallege the allegations above.

170.    This Count is asserted against Arthur Hayes, Ben Delo, and Samuel Reed (the "Individual Defendants") for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o.

171.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, had the power and authority to direct the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained

of herein.  Each Individual Defendant had and exercised the power and influence to cause the unlawful solicitation of various ERC-20 tokens as described herein.

172.    The Individual Defendants have the power to direct or cause the direction of the management and policies of BitMEX.

173.    The Individual Defendants, separately or together, have sufficient influence to have caused BitMEX to solicit transactions of securities.

174.    The Individual Defendants, separately or together, jointly participated in, and/or aided and abetted, BitMEX's solicitation of securities.

175.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages suffered.

**FIFTH CAUSE OF ACTION**
**Control Person Liability for Violations of**
**Section 20 of the Exchange Act**
**(Arthur Hayes, Ben Delo, and Samuel Reed)**

176.    Plaintiffs reallege the allegations above.

177.    This Count is asserted against the Individual Defendants for violations of Section 20 of the Exchange Act, 15 U.S.C. § 78t(a).

178.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, had the power and authority to direct the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein.  Each Individual Defendant had and exercised the power and influence to cause the unlawful sales of securities on an unregistered exchange as described herein.

179.    The Individual Defendants have the power to direct or cause the direction of the management and policies of BitMEX.

180.    The Individual Defendants, separately or together, have sufficient influence to have either caused BitMEX to register as an exchange or prevented BitMEX from effecting transactions of securities as an unregistered exchange.

181.    The Individual Defendants, separately or together, jointly participated in, and/or aided and abetted, BitMEX's failure to register as an exchange and BitMEX's offer of securities on an unregistered exchange.

182.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages suffered.

**SIXTH CAUSE OF ACTION**
**Unregistered Offer and Sale of Securities**
**N.J. Stat. Ann. § 49:3-71**
**(BitMEX)**

183.    Plaintiffs reallege the allegations above.

184.    The New Jersey Uniform Securities Law forbids the offer or sale of unregistered securities.  N.J. Stat. Ann. § 49:3-60.  Any person who unlawfully offers or sells an unregistered security is liable to the purchaser for "the consideration paid for the security …, together with interest set at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey from the date of payment of the consideration for the . . . security, and costs, less the amount of any income received on the security, upon the tender of the security and any income received from … the security, or for damages if he no longer owns the security."  *Id.* § 49:3-71(a)(1), (c).

185.    When issued, the Token Futures were securities within the meaning of N.J. Stat. Ann. § 49:3-49(m).  BitMEX sold or solicited purchases of the Token Futures to Plaintiffs and members of the Class.  The Token Futures were neither registered as required under the New Jersey Uniform Securities Law nor subject to any exemption from registration.

186.    The Token Futures were offered or sold in the State of New Jersey, including without limitation through solicitations directed by BitMEX to New Jersey and received in New Jersey.

187.    Accordingly, BitMEX has violated the New Jersey Uniform Securities Law through BitMEX's sale of unregistered securities.

188.    Neither Plaintiffs nor any Class member received, at a time when they owned any Token Futures, a written offer to refund the consideration paid, together with interest at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey at the time the offer was made, from the date of payment, less the amount of any income received on the security, and failed to accept the offer within 30 days of its receipt. Neither Plaintiffs nor any Class member received such an offer at a time when they did not own the security and failed to reject the offer in writing within 30 days of its receipt.

189.    Plaintiffs and Class members who own Token Futures hereby make any necessary tender and seek the consideration paid for any Token Futures purchased on BitMEX in the last two years, together with interest set at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey from the date of payment of the consideration for the Token Futures, and costs, less the amount of any income received on the security; together with all other remedies available to them.

190.    Plaintiffs and Class members who no longer own Token Futures seek damages for purchases of Token Futures on BitMEX within the last two years, in the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it, together with interest at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey from the date of disposition, and costs, and all other remedies available to them.

**SEVENTH CAUSE OF ACTION**
**Control Person Liability for Unregistered Offer and Sale of Securities**
**N.J. Stat. Ann. § 49:3-71**
**(Arthur Hayes, Ben Delo, and Samuel Reed)**

191.    Plaintiffs reallege the allegations above.

192.    Every person who directly or indirectly controls a seller liable under the New Jersey Uniform Securities Law for unlawfully selling unregistered securities, as well as "every partner, officer, or director of such a seller, . . . every person occupying a similar status or performing similar functions, every employee of such a seller . . . who materially aids in the sale or in the conduct giving rise to the liability, and every broker-dealer, investment adviser, investment adviser representative or agent who materially aids in the sale or conduct" is jointly and severally liable with and to the same extent as the seller, "unless the nonseller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts . . . which give rise to liability."  N.J. Stat. Ann. § 49:3-71(d).

193.    When issued, the Token Futures were securities within the meaning of N.J. Stat. Ann. § 49:3-49(m).  BitMEX sold or solicited purchases of the Token Futures to Plaintiffs and members of the Class.  The Token Futures were neither registered as required under the New Jersey Uniform Securities Law nor subject to any exemption from registration.

194.    The Token Futures were offered or sold in the State of New Jersey, including without limitation through solicitations directed by BitMEX to New Jersey and received in New Jersey.

195.    Each of the Individual Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein.  Each Individual Defendant had and exercised the power and influence to cause the unlawful sales of unregistered securities as described herein.

196.    Accordingly, the Individual Defendants, as persons who indirectly or directly controlled BitMEX, have violated the New Jersey Uniform Securities Law through BitMEX's sale of unregistered securities.

197.    Neither Plaintiffs nor any Class member received, at a time when they owned any Token Futures, a written offer to refund the consideration paid, together with interest at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey at the time the offer was made, from the date of payment, less the amount of any income received on the security, and failed to accept the offer within 30 days of its receipt. Neither Plaintiffs nor any Class member received such an offer at a time when they did not own the security and failed to reject the offer in writing within 30 days of its receipt.

198.    Plaintiffs and Class members who own Token Futures hereby make any necessary tender and seek the consideration paid for any Token Futures purchased on BitMEX in the last two years, together with interest set at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey from the date of payment of the

consideration for the Token Futures, and costs, less the amount of any income received on the security; together with all other remedies available to them.

199.    Plaintiffs and Class members who no longer own Token Futures seek damages for purchases of Token Futures through BitMEX within the last two years, in the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it, together with interest at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey from the date of disposition, and costs, and all other remedies available to them.

**EIGHTH CAUSE OF ACTION**
**Unregistered Offer and Sale of Securities**
**Tex. Rev. Civ. Stat. art. 581-33**
**(BitMEX)**

200.    Plaintiffs reallege the allegations above.

201.    The Texas Securities Act forbids the offer or sale of unregistered securities.  Tex. Rev. Civ. Stat. art. 581-7(A)(1).  Any person who unlawfully offers or sells an unregistered security "is liable to the person buying the security from him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security."  *Id.* art. 581-33(A)(1).

202.    When issued, the Token Futures were securities within the meaning of Tex. Rev. Civ. Stat. art. 581-4(A).  BitMEX sold or solicited purchases of the Tokens to Plaintiffs and members of the Class.  The Token Futures were neither registered as required under the Texas Securities Act nor subject to any exemption from registration.

203.    The Token Futures were offered or sold in the State of Texas, including without limitation through solicitations directed by BitMEX to Texas and received in Texas.

204.    Accordingly, BitMEX has violated the Texas Securities Act through BitMEX's sale of unregistered securities.

205.    Neither Plaintiffs nor any Class members have received a rescission offer to refund the consideration paid for the Tokens that also meets the requirements of Tex. Rev. Civ. Stat. Ann. art. 581-33(I).

206.    Plaintiffs and Class members who own Token Futures hereby make any necessary tender and seek the consideration paid for any Token Futures purchased on BitMEX in the last three years plus interest thereon at the legal rate from the date of payment, less the amount of any income received on the Token Futures, costs, and reasonable attorneys' fees if the court finds that the recovery would be equitable in the circumstances; together with all other remedies available to them.

207.    Plaintiffs and Class members who no longer own Token Futures seek damages for purchases of Token Futures on BitMEX within the last three years, in the amount of the consideration the buyer paid for the Tokens plus interest thereon at the legal rate from the date of payment by the buyer, less the greater of:  (i) the value of the Token Futures at the time the buyer disposed of them plus the amount of any income the buyer received on the Token Futures; or (ii) the actual consideration received for the Token Futures at the time the buyer disposed of them plus the amount of any income the buyer received on the Tokens; together with costs, reasonable attorneys' fees if the court finds that the recovery would be equitable in the circumstances, and all other remedies available to them.

**NINTH CAUSE OF ACTION**
**Control Person Liability for Unregistered Offer and Sale of Securities**
**Tex. Rev. Civ. Stat. art. 581-33**
**(Arthur Hayes, Ben Delo, and Samuel Reed)**

208.    Plaintiffs reallege the allegations above.

209.    Every person who directly or indirectly controls a seller liable under the Texas Securities Act for unlawfully selling unregistered securities is jointly and severally liable with and to the same extent as the seller, unless the controlling person "sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."  Tex. Rev. Civ. Stat. art. 581-33(F).

210.    When issued, the Token Futures were securities within the meaning of Tex. Rev. Civ. Stat. art. 581-4(A).  BitMEX sold or solicited purchases of the Token Futures to Plaintiffs and members of the Class.  The Token Futures were neither registered as required under the Texas Securities Act nor subject to any exemption from registration.

211.    The Token Futures were offered or sold in the State of Texas, including without limitation through solicitations directed by BitMEX to Texas and received in Texas.

212.    Each of the Individual Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein.  Each Individual Defendant had and exercised the power and influence to cause the unlawful sales of unregistered securities as described herein.

213.    Accordingly, the Individual Defendants, as persons who indirectly or directly controlled BitMEX, have violated the Texas Securities Act through BitMEX's sale of unregistered securities.

214.    Neither Plaintiffs nor any Class members have received a rescission offer to refund the consideration paid for the Token Futures that also meets the requirements of Tex. Rev. Civ. Stat. Ann. art. 581-33(I).

215.    Plaintiffs and Class members who own Token Futures hereby make any necessary tender and seek the consideration paid for any Token Futures purchased on BitMEX in the last three years plus interest thereon at the legal rate from the date of payment, less the amount of any income received on the Token Futures, costs, and reasonable attorneys' fees if the Court finds that the recovery would be equitable in the circumstances; together with all other remedies available to them.

216.    Plaintiffs and Class members who no longer own Token Futures seek damages for purchases of Token Futures on BitMEX within the last three years, in the amount of the consideration the buyer paid for the Token Futures plus interest thereon at the legal rate from the date of payment by the buyer, less the greater of:  (i) the value of the Token Futures at the time the buyer disposed of them plus the amount of any income the buyer received on the Token Futures; or (ii) the actual consideration received for the Token Futures at the time the buyer disposed of them plus the amount of any income the buyer received on the Token Futures; together with costs, reasonable attorneys' fees if the Court finds that the recovery would be equitable in the circumstances, and all other remedies available to them.

## **PRAYER FOR RELIEF**

217.    On behalf of themselves and the Class, Plaintiffs request relief as follows:

(a) That the Court determines that this action may be maintained as a class action, that Plaintiffs be named as Class Representatives of the Class, that the undersigned be named as Lead Class Counsel of the Class, and that notice of this action be given to Class members;

(b) That the Court enter an order declaring that Defendants' actions, as set forth in this Amended Complaint, violate the federal and state laws set forth above;

(c) That the Court award Plaintiffs and the Class damages in an amount to be determined at trial;

(d) That the Court issue appropriate equitable and any other relief against Defendants to which Plaintiffs and the Class are entitled, including a declaration that the purchase agreements between each member of the Class and BitMEX are void;

(e) That the Court award Plaintiffs and the Class pre- and post-judgment interest (including pursuant to statutory rates of interest set under State law);

(f) That the Court award Plaintiffs and the Class their reasonable attorneys' fees and costs of suit; and

(g) That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

## **JURY TRIAL**

218.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a trial by jury for all claims.

Dated:      April 23, 2020
            New York, New York

                                    Respectfully submitted,

/s/ Philippe Z. Selendy              /s/ Kyle W. Roche
Philippe Z. Selendy                  Kyle W. Roche
Jordan A. Goldstein                  Edward Normand
Joshua Margolin                      Velvel (Devin) Freedman (*pro hac pending*)
Mitchell Nobel                       Joseph M. Delich
SELENDY & GAY, PLLC                  Richard R. Cipolla (*admission pending*)
1290 Sixth Avenue, 17th Floor        ROCHE CYRULNIK
New York, NY 10104                      FREEDMAN LLP
pselendy@selendygay.com              99 Park Avenue, 19th Floor
jgoldstein@selendygay.com            New York, NY 10016
jmargolin@selendygay.com             kyle@rcfllp.com
mnobel@selendygay.com                tnormand@rcfllp.com
                                     vel@rcfllp.com
                                     jdelich@rcfllp.com
                                     rcipolla@rcfllp.com