**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHASE WILLIAMS, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>    v.<br><br>HDR GLOBAL TRADING LIMITED, ABS GLOBAL TRADING LIMITED, 100X HOLDINGS LIMITED, SHINE EFFORT INC LIMITED, HDR GLOBAL SERVICES (BERMUDA), ARTHUR HAYES, BEN DELO, and SAMUEL REED,<br><br>     Defendants. | No. 1:20-cv-02805-ALC<br><br>**JURY DEMANDED** |

## SECOND AMENDED CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

I.      INTRODUCTION ..................................................................................................1

II.     PARTIES ..............................................................................................................7

        A.      Plaintiff ....................................................................................................7

        B.      Defendants ...............................................................................................7

III.    JURISDICTION AND VENUE ..........................................................................10

IV.     FACTUAL ALLEGATIONS ..............................................................................13

        A.      The First Crypto-Asset: Bitcoin ............................................................13

        B.      Ethereum ................................................................................................15

        C.      ERC-20 Tokens.......................................................................................16

        D.      The Advent Of The "ICO"......................................................................17

        E.      The Token Futures BitMEX Offered And Sold Reference And Derive
                Their Value From Securities And Are Therefore Securities Themselves ............19

        F.      BitMEX Actively Solicited And Sold Token Futures Referencing ERC-20
                Tokens Throughout the Class Period....................................................20

        G.      Because of Defendants' and Issuers' Efforts, Investors Would Not
                Reasonably Have Understood Prior To April 3, 2019, At The Earliest,
                That The Tokens Were Securities, And Therefore That The Tokens and
                Token Futures Were Securities ...............................................................25

        H.      The Tokens Are Securities.......................................................................28

                1.      ERC-20 Investors Invested Money............................................29

                2.      ERC-20 Investors Participated In A Common Enterprise .........30

                3.      Investors Purchased The Tokens With A Reasonable Expectation
                        Of Profits From Owning Them...............................................31

                4.      Investors Expected Profits From The Tokens To Be Derived From
                        The Managerial Efforts Of Issuers........................................34

        I.      Each Token Is A Security .......................................................................39

       1.     EOS ................................................................................................39

       2.     Status (SNT)..............................................................................42

   J.     BitMEX is a Domestic Securities Exchange ...........................................44

   K.     The Class Has Suffered Substantial Damages ........................................49

V.    DEFENDANTS' AND ISSUERS' CONCEALMENT OF THEIR MISCONDUCT PREVENTED PLAINTIFF AND MEMBERS OF THE CLASS FROM BRINGING A CLAIM AT THE TIME THE EVENTS OCCURRED ...............49

VI.   CLASS ALLEGATIONS .........................................................................51

VII.  CAUSES OF ACTION...........................................................................53

FIRST CAUSE OF ACTION (SECURITIES ACT – PRIMARY LIABILITY).........................53

SECOND CAUSE OF ACTION (EXCHANGE ACT – PRIMARY LIABILITY).....................55

THIRD CAUSE OF ACTION (EXCHANGE ACT – PRIMARY LIABILITY) .........................57

FOURTH CAUSE OF ACTION (SECURITIES ACT – ADDITIONAL LIABILITY) ..............59

FIFTH CAUSE OF ACTION (EXCHANGE ACT – ADDITIONAL LIABILITY)...................60

SIXTH CAUSE OF ACTION (ALABAMA STATE LAW – PRIMARY LIABILITY).............61

SEVENTH CAUSE OF ACTION (ALABAMA STATE LAW – PRIMARY LIABILITY) ..............................................................................................62

EIGHTH CAUSE OF ACTION (ALABAMA STATE LAW – ADDITIONAL LIABILITY) ..............................................................................................64

NINTH CAUSE OF ACTION (ALASKA STATE LAW – PRIMARY LIABILITY) ...............65

TENTH CAUSE OF ACTION (ALASKA STATE LAW – PRIMARY LIABILITY)...............66

ELEVENTH CAUSE OF ACTION (ALASKA STATE LAW – ADDITIONAL LIABILITY) ..............................................................................................68

TWELFTH CAUSE OF ACTION (ARIZONA STATE LAW – PRIMARY LIABILITY) ........70

THIRTEENTH CAUSE OF ACTION (ARIZONA STATE LAW – PRIMARY LIABILITY) ..............................................................................................71

FOURTEENTH CAUSE OF ACTION (ARIZONA STATE LAW – ADDITIONAL LIABILITY) ..............................................................................................72

FIFTEENTH CAUSE OF ACTION (ARKANSAS STATE LAW – PRIMARY LIABILITY) ............................................................................................73

SIXTEENTH CAUSE OF ACTION (ARKANSAS STATE LAW – PRIMARY LIABILITY) ............................................................................................75

SEVENTEENTH CAUSE OF ACTION (ARKANSAS STATE LAW – ADDITIONAL LIABILITY) ............................................................................................76

EIGHTEENTH CAUSE OF ACTION (CALIFORNIA STATE LAW – PRIMARY LIABILITY) ............................................................................................78

NINETEENTH CAUSE OF ACTION (CALIFORNIA STATE LAW – PRIMARY LIABILITY) ............................................................................................79

TWENTIETH CAUSE OF ACTION (CALIFORNIA STATE LAW – ADDITIONAL LIABILITY) ............................................................................................80

TWENTY-FIRST CAUSE OF ACTION (COLORADO STATE LAW – PRIMARY LIABILITY) ............................................................................................82

TWENTY-SECOND CAUSE OF ACTION (COLORADO STATE LAW – PRIMARY LIABILITY) ............................................................................................83

TWENTY-THIRD CAUSE OF ACTION (COLORADO STATE LAW – ADDITIONAL LIABILITY) ............................................................................................84

TWENTY-FOURTH CAUSE OF ACTION (CONNECTICUT STATE LAW – PRIMARY LIABILITY) ............................................................................................86

TWENTY-FIFTH CAUSE OF ACTION (CONNECTICUT STATE LAW – PRIMARY LIABILITY) ............................................................................................87

TWENTY-SIXTH CAUSE OF ACTION (CONNECTICUT STATE LAW – ADDITIONAL LIABILITY) ............................................................................................89

TWENTY-SEVENTH CAUSE OF ACTION (DELAWARE STATE LAW – PRIMARY LIABILITY) ............................................................................................90

TWENTY-EIGHTH CAUSE OF ACTION (DELAWARE STATE LAW – ADDITIONAL LIABILITY) ............................................................................................92

TWENTY-NINTH CAUSE OF ACTION (DISTRICT OF COLUMBIA LAW – PRIMARY LIABILITY) ............................................................................................93

THIRTIETH CAUSE OF ACTION (DISTRICT OF COLUMBIA LAW – PRIMARY LIABILITY) ............................................................................................94

THIRTY-FIRST CAUSE OF ACTION (DISTRICT OF COLUMBIA LAW – ADDITIONAL LIABILITY)............................................................................96

THIRTY-SECOND CAUSE OF ACTION (FLORIDA STATE LAW – PRIMARY LIABILITY) .................................................................................................97

THIRTY-THIRD CAUSE OF ACTION (FLORIDA STATE LAW – PRIMARY LIABILITY) .................................................................................................99

THIRTY-FOURTH CAUSE OF ACTION (FLORIDA STATE LAW – ADDITIONAL LIABILITY) ...........................................................................100

THIRTY-FIFTH CAUSE OF ACTION (GEORGIA STATE LAW – PRIMARY LIABILITY) ...............................................................................................101

THIRTY-SIXTH CAUSE OF ACTION (GEORGIA STATE LAW – PRIMARY LIABILITY) ...............................................................................................103

THIRTY-SEVENTH CAUSE OF ACTION (GEORGIA STATE LAW – ADDITIONAL LIABILITY) ...........................................................................104

THIRTY-EIGHTH CAUSE OF ACTION (HAWAII STATE LAW – PRIMARY LIABILITY) ...............................................................................................106

THIRTY-NINTH CAUSE OF ACTION (HAWAII STATE LAW – PRIMARY LIABILITY) ...............................................................................................107

FORTIETH CAUSE OF ACTION (HAWAII STATE LAW – ADDITIONAL LIABILITY) ...............................................................................................108

FORTY-FIRST CAUSE OF ACTION (IDAHO STATE LAW – PRIMARY LIABILITY) ...............................................................................................110

FORTY-SECOND CAUSE OF ACTION (IDAHO STATE LAW – PRIMARY LIABILITY) ...............................................................................................111

FORTY-THIRD CAUSE OF ACTION (IDAHO STATE LAW – ADDITIONAL LIABILITY) ...............................................................................................112

FORTY-FORTH CAUSE OF ACTION (ILLINOIS STATE LAW – PRIMARY LIABILITY) ...............................................................................................114

FORTY-FIFTH CAUSE OF ACTION (ILLINOIS STATE LAW – PRIMARY LIABILITY) ...............................................................................................116

FORTY-SIXTH CAUSE OF ACTION (ILLINOIS STATE LAW – ADDITIONAL LIABILITY) ...............................................................................................117

FORTY-SEVENTH CAUSE OF ACTION (INDIANA STATE LAW – PRIMARY
LIABILITY) .................................................................................................120

FORTY-EIGHTH CAUSE OF ACTION (INDIANA STATE LAW – PRIMARY
LIABILITY) .................................................................................................121

FORTY-NINTH CAUSE OF ACTION (INDIANA STATE LAW – ADDITIONAL
LIABILITY) .................................................................................................122

FIFTIETH CAUSE OF ACTION (IOWA STATE LAW – PRIMARY LIABILITY)...............124

FIFTY-FIRSTTH CAUSE OF ACTION (IOWA STATE LAW – PRIMARY
LIABILITY) .................................................................................................125

FIFTY-SECOND CAUSE OF ACTION (IOWA STATE LAW – ADDITIONAL
LIABILITY) .................................................................................................126

FIFTY-THIRD CAUSE OF ACTION (KANSAS STATE LAW – PRIMARY
LIABILITY) .................................................................................................128

FIFTY-FOURTH CAUSE OF ACTION (KANSAS STATE LAW – PRIMARY
LIABILITY) .................................................................................................129

FIFTY-FIFTH CAUSE OF ACTION (KANSAS STATE LAW – ADDITIONAL
LIABILITY) .................................................................................................130

FIFTY-SIXTH CAUSE OF ACTION (KENTUCKY STATE LAW – PRIMARY
LIABILITY) .................................................................................................132

FIFTY-SEVENTH CAUSE OF ACTION (KENTUCKY STATE LAW – PRIMARY
LIABILITY) .................................................................................................133

FIFTY-EIGHTH CAUSE OF ACTION (KENTUCKY STATE LAW – ADDITIONAL
LIABILITY) .................................................................................................135

FIFTY-NINTH CAUSE OF ACTION (LOUISIANA STATE LAW – PRIMARY
LIABILITY) .................................................................................................136

SIXTIETH CAUSE OF ACTION (LOUISIANA STATE LAW – PRIMARY
LIABILITY) .................................................................................................138

SIXTY-FIRST CAUSE OF ACTION (LOUISIANA STATE LAW – ADDITIONAL
LIABILITY) .................................................................................................139

SIXTY-SECOND CAUSE OF ACTION (MAINE STATE LAW – PRIMARY
LIABILITY) .................................................................................................141

SIXTY-THIRD CAUSE OF ACTION (MAINE STATE LAW – PRIMARY
LIABILITY) .................................................................................................142

SIXTY-FOURTH CAUSE OF ACTION (MAINE STATE LAW – ADDITIONAL
    LIABILITY) ...................................................................................144

SIXTY-FIFTH CAUSE OF ACTION (MARYLAND STATE LAW – PRIMARY
    LIABILITY) ...................................................................................145

SIXTY-SIXTH CAUSE OF ACTION (MARYLAND STATE LAW – PRIMARY
    LIABILITY) ...................................................................................147

SIXTY-SEVENTH CAUSE OF ACTION (MARYLAND STATE LAW –
    ADDITIONAL LIABILITY)...............................................................148

SIXTY-EIGHTH CAUSE OF ACTION (MASSACHUSETTS STATE LAW –
    PRIMARY LIABILITY) ....................................................................150

SIXTY-NINTH CAUSE OF ACTION (MASSACHUSETTS STATE LAW –
    PRIMARY LIABILITY) ....................................................................151

SEVENIETH CAUSE OF ACTION (MASSACHUSETTS STATE LAW –
    ADDITIONAL LIABILITY)...............................................................152

SEVENTY-FIRST CAUSE OF ACTION (MICHIGAN STATE LAW – PRIMARY
    LIABILITY) ...................................................................................154

SEVENTY-SECOND CAUSE OF ACTION (MICHIGAN STATE LAW – PRIMARY
    LIABILITY) ...................................................................................155

SEVENTY-THIRD CAUSE OF ACTION (MICHIGAN STATE LAW – ADDITIONAL
    LIABILITY) ...................................................................................156

SEVENTY-FOURTH CAUSE OF ACTION (MINNESOTA STATE LAW – PRIMARY
    LIABILITY) ...................................................................................158

SEVENTY-FIFTH CAUSE OF ACTION (MINNESOTA STATE LAW – PRIMARY
    LIABILITY) ...................................................................................159

SEVENTY-SIXTH CAUSE OF ACTION (MINNESOTA STATE LAW –
    ADDITIONAL LIABILITY)...............................................................160

SEVENTY-SEVENTH CAUSE OF ACTION (MISSISSIPPI STATE LAW –
    PRIMARY LIABILITY) ....................................................................162

SEVENTY-EIGHTH CAUSE OF ACTION (MISSISSIPPI STATE LAW – PRIMARY
    LIABILITY) ...................................................................................163

SEVENTY-NINTH CAUSE OF ACTION (MISSISSIPPI STATE LAW –
    ADDITIONAL LIABILITY)...............................................................165

EIGHTIETH CAUSE OF ACTION (MISSOURI STATE LAW – PRIMARY
    LIABILITY) .................................................................................................. 167

EIGHTY-FIRST CAUSE OF ACTION (MISSOURI STATE LAW – PRIMARY
    LIABILITY) .................................................................................................. 168

EIGHTY-SECOND CAUSE OF ACTION (MISSOURI STATE LAW – ADDITIONAL
    LIABILITY) .................................................................................................. 169

EIGHTY-THIRD CAUSE OF ACTION (MONTANA STATE LAW – PRIMARY
    LIABILITY) .................................................................................................. 171

EIGHTY-FOURTH CAUSE OF ACTION (MONTANA STATE LAW – ADDITIONAL
    LIABILITY) .................................................................................................. 172

EIGHTY-FIFTH CAUSE OF ACTION (NEBRASKA STATE LAW – PRIMARY
    LIABILITY) .................................................................................................. 174

EIGHTY-SIXTH CAUSE OF ACTION (NEBRASKA STATE LAW – ADDITIONAL
    LIABILITY) .................................................................................................. 175

EIGHTY-SEVENTH CAUSE OF ACTION (NEVADA STATE LAW – PRIMARY
    LIABILITY) .................................................................................................. 176

EIGHTY-EIGHTH CAUSE OF ACTION (NEVADA STATE LAW – PRIMARY
    LIABILITY) .................................................................................................. 178

EIGHTY-NINTH CAUSE OF ACTION (NEVADA STATE LAW – ADDITIONAL
    LIABILITY) .................................................................................................. 179

NINETIETH CAUSE OF ACTION (NEW HAMPSHIRE STATE LAW – PRIMARY
    LIABILITY) .................................................................................................. 181

NINETY-FIRST CAUSE OF ACTION (NEW HAMPSHIRE STATE LAW –
    PRIMARY LIABILITY) ................................................................................ 182

NINTY-SECOND CAUSE OF ACTION (NEW HAMPSHIRE STATE LAW –
    ADDITIONAL LIABILITY) ......................................................................... 184

NINETY-THIRD CAUSE OF ACTION (NEW JERSEY STATE LAW – PRIMARY
    LIABILITY) .................................................................................................. 185

NINETY-FOURTH CAUSE OF ACTION (NEW JERSEY STATE LAW – PRIMARY
    LIABILITY) .................................................................................................. 187

NINETY-FIFTH CAUSE OF ACTION (NEW JERSEY STATE LAW – ADDITIONAL
    LIABILITY) .................................................................................................. 188

NINETY-SIXTH CAUSE OF ACTION (NEW MEXICO STATE LAW – PRIMARY LIABILITY) .................................................................................................190

NINETY-SEVENTH CAUSE OF ACTION (NEW MEXICO STATE LAW – PRIMARY LIABILITY) ........................................................................................191

NINETY-EIGHTH CAUSE OF ACTION (NEW MEXICO STATE LAW – ADDITIONAL LIABILITY)........................................................................................193

NINETY-NINTH CAUSE OF ACTION (NORTH CAROLINA STATE LAW – PRIMARY LIABILITY) ........................................................................................194

ONE HUNDREDTH CAUSE OF ACTION (NORTH CAROLINA STATE LAW – PRIMARY LIABILITY) ........................................................................................195

ONE HUNDRED AND FIRST CAUSE OF ACTION (NORTH CAROLINA STATE LAW – ADDITIONAL LIABILITY) ...............................................................197

ONE HUNDRED AND SECOND CAUSE OF ACTION (NORTH DAKOTA STATE LAW – PRIMARY LIABILITY) ...................................................................198

ONE HUNDRED AND THIRD CAUSE OF ACTION (NORTH DAKOTA STATE LAW – PRIMARY LIABILITY) ...................................................................200

ONE HUNDRED AND FOURTH CAUSE OF ACTION (NORTH DAKOTA STATE LAW – ADDITIONAL LIABILITY) ...............................................................201

ONE HUNDRED AND FIFTH CAUSE OF ACTION (OHIO STATE LAW – PRIMARY LIABILITY) ........................................................................................203

ONE HUNDRED AND SIXTH CAUSE OF ACTION (OHIO STATE LAW – PRIMARY LIABILITY) ........................................................................................204

ONE HUNDRED AND SEVENTH CAUSE OF ACTION (OHIO STATE LAW – ADDITIONAL LIABILITY)........................................................................................205

ONE HUNDRED AND EIGHTH CAUSE OF ACTION (OKLAHOMA STATE LAW – PRIMARY LIABILITY) ........................................................................206

ONE HUNDRED AND NINTH CAUSE OF ACTION (OKLAHOMA STATE LAW – PRIMARY LIABILITY) ........................................................................207

ONE HUNDRED AND TENTH CAUSE OF ACTION (OKLAHOMA STATE LAW – ADDITIONAL LIABILITY)........................................................................209

ONE HUNDRED AND ELEVENTH CAUSE OF ACTION (OREGON STATE LAW – PRIMARY LIABILITY) ........................................................................211

ONE HUNDRED AND TWELFTH CAUSE OF ACTION (OREGON STATE LAW – PRIMARY LIABILITY) ................................................................212

ONE HUNDRED AND THIRTEENTH CAUSE OF ACTION (OREGON STATE LAW – ADDITIONAL LIABILITY)...........................................................213

ONE HUNDRED AND FOURTEENTH CAUSE OF ACTION (PENNSYLVANIA STATE LAW – PRIMARY LIABILITY)..........................................215

ONE HUNDRED AND FIFTEENTH CAUSE OF ACTION (PENNSYLVANIA STATE LAW – PRIMARY LIABILITY) ........................................216

ONE HUNDRED AND SIXTEENTH CAUSE OF ACTION (PENNSYLVANIA STATE LAW – ADDITIONAL LIABILITY)...................................217

ONE HUNDRED AND SEVENTEENTH CAUSE OF ACTION (PUERTO RICO STATE LAW – PRIMARY LIABILITY)..........................................219

ONE HUNDRED AND EIGHTEENTH CAUSE OF ACTION (PUERTO RICO STATE LAW – PRIMARY LIABILITY) ........................................220

ONE HUNDRED AND NINETEENTH CAUSE OF ACTION (PUERTO RICO STATE LAW – ADDITIONAL LIABILITY) ...............................221

ONE HUNDRED AND TWENTIETH CAUSE OF ACTION (RHODE ISLAND STATE LAW – PRIMARY LIABILITY)..........................................223

ONE HUNDRED AND TWENTY-FIRST CAUSE OF ACTION (RHODE ISLAND STATE LAW – PRIMARY LIABILITY)..........................................224

ONE HUNDRED AND TWENTY-SECOND CAUSE OF ACTION (RHODE ISLAND STATE LAW – ADDITIONAL LIABILITY)...................................226

ONE HUNDRED AND TWENTY-THIRD CAUSE OF ACTION (SOUTH CAROLINA STATE LAW – PRIMARY LIABILITY)..........................................227

ONE HUNDRED AND TWENTY-FOURTH CAUSE OF ACTION (SOUTH CAROLINA STATE LAW – PRIMARY LIABILITY)..................................229

ONE HUNDRED AND TWENTY-FIFTH CAUSE OF ACTION (SOUTH CAROLINA STATE LAW – ADDITIONAL LIABILITY)...................................230

ONE HUNDRED AND TWENTY-SIXTH CAUSE OF ACTION (SOUTH DAKOTA STATE LAW – PRIMARY LIABILITY)..........................................232

ONE HUNDRED AND TWENTY-SEVENTH CAUSE OF ACTION (SOUTH DAKOTA STATE LAW – PRIMARY LIABILITY)......................................233

ONE HUNDRED AND TWENTY-EIGHTH CAUSE OF ACTION (SOUTH DAKOTA
STATE LAW – ADDITIONAL LIABILITY)..................................................................234

ONE HUNDRED AND TWENTY-NINTH CAUSE OF ACTION (TENNESSEE
STATE LAW – PRIMARY LIABILITY)........................................................................236

ONE HUNDRED AND THIRTIETH CAUSE OF ACTION (TENNESSEE STATE
LAW – PRIMARY LIABILITY).....................................................................................237

ONE HUNDRED AND THIRTY-FIRST CAUSE OF ACTION (TENNESSEE STATE
LAW – ADDITIONAL LIABILITY) ..............................................................................238

ONE HUNDRED AND THIRTY-SECOND CAUSE OF ACTION (TEXAS STATE
LAW – PRIMARY LIABILITY).....................................................................................240

ONE HUNDRED AND THIRTY-THIRD CAUSE OF ACTION (TEXAS STATE LAW
– PRIMARY LIABILITY) ..............................................................................................242

ONE HUNDRED AND THIRTY-FOURTH CAUSE OF ACTION (TEXAS STATE
LAW – ADDITIONAL LIABILITY) ..............................................................................243

ONE HUNDRED AND THIRTY-FIFTH CAUSE OF ACTION (UTAH STATE LAW –
PRIMARY LIABILITY) .................................................................................................245

ONE HUNDRED AND THIRTY-SIXTH CAUSE OF ACTION (UTAH STATE LAW –
PRIMARY LIABILITY) .................................................................................................246

ONE HUNDRED AND THIRTY-SEVENTH CAUSE OF ACTION (UTAH STATE
LAW – ADDITIONAL LIABILITY) ..............................................................................247

ONE HUNDRED AND THIRTY-EIGHTH CAUSE OF ACTION (VERMONT STATE
LAW – PRIMARY LIABILITY).....................................................................................249

ONE HUNDRED AND THIRTY-NINTH CAUSE OF ACTION (VERMONT STATE
LAW – PRIMARY LIABILITY).....................................................................................250

ONE HUNDRED AND FORTIETH CAUSE OF ACTION (VERMONT STATE LAW –
ADDITIONAL LIABILITY)...........................................................................................251

ONE HUNDRED AND FORTY-FIRST CAUSE OF ACTION (VIRGINIA STATE
LAW – PRIMARY LIABILITY).....................................................................................253

ONE HUNDRED AND FORTY-SECOND CAUSE OF ACTION (VIRGINIA STATE
LAW – PRIMARY LIABILITY).....................................................................................254

ONE HUNDRED AND FORTY-THIRD CAUSE OF ACTION (VIRGINIA STATE
LAW – ADDITIONAL LIABILITY) ..............................................................................255

ONE HUNDRED AND FORTY-FOURTH CAUSE OF ACTION (WASHINGTON STATE LAW – PRIMARY LIABILITY)........................................................257

ONE HUNDRED AND FORTY-FIFTH CAUSE OF ACTION (WASHINGTON STATE LAW – ADDITIONAL LIABILITY)...................................................258

ONE HUNDRED AND FORTY-SIXTH CAUSE OF ACTION (WEST VIRGINIA STATE LAW – PRIMARY LIABILITY)........................................................260

ONE HUNDRED AND FORTY-SEVENTH CAUSE OF ACTION (WEST VIRGINIA STATE LAW – PRIMARY LIABILITY)........................................................261

ONE HUNDRED AND FORTY-EIGHTH CAUSE OF ACTION (WEST VIRGINIA STATE LAW – ADDITIONAL LIABILITY)...................................................262

ONE HUNDRED AND FORTY-NINTH CAUSE OF ACTION (WISCONSIN STATE LAW – PRIMARY LIABILITY)......................................................264

ONE HUNDRED AND FIFTIETH CAUSE OF ACTION (WISCONSIN STATE LAW – PRIMARY LIABILITY)................................................................265

ONE HUNDRED AND FIFTY-FIRST CAUSE OF ACTION (WISCONSIN STATE LAW – ADDITIONAL LIABILITY)...............................................267

ONE HUNDRED AND FIFTY-SECOND CAUSE OF ACTION (WYOMING STATE LAW – PRIMARY LIABILITY)........................................................268

ONE HUNDRED AND FIFTY-THIRD CAUSE OF ACTION (WYOMING STATE LAW – PRIMARY LIABILITY)........................................................270

ONE HUNDRED AND FIFTH FOURTH CAUSE OF ACTION (WYOMING STATE LAW – ADDITIONAL LIABILITY)...........................................271

PRAYER FOR RELIEF ..........................................................................273

JURY TRIAL.........................................................................................274

Individually and on behalf of all others similarly situated, Plaintiff Chase Williams brings this action against Defendants HDR Global Trading Limited, ABS Global Trading Limited, 100x Holdings Limited, Shine Effort Inc Limited, HDR Global Services (Bermuda) Limited (collectively, "BitMEX"), Arthur Hayes, Ben Delo, and Samuel Reed (Hayes, Delo, and Reed collectively, the "Individual Defendants"). Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of press releases, media reports, whitepapers of the digital tokens addressed herein, and other publicly disclosed reports and information about Defendants. Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein and can be discovered after a reasonable opportunity for discovery. Plaintiff hereby alleges as follows:

I.    **INTRODUCTION**

1.    Within the Class Period, which is from June 8, 2017 through the present, BitMEX and the Individual Defendants promoted, offered and sold derivatives and security futures products on certain digital tokens (the "Token Futures"), including products that reference the tokens EOS and SNT (together, the "Tokens"), throughout the United States by means of its online exchange without registering under applicable federal and state securities laws as an exchange or broker-dealer and without a registration statement in effect as to the underlying securities. To the fullest extent subject to the U.S. securities laws, Plaintiff individually and on behalf of investors who purchased on BitMEX any of the Token Futures and continuously hold those Token Futures or sold them at a loss (the "Class") brings claims to recover the consideration he and members of the class paid for these futures products, or damages, as well as the fees they paid to BitMEX in connection with their purchases, together with interest thereon, as well as attorneys' fees and costs.

2.      BitMEX is one of the largest crypto-asset exchanges in the world, with a daily trading volume that regularly surpassed $3 billion in January 2020. BitMEX has earned over $1 billion in fees on transactions on its platform since November 2014. As of September 2020, BitMEX advertised that it had a transaction volume of $74.06 billion in the preceding 30 days and $956.83 billion in the prior year. BitMEX operates as an unregistered securities exchange that offers derivatives and security futures products on digital tokens. In its operations, BitMEX has demonstrated a flagrant disregard for the laws and regulations of the United States while at the same time targeting United States investors. This consistent disrespect for United States law led the Commodity Futures Trading Commission ("CFTC") to bring an enforcement action against it and its directors and the United States Attorney's Office for the Southern District of New York to indict its executives for their conduct at the exchange.

3.      The Token Futures reference, and derive their value from, digital tokens. A digital token is a type of digital asset that exists on a "blockchain," which is essentially a decentralized digital ledger that records transactions; these blockchain-dependent assets are sometimes referred to as "crypto-assets." Various types of crypto-assets can reside on blockchains, including crypto-assets such as Bitcoin and Ethereum, which are decentralized digital commodities. There are also so-called "smart contracts" that operate under a set of predetermined conditions agreed to by users. With smart contracts, the terms of the contract are automatically carried out by the software underlying the digital tokens (which, as relevant here, are referred to as "ERC-20 tokens" and exist on the Ethereum blockchain) when the agreed conditions are met.

4.      Certain of these digital tokens are classified as "utility tokens." Their primary purpose is to allow the holder to use or access a particular project. For example, one private-jet company has adopted a business model based on issuing utility tokens to participants in its

membership program, who can then use them to charter flights on the company's planes. A utility token presumes a functional network on which the token can be used.

5.     Other tokens are more speculative, are referred to as "security tokens," and like a traditional security essentially represent one's investment in a project that is to be undertaken with the funds raised through the sale of the tokens. Although these tokens derive their value from the startup behind the project, they are unlike traditional securities in that they do not give the holder ownership in any corporate entity. Rather, investors purchase these tokens with the hope that their value will increase in the future as the network in which the token can be used is expanded based upon the managerial efforts of the issuer and those developing the project. Because such "security tokens," including the Tokens, are properly classified as securities under federal and state law, the issuers of the Tokens (the "Issuers") were required to file registration statements with the U.S. Securities and Exchange Commission ("SEC"). As an exchange offering futures on these Tokens, BitMEX was required to register itself with the SEC. BitMEX never registered as a national exchange, nor filed any registration statements for its Token Futures. Instead, BitMEX sold Token Futures in violation of federal and state law. As a result, BitMEX and the Issuers who sold the underlying unregistered securities reaped billions of dollars in profits.

6.     The scheme worked as follows: working to capitalize on the enthusiasm for crypto-assets like bitcoin, an Issuer would announce a revolutionary digital token. This Token would typically be billed as "better," "faster," "cheaper," "more connected," "more trustworthy," and "more secure." The Issuer would then sell some of its tokens in an initial coin offering ("ICO") to a small group of investors and turn to exchanges to list the new Token, at which point these exchanges would undertake their own efforts to promote sales, and to solicit and encourage

purchases by a wide universe of investors. The Issuers would thereby raise hundreds of millions, even billions, of dollars from purchasers of the Tokens.

7.     The Issuers were generally careful to describe these Tokens both as providing some specific utility and as something other than "securities." But the vast majority of these new Tokens turned out to be empty promises. They were not "better," "faster," "cheaper," "more connected," "more trustworthy," or "more secure" than what existed in the marketplace. In reality, they often had no utility at all. The promises of new products and markets went unfulfilled, with the networks never fully developed, while investors were left holding the bag when these Tokens crashed. Indeed, most of the ERC-20 tokens created in this period are now trading at a tiny fraction of their 2017–2018 highs.

8.     Investors were provided with scant information when deciding whether to purchase a Token or Token Future. In fact, the only offering materials available to investors were "whitepapers" that would describe, in highly technical terms, the supposed utility of a Token. These whitepapers would omit, however, the robust disclosures that the securities laws and the SEC have long codified as essential to investor protections in initial public offerings, including use of "plain English" to describe the offering; a required list of key risk factors; a description of key information and incentives concerning management; warnings about relying on forward-looking statements; an explanation of how the proceeds from the offering would be used; and a standardized format that investors could readily follow. Instead, these ICOs were the "Wild West"—with investors left to fend for themselves. Without the mandatory disclosures that would have been required had these ICOs been registered with the SEC, investors could not reliably assess the representations made or the risks of their investments.

9.      In 2017 and 2018, at the height of this frenzy of activity, hundreds of ICOs raised over $20 billion with virtually no regulatory oversight or guidance to investors. Issuers and exchanges, preying on the public's lack of familiarity with the technology underpinning these tokens, characterized them as "utility tokens," even though they were in effect bets that a particular project would develop into a successful venture. In truth, the Tokens were securities under federal and state securities laws.

10.      Into this under-informed market, BitMEX sold, and profited from, these derivative products. The Token Futures allowed customers to buy an asset that would track the price of a Token at leverage that went up to 100X. BitMEX, which originated these contracts, had a strong financial incentive throughout the Class Period to solicit the sale of its Token Futures.

11.      That the Tokens on which the Token Futures are based are securities has been confirmed by recent regulatory action by the SEC. On April 3, 2019, in a "Framework for 'Investment Contract' Analysis of Digital Assets" (the "Framework"), the SEC clarified that the Tokens are "investment contracts" and therefore securities under Section 2 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77b(a)(1), and Section 3 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 77c(a)(10).[1] Prior to that time, a reasonable investor would not have concluded that these Tokens (or Token Futures) were securities that should have been registered with the SEC. But the Tokens and Token Futures are securities.

12.      The Tokens' status as securities (and therefore the Token Futures' status as securities) has been confirmed by recent regulatory action by the SEC. On September 30, 2019— nearly six months after releasing its Framework, and more than two years after the relevant ICO

---

[1] *Framework for "Investment Contract" Analysis of Digital Assets*, SEC (April 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets#_ednref1.

began—the SEC completed an investigation and found that Block.one had violated the Securities Act because it sold to the public the digital token EOS (one of the Tokens at issue in this lawsuit) without first registering it with the SEC. As a result of this SEC enforcement action, Block.one was required to pay a $24 million fine.[2] The SEC's determination that EOS was an unregistered security applies with equal force to other tokens, including SNT.

13.     BitMEX engaged in millions of transactions—including the solicitation, offer, and sale of securities—by selling the Token Futures, generating unlawful revenue from each sale. Because the Tokens were securities, the Token Futures BitMEX sold were themselves securities that needed to be registered. BitMEX did not itself register with the SEC as an exchange or broker-dealer, nor did it register the Token Futures as securities. As a result, investors were not informed of the significant risks inherent in these investments, as federal and state securities laws require.

14.     BitMEX participated in illegal solicitation and sales of Token Futures for which no registration statement was in effect, and as to which no exemption was available. BitMEX offered these Token Futures using statements posted on the Internet and distributed throughout the world, including throughout the United States, and the Token Futures were offered and sold to Plaintiff and the general public in the United States. Because these sales violated both the Securities Act and the Exchange Act, Plaintiff and the Class are entitled to recover the consideration paid for these Token Futures with interest thereon at the legal rate, or the equivalent in monetary damages plus interest at the legal rate from the date of purchase, as well as the fees they paid BitMEX on such purchases.

---

[2] Press Release, *SEC Orders Blockchain Company to Pay $24 Million Penalty for Unregistered ICO* (Sept. 30, 2019), https://www.sec.gov/news/press-release/2019-202; Block.one, Exchange Act Release No. 10714, 2019 WL 4793292 (Sept. 30, 2019).

15.     In addition, numerous Class members resided, and were present at the time they traded in the Token Futures, in States and territories that provide their own "Blue Sky" protections for investors.[3] Under these laws, investors in these jurisdictions who purchased the unregistered Token Futures are entitled to rescission or damages, and generally interest thereon, attorneys' fees, and costs.

## II.     PARTIES

### A.     Plaintiff

16.     Plaintiff Chase Williams presently resides in Houston, Texas. During the Class Period, Williams purchased, from Texas, the Token Futures on BitMEX pursuant to contracts with BitMEX. Williams' transactions on BitMEX were therefore effected in Texas. A true and correct copy of Williams' transactions in the Token Futures is set forth in Plaintiff's Certification in Support of Lead Plaintiff Motion, filed at ECF No. 39-1.

### B.     Defendants

17.     Defendant HDR Global Trading Limited ("HDR") launched in 2014; its name is an acronym of the last names of Defendants Hayes, Delo, and Reed. By January 2017, it had become, and remains, the largest crypto-asset derivatives exchange in the world, with the highest trading volume of any such futures exchange. HDR is incorporated in the Seychelles, with its principal office located at Global Gateway 8, Rue de la Perle, Providence Mahé, Seychelles. HDR is the owner of the trading platform called BitMEX and operated BitMEX out of an office in Manhattan.

---

[3] These "Blue Sky" statutes are so named because they are designed to protect investors from "speculative schemes which have no more basis than so many feet of blue sky." *Hall v. Geiger-Jones Co.*, 242 U.S. 539, 550 (1917) (internal citations omitted). Blue Sky statutes typically define "securities" to include "investment contracts," and the term "investment contracts" in each statute has been interpreted by State courts commensurate with the standard set forth by the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

In July 2020, HDR Global Trading Limited was restructured to be a subsidiary of the newly formed "100x Group."

18.     Defendant ABS Global Trading Limited ("ABS") is a Delaware corporation created in 2017 and entirely owned by HDR; its name is an acronym of the first names of Defendants Hayes, Delo, and Reed. It is registered to do business in New York. According to public records, it is headquartered at 31 Conduit Road, Flat 17B, The Morgan, Hong Kong. ABS is responsible for technical aspects of the BitMEX platform, including security services and implementing the user interface traders use to buy and sell products.

19.     Defendant 100x Holdings Limited ("100x") is a holding company incorporated by Hayes, Delo, and Reed in Bermuda. Hayes "introduc[ed]" 100x on the BitMEX website in July 2020, announcing that "100x will become the new holding structure for HDR Global Trading and all our other assets, including the BitMEX platform."

20.     Defendant Shine Effort Inc Limited ("Shine"), a Hong Kong corporation incorporated in 2014, is a subsidiary of HDR and 100x. Shine is the entity through which BitMEX conducts trading, both on its own BitMEX platform and with market participants on other exchanges.

21.     Defendant HDR Global Services (Bermuda) Limited ("HDR Services") is a Bermudian company incorporated in 2018. It employs personnel performing duties for BitMEX.

22.     Defendants ABS, HDR, 100x, Shine, and HDR Services share common ownership and directors, and refer to themselves collectively as "BitMEX." They make job postings that do not differentiate between the companies, and employees identify themselves as working for BitMEX. Each of these entities engages in sufficient marketing and technical work that necessarily touches upon every facet of BitMEX's operations.

23.     Defendant Arthur Hayes is the founder and former CEO of both HDR and ABS. Hayes is a U.S. citizen who grew up in New York and went to graduate school at the Wharton School of the University of Pennsylvania. Although he resides in Hong Kong, he frequently travels to New York to manage BitMEX's local office, to obtain investments and promote BitMEX, and to lure investors to the BitMEX platform, including by speaking at conferences in New York City such as the 2017 and 2018 Consensus Invest conferences and appearing on television programs for media outlets, including CNBC. He was indicted in October 2020 in the Southern District of New York based on his conduct at BitMEX.

24.     Defendant Samuel Reed was the Chief Technical Officer ("CTO") of both HDR and ABS and co-founded them along with Hayes and Delo. He is a U.S. citizen, and resides in United States. As the chief "front-end" designer of BitMEX's platform, responsible for its appearance, upon information and belief Defendant Reed directed key operations of ABS. In October 2020, Reed was indicted in the Southern District of New York and arrested in Massachusetts based on his conduct at BitMEX.

25.     Defendant Ben Delo co-founded both HDR and ABS with Hayes and Reed. As a mathematician, Defendant Delo is responsible for designing key trading systems implemented on the BitMEX platform. He was indicted in October 2020 in the Southern District of New York based on his conduct at BitMEX.

26.     Hayes, Reed, and Delo together controlled the operations of BitMEX. BitMEX employees who manage certain aspects of trading facility all ultimately act under the direction and control of Hayes, Delo, and Reed. Key financial and trading decisions required "Founder" approval, meaning approval by Hayes, Delo, and Reed. Hayes, Delo and Reed continued to control

BitMEX until October 8, 2020, on which they stepped back from their management responsibilities following their federal indictments.

### III.    <u>JURISDICTION AND VENUE</u>

27.    Jurisdiction of this Court is founded upon 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds the value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a State different from any defendant, and in which any member of a class of plaintiffs is a citizen of a State and any defendant is a citizen or subject of a foreign state. Because BitMEX engaged in millions of transactions in the Token Futures and extracted fees for each such transaction, the total amount in controversy from their unlawful sale of Token Futures far exceeds $5,000,000. Indeed, in just the 24 hours before the filing of the Second Amended Class Action Complaint ("Second Amended Complaint"), BitMEX publicly reported over $5,000,000 in trading volume for just one of the Token Futures.

28.    Jurisdiction of this Court is further founded upon 28 U.S.C. § 1331 because the Second Amended Complaint asserts claims under Sections 5, 12(a)(1), and 15 of the Securities Act, 15 U.S.C. §§ 77e, 77*l*(a)(1), 77o. This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

29.    Jurisdiction of this Court is also founded upon Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a), which provides that federal courts have exclusive jurisdiction over violations of the Exchange Act, including Sections 5, 15(a)(1), 20, and 29(b), 15 U.S.C. §§ 78e, 78o(a)(1), 78t, 78cc(b).

30.    This Court has jurisdiction over violations of State Blue Sky statutes pursuant to this Court's supplemental jurisdiction under 28 U.S.C. §1367(a).

31.     This Court has personal jurisdiction over Defendants as a result of acts of Defendants occurring in or aimed at the State of New York in connection with Defendants' offer or sale of unregistered securities and securities futures and failure to register with the SEC as an exchange or broker-dealer.

32.     Venue is proper pursuant to each of 15 U.S.C. § 77v(a) and 15 U.S.C. § 78aa(a) in that this is a district wherein one or more defendants is found or is an inhabitant or transacts business. Throughout most, if not all, of the Class Period, BitMEX maintained an office in Midtown Manhattan and was recruiting individuals for this office on websites such as Linkedin.com, angel.co, and builtinnyc.com. BitMEX has employed approximately half of its workforce in the U.S., including at least nine employees in New York and 56 in San Francisco. BitMEX also regularly solicited employees for positions in the New York City area, including Vice President of Marketing and Digital Marketing Manager, illustrating a clear intent to maintain a presence in, and operate from, New York in marketing itself to United States and New York residents, including members of the Class. Similarly, Greg Dwyer, BitMEX's Head of Business Development for much of the Class Period, was based in New York, along with other BitMEX employees. In September 2019, BitMEX retained the New York office of a public relations firm to popularize its platform. BitMEX employees also regularly speak and solicit business at large cryptography and blockchain conferences hosted in New York. For example, Defendant Hayes spoke at CoinDesk's annual Consensus: Invest conference in New York in 2017 and 2018 to discuss new products, and other business development employees solicited business during the 2016 event in New York. In addition, as noted above, Individual Defendants are currently under indictment in this District for their conduct at BitMEX.

33.     BitMEX also maintains a highly interactive commercial website accessible and aimed at users in the United States. BitMEX's website allows users to register an account, deposit and withdraw bitcoin, trade derivative products based on crypto-assets, review research and investing advice posted by BitMEX employees, including Defendant Hayes, contact BitMEX support, and interact with other BitMEX users through a chat application overlaying the website and thus accessible on every screen. The website also tracks the Internet Protocol ("IP") address of every user. BitMEX also uses several US-based services to maintain the website and trading platform.

34.     Although BitMEX claims to no longer allow users located within the Unites States to trade on its platform, trading from the United States is in fact both possible and common: as Defendant Hayes notes, as journalists and other commentators have explained, and as BitMEX's marketing of itself in the United States demonstrates, accessing BitMEX is trivially easy from the United States using virtual private networks that purport to mask a trader's location. BitMEX was well aware and promoted this behavior, keeping detailed records of its revenue that specifically broke out the portion attributable to United States trading as determined from location-sensitive Internet Protocol ("IP") addresses. In fact, when, during the Class Period, BitMEX itself collected information about the location of its users, it found that between 20 and 30 percent of all BitMEX users were located in the United States. Defendant Hayes would appear on New York-based television programs to market to the United States, having recognized that these appearances led to a significant number of new accounts being opened from the United States. As one example of New York residents transacting with and on behalf of BitMEX, one popular New York-based trader earned referral fees for generating 900 customer sign-ups for BitMEX using his public Twitter account. Additionally, for much of the class period, BitMEX personnel conducted BitMEX

12

operations from an office in Manhattan, New York, including customer support, business development, and marketing to customers in the United States.

## IV.    FACTUAL ALLEGATIONS

### A.    The First Crypto-Asset: Bitcoin

35.    This case involves the sale of crypto-assets, *i.e.*, digital assets designed to work as a medium of exchange, a store of value, or both. Crypto-assets leverage a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

36.    Bitcoin was the world's first decentralized crypto-asset. It is also the largest and most popular crypto-asset, with a market capitalization of approximately $672 billion. Bitcoin spawned a number of other crypto-assets that, together with bitcoin, have a current market capitalization of $990 billion. (The term "bitcoin" can refer to both a computer protocol and a unit of exchange. Accepted practice is to use the term "Bitcoin" to label the protocol and software, and the term "bitcoin" to label the units of exchange.)

37.    At its core, Bitcoin is a ledger that tracks the ownership and transfer of every bitcoin in existence. This ledger is called the blockchain.

38.    Blockchains act as the central technical commonality across most crypto-assets. While each blockchain may be subject to different technical rules and permissions based on the preferences of its creators, they are typically designed to achieve the similar goal of decentralization.

39.    Accordingly, blockchains are generally designed as a framework of incentives that encourages some people to do the work of validating transactions while allowing others to take advantage of the network. In order to ensure successful validation, those completing the validation are also required to solve a "Proof of Work" problem by expending computational resources,

which has the effect of making the blockchain more accurate and secure. For Bitcoin, those who validate the blockchain transactions and solve the "Proof of Work" program are rewarded with newly minted bitcoin. This process is colloquially referred to as "mining."

40.     Mining is one method by which an individual can acquire crypto-assets like bitcoin. A second and more common manner is to obtain crypto-assets from someone else. This is often accomplished by acquiring it through an online "crypto-asset exchange."

41.     Online crypto-asset exchanges are one place to purchase bitcoin and other crypto-assets. These exchanges are similar to traditional exchanges in that they provide a convenient marketplace to match buyers and sellers of crypto-assets.

42.     In April 2013, there were only seven crypto-assets listed on coinmartketcap.com, a popular website that tracks the crypto-asset markets. As of this filing, the site monitors more than 8,200 crypto-assets.

43.     For a time, bitcoin was the only crypto-asset available on exchanges. As crypto-assets grew in popularity, exchanges began listing other crypto-assets as well and trading volumes expanded. In early 2013, daily bitcoin trading volumes hovered between $1 million and $25 million. By the end of 2017, daily bitcoin trading volumes ranged between $200 million and $3.8 billion.

44.     Bitcoin is a commodity, rather than a security, because it allows for quick and secure transactions, can serve as a long-term store of value, and is decentralized from any government or private control. There is no "Bitcoin Inc." that has the ability to cause the price of bitcoin to rise through careful management or fall through mismanagement or deception. Instead, Bitcoin's value is purely a response to market-wide forces, and a customer buying a bitcoin is not

investing in a common enterprise. Both the CFTC and courts have accordingly recognized that Bitcoin is appropriately classified as a commodity.

### B.       Ethereum

45.      Ethereum is the second-most popular crypto-asset, with a market capitalization of approximately $133 billion as of billion as of 10:00 a.m. EST on January 15, 2021. The Ethereum blockchain functions similarly to the Bitcoin blockchain insofar as its miners act as the validators of the network. Miners of the Ethereum blockchain are paid for their services in the form of newly minted ether. (The term "Ethereum" refers to the open software platform built on top of the Ethereum blockchain, while the term "ether" is the unit of account used to exchange value within the Ethereum "ecosystem," *i.e.*, the overall network of individuals using Ethereum or participating in the development of its network. This distinction is thus similar to the "Bitcoin" versus "bitcoin" distinction noted above.) Like bitcoin, ether has been designated a commodity by the CFTC.

46.      Unlike Bitcoin's blockchain, Ethereum was designed to enable "smart contract" functionality. A smart contract is a program that verifies and enforces the negotiation or performance of a contract. Smart contracts can be self-executing and self-enforcing, which theoretically reduces the transaction costs associated with traditional contracting.

47.      As an example of how a smart contract works, consider a situation where two people want to execute a hedging contract. They each put up $1,000 worth of ether. They agree that, after a month, one of them will receive back $1,000 worth of ether at the dollar exchange rate at that time, while the other receives the rest of the ether. The rest of the ether may or may not be worth more than it was at the beginning of the month.

48.      A smart contract enables these two people to submit the ether to a secure destination and automatically distribute the ether at the end of the month without any third-party action. The

smart contract self-executes with instructions written in its code that get executed when the specified conditions are met.

49.    In order to enable widespread adoption and standardized protocols for smart contracts, the Ethereum community has created certain out-of-the-box smart contracts called Ethereum Request for Comments ("ERCs").

50.    An ERC is an application standard for a smart contract. Anyone can create an ERC and then seek support for that standard. Once an ERC is accepted by the Ethereum community, it benefits Ethereum users because it provides for uniform transactions, reduced risk, and efficient processes. This is because it allows individuals who are less technically proficient to make use of smart-contract functionality. The most widespread use of ERCs is to allow individuals to easily launch and create new digital tokens.

### C.    ERC-20 Tokens

51.    ERC-20 is an application standard that the creator of Ethereum, Vitalik Buterin, first proposed in 2015. ERC-20 is a standard that allows for the creation of smart-contract tokens on the Ethereum blockchain. These tokens are known as "ERC-20 tokens."

52.    ERC-20 tokens are built on the Ethereum blockchain, and therefore they must be exchanged on it. Accordingly, ERC-20 tokens are functionally different than crypto-assets like Bitcoin and Ethereum because they do not operate on an independent blockchain.

53.    ERC-20 tokens all function similarly by design—that is, they are compliant with the ERC-20 application standard. Some properties related to ERC-20 tokens are customizable, such as the total supply of tokens, the token's ticker symbol, and the token's name. All ERC-20 tokens transactions, however, occur over the Ethereum blockchain; none of them operates over its own blockchain.

54.    ERC-20 tokens are simple and easy to deploy. Anyone with a basic understanding of Ethereum can use the ERC-20 protocol to create her own ERC-20 tokens, which she can then distribute and make available for purchase. Even people without any technical expertise can have their own ERC-20 token created for them, which can then be marketed to investors.

### D.    The Advent Of The "ICO"

55.    Between 2014 and 2016, bitcoin's price fluctuated between $200 and $800. During this same time frame, ether's price fluctuated between roughly $1 and $10.

56.    By the end of 2016, interest in crypto-assets began to accelerate, with prices growing at a rate historically unprecedented for any asset class. Over the course of 2017 alone, bitcoin's price increased from approximately $1,000 to approximately $20,000. Ethereum's growth was even more dramatic. On January 1, 2017, Ethereum was trading at approximately $8 per ether. Approximately one year later, it was trading at over $1,400 per ether—a return of approximately 17,000 percent over that period.

57.    Seeking to capitalize on the growing enthusiasm for crypto-assets, many entrepreneurs sought to raise funds through initial coin offerings, or ICOs, including ICOs for newly created ERC-20 tokens, such as the Tokens. Many of these issuers improperly chose not to register their securities offerings with the SEC in order to save money and not "open their books" to the SEC, even though investors thereby were denied access to critical information they would have received from an SEC-registered offering. As a result, investors, including investors in digital tokens, were denied access to important information before making their investment decision.

58.    Potential purchasers were reached through various crypto-asset exchanges and social media sites that published active and upcoming ICOs.

59.    Between 2017 and 2018, nearly $20 billion was raised through ICOs. None of these ICOs was registered with the SEC. Of the approximately 800 ICOs launched between 2017 and

2018, the vast majority were issued using the ERC-20 protocol. Issuers such as Block.one, Bancor, and Status had *each* raised at least *a hundred million dollars* from selling their ERC-20 tokens through ICOs.

60.    ERC-20 ICOs were typically announced and promoted through public online channels. Issuers typically released a "whitepaper" describing the project and terms of the ICO and promoted the sale of the tokens. They typically advertised the creation of a "new blockchain architecture."

61.    The whitepapers contained vastly less information than would have been included in an SEC registration statement. For example, whitepapers typically did not include a "plain English" description of the offering; a list of key risk factors; a description of important information and incentives concerning management; warnings about relying on forward-looking statements; an explanation of how the proceeds from the offering would be used; or a standardized format that investors could readily follow.

62.    As a result of the lack of information, trading of tokens, and Token Futures on exchanges such as BitMEX, was rife for manipulation. In fact, as Aries Wanlin Wang, the founder of a rival exchange, admitted, "the secondary market [for digital assets] can be rigged by manipulators. If you put major currencies such as Bitcoin and Ethereum aside, many of the tokens you'll find issued through ICOs are there to be manipulated. These tokens are similar to penny stocks. And everyone wants to believe they've discovered the next Bitcoin and Ethereum." Wang further conceded that "[t]he problems facing the secondary market in crypto are similar to the problems that were faced by American stock exchanges 100 years ago. When a market lacks certain regulations and oversights, predictable things happen. Pump and dumps are very common

in the secondary market of crypto-assets, just as they were on the US stock exchange so many years ago."

63.　　Investors were not provided with crucial disclosures as a result of the failure of (i) the Issuers to register the Tokens with the SEC, (ii) BitMEX to register the Token Futures with the SEC, and (iii) BitMEX to register itself as an exchange or broker-dealer.

64.　　When tokens were sold through an ERC-20 ICO, the issuer usually asserted that such tokens entitled their holders to certain rights related to a venture underlying the ICO, such as the right to use certain services provided by the issuer. In almost all cases, these tokens could also be traded, thereby giving investors a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others (that is, the people operating the issuer whose efforts will impact the value of those tokens on the secondary market).

65.　　These tokens were frequently listed on crypto-asset exchanges, where they were bought and sold using other crypto-assets (such as bitcoin or ether) or traditional currencies such as the U.S. dollar.

### E.　The Token Futures BitMEX Offered And Sold Reference And Derive Their Value From Securities And Are Therefore Securities Themselves

66.　　BitMEX has offered and sold Token Futures that reference and derive their value from each of the Tokens. On June 8, 2017, BitMEX first offered a derivatives product referencing Status (SNT). On June 23, 2017, BitMEX first offered a derivatives product referencing EOS.

67.　　Under 15 U.S.C. § 77b(1), a "security" includes any "security future" or "security-based swap." Because the products BitMEX sold are futures, they are securities given that the assets they reference and from which they derive their value, the Tokens, are securities. Alternatively, the products BitMEX sold are securities because they are security-based swaps that reference and derive their value from the Tokens, which are securities.

68.     BitMEX charged a transaction fee for each of the trades involving the Token Futures.

69.     BitMEX did not register any of its offerings of Token Futures as securities under federal or State law.

70.     Accordingly, BitMEX was engaged in the offer and sale of unregistered securities.

### F. BitMEX Actively Solicited And Sold Token Futures Referencing ERC-20 Tokens Throughout the Class Period

71.     BitMEX does not list ERC-20 tokens themselves for sale. Rather, in exchange for a fee, BitMEX facilitates traders' access to crypto financial derivatives markets by creating derivatives contracts, with terms such as expiry, margin requirements, and risk limits, that traders can trade with one another. Because all margin on the platform is posted in Bitcoin, traders can gain exposure to various ERC-20 Tokens without ever purchasing the underlying securities. BitMEX also allows traders to leverage their trades—up to 100 times in some instances—by trading on margin.

72.     BitMEX solicited the buying and selling of Token Futures referencing ERC-20 tokens on its unregistered exchange and reaped extraordinary profits as a result.

73.     In fact, BitMEX recently boasted on its website that it averaged more than $3.1 billion in daily trading volume in January 2020. Based on an average of a 0.05 percent fee for every trade, BitMEX is collecting over $1.5 million in fees a day. Defendant Delo was profiled and verified in 2018 as England's youngest billionaire.

74.     After BitMEX created a contract and listed it for sale, it would advertise that contract to its user base, such as per the below:

# EOS and Tezos Futures Contracts Now Live

**Arthur Hayes**  23 Jun 2017

Behold the clash of the Titans! We believe that the EOS and Tezos token sales will be the largest of 2017.

### EOS Futures

BitMEX is proud to announce the launch of EOS Futures contracts, expiry 28 July 12:00 UTC with symbol EOSN17. Each contract is worth 1 EOS and the contract offers 2x leverage.

Since the EOS platform is still under development, the following rules will apply:

- If no EOS auction is completed before the expiry date, EOSN17 will settle at 0.
- EOSN17 will have 25% Up and Down Limit against the previous session close price to prevent price manipulation. Each session is 2 hours long, and session closes occur every even numbered hour.
- Settlement will occur either at the most recent EOS auction price (if EOS/XBT trading has not begun) or at the .EOSXBT30M Index Price if EOS/XBT has begun trading prior to 27 July 12:00 UTC.

Further details about this contract can be read in the EOS Series Guide.

75.     BitMEX only sold and offered derivative contracts that it created and listed on its platform.

76.     Beyond simply offering the Token Futures for sale, BitMEX also actively solicited their sale. Because it charged a fee for every trade, BitMEX had a direct financial incentive to increase the amount of sales of these Token Futures. BitMEX and the Individual Defendants promoted the sales of their products, including their Token Futures on social media throughout the Class Period. As seen below, BitMEX and the Individual Defendants encouraged users to buy derivative products by emphasizing the possible profits and growth among crypto-assets.



**BitMEX** ✔
@BitMEX

A new high: US$500M turnover in the last 24 hours, over 80% of it on $XBTUSD. Congrats to the team and thank you to our users!

11:02 AM · Aug 13, 2017 · Twitter Web Client

**10** Retweets    **3** Quote Tweets    **50** Likes

**BitMEX** ✔
@BitMEX

BitMEX Wishes You a Happy New Year with a $100K Giveaway! wp.me/p5iQOp-1YP

11:56 PM · Jan 7, 2018 · Twitter Web Client

**10** Retweets    **4** Quote Tweets    **42** Likes

**Arthur Hayes** ✔
@CryptoHayes

You know it's a #crypto bull market when ...

**BitConnect** (BCC)

$0.571662 USD (11.29%)

11:16 PM · Jul 17, 2018 · Twitter Web Client

**297** Retweets    **57** Quote Tweets    **1.8K** Likes



**Arthur Hayes** ✔
@CryptoHayes

Holla at ya boy!



6:20 PM · Jul 19, 2018 · Twitter for iPhone

**85** Retweets    **15** Quote Tweets    **1.2K** Likes



**Arthur Hayes** ✔
@CryptoHayes

New record for BitMEX trading volume. Praise be to volatility and our wonderful traders!



3:55 AM · May 12, 2019 · Twitter for iPhone

**374** Retweets    **69** Quote Tweets    **2K** Likes

23



77.    BitMEX also helped induce purchases of the Token Futures by creating and maintaining a blog, accessible from BitMEX's website, on which they published articles giving strategic investing advice and making predictions about the future prices for various crypto-assets.

24

For example, on July 17, 2017, BitMEX published an article by Hayes about recent ICOs of ERC-20 tokens and making predictions about their pricing.

**G. Because of Defendants' and Issuers' Efforts, Investors Would Not Reasonably Have Understood Prior To April 3, 2019, At The Earliest, That The Tokens Were Securities, And Therefore That The Tokens and Token Futures Were Securities**

78.    In connection with the ICOs for the Tokens, from 2017 until early 2019, the Issuers and BitMEX made statements that would not have reasonably led Plaintiff and Class members to conclude that the Tokens or the Token Futures were securities.

79.    <u>Issuers</u>. Issuers touted false technical details about their supposed crypto-asset and its utility, compared their Token to Bitcoin and Ethereum (which are not securities), and then often explicitly told investors that the Token was not a security.

80.    Beyond their express statements, Issuers took advantage of two key informational asymmetries in order to mislead the market into believing that the tokens were not securities. First, the market lacked understanding and awareness concerning how crypto-assets operated, and specifically the differences between Bitcoin, Ethereum, and ERC-20 tokens. Second, the market had no visibility into Issuers' technology or development during and after their ICO, and the Issuers took advantage of the excitement generated by the hundreds of millions of dollars flooding into various crypto-asset projects marketing themselves as the next Bitcoin. The high-profile success of each successive ICO lent temporary credibility to ICOs as a whole.

81.    Issuers of ERC-20 tokens repeatedly asserted that their tokens were "utility tokens," rather than "security tokens" (which would be securities that would have to be registered with the SEC). As an initial matter, Issuers refused to register the Tokens with the SEC, thus signaling to investors that these were not securities.

25

82.     Issuers in fact declared that the Tokens were not securities. For example, the EOS Purchase Agreement stated:

> As mentioned above, the EOS Tokens do not have any rights, uses, purpose, attributes, functionalities or features, expressed or implied. Although EOS Tokens may be tradable, they are not an investment, currency, security, commodity, a swap on a currency, security, or commodity or any kind of financial instrument.

83.     The EOS whitepaper also misleadingly compared EOS to Bitcoin, which is a commodity and is not required to be registered as securities. For example, the EOS whitepaper argued that EOS would replace Bitcoin and Ethereum.

84.     Accordingly, it was not apparent to a reasonable investor, at issuance, that the Tokens were securities under the law, and a reasonable investor would not have concluded they were securities. Likewise, it was not apparent to a reasonable purchaser of futures contracts referencing such tokens on BitMEX that their futures contracts referenced securities.

85.     <u>BitMEX</u>. BitMEX routinely touted that the Tokens underlying its derivative products were compliant with securities laws. For example, in August 2017, Hayes published an article on BitMEX's website explaining that the tokens "Tezos, Eos, and Bancor are the top three ICOs of 2017 in terms of money raised. All of them are protocols to perform a set of tasks. None of these tokens are collective investment schemes, or provide the owner with rights in a privately listed company." In a longer article titled "In Defense of ICOs," Hayes also explained that digital tokens were not securities because "[i]nstead of selling equity in the company producing a piece of technology, the ICO sells an interest in the usage of the product itself." Hayes continued that teams "structure their tokens so they will not be construed as a security."

86.     <u>SEC</u>. Prior to its April 2019 pronouncement, the SEC likewise left uncertain whether tokens, such as the Tokens that make up the Token Futures at issue in the Second Amended Complaint, are securities. In fact, it was not until six months after the Framework issued

in April 2019, and more than two years after the relevant ICO began, that the SEC entered into a settlement with Block.one (the issuer of ERC-20 token EOS), concluding in September 2019 that EOS's $4.1 billion issuance constituted an unlawful unregistered offering.

87.     Prior to that time, the SEC had not determined that ERC-20 tokens were securities. On June 14, 2018, the Director of the SEC's Corporation Finance Division, William H. Hinman, explained that "the ICOs I am seeing, strictly speaking, the token—or coin or whatever the digital information packet is called—all by itself is not a security." On May 2, 2018, SEC Commissioner Hester Peirce similarly expressed her view that not "all ICOs must be deemed securities offerings." Critically, Commissioner Peirce identified numerous open questions that Issuers emphasized when arguing ERC-20 tokens are not securities, such as the utility of the token in an incomplete or partially complete network.

88.     <u>Other</u>. Other thought leaders in the space, such as the registered broker-dealer Coinbase, opined in late 2016 that "we have considered the question of whether issuance of a Blockchain Token prior to the existence of a system would constitute a security. We have not found conclusive law on the subject, but believe that the better view is that a non-security Blockchain Token does not become a security merely because the system as to which it has rights has not yet been created or completed."

89.     In sum, before the SEC issued its Framework in April 2019, a reasonable investor would not have concluded that ERC-20 tokens or the Token Futures were securities subject to the securities laws. On the contrary, investors were confronted with representations both from issuers and from crypto-asset discussions that would have led them reasonably to conclude that they were not investing in securities.

**H.    The Tokens Are Securities**

90.    In 2019, the SEC clarified, with the benefit of labor-intensive research and investigations, that the Tokens were securities. On April 3, 2019, the SEC published its "Framework for 'Investment Contract' Analysis of Digital Assets," in which it "provided a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."

91.    Among the most significant statements in the Framework is its description of how to analyze the various facts surrounding ICOs in making the determination of whether a given digital asset (including an ERC-20 token) is a security. Under application of the Framework, the Tokens were securities at issuance.

92.    In the Framework, the SEC cautioned potential issuers: "If you are considering an Initial Coin Offering, sometimes referred to as an 'ICO,' or otherwise engaging in the offer, sale, or distribution of a digital asset, you need to consider whether the U.S. federal securities laws apply." The SEC explained the fundamentals of the *Howey* test:

> The U.S. Supreme Court's *Howey* case and subsequent case law have found that an "investment contract" exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. The so-called "*Howey* test" applies to any contract, scheme, or transaction, regardless of whether it has any of the characteristics of typical securities. The focus of the *Howey* analysis is not only on the form and terms of the instrument itself (in this case, the digital asset) but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary market sales). Therefore, issuers and other persons and entities engaged in the marketing, offer, sale, resale, or distribution of any digital asset will need to analyze the relevant transactions to determine if the federal securities laws apply.

Investors who bought the Tokens invested money or other valuable consideration, such as bitcoin and ether, in a common enterprise—the Issuers. Investors had a reasonable expectation of profit

based upon the efforts of the Issuers, including, among other things, the Issuers obtaining listing of their ERC-20 tokens on crypto-asset exchanges. Indeed, the SEC states in the Framework, "Based on our experiences to date, investments in digital assets have constituted investments in a common enterprise because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

93.    In the Framework, the SEC expressly recognized that the purpose of the federal securities laws is to reduce the significant information asymmetries that exist between sellers and purchasers of securities, including digital assets. At the outset of its Framework, referring to the promoter's efforts, the SEC observes:

> Absent the disclosures required by law about those efforts and the progress and prospects of the enterprise, significant informational asymmetries may exist between the management and promoters of the enterprise on the one hand and investors and prospective investors on the other hand. The reduction of these information asymmetries through required disclosures protects investors and is one of the primary purposes of the federal securities laws.

94.    Given these information asymmetries, the reasonable inference at issuance was that the Tokens were securities. However, the reasonable inference from the SEC's more fully developed April 2019 Framework was that under the relevant facts (many of which a reasonable investor did not possess), the Tokens, and thus the Token Futures, are securities.

### 1. ERC-20 Investors Invested Money

95.    Investors in ERC-20 tokens made an investment of money or other valuable consideration for purposes of *Howey*. The SEC Framework states: "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of real (or fiat) currency, another digital asset, or other type of consideration."

29

96.     Investors invested traditional and other digital currencies, such as bitcoin and ether, to purchase the Tokens.

### 2. ERC-20 Investors Participated In A Common Enterprise

97.     The SEC Framework states: "In evaluating digital assets, we have found that a 'common enterprise' typically exists." This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

98.     The Tokens are no different. Investors were passive participants in the Tokens' ICOs, and the profits of each investor were intertwined with those of the Issuers and of other investors. Issuers typically conceded in their whitepapers that they sold Tokens in order to fund their operations and promote their networks and thereby increase the value of the issued ERC-20 tokens. Issuers typically were responsible for supporting the Tokens, pooled investors' assets, and controlled those assets. Issuers would also typically hold a significant stake in the Tokens, and thus shared in the profits and risk of the project.

99.     For example, promoters of the EOS token described the proceeds of their ICO as "revenue" they would use to "offer[] developers and entrepreneurs the funding they need to create community driven business leveraging EOSIO software." That money, in return, "will be returned value for the network."

100.    Similarly, the Status Network ("Status") asserted that its governance structure "empower[ed] stakeholders in the Status Network" by giving them rights akin to holders of voting stock in a corporation. The whitepaper asserted that "[a] core part of the Status Network Token is giving stakeholders the ability to choose the direction that the software is developed. The token is used to make decisions on proposals, which can be made by any Stakeholder…. The amount of tokens you hold at that time becomes your voting power for that decision."

101.    Accordingly, investors in the Tokens participated in a common enterprise by purchasing the Tokens.

### 3.  Investors Purchased The Tokens With A Reasonable Expectation Of Profits From Owning Them

102.    As to "reasonable expectation of profits," the SEC Framework states: "A purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."

103.    Investors in the Tokens, including Plaintiff and the Class, made their investment with a reasonable expectation of profits. The Tokens were sold to investors prior to a network or "ecosystem" being fully developed on which they could be used. For pre-functional tokens, such as the Tokens at issue in the Second Amended Complaint, the primary purpose for purchasing such tokens was to make a profit, rather than to utilize the tokens themselves for a task.

104.    Alluding to the "AP" (the "Active Participant"), which is the promoter, sponsor, or other third party that "provides essential managerial efforts that affect the success of the enterprise"), the Framework identifies a series of intensely factual questions underscoring both the time the SEC had spent considering these issues and the challenges a layperson would face in analyzing whether a digital asset constitutes a security. In particular, the Framework lays out a number of characteristics to assess whether the "reasonable expectation of profits" element is met with respect to whether digital assets, thereby satisfy the *Howey* test:

105.    The more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit:

- The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset.

    o   The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the

network, particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.

- o This also can be the case where the digital asset gives the holder rights to dividends or distributions.

- The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future.

- Purchasers reasonably would expect that an AP's efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.

- The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network.

- o The digital asset is offered and purchased in quantities indicative of investment intent instead of quantities indicative of a user of the network. For example, it is offered and purchased in quantities significantly greater than any likely user would reasonably need, or so small as to make actual use of the asset in the network impractical.

- There is little apparent correlation between the purchase/offering price of the digital asset and the market price of the particular goods or services that can be acquired in exchange for the digital asset.

- There is little apparent correlation between quantities the digital asset typically trades in (or the amounts that purchasers typically purchase) and the amount of the underlying goods or services a typical consumer would purchase for use or consumption.

- The AP has raised an amount of funds in excess of what may be needed to establish a functional network or digital asset.

- The AP is able to benefit from its efforts as a result of holding the same class of digital assets as those being distributed to the public.

- The AP continues to expend funds from proceeds or operations to enhance the functionality or value of the network or digital asset.

- The digital asset is marketed, directly or indirectly, using any of the following:

- o The expertise of an AP or its ability to build or grow the value of the network or digital asset.

o   The digital asset is marketed in terms that indicate it is an investment or that the solicited holders are investors.

o   The intended use of the proceeds from the sale of the digital asset is to develop the network or digital asset.

o   The future (and not present) functionality of the network or digital asset, and the prospect that an AP will deliver that functionality.

o   The promise (implied or explicit) to build a business or operation as opposed to delivering currently available goods or services for use on an existing network.

o   The ready transferability of the digital asset is a key selling feature.

o   The potential profitability of the operations of the network, or the potential appreciation in the value of the digital asset, is emphasized in marketing or other promotional materials.

o   The availability of a market for the trading of the digital asset, particularly where the AP implicitly or explicitly promises to create or otherwise support a trading market for the digital asset.

106.    The SEC Framework clarifies that investors purchased the Tokens with a reasonable expectation of profits.

107.    For example, the "ready transferability of the" Tokens was promoted by Issuers as a "key selling feature." Status, for instance, told investors the SNT tokens "will be transferrable 7 days after the end of the Contribution Period."

108.    The Tokens also "emphasized" the "potential appreciation in the value of the digital asset" in their marketing materials. Status, for example, compared itself to highly successful enterprises such as Facebook and the Line messaging app, and asserted that it could "design mechanisms for growth that have been tried and tested." The issuer of EOS tokens, also touted the potential for EOS tokens to increase in value:

A blockchain using EOS.IO software also awards block producers tokens every time they produce a block. The value of the tokens will impact the

amount of bandwidth, storage, and computation a producer can afford to purchase; *this model naturally leverages rising token values to increase network performance*.

109.     ERC-20 tokens were also not described as "delivering currently available goods or services for use on an existing network," but rather explained as raising capital necessary "to build a business or operation." As an example, the Status whitepaper asserted that "the Status mobile Ethereum client" was "well suited for mass adoption," and that the "core team and the Status community are committed to ensuring that the SNT token adds value to the platform and drives network effects." Under the SEC's Framework, the Tokens were securities under federal and state securities laws.

### 4.     Investors Expected Profits From The Tokens To Be Derived From The Managerial Efforts Of Issuers

110.     The SEC Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues: Does the purchaser reasonably expect to rely on the efforts of an [Active Participant]? Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?"

111.     Investors' profits in the Tokens were to be derived from the managerial efforts of others—specifically the Issuers, their co-founders, and their development teams. ERC-20 investors relied on the managerial and entrepreneurial efforts of the Issuers and their executive and development teams to manage and develop the projects funded by the Tokens' ICOs.

112.     Issuers' executive teams typically held themselves out to investors as experts in the blockchain and crypto field. Investors in the Tokens reasonably expected the Issuers' development teams to provide significant managerial efforts after the Tokens' launch.

34

113.    The SEC explained in its Framework, further underlining the depth of study the agency had devoted to the matter over the years and the complexity of such legal analysis from the perspective of a reasonable investor, that the more of the following characteristics that are present, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others'":

- An AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

  o   Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly). This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.

- There are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a "decentralized" network).

- An AP creates or supports a market for, or the price of, the digital asset. This can include, for example, an AP that: (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities.

- An AP has a lead or central role in the direction of the ongoing development of the network or the digital asset. In particular, an AP plays a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

- An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents including, for example:

  o   Determining whether and how to compensate persons providing services to the network or to the entity or entities charged with oversight of the network.

  o   Determining whether and where the digital asset will trade. For example, purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform.

- o  Determining who will receive additional digital assets and under what conditions.

- o  Making or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset.

- o  Playing a leading role in the validation or confirmation of transactions on the network, or in some other way having responsibility for the ongoing security of the network.

- o  Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

- Purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, such as where:

- o  The AP has the ability to realize capital appreciation from the value of the digital asset. This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset. In these instances, purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset.

- o  The AP distributes the digital asset as compensation to management or the AP's compensation is tied to the price of the digital asset in the secondary market. To the extent these facts are present, the compensated individuals can be expected to take steps to build the value of the digital asset.

- o  The AP owns or controls ownership of intellectual property rights of the network or digital asset, directly or indirectly.

- o  The AP monetizes the value of the digital asset, especially where the digital asset has limited functionality.

114.    Shifting its focus to the numerous facts bearing on the nature of the digital asset at issue, the SEC explained still further:

Although no one of the following characteristics of use or consumption is necessarily determinative, the stronger their presence, the less likely the *Howey* test is met:

- The distributed ledger network and digital asset are fully developed and operational.

- Holders of the digital asset are immediately able to use it for its intended functionality on the network, particularly where there are built-in incentives to encourage such use.

- The digital assets' creation and structure is designed and implemented to meet the needs of its users, rather than to feed speculation as to its value or development of its network. For example, the digital asset can only be used on the network and generally can be held or transferred only in amounts that correspond to a purchaser's expected use.

- Prospects for appreciation in the value of the digital asset are limited. For example, the design of the digital asset provides that its value will remain constant or even degrade over time, and, therefore, a reasonable purchaser would not be expected to hold the digital asset for extended periods as an investment.

- With respect to a digital asset referred to as a virtual currency, it can immediately be used to make payments in a wide variety of contexts, or acts as a substitute for real (or fiat) currency.

  o This means that it is possible to pay for goods or services with the digital asset without first having to convert it to another digital asset or real currency.

  o If it is characterized as a virtual currency, the digital asset actually operates as a store of value that can be saved, retrieved, and exchanged for something of value at a later time.

- With respect to a digital asset that represents rights to a good or service, it currently can be redeemed within a developed network or platform to acquire or otherwise use those goods or services. Relevant factors may include:

  o There is a correlation between the purchase price of the digital asset and a market price of the particular good or service for which it may be redeemed or exchanged.

  o The digital asset is available in increments that correlate with a consumptive intent versus an investment or speculative purpose.

  o An intent to consume the digital asset may also be more evident if the good or service underlying the digital asset can only be acquired, or more efficiently acquired, through the use of the digital asset on the network.

- Any economic benefit that may be derived from appreciation in the value of the digital asset is incidental to obtaining the right to use it for its intended functionality.

- The digital asset is marketed in a manner that emphasizes the functionality of the digital asset, and not the potential for the increase in market value of the digital asset.

- Potential purchasers have the ability to use the network and use (or have used) the digital asset for its intended functionality.

- Restrictions on the transferability of the digital asset are consistent with the asset's use and not facilitating a speculative market.

- If the AP facilitates the creation of a secondary market, transfers of the digital asset may only be made by and among users of the platform.

115.    Purchasers of pre-functional tokens necessarily rely on the managerial efforts of others to realize value from their investments. The success of these managerial efforts in developing the networks on which these tokens will operate is the primary factor in their price, that is, until such tokens transition into being functional utility tokens. Each of the Tokens was a security at issuance because profit from the Tokens would be derived primarily from the managerial efforts of the Issuer teams developing the associated networks on which the Tokens would function, rather than having their profit derived from market forces of supply and demand, such as might affect the price of a commodity such as gold (or Bitcoin).

116.    This dependency on the managerial efforts of the Issuer, however, was not apparent at issuance to a reasonable investor. Considering the limited available information about how these Tokens were designed and intended to operate, if such an investor were even able to discern which of the relevant facts about the Tokens mattered, a reasonable investor lacked sufficient bases to conclude whether the Tokens were securities until the platform at issue, and its relevant "ecosystem," had been given time to develop. In the interim, the investor lacked the facts necessary to conclude—let alone formally allege in court—that the Tokens she had acquired were securities. It was only after the passage of some significant amount of time, and only with more information about the Issuer's intent, process of management, and lack of success in allowing decentralization

to arise, that an investor could reasonably determine that a Token that was advertised as something other than a security was a security all along.

117.    The EOS Token is a prime example. At the time of the EOS ICO, EOS had no functional software product available—instead, EOS told its investors it would use the proceeds of the ICO to develop the promised software, which would in turn make the Tokens more valuable to investors.

118.    The Issuers of the Status SNT Tokens likewise wrote in its whitepaper it had only an "alpha" build of its product, but with the funds raised through its ICO, it hoped its technology would "reach[] widespread mobile use." The whitepaper continued: "Funds raised during the Contribution Period will be used solely for the development and benefit of the Status Network."

119.    However complex the resolution of the issue would strike a reasonable investor, the Tokens satisfy most if not all of the factors the SEC described in the Framework as relevant to its determination that a digital asset is a security.

## I.    Each Token Is A Security

### 1.  EOS

120.    The EOS ICO has been widely reported as the largest ICO to date, having raised over $4 billion assets from the sale of unregistered EOS tokens from June 2017 through July 2018. EOS derivatives were listed on BitMEX as early as June 23, 2017.

121.    EOS tokens were advertised as being an improvement on Bitcoin, Ethereum, and other crypto-assets. In addition to claiming EOS's technical superiority over other crypto-assets, EOS's issuer, Block.one, publicly stated that it would use the funds raised through the ICO to continue to enhance the EOS software and support the growth of the platform.

122.    In the EOS Token Purchase Agreement, the issuers of EOS tokens made the following representations concerning the development of EOSIO:

- MATTERS RELATING TO EOS.IO SOFTWARE AND EOS PLATFORM:

1. block.one is developing the EOS.IO software (the "EOS.IO Software") as further described in the EOS.IO Technical White Paper (as it may be amended from time to time) (the "White Paper");

2. at the end of its development stage, block.one will be releasing the EOS.IO Software it has developed under an open source software license;

123.    At the time of the EOS ICO, Block.one took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked. With promises that EOS would be better than other crypto-assets, many individuals were unaware that EOS tokens had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum. One of these primary differences is that all EOS tokens were issued by Block.one at creation at very little economic cost—and enormous potential upside—to the Block.one founders.

124.    The creation of EOS tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum. This would not have been apparent at issuance, however, to a reasonable investor. Rather, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success in allowing decentralization to arise that a reasonable purchaser could know that he or she had acquired a security. Purchasers were thereby misled into believing that EOS was something other than a security, when it was a security.

125.    Investors purchased EOS tokens with the reasonable expectation that they would make a profit.

126.    EOS token holders stood to share in potential profits from the successful launch of the EOS token. A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the EOS ecosystem.

40

127.    EOS tokens were described as a technologically superior version of the Bitcoin and Ethereum blockchains. The issuers' statements fueled speculation that EOS was the next "Ethereum or Bitcoin," with one commentator referring to EOS as "The Ethereum Killer."

128.    Investors' profits were to be derived from the managerial efforts of others—Block.one, its co-founders, and the Block.one development team. Investors in EOS relied on the managerial and entrepreneurial efforts of Block.one and its executive and development team to manage and develop the EOS software.

129.    Investors in EOS reasonably expected Block.one and Block.one's development team to provide significant managerial efforts after EOS's launch.

130.    The expertise of the issuers was critical in monitoring the operation of EOS, promoting EOS, and deploying investor funds. Investors had little choice but to rely on their expertise. The EOS protocol and governance structure were predetermined before the ICO was launched.

131.    Accordingly, under the SEC's Framework, the EOS token was a security.

132.    Indeed, on September 30, 2019, the SEC found that Block.one had violated the Securities Act through its unregistered sale of EOS to U.S. investors. Among the SEC's conclusions were the following:

- "A number of US investors participated in Block.one's ICO."

- "Companies that offer or sell securities to US investors must comply with the securities laws, irrespective of the industry they operate in or the labels they place on the investment products they offer."

- "Block.one did not provide ICO investors the information they were entitled to as participants in a securities offering."

- "[EOS] Tokens were securities under the federal securities laws."

41

- "A purchaser in the offering of [EOS] Tokens would have had a reasonable expectation of obtaining a future profit based upon Block.one's efforts, including its development of the EOSIO software and its promotion of the adoption and success of EOSIO and the launch of the anticipated EOSIO blockchains."

- "Block.one violated Sections 5(a) and 5(c) of the Securities Act by offering and selling these securities without having a registration statement filed or in effect with the Commission or qualifying for an exemption from registration."

Block.one consented to a settlement whereby it would pay $24 million to the SEC. The SEC enforcement action occurred over two years after Block.one began selling EOS to the public, further underscoring the complexity of these issues for lay investors.

133.    The SEC's September 30, 2019 settlement with Block.one reflected the SEC's "Framework" for analyzing whether digital assets, and in particular ERC-20 tokens, constitute securities. Consistent with that Framework, the SEC determined that EOS tokens are securities and that Block.one had violated the Securities Act by failing to register them. Accordingly, the derivatives of EOS offered and sold by BitMEX were and are also securities.

### 2.  Status (SNT)

134.    Status's SNT token ICO has been widely reported as one of the largest ICOs to date, having raised over $100 million in assets from the sale of unregistered SNT tokens over a 24-hour period from June 20 to June 21, 2017.

135.    Derivatives of SNT tokens were listed on BitMEX since as early as June 8, 2017.

136.    Status made statements suggesting that SNT tokens were similar to Bitcoin, Ethereum, and other crypto-assets. For example, the SNT whitepaper asserted that SNT was "[i]nspired by one of Satoshi Nakamoto's original suggested use cases for Bitcoin"; "organized around smart contracts running on Ethereum"; "the first ever mobile Ethereum client," which "connects directly to the Ethereum network"; and that "Status and Ethereum provide the foundation necessary to give all stakeholders in a socioeconomic network equal footing." In

addition, the SNT whitepaper asserted that "the Status mobile Ethereum client" was "well suited for mass adoption," and that the "core team and the Status community are committed to ensuring that the SNT token adds value to the platform and drives network effects."

137.    At the time of the SNT ICO, Status took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked. With representations that SNT would be similar to other crypto-assets, many individuals were unaware that SNT tokens had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum. One of these primary differences is that all SNT tokens were issued by Status at creation at very little economic cost—and enormous potential upside—to the Status founders, Jarrad Hope and Carl Bennetts.

138.    The creation of SNT tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem. Although the centralized process by which SNT tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security. Purchasers were thereby misled into believing that SNT was something other than a security, when it was a security.

139.    Investors purchased SNT tokens with the reasonable expectation that they would make a profit.

140.    SNT token holders stood to share in potential profits from the successful launch of the SNT token. A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the SNT ecosystem.

141.    Investors' profits were to be derived from the managerial efforts of others—Status, its co-founders, Hope and Bennetts, and the Status development team. Investors in SNT relied on the managerial and entrepreneurial efforts of Status and its executive and development team to manage and develop the SNT software. Indeed, both Hope's and Bennett's biographies were featured in the Status whitepaper and were held out to be integral parts of the success of SNT. The whitepaper emphasized that "Carl and Jarrad, the co-founders of Status, have had a working relationship for 6 years on various projects, and 3 of those years were spent operating a software distribution network, driving over 20 million installs to various software offerings, the profits of which were used to fund Status and our team of 10 until this point. During the operation of this business we were uniquely positioned to see firsthand how personal data on the internet is bought and sold and how users are acquired and retained."

142.    Investors in SNT thus reasonably expected Status, co-founders Hope and Bennetts, and Status's development team to provide significant managerial efforts after SNT's launch.

143.    The expertise of the issuers was critical in monitoring the operation of SNT, promoting SNT, and deploying investor funds. Investors had little choice but to rely on their expertise. The SNT protocol and governance structure were predetermined before the ICO was launched.

144.    Accordingly, under the SEC's Framework, the SNT token, and thus BitMEX's derivatives referencing it, were and are securities.

**J.    BitMEX is a Domestic Securities Exchange**

145.    Beginning in 2017, BitMEX purported to prevent United States users from accessing its service. This limitation, however, has always been presented and recognized as a weak façade intended to skirt liability from the many sales that BitMEX continued to actively solicit from the United States. In fact, BitMEX knew that between 20 and 30 percent of its users

were located in the United States. BitMEX allows customers to open accounts with anonymous emails and passwords, and BitMEX does not collect any documents to verify the identity or location of the vast majority of its users. In reality, much of BitMEX's workforce and customer base were located in the United States as it solicited purchases from United States residents, rendering BitMEX a domestic exchange.

146.    BitMEX's only enforcement of its "ban" on United States users came from a system that prevented new accounts from being made using a United States IP address. This system, however, could easily be circumvented by using a virtual private network, or "VPN," that nominally conceals a user's location. In fact, BitMEX openly told potential United States customers that a VPN could be used to circumvent this restriction. YouTube contains videos of United States customers trading on BitMEX, along with instructions on how to access BitMEX from the United States. And the United States messaging applications Discord and Telegram have chat groups that instruct United States residents to use a VPN to access BitMEX if trading from the United States. BitMEX customer service representative emails and chats reflect regular awareness of the use by U.S. persons of VPN services to access and trade on the BitMEX platform.

147.    BitMEX's enforcement of its supposed prohibition on United States users ended with the account creation process. Once an account was created, it could be freely accessed from the United States at any time, even though BitMEX had visibility as to what IP address was being used each time an account was accessed, including the location of the user. An account could be created using a VPN that told BitMEX the user was in Hong Kong and then, minutes later, be accessed from an address that BitMEX knew was in New York and used from that address for years and BitMEX would do nothing.

45

148.     As a point of comparison, the system used by the video streaming service Netflix is far more rigorous. Netflix checks the location of the user with every log-in and limits content based on that system. Netflix also actively polices the use of VPNs and bans new ones when it becomes aware of their use, making it difficult for customers to circumvent its location-tracking system. BitMEX, which allowed customers to make highly leveraged trades in complex crypto-assets, did not employ any of these measures that Netflix uses to regulate access to episodes of *The Office*.

149.     Even when it was expressly pointed out to BitMEX that a customer was from the United States, BitMEX continued to turn a blind eye to their presence on the platform. If a user forgot his or her password, BitMEX's recovery process would sometimes require them to provide a physical address. If that address was in the United States, BitMEX would allow them to recover their assets and then close the account. But BitMEX would do nothing if that individual used a VPN to open a new account which was then filled with the identical assets and was subsequently accessed from the address of the original user, thus confirming for BitMEX that the United States user had simply moved the assets into a new BitMEX account.

150.     BitMEX had the ability to do more, and in fact did so for other jurisdictions. In early 2018, a Canadian regulatory authority in Quebec sent a cease-and-desist letter to BitMEX demanding that it take steps to prevent Canadian users from accessing the platform. After that, BitMEX prohibited any Canadian address from using the platform at all, but failed to do the same for United States users.

151.     BitMEX did not want to address these issues because they knew how much profit they were generating from United States users. For much of the Class Period, BitMEX kept revenue documentation that broke out United States users in particular. This documentation

showed precisely which trades were from the United States and showed how high a portion of BitMEX's revenues they generated. BitMEX knew that between 20 and 30 percent of all BitMEX users were located in the United States.

152.    In fact, BitMEX actively targeted United States users. For example, in an appearance on CNBC, Defendant Hayes recognized that there would be a spike in United States trading on BitMEX following his appearance.

153.    BitMEX solicits United States customers through its "affiliate" program, which allows U.S. customers to solicit other customers to trade on the platform in exchange for compensation from BitMEX. As of July 27, 2018, at least 1,100 U.S. affiliate program customers received affiliate payments from BitMEX for soliciting customers to trade on BitMEX. In 2019, BitMEX paid out $66 million to customers in affiliate commissions.

154.    BitMEX's recent so-called reforms illustrate the deficiencies in its prior user verification system. On August 13, 2020—months after the initiation of this action—BitMEX announced a new program, the BitMEX User Verification Program, that only went into effect on August 28, 2020. Under this new program, BitMEX requires users to go through a four-step process identification verification program in which users submit photo identification, proof of address, a photograph of themselves, and answer multiple-choice questions. By BitMEX's own description, this program is "similar to ID checks on many other cryptocurrency exchanges"— meaning that, until this action was initiated, and even for several months thereafter, BitMEX's identification verification was below industry standards.

155.    BitMEX and the Individual Defendants' operation of a domestic exchange that ignored legal and regulatory obligations has drawn the attention of U.S. prosecutors and regulators. Recognizing that BitMEX had actively sought to and had in fact served thousands of United States

customers after its purported withdrawal from the market, United States prosecutors in the Southern District of New York filed an indictment against Hayes, Delo, Reed, and Dwyer on October 1, 2020 for violations of the Bank Secrecy Act. This indictment recognized that BitMEX "has solicited and accepted offers on its cryptocurrency futures and swaps from customers located in the United States, including individual retail customers" and that "internal BitMEX records reflected thousands of BitMEX accounts with United States location information that were enabled for trading." The indictment also alleged a deliberate attempt to avoid United States regulations by incorporating HDR in the Seychelles because Defendants believed that it would cost less to bribe Seychellois authorities—just "a coconut" as Hayes later bragged—than it would cost to bribe regulators in the United States.

156.    On the same day the indictment was filed, the CFTC brought a civil action against Defendants, similarly recognizing that BitMEX solicited and attracted U.S. customers. The CFTC stated that BitMEX and the Individual Defendants had violated the Commodities Exchange Act and CFTC regulations because they "profited while illegally offering leveraged retail commodity transactions, futures, options and swaps; operating as an unregistered futures commission merchant; and operating a facility for the trading of swaps without being registered as a swap execution facility or as a designated contract market." (internal definitions of abbreviations omitted).

157.    In addition to its solicitations directed at U.S. customers, a substantial portion of Bitmex's operations and employees were based in the United States. As described above, for much of the class period, BitMEX personnel conducted BitMEX operations from an office in Manhattan, New York, including customer support, business development, and marketing to customers in the United States. These facts easily render BitMEX a domestic exchange.

### K.  The Class Has Suffered Substantial Damages

158.    As a direct result of Defendants' operation of an unregistered exchange selling derivatives of unregistered securities, Plaintiff and members of the Class—many of whom are retail investors who lack the technical and financial sophistication necessary to have evaluated the risks associated with their investments in the Token Futures—have suffered significant damages in an amount to be proven at trial.

159.    To the extent Plaintiff and members of the Class still hold any Token Futures, they demanded rescission at the initiation of this action and have made any necessary tender of the Token Futures. To the extent Plaintiff and members of the Class sold or were forced to sell Token Futures at a loss, they are entitled to damages.

### V.    DEFENDANTS' AND ISSUERS' CONCEALMENT OF THEIR MISCONDUCT PREVENTED PLAINTIFF AND MEMBERS OF THE CLASS FROM BRINGING A CLAIM AT THE TIME THE EVENTS OCCURRED

160.    Consistent with the perspective of a reasonable investor, neither Plaintiff nor members of the Class were in a position to appreciate their ability to bring claims based on Defendants' misconduct until April 3, 2019, at the earliest. Plaintiff makes the following allegations regarding Defendants' intentional or reckless statements and conduct solely for purposes of alleging the timeliness of all of Plaintiff's and the Class's claims, which do not sound in fraud. These intentional or reckless misstatements were material to the assessment of purchasers' legal rights and claims based on the Tokens' status as securities.

161.    In the whitepapers describing the Tokens, as well as in their social media and other marketing, as described above, Issuers deliberately created the impression that Tokens were not securities. This included explicit statements that the Tokens were not securities as well as misleading comparisons to Bitcoin and other crypto-assets that are not securities.

162.    For example, in the EOS Token Purchase Agreement, Block.one expressly represented that EOS tokens were not securities and disclaimed in its FAQ that EOS tokens were securities—stating "block.one does not believe that the distribution of EOS Tokens or the EOS Tokens themselves are securities" or similar financial instruments.

163.    BitMEX also differentiated the Tokens from securities, making statements that the Tokens, including EOS, were not "collective investment schemes" nor "provide the owner with rights in a privately listed company." Even more explicitly, Defendant Hayes said that these Tokens are commonly structured "so that they will not be considered a security."

164.    These intentional or reckless misstatements were material to the assessment of purchasers' legal rights and claims based on the Tokens' status as securities.

165.    Issuers also made material misleading omissions in their whitepapers. In describing its plan to create a decentralized blockchain that would be technically superior to other available blockchains in its June 5, 2017 whitepaper, Block.one failed to disclose that its blockchain's governance system could be controlled by a single "arbitrator" and was not decentralized.

166.    These intentional or reckless omissions were material to the assessment of the Tokens' prospective utility.

167.    Because of these representations and omissions, Plaintiff and members of the Class reasonably believed they were purchasing a derivative linked to a decentralized asset that had functionality at issuance. In fact, however, they were purchasing Token Futures dependent on Tokens that rose and fell with Issuers' efforts and did not know that Issuers had no plan for the Tokens.

168.    Under the misimpression that the Tokens, and thus the Token Futures, were not securities, as a result of Defendants' and Issuers' fraudulent statements and omissions, Plaintiff

and members of the Class did not realize that they were in a position to bring claims under federal or state law regulating securities. Defendants' and Issuers' misrepresentation would not have been apparent until, at the earliest, April 3, 2019, when the SEC clarified the legal paradigm for assessing the security status of crypto-assets like the Tokens.

169.    Indeed, independent of Defendants' and the Issuers' state of mind in making the materially misleading misstatements and omissions described above, these misstatements and omissions—which reflected the massive asymmetry in information available to Defendants and Issuers and unavailable to Plaintiff and the Class—prevented Plaintiff and the Class from realizing that they were in a position to bring claims under federal or state law regulating securities until April 3, 2019, at the earliest.

## VI.    CLASS ALLEGATIONS

170.    Plaintiff brings this action as a class action pursuant to Federal Rule Civil Procedure 23 and seek certification of the following Class: All persons who purchased securities futures products tied to EOS or SNT on BitMEX between June 8, 2017 and the present, and were injured thereby (*i.e.*, who continuously hold those products or sold them at a loss), to the fullest extent subject to the U.S. securities laws. Accordingly, the Class Period is June 8, 2017 through the present.

171.    Plaintiff reserves the right to amend the Class definition if investigation or discovery indicate that the definition should be narrowed, expanded, or otherwise modified.

172.    The members of the Class are so numerous that joinder of all members is impracticable. The precise number of Class members is unknown to Plaintiff at this time, but it is believed to be in the tens of thousands.

173.    Members of the Class are readily ascertainable and identifiable. Members of the Class may be identified by publicly accessible blockchain ledger information and records

maintained by Defendants or its agents. They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in securities class actions.

174.    Plaintiff's claims are typical of the claims of the Class members as all members are similarly affected by Defendants' respective wrongful conduct in violation of the laws complained of herein. Plaintiff does not have any interest that is in conflict with the interests of the members of the Class.

175.    Plaintiff and members of the Class were injured by Defendants' common course of unlawful conduct based upon their transactions in unregistered Token Futures that they continuously hold or sold at a loss.

176.    Plaintiff has fairly and adequately protected, and will continue to fairly and adequately protect, the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

177.    Plaintiff seeks declaratory relief for himself and the Class, asking the Court to declare their purchase agreements with BitMEX void, such that prosecuting separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for BitMEX; and BitMEX has acted on grounds that apply generally to the Class, so that the declaratory relief is appropriate respecting the Class as a whole.

178.    Common questions and answers of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including but not limited to the following:

- Whether the Tokens, and BitMEX's Token Futures, are securities under federal and state law;

- Whether BitMEX operated as an unregistered exchange;

- Whether BitMEX operated as an unregistered broker-dealer;

- Whether BitMEX offered or sold Token Futures to members of the Class;

- Whether the members of the Class suffered damages as a result of Defendants' conduct in violation of federal and state law; and

- Whether the Class members are entitled to void their purchase agreements with BitMEX and to recover the monies they paid thereunder.

179.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by some of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

180.    There will be no difficulty in the management of this action as a class action.

**VII.    CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**(SECURITIES ACT – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Sections 5 and 12(a)(1) of the Securities Act**
**(BitMEX)**

181.    Plaintiff realleges the allegations above.

182.    Section 5(a) of the Securities Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails

to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

183.    Section 5(c) of the Securities Act states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." *Id.* § 77e(c).

184.    When issued, the Tokens were and are securities within the meaning of Section 2(a)(1) of the Securities Act, *id.* § 77b(a)(1). BitMEX's Token Futures also were and are securities as defined by Section 77b(1). BitMEX promoted, solicited, or sold Token Futures to Plaintiff and members of the Class. BitMEX thus directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities derivative products, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale. No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

185.    Section 12(a)(1) of the Securities Act provides in relevant part: "Any person who offers or sells a security in violation of Section 77e of this title … shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in

equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id.* § 77*l*(a)(1).

186.    Accordingly, BitMEX has violated Sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§ 77e(a), 77e(c), and 77*l*(a)(1).

187.    Plaintiff and Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

188.    Plaintiff and Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SECOND CAUSE OF ACTION**
**(EXCHANGE ACT – PRIMARY LIABILITY)**
**Contracts With an Unregistered Exchange**
**Sections 5, 6, and 29(b) of the Exchange Act**
**(BitMEX)**

189.    Plaintiff realleges the allegations above.

190.    In relevant part, Section 5 of the Exchange Act makes it unlawful "for any … exchange, directly or indirectly, to make use of … any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security … unless such exchange (1) is registered as national securities exchange under Section 78f of this title, or (2) is exempted from such registration." 15 U.S.C. § 78e. An "exchange" is any entity that "constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities." 17 C.F.R. § 240.3b-16.

191.    BitMEX has made use of means and instrumentalities of interstate commerce for the purpose of using a facility of an exchange within and subject to the jurisdiction of the United States throughout the Class Period, including because BitMEX has operated as an exchange throughout the Class Period through the utilization of the Internet within, and multiple servers throughout, the United States.

192.    BitMEX has thus made use of such means and instrumentality without being registered as national securities exchange under Section 78f and without any exemption from such registration requirement.

193.    In the course of operating as an unregistered exchange within and subject to the jurisdiction of the United States, BitMEX has entered into contracts with the members of the Class pursuant to which the members purchased Token Futures through BitMEX and paid BitMEX fees for the use of its exchange. The parties to these contracts thus reached an agreement whereby and pursuant to which BitMEX was operating in violation of Section 5 of the Exchange Act, and whereby and pursuant to which these parties were continuing a practice in violation of Section 5 of the Exchange Act.

194.    The foregoing contracts were made in violation of Section 5 of the Exchange Act, and their performance involves the violation of Section 5, and the continuation of a practice in violation of Section 5, because BitMEX entered into them for the purpose of operating, and as operating, as an unlicensed exchange in violation of Section 5; and because the parties to the contracts reached agreements whereby and pursuant to which BitMEX would be and was operating in violation of Section 5.

195.    Additionally, Section 6 of the Exchange Act states, "It shall be unlawful for any person to effect transactions in security futures products that are not listed on a national securities

56

exchange or a national securities association registered pursuant to Section 78o-3(a) of this title."
15 U.S.C. § 78f (h)(1). None of the assets on which the Token Futures were based were listed on
a national securities exchange or a national securities association. Defendants accordingly violated
Section 6 in effecting these transactions.

196.    Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract
made in violation of any provision of this chapter … and every contract (including any contract
for listing a security on an exchange) … the performance of which involves the violations of, or
the continuance of any relationship or practice in violation of, any provision of this chapter …
shall be void … as regards the rights of any person who, in violation of any such provision, …
shall have made or engaged in the performance of such contract." *Id.* § 78cc.

197.    Section 29(b) affords Plaintiff and the Class the right, which they hereby pursue, to
void their purchase agreements with BitMEX and to recover, as rescissory damages, the fees they
have paid under those contracts.

198.    Plaintiff and the Class seek to void contracts and recover damages for purchases of
Token Futures through BitMEX in domestic U.S. transactions in the Class Period. *Id.* § 78cc(b).

**THIRD CAUSE OF ACTION**
**(EXCHANGE ACT – PRIMARY LIABILITY)**
**Unregistered Broker and Dealer**
**Sections 15(a)(1) and 29(b) of the Exchange Act**
**(BitMEX)**

199.    Plaintiff realleges the allegations above.

200.    In relevant part, with respect to a broker or dealer who is engaged in interstate
commerce in using the facility of an exchange, Section 15(a)(1) of the Exchange Act makes it
unlawful "for any broker or dealer … to make use of … any means or instrumentality of interstate
commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of,

any security … unless such broker or dealer is registered in accordance with subsection (b) of this section." 15 U.S.C. § 78o(a)(1).

201.    As a broker-dealer engaged in interstate commerce using the facility of an exchange, and without being registered in accordance with subsection (b) of Section 15 of the Exchange Act, throughout the Class Period, BitMEX has made use of means and instrumentalities of interstate commerce to effect transactions in, and to induce or attempt to induce the purchase or sale of, securities.

202.    A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others." *Id.* § 78(a)(4)(A). In addition, an entity is a broker if it assists issuers with structuring a securities offering, identifies potential purchasers, or advertises a securities offering. BitMEX has operated as a broker during the Class Period by facilitating the sale of derivatives referencing digital assets, including by marketing the derivatives, creating derivatives contracts, and making margin calls and liquidating positions for traders.

203.    In the course of operating as an unregistered broker-dealer BitMEX has entered into contracts with the members of the Class pursuant to which the members purchased Token Futures through BitMEX and paid BitMEX fees for the use of its exchange. The parties to these contracts thus reached an agreement whereby and pursuant to which BitMEX was operating in violation of Section 15(a)(1) of the Exchange Act.

204.    The foregoing contracts were made in violation of Section 5 of the Exchange Act, and their performance involves the violation of Section 5, and the continuation of a practice in violation of Section 5, because BitMEX entered into them for the purpose of operating, and as operating, as an unlicensed exchange in violation of Section 5; and because the parties to the

contracts reached agreements whereby and pursuant to which BitMEX would be and was operating in violation of Section 5.

205.    Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter … and every contract (including any contract for listing a security on an exchange) … the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter … shall be void … as regards the rights of any person who, in violation of any such provision, … shall have made or engaged in the performance of such contract." *Id.* § 78cc.

206.    Section 29(b) affords Plaintiff and the Class the right, which they hereby pursue, to void their purchase agreements with BitMEX and to recover, as rescissory damages, the fees they have paid under those contracts.

207.    Plaintiff and the Class seek to void contracts and recover damages for purchases of Token Futures through BitMEX in domestic U.S. transactions in the Class Period. *Id.* § 78cc(b).

<div align="center">

**FOURTH CAUSE OF ACTION**
**(SECURITIES ACT – ADDITIONAL LIABILITY)**
**Control Person Liability for Violations of**
**Sections 5 and 12(a)(1) of the Securities Act**
**(Individual Defendants)**

</div>

208.    Plaintiff realleges the allegations above.

209.    This Count is asserted against Arthur Hayes, Ben Delo, and Samuel Reed (the "Individual Defendants") for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o.

210.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, had the power and authority to direct the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained

of herein. Each Individual Defendant had and exercised the power and influence to cause the unlawful solicitation of various ERC-20 tokens as described herein.

211.    The Individual Defendants have the power to direct or cause the direction of the management and policies of BitMEX.

212.    The Individual Defendants, separately or together, have sufficient influence to have caused BitMEX to solicit transactions of securities.

213.    The Individual Defendants, separately or together, jointly participated in, and/or aided and abetted, BitMEX's solicitation of securities.

214.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiff and the Class for rescission and/or damages suffered.

<div align="center">

**FIFTH CAUSE OF ACTION**
**(EXCHANGE ACT – ADDITIONAL LIABILITY)**
**Section 20 of the Exchange Act**
**(Individual Defendants)**

</div>

215.    Plaintiff realleges the allegations above.

216.    This Count is asserted against the Individual Defendants for violations of Section 20 of the Exchange Act, 15 U.S.C. § 78t(a).

217.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, had the power and authority to direct the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant had and exercised the power and influence to cause the unlawful sales of securities on an unregistered exchange as described herein.

218.    The Individual Defendants have the power to direct or cause the direction of the management and policies of BitMEX.

219.    The Individual Defendants, separately or together, have sufficient influence to have either caused BitMEX to register as an exchange or prevented BitMEX from effecting transactions of securities as an unregistered exchange.

220.    The Individual Defendants, separately or together, jointly participated in, and/or aided and abetted, BitMEX's failure to register as an exchange and BitMEX's offer of securities on an unregistered exchange.

221.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiff and the Class for rescission and/or damages suffered.

### SIXTH CAUSE OF ACTION
### (ALABAMA STATE LAW – PRIMARY LIABILITY)
**Unregistered Offer and Sale of Securities**
**Ala. Code § 8-6-19**
**(BitMEX)**

222.    Plaintiff realleges the allegations above.

223.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Alabama.

224.    The Alabama Securities Act forbids the offer or sale of unregistered securities. Ala. Code § 8-6-4. Any person who offers or sells a security in violation of Section 8-6-4 is "liable to the person buying the security from him who may bring an action to recover the consideration paid for the security, together with interest at six percent per year from the date of payment, court costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount

that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six percent per year from the date of disposition." *Id.* § 8-6-19(a).

225.    When issued, the Token Futures were securities within the meaning of the Alabama Securities Act. *Id.* § 8-6-2. On information and belief, BitMEX offered or sold the Token Futures to members of the Class in Alabama. The Token Futures were neither registered under, nor subject to exemption from registration under the Alabama Securities Act. *Id.* § 8-6-10.

226.    Upon information and belief, the Token Futures were offered or sold in Alabama, including without limitation through solicitations directed by BitMEX to Alabama and received in Alabama.

227.    Accordingly, BitMEX has violated the Alabama Securities Act through BitMEX's sale of unregistered securities.

228.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

229.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SEVENTH CAUSE OF ACTION**
**(ALABAMA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Ala. Code § 8-6-19**
**(BitMEX)**

230.    Plaintiff realleges the allegations above.

231.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Alabama.

232.    The Alabama Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered under Alabama law. Ala. Code § 8-6-3. Any person

who offers or sells a security in violation of Section 8-6-3 is "liable to the person buying the security from him who may bring an action to recover the consideration paid for the security, together with interest at six percent per year from the date of payment, court costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six percent per year from the date of disposition." *Id.* § 8-6-19.

233.    When issued, the Token Futures were securities within the meaning of the Alabama Securities Act. *Id.* § 8-6-2. On information and belief, BitMEX transacted business as a broker-dealer or agent when it offered or sold the Token Futures to members of the Class in Alabama. *Id.* § 8-6-2.

234.    On information and belief, BitMEX transacted business as a broker-dealer or agent in Alabama, including without limitation through solicitations directed by BitMEX to Alabama and received in Alabama.

235.    BitMEX was not registered as a broker-dealer or agent in Alabama, nor was it subject to any exemption from registration.

236.    Accordingly, BitMEX has violated the Alabama Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

237.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

238.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## EIGHTH CAUSE OF ACTION
## (ALABAMA STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### Ala. Code § 8-6-19
### (Individual Defendants)

239.    Plaintiff realleges the allegations above.

240.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Alabama.

241.    Every person who directly or indirectly controls an entity liable under the Alabama Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer, or director of such a person, every person occupying a similar status or performing similar functions, every employee of such a person who materially aids in the conduct giving rise to the liability, and every dealer or agent who materially aids in such conduct" is jointly and severally liable "with and to the same extent" as the seller, unless the non-seller "is able to sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist." Ala. Code § 8-6-19(c).

242.    When issued, the Token Futures were securities within the meaning of the Alabama Securities Act. *Id.* § 8-6-19. On information and belief, BitMEX offered and sold the Token Futures to members of the Class in Alabama and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Alabama Securities Act, and BitMEX was not registered as a broker-dealer or agent under Alabama law. *Id.* § 8-6-3.

243.    On information and belief, BitMEX offered and sold the Token Futures and acted as a broker-dealer or agent in Alabama, including without limitation through solicitations directed by BitMEX to Alabama and received in Alabama.

64

244.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

245.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Alabama Securities Act through BitMEX's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

246.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

247.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**NINTH CAUSE OF ACTION**
**(ALASKA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**AS § 45.56.710**
**(BitMEX)**

248.    Plaintiff realleges the allegations above.

249.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Alaska.

250.    The Alaska Securities Act forbids the sale of unregistered securities. AS § 45.56.100. Any person who sells a security in violation of Section 45.56.100 is "liable to the purchaser," who "may maintain an action to recover the consideration paid for the security, less

the amount of any income received on the security, and interest at the legal rate of interest under AS § 09.30.070, or eight percent a year, whichever is greater, from the date of the purchase, costs, and attorney fees as determined by the court, upon the tender of the security, or for actual damages," defined as "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest under AS § 09.30.070, or eight percent a year, whichever is greater, from the date of the purchase, costs, and attorney fees as determined by the court." *Id.* § 45.56.710.

251.    When issued, the Token Futures were securities within the meaning of the Alaska Securities Act. *Id.* § 45.56.900. On information and belief, BitMEX sold the Token Futures to members of the Class in Alaska. The Token Futures were neither registered under, nor subject to exemption from registration under the Alaska Securities Act. *Id.* § 45.56.110.

252.    Upon information and belief, the Token Futures were sold in Alaska, including without limitation through solicitations directed by BitMEX to Alaska and received in Alaska.

253.    Accordingly, BitMEX has violated the Alaska Securities Act through BitMEX's sale of unregistered securities.

254.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

255.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TENTH CAUSE OF ACTION**
**(ALASKA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**AS § 45.56.710**
**(BitMEX)**

256.    Plaintiff realleges the allegations above.

257.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Alaska.

258.    The Alaska Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Alaska law. AS § 45.56.300. Any person who sells a security in violation of Section 45.56.300 is "liable to the customer," who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest under AS § 09.30.070, or eight percent a year, whichever is greater, from the date of the purchase, costs, and attorney fees as determined by the court, upon the tender of the security, or for actual damages," defined as "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest under AS § 09.30.070, or eight percent a year, whichever is greater, from the date of the purchase, costs, and attorney fees as determined by the court." *Id.* § 45.56.710.

259.    When issued, the Token Futures were securities within the meaning of the Alaska Securities Act. *Id.* § 45.56.900. On information and belief, BitMEX transacted business as a broker-dealer or agent when it sold the Token Futures to members of the Class in Alaska. *Id.*

260.    On information and belief, BitMEX transacted business as a broker-dealer or agent in Alaska, including without limitation through solicitations directed by BitMEX to Alaska and received in Alaska.

261.    BitMEX was not registered as a broker-dealer or agent in Alaska, nor was it subject to any exemption from registration.

262.    Accordingly, BitMEX has violated the Alaska Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

263.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

264.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ELEVENTH CAUSE OF ACTION**
**(ALASKA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**AS § 45.56.710(g)**
**(Individual Defendants)**

</div>

265.    Plaintiff realleges the allegations above.

266.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Alaska.

267.    Every person who "directly or indirectly controls a person liable under" the Alaska Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "managing partner, executive officer, or director of a person liable … including an individual having a similar status or performing similar functions," every "individual who is an employee of or associated with a person liable … and who materially aids the conduct giving rise to the liability," and every "person that is a broker-dealer, agent, investment adviser, or investment adviser representative that materially aids the conduct giving rise to the liability" is "jointly and severally with and to the same extent as" the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. *Id.* § 45.56.710(g).

268.    When issued, the Token Futures were securities within the meaning of the Alaska Securities Act. *Id.* § 45.56.900. On information and belief, BitMEX sold the Token Futures to

members of the Class in Alaska and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Alaska Securities Act, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Alaska law. *Id.* § 45.56.300.

269.    On information and belief, BitMEX sold the Token Futures and acted as a broker-dealer or agent in Alaska, including without limitation through solicitations directed by BitMEX to Alaska and received in Alaska.

270.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

271.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Alaska Securities Act through BitMEX's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

272.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

273.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TWELFTH CAUSE OF ACTION**
**(ARIZONA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**A.R.S. § 44-2001**
**(BitMEX)**

274.    Plaintiff realleges the allegations above.

275.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Arizona.

276.    The Arizona Securities Act forbids the sale of unregistered securities. A.R.S. § 44-1841. Any purchase of a security in violation of Section 44-1841 is "voidable at the election of the purchaser," who "may bring an action in a court of competent jurisdiction to recover the consideration paid for the securities, with interest, taxable court costs and reasonable attorney fees, less the amount of any income received by dividend or otherwise from ownership of the securities, on tender of the securities purchased or the contract made, or for damages if the purchaser no longer owns the securities." *Id.* § 44-2001.

277.    When issued, the Token Futures were securities within the meaning of the Arizona Securities Act. *Id.* § 1801. On information and belief, BitMEX sold the Token Futures to members of the Class in Arizona. The Token Futures were neither registered under, nor subject to exemption from registration under the Arizona Securities Act. *Id.* § 1843.

278.    Upon information and belief, the Token Futures were sold in Arizona, including without limitation through solicitations directed by BitMEX to Arizona and received in Arizona.

279.    Accordingly, BitMEX has violated the Arizona Securities Act through BitMEX's sale of unregistered securities.

280.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

281.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**THIRTEENTH CAUSE OF ACTION**
**(ARIZONA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Dealer**
**A.R.S. § 44-2001**
**(BitMEX)**

282.    Plaintiff realleges the allegations above.

283.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Arizona.

284.    The Arizona Securities Act forbids any person from transacting business as a dealer or agent unless he is registered under Arizona law. A.R.S. § 44-1842. Any purchase of a security in violation of Section 44-1842 is "voidable at the election of the purchaser," who "may bring an action in a court of competent jurisdiction to recover the consideration paid for the securities, with interest, taxable court costs and reasonable attorney fees, less the amount of any income received by dividend or otherwise from ownership of the securities, on tender of the securities purchased or the contract made, or for damages if the purchaser no longer owns the securities." *Id.* § 44-2001.

285.    When issued, the Token Futures were securities within the meaning of the Arizona Securities Act. *Id.* § 1801. On information and belief, BitMEX transacted business as a dealer or agent when it sold the Token Futures to members of the Class in Arizona. *Id.* § 1801.

286.    On information and belief, BitMEX transacted business as a dealer or agent in Arizona, including without limitation through solicitations directed by BitMEX to Arizona and received in Arizona.

287.    BitMEX was not registered as a dealer or agent in Arizona, nor was it subject to any exemption from registration.

288.     Accordingly, BitMEX has violated the Arizona Securities Act by transacting business as an unregistered dealer or agent in the sale of securities.

289.     Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

290.     Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## FOURTEENTH CAUSE OF ACTION
## (ARIZONA STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### A.R.S. § 44-2003
### (Individual Defendants)

291.     Plaintiff realleges the allegations above.

292.     This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Arizona.

293.     Any person, including any dealer, salesman or agent, who made, participated in or induced the unlawful sale of securities under the Arizona Securities Act "shall be jointly and severally liable to the person who is entitled to maintain" an action under A.R.S. § 44-2001. A.R.S. § 44-2003.

294.     When issued, the Token Futures were securities within the meaning of the Arizona Securities Act. *Id.* § 1801. On information and belief, BitMEX sold the Token Futures to members of the Class in Arizona and acted as the dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Arizona Securities Act, and BitMEX was not registered as a dealer or agent under Arizona law. *Id.* § 1841.

295.    On information and belief, BitMEX sold the Token Futures and acted as a dealer or agent in Arizona, including without limitation through solicitations directed by BitMEX to Arizona and received in Arizona.

296.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered dealer or agent as described herein.

297.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Arizona Securities Act through BitMEX's sale of unregistered securities and operation as an unregistered dealer or agent.

298.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

299.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## FIFTEENTH CAUSE OF ACTION
### (ARKANSAS STATE LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Broker-Dealer**
**Ark. Stat. Ann. § 23-42-106**
**(BitMEX)**

300.    Plaintiff realleges the allegations above.

301.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Arkansas.

302.    The Arkansas Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered under Arkansas law. *Id.* 23-42-301. Any person who transacts business in violation of Section 23-42-301 is liable to the person buying the security from him, who "may recover costs and reasonable attorney's fees plus: (A) [u]pon tender of the security, the consideration paid for the security and interest at six percent (6%) per year from the date of payment, less the amount of any income received from owning the security; or (B)(i) [d]amages if the buyer no longer owns the security." *Id.* § 23-42-106(a)(1) – (2)(B)(i). "Damages are the amount that would be recoverable upon a tender of the security less the value of the security when the buyer disposed of the security plus interest at six percent (6%) per year from the date of disposition of the security." *Id.* § 23-42-106(a)(2)(B)(ii).

303.    When issued, the Token Futures were securities within the meaning of the Arkansas Securities Act. *Id.* § 23-42-102(17). On information and belief, BitMEX transacted business as a broker-dealer or agent when it offered or sold the Token Futures to members of the Class in Arkansas. *Id.* §§ 23-42-102(1)(A), 23-42-102(3)(A).

304.    On information and belief, BitMEX transacted business as a broker-dealer or agent in Arkansas, including without limitation through solicitations directed by BitMEX to Arkansas and received in Arkansas.

305.    BitMEX was not registered as a broker-dealer or agent in Arkansas.

306.    Accordingly, BitMEX has violated the Arkansas Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

307.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

308.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SIXTEENTH CAUSE OF ACTION**
**(ARKANSAS STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer or Sale of Securities**
**Ark. Stat. Ann. § 23-42-106(a)**
**(BitMEX)**

309.    Plaintiff realleges the allegations above.

310.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Arkansas.

311.    The Arkansas Securities Act forbids the offer or sale of unregistered securities. Ark. Code Ann. § 23-42-501. Any person who offers or sells a security in violation of Section 23-42-501 is liable to the person buying the security from him, who "may recover costs and reasonable attorney's fees plus: (A) [u]pon tender of the security, the consideration paid for the security and interest at six percent (6%) per year from the date of payment, less the amount of any income received from owning the security; or (B)(i) [d]amages if the buyer no longer owns the security." *Id.* § 23-42-106(a)(1) – (2)(B)(i). "Damages are the amount that would be recoverable upon a tender of the security less the value of the security when the buyer disposed of the security plus interest at six percent (6%) per year from the date of disposition of the security." *Id.* § 23-42-106(a)(2)(B)(ii).

312.    When issued, the Token Futures were securities within the meaning of the Arkansas Securities Act. *Id.* § 23-42-102(17). On information and belief, BitMEX offered or sold the Token Futures to members of the Class in Arkansas. The Token Futures were neither registered under, nor subject to exemption from registration under the Arkansas Securities Act. *Id.* § 23-42-503.

313.    Upon information and belief, the Token Futures were offered or sold in Arkansas, including without limitation through solicitations directed by BitMEX to Arkansas and received in Arkansas.

314.    Accordingly, BitMEX has violated the Arkansas Securities Act through BitMEX's sale of unregistered securities.

315.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

316.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SEVENTEENTH CAUSE OF ACTION**
**(ARKANSAS STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Ark. Stat. Ann § 23-42-106**
**(Individual Defendants)**

</div>

317.    Plaintiff realleges the allegations above.

318.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Arkansas.

319.    Every person who controls a person liable under the Arkansas Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every partner, officer, or director of the seller and any other person occupying a similar status or performing a similar function with respect to the seller is jointly and severally liable for the actions of the seller, unless the non-seller satisfies the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of actions of the seller that give rise to the liability alleged to exist. *Id.* § 23-42-106(d).

320.    When issued, the Token Futures were securities within the meaning of the Arkansas Securities Act. *Id.* § 23-42-102(17). On information and belief, BitMEX offered and sold the Token Futures to members of the Class in Arkansas and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Arkansas Securities Act, and BitMEX was not registered as a broker-dealer or agent under Arkansas law. *Id.* §§ 23-42-501, 23-42-301.

321.    On information and belief, BitMEX offered and sold the Token Futures and acted as a broker-dealer or agent in Arkansas, including without limitation through solicitations directed by BitMEX to Arkansas and received in Arkansas.

322.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

323.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Arkansas Securities Act through BitMEX's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

324.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

325.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**EIGHTEENTH CAUSE OF ACTION**
**(CALIFORNIA STATE LAW – PRIMARY LIABILITY)**
**Unqualified Offer or Sale of Securities**
**Cal. Corp. Code § 25503**
**(BitMEX)**

326.    Plaintiff realleges the allegations above.

327.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in California.

328.    The California Corporate Securities Law of 1968 ("California Securities Act") forbids the offer or sale of unqualified securities. Cal Corp. Code §§ 25110, 25130. Any person who offers or sells a security in violation of Sections 25110 or 25130 are "liable to any person acquiring from him the security sold in violation of such section, who may sue to recover the consideration he paid for such security with interest thereon at the legal rate, less the amount of any income received therefrom, upon the tender of such security, or for damages, if he no longer owns the security, or if the consideration given for the security is not capable of being returned. Damages, if the plaintiff no longer owns the security, shall be equal to the difference between (a) his purchase price plus interest at the legal rate from the date of purchase and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff." *Id.* § 25503.

329.    When issued, the Token Futures were securities within the meaning of the California Securities Act. *Id.* § 25019. On information and belief, BitMEX offered or sold the Token Futures to members of the Class in California. The Token Futures were neither qualified under, nor subject to exemption from qualification under the California Securities Act. *Id.* §§ 25110, 25130.

330.    Upon information and belief, the Token Futures were offered or sold in California, including without limitation through solicitations directed by BitMEX to California and received in California.

331.    Accordingly, BitMEX has violated the California Securities Act through BitMEX's sale of unqualified securities.

332.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

333.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**NINETEENTH CAUSE OF ACTION**
**(CALIFORNIA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unlicensed Broker-Dealer**
**Cal. Corp. Code § 25501.5(a)**
**(BitMEX)**

</div>

334.    Plaintiff realleges the allegations above.

335.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in California.

336.    The California Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is licensed or exempt from licensing under California law. *Id*. § 25210. Any person who offers or sells a security in violation of Section 25210 is liable to the purchaser for recission of the sale, or if the purchaser no longer owns the security, for damages. *Id.* § 25501.5(a)(1). Upon recission and tender of the Token Futures, such purchaser is entitled to recover the consideration paid for the Token Futures plus interest at the legal rate, less the amount of any income received on the Token Futures. *Id.* § 25501.5(a)(2). A purchaser who no longer owns the Token Futures is entitled to damages in an amount equal to the difference between: (i)

the price at which the security was brought plus interest at the legal rate from the date of purchase; and (ii) the value of the security at the time it was disposed of by the purchaser plus the amount of any income received on the Token Futures by the purchaser. *Id.* § 25501.5(a)(4).

337.    When issued, the Token Futures were securities within the meaning of the California Securities Act. *Id.* § 25019. On information and belief, BitMEX transacted business as a broker-dealer or agent when it offered or sold the Token Futures to members of the Class in California. *Id.* § 25004.

338.    On information and belief, BitMEX transacted business as a broker-dealer or agent in California, including without limitation through solicitations directed by BitMEX to California and received in California.

339.    BitMEX was not licensed as a broker-dealer or agent in California, nor was it subject to any exemption from licensing.

340.    Accordingly, BitMEX has violated the California Securities Act by transacting business as an unlicensed broker-dealer or agent in the sale of securities.

341.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

342.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TWENTIETH CAUSE OF ACTION**
**(CALIFORNIA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Cal. Corp. Code § 25504**
**(Individual Defendants)**

343.    Plaintiff realleges the allegations above.

344.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in California.

345.    Every person who directly or indirectly controls an entity liable under the California Securities Act for unlawfully selling unqualified securities or for operating as an unregistered broker-dealer or agent in the sale of those securities as well as "every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions … are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 25504.

346.    When issued, the Token Futures were securities within the meaning of the California Securities Act. *Id.* § 25019. On information and belief, BitMEX offered and sold the Token Futures to members of the Class in California. The Token Futures were neither qualified under, nor subject to exemption from qualification under the California Securities Act, and BitMEX was not licensed or exempt from licensing as a broker-dealer or agent under California law. *Id.* § 25210.

347.    On information and belief, BitMEX offered and sold the Token Futures and acted as a broker-dealer or agent in California, including without limitation through solicitations directed by BitMEX to California and received in California.

348.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the

wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unqualified securities.

349.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the California Securities Act through BitMEX's offer or sale of unqualified securities.

350.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

351.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**TWENTY-FIRST CAUSE OF ACTION**
**(COLORADO STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Colo. Rev. Stat. § 11-51-604**
**(BitMEX)**

</div>

352.    Plaintiff realleges the allegations above.

353.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in state of Colorado.

354.    The Colorado Securities Act forbids the sale of unregistered securities. Colo. Rev. Stat. § 11-51-301. Any person who sells a security in violation of Section 301 "is liable to the person buying the security from such seller for the consideration paid for the security, together with interest at the statutory rate from the date of payment, costs, and reasonable attorney fees, less the amount of any income received on the security, upon the tender of the security, or is liable for damages if the buyer no longer owns the security. Damages are deemed to be the amount that would be recoverable upon a tender, less the value of the security when the buyer disposed of it, and interest at the statutory rate from the date of disposition." *Id.* § 11-51-604(1).

355.    When issued, the Token Futures were securities within the meaning of the Colorado Securities Act. *Id.* § 11-51-201(17). On information and belief, BitMEX sold the Token Futures to members of the Class in the state of Colorado. The Token Futures were neither registered under, nor subject to exemption from registration under the Colorado Securities Act. *Id.* § 11-51-301.

356.    On information and belief, the Token Futures were sold in the state of Colorado, including without limitation through solicitations directed by BitMEX to the state of Colorado and received in the state of Colorado.

357.    Accordingly, BitMEX has violated the Colorado Securities Act through BitMEX's sale of unregistered securities.

358.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

359.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TWENTY-SECOND CAUSE OF ACTION**
**(COLORADO STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Colo. Rev. Stat. § 11-51-604**
**(BitMEX)**

360.    Plaintiff realleges the allegations above.

361.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in the state of Colorado.

362.    The Colorado Securities Act forbids any person from transacting business as a broker-dealer or sales representative unless he is registered or exempt from registration under Colorado law. Colo. Rev. Stat. § 11-51-401(1). Any person who sells a security in violation of Section 401 "is liable to the person buying the security from such seller for the consideration paid

for the security, together with interest at the statutory rate from the date of payment, costs, and reasonable attorney fees, less the amount of any income received on the security, upon the tender of the security, or is liable for damages if the buyer no longer owns the security." *Id.* § 11-51-604(2)(a).

363. When issued, the Token Futures were securities within the meaning of the Colorado Securities Act. *Id.* § 11-51-201(17). BitMEX transacted business as a broker-dealer or sales representative when it sold the Token Futures to members of the Class in the state of Colorado. *Id.* § 11-51-201(2), (14).

364. On information and belief, BitMEX transacted business as a broker-dealer or sales representative in the state of Colorado, including without limitation through solicitations directed by BitMEX to the state of Colorado and received in the state of Colorado.

365. BitMEX was not registered as a broker-dealer or sales representative in the state of Colorado, nor was it subject to any exemption from registration.

366. Accordingly, BitMEX has violated the Colorado Securities Act by transacting business as an unregistered broker-dealer or sales representative in the sale of securities.

367. Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

368. Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**TWENTY-THIRD CAUSE OF ACTION**
**(COLORADO STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Colo. Rev. Stat. § 11-51-604**
**(Individual Defendants)**

</div>

369. Plaintiff realleges the allegations above.

370. This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in the state of Colorado.

371. Every person who directly or indirectly controls an entity liable under the Colorado Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or sales representative in the sale of those securities, "is liable jointly and severally with and to the same extent as such controlled person, unless the controlling person sustains the burden of proof that such person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Colo. Rev. Stat. § 11-51-604(5).

372. When issued, the Token Futures were securities within the meaning of the Colorado Securities Act. *Id.* § 11-51-201(17). On information and belief, BitMEX sold the Token Futures to members of the Class in the state of Colorado and acted as the broker-dealer or sales representative for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Colorado Securities Act, and BitMEX was not registered or exempt from registration as a broker-dealer or sales representative under Colorado law. *Id.* §§ 11-51-301, 11-51-401(1).

373. On information and belief, BitMEX sold the Token Futures and acted as a broker-dealer or sales representative in the state of Colorado, including without limitation through solicitations directed by BitMEX to the state of Colorado and received in the state of Colorado.

374. Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the

wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or sales representative as described herein.

375.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Colorado Securities Act through BitMEX's sale of unregistered securities and operation as an unregistered broker-dealer or sales representative.

376.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

377.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## TWENTY-FOURTH CAUSE OF ACTION
### (CONNECTICUT STATE LAW – PRIMARY LIABILITY)
Unregistered Offer and Sale of Securities
**Conn. Gen. Stat. § 36b-29**
**(BitMEX)**

378.    Plaintiff realleges the allegations above.

379.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in the state of Connecticut.

380.    The Connecticut Uniform Securities Act forbids the offer or sale of unregistered securities. Conn. Gen. Stat. § 36b-16. Any person who offers or sells a security in violation of Section 36b-16 "is liable to the person buying the security, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at eight per cent per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 36b-29(a).

86

381.    When issued, the Token Futures were securities within the meaning of the Connecticut Uniform Securities Act. *Id.* § 36b-3(19). BitMEX offered or sold the Token Futures to members of the Class in the state of Connecticut. The Token Futures were neither registered under, nor subject to exemption from registration under the Connecticut Uniform Securities Act. *Id.* § 36b-16.

382.    On information and belief, the Token Futures were offered or sold in the state of Connecticut, including without limitation through solicitations directed by BitMEX to the state of Connecticut and received in the state of Connecticut.

383.    Accordingly, BitMEX has violated the Connecticut Uniform Securities Act through BitMEX's sale of unregistered securities.

384.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

385.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TWENTY-FIFTH CAUSE OF ACTION**
**(CONNECTICUT STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Conn. Gen. Stat. § 36b-29**
**(BitMEX)**

386.    Plaintiff realleges the allegations above.

387.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in the state of Connecticut.

388.    The Connecticut Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Connecticut law. Conn. Gen. Stat. § 36b-6(a). Any person who offers or sells a security in violation

of Section 36b-6(a) is "is liable to the person buying the security, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at eight per cent per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 36b-29(a).

389.    When issued, the Token Futures were securities within the meaning of the Connecticut Uniform Securities Act. *Id.* § 36b-3(19). BitMEX transacted business as a broker-dealer or agent when it offered or sold the Token Futures to members of the Class in the state of Connecticut. *Id.* § 36b-3(1) and (5).

390.    On information and belief, BitMEX transacted business as a broker-dealer or agent in the state of Connecticut, including without limitation through solicitations directed by BitMEX to the state of Connecticut and received in the state of Connecticut.

391.    BitMEX was not registered as a broker-dealer or agent in the state of Connecticut, nor was it subject to any exemption from registration.

392.    Accordingly, BitMEX has violated the Connecticut Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

393.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

394.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### TWENTY-SIXTH CAUSE OF ACTION
### (CONNECTICUT STATE LAW – ADDITIONAL LIABILITY)
Control Person Liability
### Conn. Gen. Stat. § 36b-29
### (Individual Defendants)

395.    Plaintiff realleges the allegations above.

396.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in the state of Connecticut.

397.    Every person who directly or indirectly controls an entity liable under the Connecticut Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer or director of such a person, [and] every person occupying a similar status or performing similar functions," is jointly and severally liable "with and to the same extent" as the entity liable, unless "the person who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist." Conn. Gen. Stat. § 36b-29(c).

398.    When issued, the Token Futures were securities within the meaning of the Connecticut Uniform Securities Act. *Id.* § 36b-3(19). BitMEX offered and sold the Token Futures to members of the Class in the state of Connecticut and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Connecticut Uniform Securities Act, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Connecticut law. *Id.* §§ 36b-16, 36b-6(a).

399.    On information and belief, BitMEX offered and sold the Token Futures and acted as a broker-dealer or agent in the state of Connecticut, including without limitation through

solicitations directed by BitMEX to the state of Connecticut and received in the state of Connecticut.

400.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

401.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Connecticut Uniform Securities Act through BitMEX's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

402.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

403.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TWENTY-SEVENTH CAUSE OF ACTION**
**(DELAWARE STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Del. Code tit. 6, § 73-605**
**(BitMEX)**

404.    Plaintiff realleges the allegations above.

405.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in the state of Delaware.

406.    The Delaware Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered under Delaware law. Del. Code tit. 6, § 73-301. Any person who offers or sells a security in violation of Section 301 "is liable to the person buying … the security from or to him or her, who may sue either at law or in equity to recover the consideration paid for the security, together with the interest at the legal rate from the date of payment costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he or she no longer owns the security." *Id.* § 73-605(a)(1-2).

407.    When issued, the Token Futures were securities within the meaning of the Delaware Securities Act. *Id.* § 73-103(23). BitMEX transacted business as a broker-dealer or agent when it offered or sold the Token Futures to members of the Class in the state of Delaware. *Id.* § 73-103(1), (3).

408.    On information and belief, BitMEX transacted business as a broker-dealer or agent in the state of Delaware, including without limitation through solicitations directed by BitMEX to the state of Delaware and received in the state of Delaware.

409.    BitMEX was not registered as a broker-dealer or agent in the state of Delaware.

410.    Accordingly, BitMEX has violated the Delaware Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

411.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

412.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TWENTY-EIGHTH CAUSE OF ACTION**
**(DELAWARE STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Del. Code tit. 6, § 73-605**
**(Individual Defendants)**

413.    Plaintiff realleges the allegations above.

414.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in the state of Delaware.

415.    Every person who directly or indirectly controls an entity liable under the Delaware Securities Act for operating as an unregistered broker-dealer or agent, as well as "every partner, officer, or director of such a seller … [and] every person occupying a similar status or performing similar functions" is jointly and severally liable "unless the nonseller who is so liable sustains the burden of proof that the person did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Del. Code tit. 6, § 73-605(b).

416.    When issued, the Token Futures were securities within the meaning of the Delaware Securities Act. *Id.* § 73-103(23). BitMEX offered and sold the Token Futures to members of the Class in the state of Delaware and acted as the broker-dealer or agent for the sale and purchase of those securities. BitMEX was not registered as a broker-dealer or agent under Delaware law. *Id.* § 73-301.

417.    On information and belief, BitMEX offered and sold the Token Futures and acted as a broker-dealer or agent in the state of Delaware, including without limitation through solicitations directed by BitMEX to the state of Delaware and received in the state of Delaware.

418.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the

management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of securities and the operation of an unregistered broker-dealer or agent as described herein.

419.     Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Delaware Securities Act through BitMEX's offer or sale of securities and operation as an unregistered broker-dealer or agent.

420.     Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

421.     Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TWENTY-NINTH CAUSE OF ACTION**
**(DISTRICT OF COLUMBIA LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**D.C. Code Ann. § 31-5606.05**
**(BitMEX)**

422.     Plaintiff realleges the allegations above.

423.     This Cause of Action is brought on behalf of Class members to whom the Token Futures were offered or sold in the District of Columbia.

424.     The District of Columbia Securities and Investor Protection Act forbids the offer or sale of unregistered securities. D.C. Code Ann. § 31-5603.01. Any person who offers or sells a security in violation of Section 5603.01 is liable to the purchaser for "the consideration paid for the security, interest at the rate used in the Superior Court of the District of Columbia from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security and any income received on it" or for "damages if the buyer no longer owns the security" in the "amount that would be recoverable on a tender less the

value of the security when the buyer disposed of it, plus interest at the rate used in the Superior Court of the District of Columbia from the date of disposition." *Id.* § 31.5606.05(b).

425.    When issued, the Token Futures were securities within the meaning of the District of Columbia Securities and Investor Protection Act. *Id.* § 517.021(22). On information and belief, BitMEX offered or sold the Token Futures to members of the Class in District of Columbia. The Token Futures were neither registered under, nor subject to exemption from registration under the District of Columbia Securities and Investor Protection Act. *Id.* § 31.5601.01(31).

426.    On information and belief, the Token Futures were offered or sold in District of Columbia, including without limitation through solicitations directed by BitMEX to District of Columbia and received in District of Columbia.

427.    Accordingly, BitMEX has violated the District of Columbia Securities and Investor Protection Act through BitMEX's sale of unregistered securities.

428.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any the Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

429.    Class members who no longer own the Token Futures seek damages for any the Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### THIRTIETH CAUSE OF ACTION
### (DISTRICT OF COLUMBIA LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Broker-Dealer**
**D.C. Code Ann. § 31-5606.05**
**(Individual Defendants)**

430.    Plaintiff realleges the allegations above.

431.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in the District of Columbia.

432.    The District of Columbia Securities and Investor Protection Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under District of Columbia law. D.C. Code Ann. § 31-5602.01. Any person who offers or sells a security in violation of Section 5603.01 is liable to the purchaser for "the consideration paid for the security, interest at the rate used in the Superior Court of the District of Columbia from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security and any income received on it" or for "damages if the buyer no longer owns the security" in the "amount that would be recoverable on a tender less the value of the security when the buyer disposed of it, plus interest at the rate used in the Superior Court of the District of Columbia from the date of disposition." *Id.* § 31.5606.05(b).

433.    When issued, the Token Futures were securities within the meaning of the District of Columbia Securities and Investor Protection Act. *Id.* § 517.021(22). BitMEX transacted business as a broker-dealer or agent when it offered or sold the Token Futures to members of the Class in the District of Columbia. *Id.* § 36b-3(1) and (5).

434.    On information and belief, BitMEX transacted business as a broker-dealer or agent in the District of Columbia, including without limitation through solicitations directed by BitMEX to the District of Columbia and received in District of Columbia.

435.    BitMEX was not registered as a broker-dealer or agent in the District of Columbia, nor was it subject to any exemption from registration.

436.    Accordingly, BitMEX has violated the District of Columbia Securities and Investor Protection Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

437.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

438.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### THIRTY-FIRST CAUSE OF ACTION
### (DISTRICT OF COLUMBIA LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**D.C. Code Ann. § 31-5606.05**
**(Individual Defendants)**

439.    Plaintiff realleges the allegations above.

440.    This Cause of Action is brought on behalf of Class members to whom the Token Futures were offered or sold in District of Columbia.

441.    Every person who directly or indirectly controls an entity liable under the District of Columbia Securities Act for unlawfully selling unregistered securities or for operation of an unlicensed broker-dealer, as well as "partner, officer, or director of the person liable" or "a person occupying a similar status or performing similar functions" is "liable jointly and severally with, and to the same extent as the person liable, unless her or she is able to sustain the burden of proof that he or she did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There shall be contribution among the several persons so liable." D.C. Code Ann. § 31-5606.05(c).

442.    When issued, the Token Futures were securities within the meaning of the District of Columbia Securities and Investor Protection Act. *Id.* § 517.021(22). On information and belief, BitMEX offered and sold the Token Futures to members of the Class in District of Columbia and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the District of

Columbia Securities and Investor Protection Act, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under District of Columbia law.

443.    On information and belief, BitMEX offered and sold the Token Futures and acted as a broker-dealer or agent in District of Columbia, including without limitation through solicitations directed by BitMEX to District of Columbia and received in District of Columbia.

444.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and operation of an unregistered broker-dealer as described herein.

445.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the District of Columbia Securities and Investor Protection Act through BitMEX's offer or sale of unregistered securities and operation as an unregistered broker-dealer.

446.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any the Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

447.    Class members who no longer own the Token Futures seek damages for any the Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**THIRTY-SECOND CAUSE OF ACTION**
**(FLORIDA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Fla. Stat. § 517.211**
**(BitMEX)**

448.    Plaintiff realleges the allegations above.

97

449.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Florida.

450.    The Florida Securities and Investor Protection Act forbids the offer or sale of unregistered securities. Fla. Stat. § 517.07(1). Any person who offers or sells a security in violation of Section 517.07(1) is liable to the purchaser for "the consideration paid for the security or investment, plus interest thereon at the legal rate, less the amount of any income received by the purchaser on the security or investment upon tender of the security or investment," as well as reasonable attorneys' fees. *Id.* § 517.211.

451.    When issued, the Token Futures were securities within the meaning of the Florida Securities and Investor Protection Act. *Id.* § 517.021(22). On information and belief, BitMEX offered or sold the Token Futures to members of the Class in Florida. The Token Futures were neither registered under, nor subject to exemption from registration under the Florida Securities and Investor Protection Act. *Id.* §§ 517.051, 517.061.

452.    Upon information and belief, the Token Futures were offered or sold in Florida, including without limitation through solicitations directed by BitMEX to Florida and received in Florida.

453.    Accordingly, BitMEX has violated the Florida Securities and Investor Protection Act through BitMEX's sale of unregistered securities.

454.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

455.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## THIRTY-THIRD CAUSE OF ACTION
## (FLORIDA STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Dealer
### Fla. Stat. § 517.211
### (BitMEX)

456.    Plaintiff realleges the allegations above.

457.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Florida.

458.    The Florida Securities and Investor Protection Act forbids any person from transacting business as a dealer unless he is registered or exempt from registration under Florida law. Fla. Stat. § 517.12(1). Any person who offers or sells a security in violation of Section 517.12(1) is liable to the purchaser for "the consideration paid for the security or investment, plus interest thereon at the legal rate, less the amount of any income received by the purchaser on the security or investment upon tender of the security or investment," as well as reasonable attorneys' fees. *Id.* § 517.211.

459.    When issued, the Token Futures were securities within the meaning of the Florida Securities and Investor Protection Act. *Id.* § 517.021(22). On information and belief, BitMEX transacted business as a dealer when it offered or sold the Token Futures to members of the Class in Florida. *Id.* § 517.021(6).

460.    On information and belief, BitMEX transacted business as a dealer in Florida, including without limitation through solicitations directed by BitMEX to Florida and received in Florida.

461.    BitMEX was not registered as a dealer in Florida, nor was it subject to any exemption from registration.

462.    Accordingly, BitMEX has violated the Florida Securities and Investor Protection Act by transacting business as an unregistered dealer in the sale of securities.

463.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

464.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**THIRTY-FOURTH CAUSE OF ACTION**
**(FLORIDA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Fla. Stat. § 517.211**
**(Individual Defendants)**

</div>

465.    Plaintiff realleges the allegations above.

466.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Florida.

467.    Every person who directly or indirectly controls an entity liable under the Florida Securities and Investor Protection Act for unlawfully selling unregistered securities or for operating as an unregistered dealer in the sale of those securities, as well as "every director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security." *Id.* § 517.211(1).

468.    When issued, the Token Futures were securities within the meaning of the Florida Securities and Investor Protection Act. *Id.* § 517.021(22). On information and belief, BitMEX offered and sold the Token Futures to members of the Class in Florida and acted as the dealer for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Florida Securities and Investor Protection Act,

<div align="center">100</div>

and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Florida law. *Id.* § 517.12(1).

469.    On information and belief, BitMEX offered and sold the Token Futures and acted as a dealer in Florida, including without limitation through solicitations directed by BitMEX to Florida and received in Florida.

470.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered dealer as described herein.

471.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Florida Securities and Investor Protection Act through BitMEX's offer or sale of unregistered securities and operation as an unregistered dealer.

472.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

473.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**THIRTY-FIFTH CAUSE OF ACTION**
**(GEORGIA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Ga. Code Ann. § 10-5-58**
**(BitMEX)**

</div>

474.    Plaintiff realleges the allegations above.

475.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Georgia.

476.    The Georgia Uniform Securities Act forbids the sale of unregistered securities. Ga. Code Ann. § 10-5-20. Any person who sells a security in violation of Section 10-5-20 is "liable to the purchaser," who may "maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of purchase, costs, and reasonable attorney fees determined by the Court upon the tender of the security or for actual damages." *Id.* § 10-5-58.

477.    When issued, the Token Futures were securities within the meaning of the Georgia Uniform Securities Act. *Id.* § 10-5-2(31). On information and belief, BitMEX sold the Token Futures to members of the Class in Georgia. The Token Futures were neither registered under, nor subject to exemption from registration under the Georgia Uniform Securities Act. *Id.* § 10-5-10.

478.    Upon information and belief, the Token Futures were sold in Georgia, including without limitation through solicitations directed by BitMEX to Georgia and received in Georgia.

479.    Accordingly, BitMEX has violated the Georgia Uniform Securities Act through BitMEX's sale of unregistered securities.

480.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

481.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### THIRTY-SIXTH CAUSE OF ACTION
### (GEORGIA STATE LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Broker-Dealer**
**Ga. Code Ann. § 10-5-58**
**(BitMEX)**

482.    Plaintiff realleges the allegations above.

483.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Georgia.

484.    The Georgia Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Georgia law. Ga. Code Ann. §§ 10-5-30, 10-5-31. Any person who sells a security in violation of Sections 10-5-30 or 10-5-31 is "liable to the purchaser," who may "maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of purchase, costs, and reasonable attorney fees determined by the Court upon the tender of the security or for actual damages." *Id.* § 10-5-58.

485.    When issued, the Token Futures were securities within the meaning of the Georgia Uniform Securities Act. *Id.* § 10-5-2(31). On information and belief, BitMEX transacted business as a broker-dealer or agent when it sold the Token Futures to members of the Class in Georgia. *Id.* §§ 10-5-2(1), (3).

486.    On information and belief, BitMEX transacted business as a broker-dealer or agent in Georgia, including without limitation through solicitations directed by BitMEX to Georgia and received in Georgia.

487.    BitMEX was not registered as a broker-dealer or agent in Georgia, nor was it subject to any exemption from registration.

488.    Accordingly, BitMEX has violated the Georgia Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

489.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

490.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### THIRTY-SEVENTH CAUSE OF ACTION
### (GEORGIA STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**Ga. Code Ann. § 10-5-58**
**(Individual Defendants)**

491.    Plaintiff realleges the allegations above.

492.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Georgia.

493.    Every person who directly or indirectly controls an entity liable under the Georgia Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "[a]n individual who is a managing partner, executive officer, or director of a person liable" including "an individual having similar status or performing similar functions," "[a]n individual who is an employee of or associated with the person liable, and who materially aids the conduct giving rise to the liability," and "[a] person who is a broker-dealer, agent, investment adviser, or investment adviser representative that materially aids the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the seller, unless the non-seller "sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist." *Id.* §§ 10-5-58(g).

494.    When issued, the Token Futures were securities within the meaning of the Georgia Uniform Securities Act. *Id.* § 10-5-2(31). On information and belief, BitMEX sold the Token

Futures to members of the Class in Georgia and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Georgia Uniform Securities Act, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Georgia law. *Id.* §§ 10-5-30, 10-5-31.

495.    On information and belief, BitMEX sold the Token Futures and acted as a broker-dealer or agent in Georgia, including without limitation through solicitations directed by BitMEX to Georgia and received in Georgia.

496.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

497.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Georgia Uniform Securities Act through BitMEX's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

498.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

499.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**THIRTY-EIGHTH CAUSE OF ACTION**
**(HAWAII STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**HRS § 485A-509(d)**
**(BitMEX)**

500.    Plaintiff realleges the allegations above.

501.    This Cause of Action is brought on behalf of Class members to whom Token
Futures were sold in Hawaii.

502.    The Hawaii Uniform Securities Act forbids the offer or sale of unregistered
securities. HRS § 485A-301. Any person who sells a security in violation of Section 485A-301 is
"liable to the purchaser … the consideration paid for the security, less the amount of any income
received on the security, and interest at the legal rate of interest, from the date of the purchase,
costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or
for actual damages" if the purchaser no longer owns the security. *Id.* § 485A-509(b).

503.    When issued, the Token Futures were securities within the meaning of the Hawaii
Uniform Securities Act. *Id.* § 485A-102. On information and belief, BitMEX sold the Token
Futures to members of the Class in Hawaii. The Token Futures were neither registered under, nor
subject to exemption from registration under the Hawaii Uniform Securities Act. *Id.* § 485A-201.

504.    Upon information and belief, the Token Futures were sold in Hawaii, including
without limitation through solicitations directed by BitMEX to Hawaii and received in Hawaii.

505.    Accordingly, BitMEX has violated the Hawaii Uniform Securities Act through
BitMEX's sale of unregistered securities.

506.    Class members who own the Token Futures have made or will make any necessary
tender and seek all remedies available at law or in equity for any Token Futures purchased in the
Class Period, including any applicable costs, attorneys' fees, and interest.

507.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## THIRTY-NINTH CAUSE OF ACTION
### (HAWAII STATE LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Broker-Dealer**
**HRS § 485A-509(d)**
**(BitMEX)**

508.    Plaintiff realleges the allegations above.

509.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Hawaii.

510.    The Hawaii Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Hawaii law. HRS § 485A-401(a). Any person who sells a security in violation of Section 485A-401(a) is "liable to the purchaser … the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest, from the date of the purchase, costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or for actual damages" if the purchaser no longer owns the security. *Id.* § 485A-509(d) (citing *Id.* § 485A-509(b)).

511.    When issued, the Token Futures were securities within the meaning of the Hawaii Uniform Securities Act. *Id.* § *Id.* § 485A-102. On information and belief, BitMEX transacted business as a broker-dealer or agent when it sold the Token Futures to members of the Class in Hawaii. *Id.* § *Id.* § 485A-402.

512.    On information and belief, BitMEX transacted business as a broker-dealer or agent in Hawaii, including without limitation through solicitations directed by BitMEX to Hawaii and received in Hawaii.

513.    BitMEX was not registered as a broker-dealer or agent in Hawaii, nor was it subject to any exemption from registration.

514.    Accordingly, BitMEX has violated the Hawaii Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

515.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

516.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**FORTIETH CAUSE OF ACTION**
**(HAWAII STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**HRS § 485A-509(g)**
**(Individual Defendants)**

</div>

517.    Plaintiff realleges the allegations above.

518.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Hawaii.

519.    Every person who directly or indirectly controls an entity liable under the Hawaii Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as any "individual who is a managing partner, executive officer, or director of a person liable," is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. HRS § 485A-509(g).

520.    When issued, the Token Futures were securities within the meaning of the Hawaii Uniform Securities Act. *Id.* § 485A-102. On information and belief, BitMEX sold the Token

Futures to members of the Class in Hawaii and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Hawaii Uniform Securities Act, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Hawaii law. *Id.* § 485A-401(a).

521.    On information and belief, BitMEX sold the Token Futures and acted as a broker-dealer or agent in Hawaii, including without limitation through solicitations directed by BitMEX to Hawaii and received in Hawaii.

522.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

523.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Hawaii Uniform Securities Act through BitMEX's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

524.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

525.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FORTY-FIRST CAUSE OF ACTION**
**(IDAHO STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**I.C. § 30-14-509(b)**
**(BitMEX)**

526.    Plaintiff realleges the allegations above.

527.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Idaho.

528.    The Idaho Uniform Securities Act forbids the offer or sale of unregistered securities. I.C. § 30-14-301. Any person who sells a security in violation of Section 30-14-301 is liable to the purchaser for "the consideration paid for the security, less the amount of any income received on the security, and interest at the annual rate of interest set forth in section 28-22-104(2), Idaho Code, from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages as provided in subsection (b)(3) of this section. *Id.* § 30-14-509(b)(1). The annual rate of interest on judgments is "five percent (5%) plus the base rate in effect at the time of entry of the judgment. The base rate shall be determined on July 1 of each year by the Idaho state treasurer and shall be the weekly average yield on United States treasury securities as adjusted to a constant maturity of one (1) year and rounded up to the nearest one-eighth percent (1/8%)." *Id.* § 28-22-104.

529.    When issued, the Token Futures were securities within the meaning of the Idaho Uniform Securities Act. *Id.* § 30-14-102 (28). On information and belief, BitMEX sold the Token Futures to members of the Class in Idaho. The Token Futures were neither registered under, nor subject to exemption from registration under the Idaho Uniform Securities Act. *Id.* § 30-14-201.

530.    Upon information and belief, the Token Futures were sold in Idaho, including without limitation through solicitations directed by BitMEX to Idaho and received in Idaho.

531.    Accordingly, BitMEX has violated the Idaho Uniform Securities Act through BitMEX's sale of unregistered securities.

532.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

533.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**FORTY-SECOND CAUSE OF ACTION**
**(IDAHO STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**I.C. § 30-14-509(d)**
**(BitMEX)**

</div>

534.    Plaintiff realleges the allegations above.

535.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Idaho.

536.    The Idaho Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Idaho law. I.C. §§ 30-14-401(a), 30-14-402(a). Any person who sells a security in violation of Sections 30-14-401(a) and 30-14-402(a) "is liable to the customer. The customer, if a purchaser, may maintain an action for recovery of actual damages as specified in subsections (b)(1) through (3)." *Id.* § 30-14-509(d). Actual damages are defined as "the amount that would be recoverable upon a tender [of the security] less the value of the security when the purchaser disposed of it, and interest at the annual rate of interest set forth in section 28-22-104(2), Idaho Code, from the date of the purchase, costs, and reasonable attorneys' fees determined by the court." *Id.* § 30-14-509(b)(3). The annual rate of interest on judgments is "five percent (5%) plus the base rate in effect at the time of entry of the judgment. The base rate shall be determined on July 1 of each year by the Idaho state

treasurer and shall be the weekly average yield on United States treasury securities as adjusted to a constant maturity of one (1) year and rounded up to the nearest one-eighth percent (1/8%)." *Id.* § 28-22-104.

537.    When issued, the Token Futures were securities within the meaning of the Idaho Uniform Securities Act. *Id.* § 30-14-102(28). On information and belief, BitMEX transacted business as a broker-dealer or agent when it sold the Token Futures to members of the Class in Idaho. *Id.* §§ 30-14-102(2), 30-14-102(4).

538.    On information and belief, BitMEX transacted business as a broker-dealer or agent in Idaho, including without limitation through solicitations directed by BitMEX to Idaho and received in Idaho.

539.    BitMEX was not registered as a broker-dealer or agent in Idaho, nor was it subject to any exemption from registration.

540.    Accordingly, BitMEX has violated the Idaho Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

541.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

542.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**FORTY-THIRD CAUSE OF ACTION**
**(IDAHO STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**I.C. § 30-14-509(g)**
**(Individual Defendants)**

</div>

543.    Plaintiff realleges the allegations above.

<div align="center">112</div>

544.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Idaho.

545.    Every person who directly or indirectly controls an entity liable under the Idaho Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "individual who is a managing partner, executive officer, or director of a person liable under subsections (b) through (f), including an individual having a similar status or performing similar functions" is liable jointly and severally with and to the same extent as the seller, unless the individual sustains the burden of proof that the individual did not know and, in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist. I.C. § 30-14-509(g).

546.    When issued, the Token Futures were securities within the meaning of the Idaho Uniform Securities Act. *Id.* § 30-14-102(28). On information and belief, BitMEX sold the Token Futures to members of the Class in Idaho and acted as the broker-dealer or agent for the sale and purchase of those securities. *Id.* §§ 30-14-102(2), 30-14-102(4). The Token Futures were neither registered under, nor subject to exemption from registration under the Idaho Uniform Securities Act, and BitMEX was not registered as a broker-dealer or agent under Idaho law. *Id.* §§ 30-14-201, 30-14-202.

547.    On information and belief, BitMEX sold the Token Futures and acted as a broker-dealer or agent in Idaho, including without limitation through solicitations directed by BitMEX to Idaho and received in Idaho.

548.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged

herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

549.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Idaho Uniform Securities Act through BitMEX's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

550.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

551.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## FORTY-FORTH CAUSE OF ACTION
## (ILLINOIS STATE LAW – PRIMARY LIABILITY)
Unregistered Sale of Securities
**815 Ill. Comp. Stat. Ann. 5/13**
**(BitMEX)**

552.    Plaintiff realleges the allegations above.

553.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Illinois.

554.    The Illinois Securities Law of 1953 forbids the sale of unregistered securities. 815 Ill. Comp. Stat. Ann. 5/5. Any person who sells a security in violation of Section 5/5 is "liable to the purchaser," who may recover "the full amount paid, together with interest from the date of payment for the securities sold at the rate of the interest or dividend stipulated in the securities sold (or if no rate is stipulated, then at the rate of 10% per annum) less any income or other amounts

received by the purchaser on the securities, upon offer to tender to the seller or tender into court of the securities sold," as well as "reasonable fees and expenses." *Id.* § 5/13.

555.    When issued, the Token Futures were securities within the meaning of the Illinois Securities Law of 1953. *Id.* § 5/2.1. On information and belief, BitMEX sold the Token Futures to members of the Class in Illinois. The Token Futures were neither registered under, nor subject to exemption from registration under the Illinois Securities Law of 1953. *Id.* §§ 5/3, 5/4.

556.    Upon information and belief, the Token Futures were sold in Illinois, including without limitation through solicitations directed by BitMEX to Illinois and received in Illinois.

557.    Accordingly, BitMEX has violated the Illinois Securities Law of 1953 through BitMEX's sale of unregistered securities.

558.    Plaintiff learned that the sale was voidable under Illinois law within six months prior to first asserting this cause of action. Prior to first asserting this cause of action, Plaintiff provided to BitMEX, by registered or certified mail in a properly addressed envelope with adequate postage affixed and deposited in the mail, notice of the election to rescind, on behalf of himself and the Class, the purchase of any Token Futures they hold, which thereby satisfies the statutory requirement that notice of the election to rescind "shall be given by the purchaser within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable, to each person from whom recovery will be sought, by registered or certified mail or certified mail, return receipt requested, addressed to the person to be notified at his or her last known address with proper postage affixed, or by personal service." *Id.* 5/13(B).

559.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

560.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### FORTY-FIFTH CAUSE OF ACTION
### (ILLINOIS STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Dealer or Salesperson
### 815 Ill. Comp. Stat. Ann. 5/13
### (BitMEX)

561.    Plaintiff realleges the allegations above.

562.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Illinois.

563.    The Illinois Securities Law of 1953 forbids any person from transacting business as a dealer or salesperson unless he is registered or exempt from registration under Illinois law. 815 Ill. Comp. Stat. Ann. 5/8. Any person who sells a security in violation of Section 5/8 is "liable to the purchaser," who may recover "the full amount paid, together with interest from the date of payment for the securities sold at the rate of the interest or dividend stipulated in the securities sold (or if no rate is stipulated, then at the rate of 10% per annum) less any income or other amounts received by the purchaser on the securities, upon offer to tender to the seller or tender into court of the securities sold," as well as "reasonable fees and expenses." *Id.* § 5/13.

564.    When issued, the Token Futures were securities within the meaning of the Illinois Securities Law of 1953. *Id.* § 5/2.1. On information and belief, BitMEX transacted business as a dealer or salesperson when it sold the Token Futures to members of the Class in Illinois. *Id.* §§ 5/2.7, 5/2.9.

565.    On information and belief, BitMEX transacted business as a dealer or salesperson in Illinois, including without limitation through solicitations directed by BitMEX to Illinois and received in Illinois.

116

566.    BitMEX was not registered as a dealer or salesperson in Illinois, nor was it subject to any exemption from registration.

567.    Accordingly, BitMEX has violated the Illinois Securities Law of 1953 by transacting business as an unregistered dealer or salesperson in the sale of securities.

568.    Plaintiff learned that the sale was voidable under Illinois law within six months prior to first asserting this cause of action. Prior to first asserting this cause of action, Plaintiff provided to BitMEX, by registered or certified mail in a properly addressed envelope with adequate postage affixed and deposited in the mail, notice of the election to rescind, on behalf of himself and the Class, the purchase of any Token Futures they hold, which thereby satisfies the statutory requirement that notice of the election to rescind "shall be given by the purchaser within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable, to each person from whom recovery will be sought, by registered or certified mail or certified mail, return receipt requested, addressed to the person to be notified at his or her last known address with proper postage affixed, or by personal service." *Id.* 5/13(B).

569.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

570.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### FORTY-SIXTH CAUSE OF ACTION
### (ILLINOIS STATE LAW – ADDITIONAL LIABILITY)
Control Person Liability
**815 Ill. Comp. Stat. Ann. 5/13**
**(Individual Defendants)**

571.    Plaintiff realleges the allegations above.

572.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Illinois.

573.    Every person who directly or indirectly controls an entity liable under the Illinois Securities Law of 1953 for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "issuer, controlling person, underwriter, dealer or other person by or on behalf of whom said sale was made, and each underwriter, dealer, internet portal, or salesperson who shall have participated or aided in any way in making the sale, and in case the issuer, controlling person, underwriter, dealer, or internet portal is a corporation or unincorporated association or organization, each of its officers and directors (or persons performing similar functions) who shall have participated or aided in making the sale, shall be jointly and severally liable to the purchaser." *Id.* § 5/15(A).

574.    When issued, the Token Futures were securities within the meaning of the Illinois Securities Law of 1953. *Id.* § 5/2.1. On information and belief, BitMEX sold the Token Futures to members of the Class in Illinois and acted as the dealer or salesperson for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Illinois Securities Law of 1953, and BitMEX was not registered or exempt from registration as a dealer or salesperson under Illinois law. *Id.* § 5/8.

575.    On information and belief, BitMEX sold the Token Futures and acted as a dealer or salesperson in Illinois, including without limitation through solicitations directed by BitMEX to Illinois and received in Illinois.

576.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the

management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered dealer or salesperson as described herein.

577.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Illinois Securities Law of 1953 through BitMEX's sale of unregistered securities and operation as an unregistered dealer or salesperson.

578.    Plaintiff learned that the sale was voidable under Illinois law within six months prior to first asserting this cause of action. Prior to first asserting this cause of action, Plaintiff provided to BitMEX, by registered or certified mail in a properly addressed envelope with adequate postage affixed and deposited in the mail, notice of the election to rescind, on behalf of himself and the Class, the purchase of any Token Futures they hold, which thereby satisfies the statutory requirement that notice of the election to rescind "shall be given by the purchaser within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable, to each person from whom recovery will be sought, by registered or certified mail or certified mail, return receipt requested, addressed to the person to be notified at his or her last known address with proper postage affixed, or by personal service." *Id.* 5/13(B).

579.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

580.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FORTY-SEVENTH CAUSE OF ACTION**
**(INDIANA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Indiana Code § 23-19-5-9(a)**
**(BitMEX)**

581.    Plaintiff realleges the allegations above.

582.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Indiana.

583.    The Indiana Uniform Securities Act forbids the offer or sale of unregistered securities. Indiana Code § 23-19-3-1. Any person who sells a security in violation of Section 23-19-3-1 is "liable to the purchaser" for "the consideration paid for the security, less the amount of any income received on the security, and interest at the greater of eight percent (8%) per annum or the rate provided for in the security from the date of the purchase, costs, and reasonable attorney's fees determined by the court or arbitrator, upon the tender of the security, or for actual damages…." *Id.* § 23-19-5-9(a).

584.    When issued, the Token Futures were securities within the meaning of the Indiana Securities Act. *Id.* § 23-19-1-2(28). On information and belief, BitMEX sold the Token Futures to members of the Class in Indiana. The Token Futures were neither registered under, nor subject to exemption from registration under the Indiana Securities Act. *Id.* § 23-19-2-1

585.    Upon information and belief, the Token Futures were sold in Indiana, including without limitation through solicitations directed by BitMEX to Indiana and received in Indiana.

586.    Accordingly, BitMEX has violated the Indiana Uniform Securities Act through BitMEX's sale of unregistered securities.

587.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

588.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FORTY-EIGHTH CAUSE OF ACTION**
**(INDIANA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**23-19-5-9(a)**
**(BitMEX)**

589.    Plaintiff realleges the allegations above.

590.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Indiana.

591.    The Indiana Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Indiana law. Indiana Code § 23-19-4-1(a). Any person who sells a security in violation of Section 23-19-4-1(a) is "liable to the purchaser" for "the consideration paid for the security, less the amount of any income received on the security, and interest at the greater of eight percent (8%) per annum or the rate provided for in the security from the date of the purchase, costs, and reasonable attorney's fees determined by the court or arbitrator, upon the tender of the security, or for actual damages…." *Id.* § 23-19-5-9(a).

592.    When issued, the Token Futures were securities within the meaning of the Indiana Securities Act. *Id.* § 23-19-1-2(28). On information and belief, BitMEX transacted business as a broker-dealer or agent when it sold the Token Futures to members of the Class in Indiana. *Id.* § 23-19-1-2(1), (3).

593.    On information and belief, BitMEX transacted business as a broker-dealer or agent in Indiana, including without limitation through solicitations directed by BitMEX to Indiana and received in Indiana.

594.    BitMEX was not registered as a broker-dealer or agent in Indiana, nor was it subject to any exemption from registration.

595.    Accordingly, BitMEX has violated the Indiana Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

596.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

597.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### FORTY-NINTH CAUSE OF ACTION
### (INDIANA STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**Indiana Code § 23-19-5-9(d)**
**(Individual Defendants)**

598.    Plaintiff realleges the allegations above.

599.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Indiana.

600.    Every person who directly or indirectly controls an entity liable under the Indiana Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "individual who is a managing partner, executive officer, or director of a person liable," is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist Indiana Code § 23-19-5-9(d).

601.    When issued, the Token Futures were securities within the meaning of the Indiana Securities Act. *Id.* § 23-19-1-2(28). On information and belief, BitMEX sold the Token Futures to

members of the Class in Indiana and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Indiana Securities Act, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Indiana law. *Id.* § 23-19-4-1(a).

602.    On information and belief, BitMEX sold the Token Futures and acted as a broker-dealer or agent in Indiana, including without limitation through solicitations directed by BitMEX to Indiana and received in Indiana.

603.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

604.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Indiana Uniform Securities Act through BitMEX's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

605.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

606.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FIFTIETH CAUSE OF ACTION**
**(IOWA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**I.C.A. § 502.509(2)**
**(BitMEX)**

607.     Plaintiff realleges the allegations above.

608.     This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Iowa.

609.     The Iowa Uniform Securities Act forbids the offer or sale of unregistered securities. I.C.A. § 502.301. Any person who sells a security in violation of Section 502.301 is "liable to the purchaser" for "the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate from the date of the purchase, costs, and reasonable attorney fees determined by the court, upon the tender of the security, or for actual damages…." *Id.* § 502.509(2).

610.     When issued, the Token Futures were securities within the meaning of the Iowa Securities Act. *Id.* § 502.102(28) sold the Token Futures to members of the Class in Iowa. The Token Futures were neither registered under, nor subject to exemption from registration under the Iowa Securities Act. *Id.* § 502.201.

611.     Upon information and belief, the Token Futures were sold in Iowa, including without limitation through solicitations directed by BitMEX to Iowa and received in Iowa.

612.     Accordingly, BitMEX has violated the Iowa Uniform Securities Act through BitMEX's sale of unregistered securities.

613.     Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

614.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### FIFTY-FIRSTTH CAUSE OF ACTION
### (IOWA STATE LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Broker-Dealer**
**I.C.A. § 502.509(4)**
**(BitMEX)**

615.    Plaintiff realleges the allegations above.

616.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Iowa.

617.    The Iowa Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Iowa law. I.C.A. § 502.401(1). Any person who sells a security in violation of Section 502.401(1) is "liable to the customer" for "the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate from the date of the purchase, costs, and reasonable attorney fees determined by the court, upon the tender of the security, or for actual damages…." *Id.* § 502.509(4) (citing § 502.509(2)).

618.    When issued, the Token Futures were securities within the meaning of the Iowa Securities Act. *Id.* § 502.102(28). On information and belief, BitMEX transacted business as a broker-dealer or agent when it sold the Token Futures to members of the Class in Iowa. *Id.* § 502.102(2), (4).

619.    On information and belief, BitMEX transacted business as a broker-dealer or agent in Iowa, including without limitation through solicitations directed by BitMEX to Iowa and received in Iowa.

620.    BitMEX was not registered as a broker-dealer or agent in Iowa, nor was it subject to any exemption from registration.

125

621.    Accordingly, BitMEX has violated the Iowa Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

622.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

623.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**FIFTY-SECOND CAUSE OF ACTION**
**(IOWA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**I.C.A. § 502.509(7)**
**(Individual Defendants)**

</div>

624.    Plaintiff realleges the allegations above.

625.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Iowa.

626.    Every person who directly or indirectly controls an entity liable under the Iowa Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "managing partner, executive officer, or director of a person liable … including an individual having a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. I.C.A. § 502.509(7)

627.    When issued, the Token Futures were securities within the meaning of the Iowa Securities Act. *Id.* § 502.102(28). On information and belief, BitMEX sold the Token Futures to

members of the Class in Iowa and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Iowa Securities Act, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Iowa law. *Id.* § 502.401(1).

628.    On information and belief, BitMEX sold the Token Futures and acted as a broker-dealer or agent in Iowa, including without limitation through solicitations directed by BitMEX to Iowa and received in Iowa.

629.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

630.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Iowa Uniform Securities Act through BitMEX's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

631.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

632.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FIFTY-THIRD CAUSE OF ACTION**
**(KANSAS STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Kan. Stat. Ann. § 17-12a509**
**(BitMEX)**

633.    Plaintiff realleges the allegations above.

634.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Kansas.

635.    The Kansas Uniform Securities Act forbids the offer or sale of unregistered securities. Kan. Stat. Ann. § 17-12a301. Any person who sells a security in violation of Section 17-12a301 is "liable to the purchaser," who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest from the date of the purchase … costs, and reasonable attorneys' fees determined by the court, upon the tender of the security," or if the purchaser no longer owns the security, "[a]ctual damages" in "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest from the date of the purchase … costs, and reasonable attorneys' fees determined by the court." *Id.* § 17-12a509(b).

636.    When issued, the Token Futures were securities within the meaning of the Kansas Uniform Securities Act. *Id.* § 17-12a102(28). On information and belief, BitMEX sold the Token Futures to members of the Class in Kansas. The Token Futures were neither registered under, nor subject to exemption from registration under the Kansas Uniform Securities Act. *Id.* § 17-12a301.

637.    Upon information and belief, the Token Futures were sold in Kansas, including without limitation through solicitations directed by BitMEX to Kansas and received in Kansas.

638.    Accordingly, BitMEX has violated the Kansas Uniform Securities Act through BitMEX's sale of unregistered securities.

639.     Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

640.     Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### FIFTY-FOURTH CAUSE OF ACTION
### (KANSAS STATE LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Broker-Dealer**
**Kan. Stat. Ann. § 17-12a509**
**(BitMEX)**

641.     Plaintiff realleges the allegations above.

642.     This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Kansas.

643.     The Kansas Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Kansas law. Kan. Stat. Ann. § 17-12a401(a). Any person acting as a broker-dealer who sells a security in violation of Section 17-12a401(a) is "liable to the customer," who may "maintain an action to recover the consideration paid for the security, less the amount of any income received on the security … upon the tender of the security, or for actual damages" in "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it," and "interest from the date of the purchase at the rate provided for interest on judgments by Kan. Stat. Ann. § 16-204, and amendments thereto, costs, and reasonable attorneys' fees determined by the court." *Id.* §§ 17-12a509(b)(1)-(3), (d).

644.     When issued, the Token Futures were securities within the meaning of the Kansas Uniform Securities Act. *Id.* § 17-12a102(28). On information and belief, BitMEX transacted

business as a broker-dealer or agent when it sold the Token Futures to members of the Class in Kansas. *Id.* § 17-12a102(2), (4).

645.    On information and belief, BitMEX transacted business as a broker-dealer or agent in Kansas, including without limitation through solicitations directed by BitMEX to Kansas and received in Kansas.

646.    BitMEX was not registered as a broker-dealer or agent in Kansas, nor was it subject to any exemption from registration.

647.    Accordingly, BitMEX has violated the Kansas Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

648.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

649.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FIFTY-FIFTH CAUSE OF ACTION**
**(KANSAS STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Kan. Stat. Ann. § 17-12a509**
**(Individual Defendants)**

650.    Plaintiff realleges the allegations above.

651.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Kansas.

652.    Every person who directly or indirectly controls an entity liable under the Kansas Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as any "individual who is a managing partner, executive officer, or director" of such an entity, "including an individual

having a similar status or performing similar functions," and any "individual who is an employee of or associated with" such an entity "and who materially aids the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the entity, unless the individual "sustains the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist." Kan. Stat. Ann. § 17-12a509(g).

653.    When issued, the Token Futures were securities within the meaning of the Kansas Uniform Securities Act. *Id.* § 17-12a102(28). On information and belief, BitMEX sold the Token Futures to members of the Class in Kansas and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Kansas Uniform Securities Act, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Kansas law. *Id.* §§ 17-12a301, 17-12a401.

654.    On information and belief, BitMEX sold the Token Futures and acted as a broker-dealer or agent in Kansas, including without limitation through solicitations directed by BitMEX to Kansas and received in Kansas.

655.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

656.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Kansas Uniform Securities Act through BitMEX's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

657.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

658.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FIFTY-SIXTH CAUSE OF ACTION**
**(KENTUCKY STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Ky. Rev. Stat. Ann. § 292.480**
**(BitMEX)**

659.    Plaintiff realleges the allegations above.

660.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Kentucky.

661.    The Securities Act of Kentucky forbids the offer or sale of unregistered securities. Ky. Rev. Stat. Ann. § 292.340. Any person who offers or sells a security in violation of Section 292.340 is "liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security," or if the purchaser no longer owns the security, for damages in the "amount that would be recoverable upon a tender less … [t]he value of the security when the buyer is disposed of it; and … [i]nterest at the legal rate per annum from the date of disposition." *Id.* § 292.480(1).

662.    When issued, the Token Futures were securities within the meaning of the Securities Act of Kentucky. *Id.* § 292.310(19). On information and belief, BitMEX offered or sold the Token Futures to members of the Class in Kentucky. The Token Futures were neither registered under, nor subject to exemption from registration under the Securities Act of Kentucky. *Id.* § 292.340.

663.    Upon information and belief, the Token Futures were offered or sold in Kentucky, including without limitation through solicitations directed by BitMEX to Kentucky and received in Kentucky.

664.    Accordingly, BitMEX has violated the Securities Act of Kentucky through BitMEX's offer and sale of unregistered securities.

665.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

666.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## FIFTY-SEVENTH CAUSE OF ACTION
### (KENTUCKY STATE LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Broker-Dealer**
**Ky. Rev. Stat. Ann. § 292.480**
**(BitMEX)**

667.    Plaintiff realleges the allegations above.

668.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Kentucky.

669.    The Securities Act of Kentucky forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Kentucky law. Ky. Rev. Stat. Ann. § 292.330(1), (3). Any person who offers or sells a security in violation of Section

292.330 is "liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security," or if the purchaser no longer owns the security, for damages in the "amount that would be recoverable upon a tender less … [t]he value of the security when the buyer is disposed of it; and … [i]nterest at the legal rate per annum from the date of disposition." *Id.* § 292.480(1).

670.    When issued, the Token Futures were securities within the meaning of the Securities Act of Kentucky. *Id.* § 292.310(19). On information and belief, BitMEX transacted business as a broker-dealer or agent when it offered or sold the Token Futures to members of the Class in Kentucky. *Id.* § 292.310(1), (2).

671.    On information and belief, BitMEX transacted business as a broker-dealer or agent in Kentucky, including without limitation through solicitations directed by BitMEX to Kentucky and received in Kentucky.

672.    BitMEX was not registered as a broker-dealer or agent in Kentucky, nor was it subject to any exemption from registration.

673.    Accordingly, BitMEX has violated the Securities Act of Kentucky by transacting business as an unregistered broker-dealer or agent in the offer and sale of securities.

674.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

675.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## FIFTY-EIGHTH CAUSE OF ACTION
### (KENTUCKY STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**Ky. Rev. Stat. Ann. § 292.480**
**(Individual Defendants)**

676.    Plaintiff realleges the allegations above.

677.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Kentucky.

678.    Every person who directly or indirectly controls an entity liable under the Securities Act of Kentucky for unlawfully offering or selling unregistered securities or for operating as an unregistered broker-dealer or agent in the offer or sale of those securities, as well as "every partner, officer, or director (or person occupying a similar status or performing similar functions) or employee of a seller or purchaser who materially aids in the sale or purchase, and every broker-dealer or agent who materially aids in the sale or purchase is also liable jointly and severally with and to the same extent as the seller or purchaser, unless the nonseller or nonpurchaser who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. Ky. Rev. Stat. Ann. § 292.480(4).

679.    When issued, the Token Futures were securities within the meaning of the Securities Act of Kentucky. *Id.* § 292.310(19). On information and belief, BitMEX offered and sold the Token Futures to members of the Class in Kentucky and acted as the broker-dealer or agent for the offer, sale, and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Securities Act of Kentucky, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Kentucky law. *Id.* §§ 292.330, 292.340.

680.    On information and belief, BitMEX offered and sold the Token Futures and acted as a broker-dealer or agent in Kentucky, including without limitation through solicitations directed by BitMEX to Kentucky and received in Kentucky.

681.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

682.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Securities Act of Kentucky through BitMEX's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

683.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

684.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## FIFTY-NINTH CAUSE OF ACTION
### (LOUISIANA STATE LAW – PRIMARY LIABILITY)
### Unregistered Offer and Sale of Securities
### La. Stat. Ann. § 51:714
### (BitMEX)

685.    Plaintiff realleges the allegations above.

686.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Louisiana.

687.    The Louisiana Securities Law forbids the offer or sale of unregistered securities. La. Stat. Ann. § 51:705. Any person who offers or sells a security in violation of Section 51:705 is "liable to the person buying such security, and such buyer may sue in any court to recover the consideration paid in cash or, if such consideration was not paid in cash, the fair value thereof at the time such consideration was paid for the security with interest thereon from the date of payment down to the date of repayment … less the amount of any income received thereon, together with all taxable court costs and reasonable attorneys' fees, upon the tender, where practicable, of the security at any time before the entry of judgment, or for damages if he no longer owns the security" in the amount "which equals the difference between the fair value of the consideration the buyer gave for the security and the fair value of the security at the time the buyer disposed of it, plus interest thereon from the date of payment to the date of repayment." *Id.* §§ 51:714(A); 51:712(A)(1).

688.    When issued, the Token Futures were securities within the meaning of the Louisiana Securities Law. *Id.* § 51:702(15)(b). On information and belief, BitMEX offered or sold the Token Futures to members of the Class in Louisiana. The Token Futures were neither registered under, nor subject to exemption from registration under the Louisiana Securities Law. *Id.* § 51:705.

689.    Upon information and belief, the Token Futures were offered or sold in Louisiana, including without limitation through solicitations directed by BitMEX to Louisiana and received in Louisiana.

690.    Accordingly, BitMEX has violated the Louisiana Securities Law through BitMEX's offer and sale of unregistered securities.

691.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

692.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### SIXTIETH CAUSE OF ACTION
### (LOUISIANA STATE LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Dealer**
**La. Stat. Ann. § 51:714**
**(BitMEX)**

693.    Plaintiff realleges the allegations above.

694.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Louisiana.

695.    The Louisiana Securities Law forbids any dealer or salesman from offering for sale or selling any securities unless he is registered or exempt from registration under Louisiana law. La. Stat. Ann. § 51:703(1). Any person who offers or sells a security in violation of Section 51:703 is "liable to the person buying such security, and such buyer may sue in any court to recover the consideration paid in cash or, if such consideration was not paid in cash, the fair value thereof at the time such consideration was paid for the security with interest thereon from the date of payment down to the date of repayment … less the amount of any income received thereon, together with all taxable court costs and reasonable attorneys' fees, upon the tender, where practicable, of the security at any time before the entry of judgment, or for damages if he no longer owns the security" in the amount "which equals the difference between the fair value of the consideration the buyer gave for the security and the fair value of the security at the time the buyer disposed of it, plus interest thereon from the date of payment to the date of repayment." *Id.* §§ 51:714(A); 51:712(A)(1).

696.    When issued, the Token Futures were securities within the meaning of the Louisiana Securities Law. *Id.* § 51:702(15)(b). On information and belief, BitMEX transacted business as a dealer or salesman when it offered or sold the Token Futures to members of the Class in Louisiana. *Id.* § 51:702(5), (14).

697.    On information and belief, BitMEX transacted business as a dealer or salesman in Louisiana, including without limitation through solicitations directed by BitMEX to Louisiana and received in Louisiana.

698.    BitMEX was not registered as a dealer or salesman in Louisiana, nor was it subject to any exemption from registration.

699.    Accordingly, BitMEX has violated the Louisiana Securities Law by transacting business as an unregistered dealer or salesman in the offer or sale of securities.

700.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

701.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SIXTY-FIRST CAUSE OF ACTION**
**(LOUISIANA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**La. Stat. Ann. § 51:714**
**(Individual Defendants)**

702.    Plaintiff realleges the allegations above.

703.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Louisiana.

704.    Every person who directly or indirectly controls an entity liable under the Louisiana Securities Act for unlawfully offering or selling unregistered securities or for operating as an

139

unregistered dealer or salesman in the offer or sale of those securities, as well as "every general partner, executive officer, or director of such [entity], every person occupying a similar status or performing similar functions, and every dealer or salesman who participates in any material way in the sale is liable jointly and severally with and to the same extent as the [entity] unless the person whose liability arises under this Subsection sustains the burden of proof that he did not know and in the exercise of reasonable care could not have known of the existence of the facts by reason of which liability is alleged to exist." La. Stat. Ann. § 51:714(B).

705.    When issued, the Token Futures were securities within the meaning of the Louisiana Securities Law. *Id.* § 51:702(15)(b). On information and belief, BitMEX offered and sold the Token Futures to members of the Class in Louisiana and acted as the dealer or salesman for the offer, sale, and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Louisiana Securities Law, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Louisiana law. *Id.* §§ 51:703; 51:705.

706.    On information and belief, BitMEX offered and sold the Token Futures and acted as a dealer or salesman in Louisiana, including without limitation through solicitations directed by BitMEX to Louisiana and received in Louisiana.

707.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or

sales of unregistered securities and the operation of an unregistered dealer or salesman as described herein.

708.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Louisiana Securities Law through BitMEX's offer or sale of unregistered securities and operation as an unregistered dealer or salesman.

709.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

710.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SIXTY-SECOND CAUSE OF ACTION**
**(MAINE STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Me. Rev. Stat. tit. 32, § 16509**
**(BitMEX)**

</div>

711.    Plaintiff realleges the allegations above.

712.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Maine.

713.    The Maine Uniform Securities Act forbids the offer or sale of unregistered securities. Me. Rev. Stat. tit. 32, § 16301. Any person who sells a security in violation of Section 16301 is "liable to the purchaser," who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and the interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it and the

interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined by the court." *Id.* § 16509(2).

714.    When issued, the Token Futures were securities within the meaning of the Maine Uniform Securities Act. *Id.* § 16102(28). On information and belief, BitMEX sold the Token Futures to members of the Class in Maine. The Token Futures were neither registered under, nor subject to exemption from registration under the Maine Uniform Securities Act. *Id.* § 16301.

715.    Upon information and belief, the Token Futures were sold in Maine, including without limitation through solicitations directed by BitMEX to Maine and received in Maine.

716.    Accordingly, BitMEX has violated the Maine Uniform Securities Act through BitMEX's sale of unregistered securities.

717.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

718.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### SIXTY-THIRD CAUSE OF ACTION
### (MAINE STATE LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Broker-Dealer**
**Me. Rev. Stat. tit. 32, § 16509**
**(BitMEX)**

719.    Plaintiff realleges the allegations above.

720.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Maine.

721.    The Maine Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Maine law. Me. Rev. Stat. tit. 32, §§ 16401(1), 16402(1). Any person who sells a security in violation of Sections

16401(1) or 16402(1) is "liable to the purchaser," who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and the interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it and the interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined by the court." *Id.* § 16509(2).

722.    When issued, the Token Futures were securities within the meaning of the Maine Uniform Securities Act. *Id.* § 16102(28). On information and belief, BitMEX transacted business as a broker-dealer or agent when it sold the Token Futures to members of the Class in Maine. *Id.* § 16102(2), (4).

723.    On information and belief, BitMEX transacted business as a broker-dealer or agent in Maine, including without limitation through solicitations directed by BitMEX to Maine and received in Maine.

724.    BitMEX was not registered as a broker-dealer or agent in Maine, nor was it subject to any exemption from registration.

725.    Accordingly, BitMEX has violated the Maine Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

726.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

727.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## SIXTY-FOURTH CAUSE OF ACTION
### (MAINE STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**Me. Rev. Stat. tit. 32, § 16509**
**(Individual Defendants)**

728.    Plaintiff realleges the allegations above.

729.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Maine.

730.    Every person who directly or indirectly controls an entity liable under the Maine Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as any "managing partner, executive officer or director" of such an entity, "including an individual having a similar status or performing similar functions," any "individual who is an employee of or associated with" such an entity "and who materially aids the conduct giving rise to the liability," and any "broker-dealer, agent, investment adviser or investment adviser representative that materially aids the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the entity, unless the individual sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. Me. Rev. Stat. tit. 32, § 16509(7).

731.    When issued, the Token Futures were securities within the meaning of the Maine Uniform Securities Act. *Id.* § 16102(28). On information and belief, BitMEX sold the Token Futures to members of the Class in Maine and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Maine Uniform Securities Act, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Maine law. *Id.* §§ 16401(1), 16402(1).

144

732.    On information and belief, BitMEX sold the Token Futures and acted as a broker-dealer or agent in Maine, including without limitation through solicitations directed by BitMEX to Maine and received in Maine.

733.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

734.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Maine Uniform Securities Act through BitMEX's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

735.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

736.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SIXTY-FIFTH CAUSE OF ACTION**
**(MARYLAND STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Md. Code Ann., Corps. & Ass'ns § 11-703**
**(BitMEX)**

737.    Plaintiff realleges the allegations above.

738.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Maryland.

739.    The Maryland Securities Act forbids the offer or sale of unregistered securities. Md. Code Ann., Corps. & Ass'ns § 11-501. Any person who offers or sells a security in violation of Section 501 is "civilly liable to the person buying a security from him," who "may sue either at law or in equity … [o]n tender of the security, to recover the consideration paid for the security, together with interest at the rate provided for in § 11-107(a) of the [Maryland] Courts and Judicial Proceedings Article, as amended, from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security; or … [i]f he no longer owns the security, for damages" in "the amount that would be recoverable on a tender less the value of the security when the buyer disposed of it and interest at the rate provided for in § 11-107(a) of the Courts and Judicial Proceedings Article, as amended, from the date of disposition." *Id.* § 11-703(a)(1)(i), (b)(1), (b)(3).

740.    When issued, the Token Futures were securities within the meaning of the Maryland Securities Act. *Id.* § 11-101(s)(1). On information and belief, BitMEX offered or sold the Token Futures to members of the Class in Maryland. The Token Futures were neither registered under, nor subject to exemption from registration under the Maryland Securities Act. *Id.* § 11-501.

741.    Upon information and belief, the Token Futures were offered or sold in Maryland, including without limitation through solicitations directed by BitMEX to Maryland and received in Maryland.

742.    Accordingly, BitMEX has violated the Maryland Securities Act through BitMEX's offer and sale of unregistered securities.

743.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

744.    Class members who no longer own the Token Futures seek damages for any Token

Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SIXTY-SIXTH CAUSE OF ACTION**
**(MARYLAND STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Md. Code Ann., Corps. & Ass'ns § 11-703**
**(BitMEX)**

745.    Plaintiff realleges the allegations above.

746.    This Cause of Action is brought on behalf of Class members to whom Token

Futures were offered or sold in Maryland.

747.    The Maryland Securities Act forbids any person from transacting business as a

broker-dealer or agent unless he is registered or exempt from registration under Maryland law.

Md. Code Ann., Corps. & Ass'ns § 11-401(a). Any person who offers or sells a security in violation

of Section 401(a) is "civilly liable to the person buying a security from him," who "may sue either

at law or in equity … [o]n tender of the security, to recover the consideration paid for the security,

together with interest at the rate provided for in § 11-107(a) of the [Maryland] Courts and Judicial

Proceedings Article, as amended, from the date of payment, costs, and reasonable attorneys' fees,

less the amount of any income received on the security; or … [i]f he no longer owns the security,

for damages" in "the amount that would be recoverable on a tender less the value of the security

when the buyer disposed of it and interest at the rate provided for in § 11-107(a) of the Courts and

Judicial Proceedings Article, as amended, from the date of disposition." *Id.* § 11-703(a)(1)(i),

(b)(1), (b)(3).

748.    When issued, the Token Futures were securities within the meaning of the

Maryland Securities Act. *Id.* § 11-101(s)(1). On information and belief, BitMEX transacted

business as a broker-dealer or agent when it offered or sold the Token Futures to members of the

Class in Maryland. *Id.* § 11-101(b), (c).

749.    On information and belief, BitMEX transacted business as a broker-dealer or agent in Maryland, including without limitation through solicitations directed by BitMEX to Maryland and received in Maryland.

750.    BitMEX was not registered as a broker-dealer or agent in Maryland, nor was it subject to any exemption from registration.

751.    Accordingly, BitMEX has violated the Maryland Securities Act by transacting business as an unregistered broker-dealer or agent in the offer or sale of securities.

752.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

753.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SIXTY-SEVENTH CAUSE OF ACTION**
**(MARYLAND STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Md. Code Ann., Corps. & Ass'ns § 11-703**
**(Individual Defendants)**

754.    Plaintiff realleges the allegations above.

755.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Maryland.

756.    Every person who directly or indirectly controls an entity liable under the Maryland Securities Act for unlawfully offering or selling unregistered securities or for operating as an unregistered broker-dealer or agent in the offer or sale of those securities, as well as "every person occupying a similar status or performing similar functions, every employee of the [entity] who materially aids in the conduct giving rise to the liability, and every broker-dealer or agent who materially aids in such conduct are also liable jointly and severally with and to the same extent as

148

the [entity], unless able to sustain the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 11-703(c)(1).

757.    When issued, the Token Futures were securities within the meaning of the Maryland Securities Act. *Id.* § 11-101(s)(1). On information and belief, BitMEX offered and sold the Token Futures to members of the Class in Maryland and acted as the broker-dealer or agent for the offer, sale, and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Maryland Securities Act, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Maryland law. *Id.* § 11-401(a).

758.    On information and belief, BitMEX offered and sold the Token Futures and acted as a broker-dealer or agent in Maryland, including without limitation through solicitations directed by BitMEX to Maryland and received in Maryland.

759.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

760.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Maryland Securities Act through BitMEX's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

761.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

762.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SIXTY-EIGHTH CAUSE OF ACTION**
**(MASSACHUSETTS STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Mass. Gen. Laws Ann. ch. 110A, § 410(a)**
**(BitMEX)**

</div>

763.    Plaintiff realleges the allegations above.

764.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Massachusetts.

765.    The Massachusetts Securities Act forbids the offer or sale of unregistered securities. Mass. Gen. Laws Ann. ch. 110A, § 301. Any person who offers or sells a security in violation of Section 301 is "is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six per cent per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 410(a).

766.    When issued, the Token Futures were securities within the meaning of the Massachusetts Securities Act. *Id.* § 401(f). On information and belief, BitMEX offered or sold the Token Futures to members of the Class in Massachusetts. The Token Futures were neither registered under, nor subject to exemption from registration under the Massachusetts Securities Act. *Id.* § 402.

767.    Upon information and belief, the Token Futures were offered or sold in Massachusetts, including without limitation through solicitations directed by BitMEX to Massachusetts and received in Massachusetts.

768.    Accordingly, BitMEX has violated the Massachusetts Securities Act through BitMEX's sale of unregistered securities.

769.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

770.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SIXTY-NINTH CAUSE OF ACTION**
**(MASSACHUSETTS STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Mass. Gen. Laws Ann. ch. 110A, § 410(a)**
**(BitMEX)**

</div>

771.    Plaintiff realleges the allegations above.

772.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Massachusetts.

773.    The Massachusetts Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Massachusetts law. Mass. Gen. Laws Ann. ch. 110A, § 201. Any person who offers or sells a security in violation of Section 201 is "liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six per cent per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 410.

774.    When issued, the Token Futures were securities within the meaning of the Massachusetts Securities Act. *Id.* § 401(f). On information and belief, BitMEX transacted business as a broker-dealer or agent when it offered or sold the Token Futures to members of the Class in Massachusetts. *Id.* § 401(b),(c).

775.    On information and belief, BitMEX transacted business as a broker-dealer or agent in Massachusetts, including without limitation through solicitations directed by BitMEX to Massachusetts and received in Massachusetts.

776.    BitMEX was not registered as a broker-dealer or agent in Massachusetts, nor was it subject to any exemption from registration.

777.    Accordingly, BitMEX has violated the Massachusetts Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

778.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

779.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## SEVENIETH CAUSE OF ACTION
### (MASSACHUSETTS STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**Mass. Gen. Laws Ann. ch. 110A, § 410(b)**
**(Individual Defendants)**

780.    Plaintiff realleges the allegations above.

781.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Massachusetts.

782.    Every person who directly or indirectly controls an entity liable under the Massachusetts Securities Act for unlawfully selling unregistered securities or for operating as an

unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the non-seller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Mass. Gen. Laws Ann. ch. 110A, § 410(b).

783.    When issued, the Token Futures were securities within the meaning of the Massachusetts Securities Act. *Id.* § 401(f). On information and belief, BitMEX offered and sold the Token Futures to members of the Class in Massachusetts and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Massachusetts Securities Act, and BitMEX was not registered as a broker-dealer or agent under Massachusetts law. *Id.* §§ 201(a), 301.

784.    On information and belief, BitMEX offered and sold the Token Futures and acted as a broker-dealer or agent in Massachusetts, including without limitation through solicitations directed by BitMEX to Massachusetts and received in Massachusetts.

785.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or

sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

786.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Massachusetts Securities Act through BitMEX's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

787.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

788.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SEVENTY-FIRST CAUSE OF ACTION**
**(MICHIGAN STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Mich. Comp. Laws Ann. § 451.2509**
**(BitMEX)**

</div>

789.    Plaintiff realleges the allegations above.

790.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Michigan.

791.    The Michigan Securities Act forbids the offer or sale of unregistered securities. Mich. Comp. Laws Ann. § 451.2301. Any person who sells a security in violation of Section 451.2301 is "liable to the purchaser" who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at 6% per year from the date of the purchase, costs, and reasonable attorney fees determined by the court, upon the tender of the security," or for "actual damages" if the purchaser no longer owns the security. *Id.* § 451.2509.

792.    When issued, the Token Futures were securities within the meaning of the Michigan Securities Act. *Id.* § 451.2102c. On information and belief, BitMEX sold the Token Futures to members of the Class in Michigan. The Token Futures were neither registered under, nor subject to exemption from registration under the Michigan Securities Act. *Id.* § 451.2201.

793.    Upon information and belief, the Token Futures were sold in Michigan, including without limitation through solicitations directed by BitMEX to Michigan and received in Michigan.

794.    Accordingly, BitMEX has violated the Michigan Securities Act through BitMEX's sale of unregistered securities.

795.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

796.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SEVENTY-SECOND CAUSE OF ACTION**
**(MICHIGAN STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Mich. Comp. Laws Ann. § 451.2509**
**(BitMEX)**

</div>

797.    Plaintiff realleges the allegations above.

798.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Michigan.

799.    The Michigan Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Michigan law. Mich. Comp. Laws Ann. § 451.2401. Any person who sells a security in violation of Section 451.2401 is "liable to the customer" who, if a purchaser, "may maintain an action to recover the

consideration paid for the security, less the amount of any income received on the security, and interest at 6% per year from the date of the purchase, costs, and reasonable attorney fees determined by the court, upon the tender of the security" or for "actual damages" if the purchaser no longer owns the security. *Id.* § 451.2509.

800.    When issued, the Token Futures were securities within the meaning of the Michigan Securities Act. *Id.* § 451.2102c. On information and belief, BitMEX transacted business as a broker-dealer or agent when it sold the Token Futures to members of the Class in Michigan. *Id.* § 451.2102.

801.    On information and belief, BitMEX transacted business as a broker-dealer or agent in Michigan, including without limitation through solicitations directed by BitMEX to Michigan and received in Michigan.

802.    BitMEX was not registered as a broker-dealer or agent in Michigan, nor was it subject to any exemption from registration.

803.    Accordingly, BitMEX has violated the Michigan Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

804.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

805.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SEVENTY-THIRD CAUSE OF ACTION**
**(MICHIGAN STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Mich. Comp. Laws Ann. § 451.2509**
**(Individual Defendants)**

806.    Plaintiff realleges the allegations above.

156

807. This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Michigan.

808. Every person who directly or indirectly controls an entity liable under the Michigan Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as an "individual who is a managing partner, executive officer, or director" of a person liable … including each individual having a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. Mich. Comp. Laws Ann. § 451.2509(7).

809. When issued, the Token Futures were securities within the meaning of the Michigan Securities Act. *Id.* § 451.2102c. On information and belief, BitMEX sold the Token Futures to members of the Class in Michigan and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Michigan Securities Act, *id.* § 451.2201, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Michigan law. *Id.* § 451.2401.

810. On information and belief, BitMEX sold the Token Futures and acted as a broker-dealer or agent in Michigan, including without limitation through solicitations directed by BitMEX to Michigan and received in Michigan.

811. Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the

management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

812.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Michigan Securities Act through BitMEX's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

813.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

814.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SEVENTY-FOURTH CAUSE OF ACTION**
**(MINNESOTA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Minnesota Statutes § 80A.76(b)**
**(BitMEX)**

815.    Plaintiff realleges the allegations above.

816.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Minnesota.

817.    The Minnesota Securities Act forbids the offer or sale of unregistered securities. Minnesota Statutes § 80A.49(c). Any person who sells a security in violation of Section 80A.49(c) is "liable to the purchaser" for "consideration paid for the security, less the amount of any income received on the security, and interest from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages." *Id.* § 80A.76(b).

818.    When issued, the Token Futures were securities within the meaning of the Minnesota Securities Act. *Id.* § 80A.41(30). On information and belief, BitMEX sold the Token Futures to members of the Class in Minnesota. The Token Futures were neither registered under, nor subject to exemption from registration under the Minnesota Securities Act. *Id.* § 80A.45.

819.    Upon information and belief, the Token Futures were sold in Minnesota, including without limitation through solicitations directed by BitMEX to Minnesota and received in Minnesota.

820.    Accordingly, BitMEX has violated the Minnesota Securities Act through BitMEX's sale of unregistered securities.

821.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

822.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### SEVENTY-FIFTH CAUSE OF ACTION
### (MINNESOTA STATE LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Broker-Dealer**
**Minnesota Statutes § 80A.76(d)**
**(BitMEX)**

823.    Plaintiff realleges the allegations above.

824.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Minnesota.

825.    The Minnesota Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Minnesota law. Minnesota Statutes § 80A.56(a). Any person who sells a security in violation of Section 80A.56(a) is "liable to the person buying the security from him, who may sue either at law or in equity to

recover the consideration paid for the security together with interest at 6 percent per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 80A.76(d)

826.     When issued, the Token Futures were securities within the meaning of the Minnesota Securities Act. *Id.* § 80A.41(30). On information and belief, BitMEX transacted business as a broker-dealer or agent when it sold the Token Futures to members of the Class in Minnesota. *Id.* § 80A.41(3), (5).

827.     On information and belief, BitMEX transacted business as a broker-dealer or agent in Minnesota, including without limitation through solicitations directed by BitMEX to Minnesota and received in Minnesota.

828.     BitMEX was not registered as a broker-dealer or agent in Minnesota, nor was it subject to any exemption from registration.

829.     Accordingly, BitMEX has violated the Minnesota Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

830.     Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

831.     Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SEVENTY-SIXTH CAUSE OF ACTION**
**(MINNESOTA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Minnesota Statutes § 80A.76(g)**
**(Individual Defendants)**

832.     Plaintiff realleges the allegations above.

833.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Minnesota.

834.    Every person who directly or indirectly controls an entity liable under the Minnesota Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "managing partner, executive officer, or director of a person liable … including an individual having a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. *Id.* § 80A.76(g).

835.    When issued, the Token Futures were securities within the meaning of the Minnesota Securities Act. *Id.* § 80A.41(30). On information and belief, BitMEX sold the Token Futures to members of the Class in Minnesota and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Minnesota Securities Act, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Minnesota law. *Id.* § 80A.56(a).

836.    On information and belief, BitMEX sold the Token Futures and acted as a broker-dealer or agent in Minnesota, including without limitation through solicitations directed by BitMEX to Minnesota and received in Minnesota.

837.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the

wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

838.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Minnesota Securities Act through BitMEX's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

839.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

840.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### SEVENTY-SEVENTH CAUSE OF ACTION
### (MISSISSIPPI STATE LAW – PRIMARY LIABILITY)
**Unregistered Sale of Securities**
**Miss. Code Ann. § 75-71-509(b)**
**(BitMEX)**

841.    Plaintiff realleges the allegations above.

842.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Mississippi.

843.    The Mississippi Securities Act forbids the offer or sale of unregistered securities. Miss. Code Ann. § 75-71-301. "A person is liable to the purchaser if the person sells a security in violation of Section 75-71-301." *Id.* § 75-71-509(b). Such purchaser "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or," *id.* § 75-71-509(b)(1), "[a]ctual damages … [in] the amount that would be recoverable upon a tender less the value of the

security when the purchaser disposed of it, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court," *id.* § 75-71-509(b)(3).

844.    When issued, the Token Futures were securities within the meaning of the Mississippi Securities Act. *Id.* § 75-71-102(28). On information and belief, BitMEX sold the Token Futures to members of the Class in Mississippi. The Token Futures were neither registered under, nor subject to exemption from registration under the Mississippi Securities Act. *Id.* § 75-71-301.

845.    Upon information and belief, the Token Futures were sold in Mississippi, including without limitation through solicitations directed by BitMEX to Mississippi and received in Mississippi.

846.    Accordingly, BitMEX has violated the Mississippi Securities Act through BitMEX's sale of unregistered securities.

847.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

848.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SEVENTY-EIGHTH CAUSE OF ACTION**
**(MISSISSIPPI STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Miss. Code Ann. § 75-71-509(d)**
**(BitMEX)**

849.    Plaintiff realleges the allegations above.

850.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Mississippi.

851.    The Mississippi Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Mississippi law. Miss. Code Ann. § 75-71-401(a). "A person acting as a broker-dealer or agent that sells or buys a security in violation of Section 75-71-401(a) … is liable to the customer," *id.* § 75-71-509(d), who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or," *id.* § 75-71-509(b)(1), "[a]ctual damages … [in] the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court," *id.* § 75-71-509(b)(3).

852.    When issued, the Token Futures were securities within the meaning of the Mississippi Securities Act. *Id.* § 75-71-102(28). On information and belief, BitMEX transacted business as a broker-dealer or agent when it sold the Token Futures to members of the Class in Mississippi. *Id.* § 75-71-102(2), (4).

853.    On information and belief, BitMEX transacted business as a broker-dealer or agent in Mississippi, including without limitation through solicitations directed by BitMEX to Mississippi and received in Mississippi.

854.    BitMEX was not registered as a broker-dealer or agent in Mississippi, nor was it subject to any exemption from registration.

855.    Accordingly, BitMEX has violated the Mississippi Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

856.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

857.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SEVENTY-NINTH CAUSE OF ACTION**
**(MISSISSIPPI STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Miss. Code Ann. § 75-71-509(g)**
**(Individual Defendants)**

</div>

858.    Plaintiff realleges the allegations above.

859.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Mississippi.

860.    Every person who directly or indirectly controls an entity liable under the Mississippi Securities Act for unlawfully selling unregistered securities or for unlawfully operating as an unregistered broker-dealer or agent in the sale of those securities, as well as any "managing partner, executive officer, or director of" such entity, and every person who was "an employee of or associated with" such entity "who materially aid[ed] the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the entity, unless such person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which liability is alleged to exist. Miss. Code Ann. § 75-71-509(g).

861.    When issued, the Token Futures were securities within the meaning of the Mississippi Securities Act. *Id.* § 75-71-102(28). On information and belief, BitMEX sold the Token Futures to members of the Class in Mississippi and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor

<div align="center">165</div>

subject to exemption from registration under the Mississippi Securities Act, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Mississippi law. *Id.* §§ 75-71-301, 75-71-401(a).

862.    On information and belief, BitMEX sold the Token Futures and acted as a broker-dealer or agent in Mississippi, including without limitation through solicitations directed by BitMEX to Mississippi and received in Mississippi.

863.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

864.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Mississippi Securities Act through BitMEX's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

865.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

866.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**EIGHTIETH CAUSE OF ACTION**
**(MISSOURI STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Mo. Rev. Stat. § 409.5-509(b)**
**(BitMEX)**

867.    Plaintiff realleges the allegations above.

868.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Missouri.

869.    The Missouri Securities Act forbids the offer or sale of unregistered securities. Mo. Rev. Stat. § 409.3-301. "A person is liable to the purchaser if the person sells a security in violation of section 409.3-301," and such purchaser "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the rate of eight percent per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or," *id.* § 409.5-509(b)(1), "[a]ctual damages … [in] the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the rate of eight percent per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court," *id.* § 409.5-509(b)(3).

870.    When issued, the Token Futures were securities within the meaning of the Missouri Securities Act. *Id.* § 409.1-102(28). On information and belief, BitMEX sold the Token Futures to members of the Class in Missouri. The Token Futures were neither registered under, nor subject to exemption from registration under the Missouri Securities Act. *Id.* § 409.3-301.

871.    Upon information and belief, the Token Futures were sold in Missouri, including without limitation through solicitations directed by BitMEX to Missouri and received in Missouri.

872.    Accordingly, BitMEX has violated the Missouri Securities Act through BitMEX's sale of unregistered securities.

167

873.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

874.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**EIGHTY-FIRST CAUSE OF ACTION**
**(MISSOURI STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Mo. Rev. Stat. § 409.5-509(d)**
**(BitMEX)**

</div>

875.    Plaintiff realleges the allegations above.

876.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Missouri.

877.    The Missouri Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Missouri law. Mo. Rev. Stat. § 409.4-401(a). "A person acting as a broker-dealer or agent that sells or buys a security in violation of section 409.4-401(a) … is liable to the customer," *id.* § 409.5-509(d), who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the rate of eight percent per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security" *id.* § 409.5-509(b)(1), or "[a]ctual damages … [in] the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the rate of eight percent per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court," *id.* § 409.5-509(b)(3).

878.    When issued, the Token Futures were securities within the meaning of the Missouri Securities Act. *Id.* § 409.1-102(28). On information and belief, BitMEX transacted business as a

<div align="center">168</div>

broker-dealer or agent when it sold the Token Futures to members of the Class in the state of Missouri. *Id.* § 409.1-102(1), (4).

879.    On information and belief, BitMEX transacted business as a broker-dealer or agent in Missouri, including without limitation through solicitations directed by BitMEX to Missouri and received in Missouri.

880.    BitMEX was not registered as a broker-dealer or agent in Missouri, nor was it subject to any exemption from registration.

881.    Accordingly, BitMEX has violated the Missouri Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

882.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

883.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**EIGHTY-SECOND CAUSE OF ACTION**
**(MISSOURI STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Mo. Rev. Stat. § 409.5-509(g)**
**(Individual Defendants)**

</div>

884.    Plaintiff realleges the allegations above.

885.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Missouri.

886.    Every person who directly or indirectly controls an entity liable under the Missouri Securities Act for unlawfully selling unregistered securities or for unlawfully operating as an unregistered broker-dealer or agent in the sale of those securities, as well as any "managing partner, executive officer, or director of" such entity, and every person who was "an employee of or

associated with" such entity "who materially aid[ed] the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the entity, unless such person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which liability is alleged to exist. Mo. Rev. Stat. § 409.5-509(g).

887.    When issued, the Token Futures were securities within the meaning of the Missouri Securities Act. *Id.* § 409.1-102(28). On information and belief, BitMEX sold the Token Futures to members of the Class in Missouri and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Missouri Securities Act, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Missouri law. *Id.* §§ 409.3-301, 409.4-401(a).

888.    On information and belief, BitMEX sold the Token Futures and acted as a broker-dealer or agent in Missouri, including without limitation through solicitations directed by BitMEX to Missouri and received in Missouri.

889.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

890.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Missouri Securities Act through BitMEX's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

891.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

892.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**EIGHTY-THIRD CAUSE OF ACTION**
**(MONTANA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Mont. Code Ann. § 30-10-307(1)**
**(BitMEX)**

</div>

893.    Plaintiff realleges the allegations above.

894.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Montana.

895.    The Montana Securities Act forbids the offer or sale of unregistered securities. Mont. Code Ann. § 30-10-202. "Any person who offers or sells a security in violation of 30-10-202 … is liable to the person buying the security from the offeror or seller, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at 10% a year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if the buyer no longer owns the security" in "the amount that would be recoverable upon a tender less: (a) the value of the security when the buyer disposed of it; and (b) interest at 10% a year from the date of disposition." *Id.* § 30-10-307(1).

896.    When issued, the Token Futures were securities within the meaning of the Montana

Securities Act. *Id.* § 30-10-103(24). On information and belief, BitMEX offered or sold the Token

Futures to members of the Class in Montana. The Token Futures were neither registered under,

nor subject to exemption from registration under the Montana Securities Act. *Id.* § 30-10-202.

897.    Upon information and belief, the Token Futures were offered or sold in Montana,

including without limitation through solicitations directed by BitMEX to Montana and received in

Montana.

898.    Accordingly, BitMEX has violated the Montana Securities Act through BitMEX's

sale of unregistered securities.

899.    Class members who own the Token Futures have made or will make any necessary

tender and seek all remedies available at law or in equity for any Token Futures purchased in the

Class Period, including any applicable costs, attorneys' fees, and interest.

900.    Class members who no longer own the Token Futures seek damages for any Token

Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**EIGHTY-FOURTH CAUSE OF ACTION**
**(MONTANA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Mont. Code Ann. § 30-10-307(2)**
**(Individual Defendants)**

901.    Plaintiff realleges the allegations above.

902.    This Cause of Action is brought on behalf of Class members to whom Token

Futures were offered or sold in Montana.

903.    "Every person who directly or indirectly controls a seller liable under subsection

(1), every partner, officer, or director (or person occupying a similar status or performing similar

functions) or employee of the seller, and every broker-dealer or salesperson who participates or

materially aids in the sale is liable jointly and severally with and to the same extent as the seller if

the nonseller knew, or in the exercise of reasonable care could have known, of the existence of the facts by reason of which the liability is alleged to exist." Mont. Code Ann. § 30-10-307(2).

904. When issued, the Token Futures were securities within the meaning of the Montana Securities Act. *Id.* § 30-10-103(24). On information and belief, BitMEX offered or sold the Token Futures to members of the Class in Montana. The Token Futures were neither registered under, nor subject to exemption from registration under the Montana Securities Act. *Id.* § 30-10-202.

905. BitMEX offered or sold the Token Futures in Montana, including without limitation through solicitations directed by BitMEX to Montana and received in Montana.

906. Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers and sales of unregistered securities.

907. Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Montana Securities Act through BitMEX's offer and sale of unregistered securities.

908. Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

909. Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**EIGHTY-FIFTH CAUSE OF ACTION**
**(NEBRASKA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Neb. Rev. Stat. § 8-1118(1)**
**(BitMEX)**

910.     Plaintiff realleges the allegations above.

911.     This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Nebraska.

912.     The Nebraska Securities Act forbids the offer or sale of unregistered securities. Neb. Rev. Stat. § 8-1104. Any person who offers or sells a security in violation of section 8-1104 … shall be liable to the person buying the security from him or her, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six percent per annum from the date of payment, costs, and reasonable attorney's fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he or she no longer owns the security" in "the amount that would be recoverable upon a tender less (a) the value of the security when the buyer disposed of it and (b) interest at six percent per annum from the date of disposition." *Id.* § 8-1118(1).

913.     When issued, the Token Futures were securities within the meaning of the Nebraska Securities Act. *Id.* § 8-1101(15). On information and belief, BitMEX offered or sold the Token Futures to members of the Class in Nebraska. The Token Futures were neither registered under, nor subject to exemption from registration under the Nebraska Securities Act. *Id.* § 8-1104.

914.     Upon information and belief, the Token Futures were offered or sold in Nebraska, including without limitation through solicitations directed by BitMEX to Nebraska and received in Nebraska.

915.     Accordingly, BitMEX has violated the Nebraska Securities Act through BitMEX's sale of unregistered securities.

916.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

917.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**EIGHTY-SIXTH CAUSE OF ACTION**
**(NEBRASKA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Neb. Rev. Stat. § 8-1118(3)**
**(Individual Defendants)**

</div>

918.    Plaintiff realleges the allegations above.

919.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Nebraska.

920.    "Every person who directly or indirectly controls a person liable under subsections (1) … of this section, including every partner, limited liability company member, officer, director, or person occupying a similar status or performing similar functions of a partner, limited liability company member, officer, or director, or employee of such person who materially aids in the conduct giving rise to liability, and every broker-dealer, issuer-dealer, agent, investment adviser, or investment adviser representative who materially aids in such conduct shall be liable jointly and severally with and to the same extent as such person, unless able to sustain the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Neb. Rev. Stat. § 8-1118(3).

921.    When issued, the Token Futures were securities within the meaning of the Nebraska Securities Act. *Id.* § 8-1101(15). On information and belief, BitMEX offered or sold the Token

Futures to members of the Class in Nebraska. The Token Futures were neither registered under, nor subject to exemption from registration under the Nebraska Securities Act. *Id.* § 8-1104.

922.    BitMEX offered or sold the Token Futures in Nebraska, including without limitation through solicitations directed by BitMEX to Nebraska and received in Nebraska.

923.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers and sales of unregistered securities.

924.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Nebraska Securities Act through BitMEX's offer and sale of unregistered securities.

925.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

926.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**EIGHTY-SEVENTH CAUSE OF ACTION**
**(NEVADA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Nev. Stat. § 90.660(1)(b)**
**(BitMEX)**

927.    Plaintiff realleges the allegations above.

928.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Nevada.

929.    The Nevada Securities Act forbids the offer or sale of unregistered securities. Nev. Stat. § 90.460. "A person who offers or sells a security in violation of" Neb. Rev. Stat. § 90.460 "is liable to the person purchasing the security." *Id.* § 90.660. "Upon tender of the security, the purchaser may recover the consideration paid for the security and interest at the legal rate of [Nevada] from the date of payment, costs and reasonable attorney's fees, less the amount of income received on the security. A purchaser who no longer owns the security may recover damages" in "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, plus interest at the legal rate of [Nevada] from the date of disposition of the security, costs and reasonable attorney's fees determined by the court." *Id.*

930.    When issued, the Token Futures were securities within the meaning of the Nevada Securities Act. *Id.* § 90.295. On information and belief, BitMEX offered or sold the Token Futures to members of the Class in Nevada. The Token Futures were neither registered under, nor subject to exemption from registration under the Nevada Securities Act. *Id.* § 90.460.

931.    Upon information and belief, the Token Futures were offered or sold in Nevada, including without limitation through solicitations directed by BitMEX to Nevada and received in Nevada.

932.    Accordingly, BitMEX has violated the Nevada Securities Act through BitMEX's sale of unregistered securities.

933.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

934.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**EIGHTY-EIGHTH CAUSE OF ACTION**
**(NEVADA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Nev. Stat. § 90.660(1)(a)**
**(BitMEX)**

935.    Plaintiff realleges the allegations above.

936.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Nevada.

937.    The Nevada Securities Act forbids any person from transacting business as a broker-dealer or sales representative unless the person is registered or exempt from registration under Nevada law. Nev. Stat. § 90.310(1). "A person who offers or sells a security in violation of … Subsection 1 of [Nevada Securities Act Section] 90.310 … is liable to the person purchasing the security," who "may recover the consideration paid for the security and interest at the legal rate of [Nevada] from the date of payment, costs and reasonable attorney's fees, less the amount of income received on the security" or "[d]amages … [in] the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, plus interest at the legal rate of [Nevada] from the date of disposition of the security, costs and reasonable attorney's fees determined by the court." *Id.* § 90.660(1)(a).

938.    When issued, the Token Futures were securities within the meaning of the Nevada Securities Act. *Id.* § 90.295. On information and belief, BitMEX transacted business as a broker-dealer or agent when it sold the Token Futures to members of the Class in the state of Nevada. *Id.* §§ 90.220, 90.285.

939.    On information and belief, BitMEX transacted business as a broker-dealer or agent in Nevada, including without limitation through solicitations directed by BitMEX to Nevada and received in Nevada.

940.    BitMEX was not registered as a broker-dealer or agent in Nevada, nor was it subject to any exemption from registration.

941.    Accordingly, BitMEX has violated the Nevada Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

942.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

943.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**EIGHTY-NINTH CAUSE OF ACTION**
**(NEVADA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Nev. Stat. § 90.660(4)**
**(Individual Defendants)**

</div>

944.    Plaintiff realleges the allegations above.

945.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Nevada.

946.    Every person who directly or indirectly controls an entity liable under the Nevada Securities Act for unlawfully selling unregistered securities or for unlawfully operating as an unregistered broker-dealer or sales representative in the sale of those securities, as well as any "partner, officer or director of the [entity] liable, a person occupying a similar status or performing similar functions, any agent of the [entity] liable, an employee of the [entity] liable if the employee materially aids in the act, omission or transaction constituting the violation," is jointly and severally liable with and to the same extent as the entity, unless such person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by which the liability is alleged to exist. Nev. Stat. § 90.660(4).

947.    When issued, the Token Futures were securities within the meaning of the Nevada Securities Act. *Id.* § 90.295. On information and belief, BitMEX offered or sold the Token Futures to members of the Class in Nevada and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Nevada Securities Act, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Nevada law. *Id.* §§ 90.310(1), 90.460.

948.    BitMEX offered or sold the Token Futures and acted as a broker-dealer or agent in Nevada, including without limitation through solicitations directed by BitMEX to Nevada and received in Nevada.

949.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

950.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Nevada Securities Act through BitMEX's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

951.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

952.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### NINETIETH CAUSE OF ACTION
### (NEW HAMPSHIRE STATE LAW – PRIMARY LIABILITY)
**Unregistered Sale of Securities**
**N.H. Rev. Stat. § 421-B:5-509(b)**
**(BitMEX)**

953.    Plaintiff realleges the allegations above.

954.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in New Hampshire.

955.    The New Hampshire Uniform Securities Act forbids the offer or sale of unregistered securities. N.H. Rev. Stat. § 421-B:3-301. Any person who sells a security in violation of Section 421-B:3-301 is liable to the purchaser for "the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages as provided in subsection (b)(3)." *Id.* § 421-B:5-509(b)(1). The annual rate of interest on judgments is "a rate determined by the state treasurer as the prevailing discount rate of interest on 26-week United States Treasury bills at the last auction thereof preceding the last day of September in each year, plus 2 percentage points, rounded to the nearest tenth of a percentage point." *Id.* § 336-1 II.

956.    When issued, the Token Futures were securities within the meaning of the New Hampshire Uniform Securities Act. *Id.* § 421-B:1-102(53)(A). On information and belief, BitMEX sold the Token Futures to members of the Class in New Hampshire. The Token Futures were neither registered under, nor subject to exemption from registration under the New Hampshire Uniform Securities Act. *Id.* § 421-B:2-201.

957.    Upon information and belief, the Token Futures were sold in New Hampshire, including without limitation through solicitations directed by BitMEX to New Hampshire and received in New Hampshire.

958.    Accordingly, BitMEX has violated the New Hampshire Uniform Securities Act through BitMEX's sale of unregistered securities.

959.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

960.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**NINETY-FIRST CAUSE OF ACTION**
**(NEW HAMPSHIRE STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**N.H. Rev. Stat. § 421-B:5-509(d)**
**(BitMEX)**

</div>

961.    Plaintiff realleges the allegations above.

962.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in New Hampshire.

963.    The New Hampshire Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under New Hampshire law. N.H. Rev. Stat. §§ 421-B:4-401(a), 421-B:4-402(a). Any person who sells a security in violation of Sections 421-B:4-401(a) and 421-B:4-402(a) "is liable to the customer. The customer, if a purchaser, may maintain an action for recovery of actual damages as specified in subsections (b)(1) through (c)(3) [*sic*]." ((b)(3)) *Id.* § 421-B:5-509(d). Actual damages are defined as "the amount that would be recoverable upon a tender [of the security] less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest from the

date of the purchase, costs, and reasonable attorneys' fees determined by the court." *Id.* § 421-B:5-509(b)(3). The annual rate of interest on judgments is "a rate determined by the state treasurer as the prevailing discount rate of interest on 26-week United States Treasury bills at the last auction thereof preceding the last day of September in each year, plus 2 percentage points, rounded to the nearest tenth of a percentage point." *Id.* § 336-1 II.

964.    When issued, the Token Futures were securities within the meaning of the New Hampshire Uniform Securities Act. *Id.* § 421-B:1-102(53)(A). On information and belief, BitMEX transacted business as a broker-dealer or agent when it sold the Token Futures to members of the Class in New Hampshire. *Id.* §§ 421-B:1-102(3), 421-B:1-102(6).

965.    On information and belief, BitMEX transacted business as a broker-dealer or agent in New Hampshire, including without limitation through solicitations directed by BitMEX to New Hampshire and received in New Hampshire.

966.    BitMEX was not registered as a broker-dealer or agent in New Hampshire, nor was it subject to any exemption from registration.

967.    Accordingly, BitMEX has violated the New Hampshire Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

968.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

969.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## NINTY-SECOND CAUSE OF ACTION
## (NEW HAMPSHIRE STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### N.H. Rev. Stat. § 421-B:5-509(g)
### (Individual Defendants)

970.    Plaintiff realleges the allegations above.

971.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in New Hampshire.

972.    Every person who directly or indirectly controls an entity liable under the New Hampshire Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "individual who is a managing partner, executive officer, or director of a person liable under subsections (b) through (f), including an individual having a similar status or performing similar functions" is liable jointly and severally with and to the same extent as the seller, unless the individual sustains the burden of proof that the individual did not know and, in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist. N.H. Rev. Stat. § 421-B:5-509(g).

973.    When issued, the Token Futures were securities within the meaning of the New Hampshire Uniform Securities Act. *Id.* § 421-B:1-102(53)(A). On information and belief, BitMEX sold the Token Futures to members of the Class in New Hampshire and acted as the broker-dealer or agent for the sale and purchase of those securities. *Id.* §§ 421-B:1-102(3), 421-B:1-102(6). The Token Futures were neither registered under, nor subject to exemption from registration under the New Hampshire Uniform Securities Act, and BitMEX was not registered as a broker-dealer or agent under New Hampshire law. *Id.* §§ 421-B:2-201, 421-B:2-202.

974.    On information and belief, BitMEX sold the Token Futures and acted as a broker-dealer or agent in New Hampshire, including without limitation through solicitations directed by BitMEX to New Hampshire and received in New Hampshire.

975.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

976.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the New Hampshire Uniform Securities Act through BitMEX's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

977.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

978.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### NINETY-THIRD CAUSE OF ACTION
### (NEW JERSEY STATE LAW – PRIMARY LIABILITY)
**Unregistered Offer and Sale of Securities**
**NJ Stat. Ann. § 49:3-71(a), (c)**
**(BitMEX)**

979.    Plaintiff realleges the allegations above.

980.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in New Jersey.

981.    The New Jersey Uniform Securities Act forbids the offer or sale of unregistered securities. NJ Stat. Ann. § 49:3-60(e). Any person who offers or sells a security in violation of Section 49:3-60 is "liable … an action either at law or in equity to recover the consideration paid for the security or the investment advice and any loss due to the advice, together with interest set at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey from the date of payment of the consideration for the investment advice or security, and costs, less the amount of any income received on the security, upon the tender of the security and any income received from the investment advice or on the security, or for damages if he no longer owns the security." *Id.* § 49:3-71(c).

982.    When issued, the Token Futures were securities within the meaning of the New Jersey Securities Act. *Id.* § 49:3-49(m). On information and belief, BitMEX offered or sold the Token Futures to members of the Class in New Jersey. The Token Futures were neither registered under, nor subject to exemption from registration under the New Jersey Securities Act. *Id.* § 49:3-50

983.    Upon information and belief, the Token Futures were offered or sold in New Jersey, including without limitation through solicitations directed by BitMEX to New Jersey and received in New Jersey.

984.    Accordingly, BitMEX has violated the New Jersey Uniform Securities Act through BitMEX's sale of unregistered securities.

985.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

986.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**NINETY-FOURTH CAUSE OF ACTION**
**(NEW JERSEY STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**NJ Stat. Ann. § 49:3-71(a)**
**(BitMEX)**

</div>

987.    Plaintiff realleges the allegations above.

988.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in New Jersey.

989.    The New Jersey Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under New Jersey law. NJ Stat. Ann. § 49:3-56(a). Any person who offers or sells a security in violation of Section 49:3-56(a) is "liable … an action either at law or in equity to recover the consideration paid for the security or the investment advice and any loss due to the advice, together with interest set at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey from the date of payment of the consideration for the investment advice or security, and costs, less the amount of any income received on the security, upon the tender of the security and any income received from the investment advice or on the security, or for damages if he no longer owns the security." *Id.* § 49:3-71(c).

990.    When issued, the Token Futures were securities within the meaning of the New Jersey Securities Act. *Id.* § 49:3-49(m). On information and belief, BitMEX transacted business as a broker-dealer or agent when it offered or sold the Token Futures to members of the Class in New Jersey. *Id.* § 49:3-49(b), (c).

991.    On information and belief, BitMEX transacted business as a broker-dealer or agent in New Jersey, including without limitation through solicitations directed by BitMEX to New Jersey and received in New Jersey.

992.    BitMEX was not registered as a broker-dealer or agent in New Jersey, nor was it subject to any exemption from registration.

993.    Accordingly, BitMEX has violated the New Jersey Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

994.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

995.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**NINETY-FIFTH CAUSE OF ACTION**
**(NEW JERSEY STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**NJ Stat. Ann. § 49:3-71(d)**
**(Individual Defendants)**

996.    Plaintiff realleges the allegations above.

997.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in New Jersey.

998.    Every person who directly or indirectly controls an entity liable under the New Jersey Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer, or director of such a seller, or investment adviser, every person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise

of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. *Id.* § 49:3-71(d)

999.    When issued, the Token Futures were securities within the meaning of the New Jersey Securities Act. *Id.* § 49:3-49(m). On information and belief, BitMEX offered and sold the Token Futures to members of the Class in New Jersey and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the New Jersey Securities Act, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under New Jersey law. *Id.* § 49:3-56(a).

1000.   On information and belief, BitMEX offered and sold the Token Futures and acted as a broker-dealer or agent in New Jersey, including without limitation through solicitations directed by BitMEX to New Jersey and received in New Jersey.

1001.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1002.   Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the New Jersey Uniform Securities Act through BitMEX's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1003.   Class members who own the Token Futures have made or will make any necessary

tender and seek all remedies available at law or in equity for any Token Futures purchased in the

Class Period, including any applicable costs, attorneys' fees, and interest.

1004.   Class members who no longer own the Token Futures seek damages for any Token

Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**NINETY-SIXTH CAUSE OF ACTION**
**(NEW MEXICO STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**N.M. Stat. Ann. § 58-13C-509**
**(BitMEX)**

</div>

1005.   Plaintiff realleges the allegations above.

1006.   This Cause of Action is brought on behalf of Class members to whom Token

Futures were sold in New Mexico.

1007.   The New Mexico Uniform Securities Act forbids the sale of unregistered securities.

N.M. Stat. Ann. § 58-13C-301. Any person who sells a security in violation of Section 58-13C-

301 is "liable to the purchaser," who may "maintain an action to recover the consideration paid for

the security, less the amount of any income received on the security, and interest at the legal rate

of interest from the date of the purchase, costs and reasonable attorney fees determined by the

court, upon the tender of the security, or for actual damages," which are "the difference between

the price at which the security was sold and the value the security would have had at the time of

the sale in the absence of the purchaser's conduct causing liability, and interest at the legal rate of

interest from the date of the sale of the security, costs and reasonable attorney fees determined by

the court." *Id.* § 58-13C-509.

1008.   When issued, the Token Futures were securities within the meaning of the New

Mexico Uniform Securities Act. *Id.* § 58-13C-102(DD). On information and belief, BitMEX sold

the Token Futures to members of the Class in New Mexico. The Token Futures were neither

<div align="center">190</div>

registered under, nor subject to exemption from registration under the New Mexico Uniform Securities Act. *Id.* §§ 58-13C-201–202.

1009.  Upon information and belief, the Token Futures were sold in New Mexico, including without limitation through solicitations directed by BitMEX to New Mexico and received in New Mexico.

1010.  Accordingly, BitMEX has violated the New Mexico Uniform Securities Act through BitMEX's sale of unregistered securities.

1011.  Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1012.  Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**NINETY-SEVENTH CAUSE OF ACTION**
**(NEW MEXICO STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**N.M. Stat. Ann. § 58-13C-509**
**(BitMEX)**

</div>

1013.  Plaintiff realleges the allegations above.

1014.  This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in New Mexico.

1015.  The New Mexico Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under New Mexico law. N.M. Stat. Ann. §§ 58-13C-401–402. Any person who sells a security in violation of Sections 58-13C-401 or 58-13C-402 is "liable to the customer," who may "maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs and reasonable

<div align="center">191</div>

attorney fees determined by the court, upon the tender of the security, or for actual damages," which are "the difference between the price at which the security was sold and the value the security would have had at the time of the sale in the absence of the purchaser's conduct causing liability, and interest at the legal rate of interest from the date of the sale of the security, costs and reasonable attorney fees determined by the court." *Id.* § 58-13C-509.

1016.  When issued, the Token Futures were securities within the meaning of the New Mexico Uniform Securities Act. *Id.* § 58-13C-102(DD). On information and belief, BitMEX transacted business as a broker-dealer or agent when it sold the Token Futures to members of the Class in New Mexico. *Id.* §§ 58-13C-102(A), (C).

1017.  On information and belief, BitMEX transacted business as a broker-dealer or agent in New Mexico, including without limitation through solicitations directed by BitMEX to New Mexico and received in New Mexico.

1018.  BitMEX was not registered as a broker-dealer or agent in New Mexico, nor was it subject to any exemption from registration.

1019.  Accordingly, BitMEX has violated the New Mexico Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1020.  Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1021.  Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**NINETY-EIGHTH CAUSE OF ACTION**
**(NEW MEXICO STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**N.M. Stat. Ann. § 58-13C-509**
**(Individual Defendants)**

1022.   Plaintiff realleges the allegations above.

1023.   This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in New Mexico.

1024.   Every person who directly or indirectly controls an entity liable under the New Mexico Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "individual who is a managing partner, executive officer or director of a person liable" and every "individual who is an employee of or associated with a person liable" is jointly and severally liable with and to the same extent as the seller, unless the non-seller "sustains the burden of proof that the person did not know and, in the exercise of reasonable care could not have known, of the existence of conduct by reason of which liability is alleged to exist." *Id.* § 58-13C-509(G).

1025.   When issued, the Token Futures were securities within the meaning of the New Mexico Uniform Securities Act. *Id.* § 58-13C-102(DD). On information and belief, BitMEX sold the Token Futures to members of the Class in New Mexico and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the New Mexico Uniform Securities Act, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under New Mexico law. *Id.* §§ 58-13C-(401)–(402).

1026.   On information and belief, BitMEX sold the Token Futures and acted as a broker-dealer or agent in New Mexico, including without limitation through solicitations directed by BitMEX to New Mexico and received in New Mexico.

193

1027.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1028.   Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the New Mexico Uniform Securities Act through BitMEX's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1029.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1030.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### NINETY-NINTH CAUSE OF ACTION
### (NORTH CAROLINA STATE LAW – PRIMARY LIABILITY)
**Unregistered Offer and Sale of Securities**
**N.C. Gen. Stat. Ann. § 78A-56(a)**
**(BitMEX)**

1031.   Plaintiff realleges the allegations above.

1032.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in North Carolina.

1033.   The North Carolina Securities Act forbids the offer or sale of unregistered securities. N.C. Gen. Stat. Ann. § 78A-24. Any person who offers or sells a security in violation of Section 24 is "is liable to the person purchasing the security" who "may sue either at law or in

equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if the purchaser no longer owns the security." Id. §§ 78A-56(a)(1)–(2).

1034.    When issued, the Token Futures were securities within the meaning of the North Carolina Securities Act. *Id.* § 78A-2(11). On information and belief, BitMEX offered or sold the Token Futures to members of the Class in North Carolina. The Token Futures were neither registered under, nor subject to exemption from registration under the North Carolina Securities Act. *Id.* § 78A-24.

1035.    Upon information and belief, the Token Futures were offered or sold in North Carolina, including without limitation through solicitations directed by BitMEX to North Carolina and received in North Carolina.

1036.    Accordingly, BitMEX has violated the North Carolina Securities Act through BitMEX's sale of unregistered securities.

1037.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1038.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDREDTH CAUSE OF ACTION**
**(NORTH CAROLINA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Dealer**
**N.C. Gen. Stat. Ann. § 78A-36**
**(BitMEX)**

1039.    Plaintiff realleges the allegations above.

1040.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in North Carolina.

1041.   The North Carolina Securities Act forbids any person from transacting business as a dealer or salesman unless he is registered under North Carolina law. N.C. Gen. Stat. Ann § 78A-36(a). Any person who offers or sells a security in violation of Section 36(a) "is liable to the person purchasing the security" who "may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if the purchaser no longer owns the security." Id. §§ 78A-56(a)(1)–(2).

1042.   When issued, the Token Futures were securities within the meaning of the North Carolina Securities Act. *Id.* § 78A-2 (11). On information and belief, BitMEX transacted business as a dealer or salesman when it offered or sold the Token Futures to members of the Class in North Carolina. *Id.* §§ 78A-2 (2), (9).

1043.   On information and belief, BitMEX transacted business as a dealer or salesman in North Carolina, including without limitation through solicitations directed by BitMEX to North Carolina and received in North Carolina.

1044.   BitMEX was not registered as a dealer or salesman in North Carolina, nor was it subject to any exemption from registration.

1045.   Accordingly, BitMEX has violated the North Carolina Securities Act by transacting business as an unregistered dealer or salesman in the sale of securities.

1046.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1047.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND FIRST CAUSE OF ACTION**
**(NORTH CAROLINA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**N.C. Gen. Stat. Ann. § 78A-56(c)**
**(Individual Defendants)**

</div>

1048.   Plaintiff realleges the allegations above.

1049.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in North Carolina.

1050.   Every person who directly or indirectly controls an entity liable under the North Carolina Securities Act for unlawfully offering or selling unregistered securities or for operating as an unregistered dealer or salesman in the sale of those securities, as well as every "partner, officer, or director of the person," "every person occupying a similar status or performing similar functions," as well as "every dealer or salesman who materially aids in the sale" is jointly and severally liable with and to the same extent as the person, unless "able to sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Id. §§ 78A-56(c)(1).

1051.   When issued, the Token Futures were securities within the meaning of the North Carolina Securities Act. Id. § 78A-2 (11). On information and belief, BitMEX offered and sold the Token Futures to members of the Class in North Carolina and acted as the dealer or salesman for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the North Carolina Securities Act, and BitMEX was

<div align="center">197</div>

not registered or exempt from registration as a dealer or salesman under North Carolina law. *Id.* 78A-24.

1052.   On information and belief, BitMEX offered and sold the Token Futures and acted as a dealer or salesman in North Carolina, including without limitation through solicitations directed by BitMEX to North Carolina and received in North Carolina.

1053.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered dealer or salesman as described herein.

1054.   Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the North Carolina Securities Act through BitMEX's offer or sale of unregistered securities and operation as an unregistered dealer or salesman.

1055.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1056.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDRED AND SECOND CAUSE OF ACTION**
**(NORTH DAKOTA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**N.D.C.C. § 10-04-17**
**(BitMEX)**

1057.   Plaintiff realleges the allegations above.

198

1058.  This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in North Dakota.

1059.  The North Dakota Securities Act forbids the offer or sale of unregistered securities. N.D.C.C. § 10-04-04. Any person who unlawfully contracts to sell or sells an unregistered security is liable to "such purchaser" who "may sue either at law or in equity to recover the full amount paid," together with "all taxable court costs, interest as provided in this subsection, and reasonable attorney's fees, less the amount of any income received on the securities, upon tender to the seller, in person or in open court, of the securities sold or of the contracts made, or for damages if the purchaser no longer owns the securities." Id. § 10-04-17(1).

1060.  When issued, the Token Futures were securities within the meaning of the North Dakota Securities Act. Id. § 10-04-02 (19). On information and belief, BitMEX offered or sold the Token Futures to members of the Class in North Dakota. The Token Futures were neither registered under, nor subject to exemption from registration under the North Dakota Securities Act. Id. § 10-04-04.

1061.  Upon information and belief, the Token Futures were offered or sold in North Dakota, including without limitation through solicitations directed by BitMEX to North Dakota and received in North Dakota.

1062.  Accordingly, BitMEX has violated the North Dakota Securities Act through BitMEX's sale of unregistered securities.

1063.  Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1064.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND THIRD CAUSE OF ACTION
### (NORTH DAKOTA STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### N.D.C.C. § 10-04-17
### (BitMEX)

1065.   Plaintiff realleges the allegations above.

1066.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in North Dakota.

1067.   The North Dakota Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under North Dakota law. N.D.C.C. § 10-04-10. Any person who offers or sells a security in violation of Section 10 is liable to "such purchaser" who "may sue either at law or in equity to recover the full amount paid," together with "all taxable court costs, interest as provided in this subsection, and reasonable attorney's fees, less the amount of any income received on the securities, upon tender to the seller, in person or in open court, of the securities sold or of the contracts made, or for damages if the purchaser no longer owns the securities." Id. § 10-04-17 (1).

1068.   When issued, the Token Futures were securities within the meaning of the North Dakota Securities Act. *Id.* § 10-04-02(19). On information and belief, BitMEX transacted business as a broker-dealer or agent when it offered or sold the Token Futures to members of the Class in North Dakota. *Id.* §§ 10-04-02 (1), (3).

1069.   On information and belief, BitMEX transacted business as a broker-dealer or agent in North Dakota, including without limitation through solicitations directed by BitMEX to North Dakota and received in North Dakota.

1070.   BitMEX was not registered as a broker-dealer or agent in North Dakota, nor was it subject to any exemption from registration.

1071.   Accordingly, BitMEX has violated the North Dakota Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1072.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1073.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.


### ONE HUNDRED AND FOURTH CAUSE OF ACTION
### (NORTH DAKOTA STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### N.D.C.C. § 10-04-17
### (Individual Defendants)

1074.   Plaintiff realleges the allegations above.

1075.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in North Dakota.

1076.   Every person who directly or indirectly controls a seller liable under the North Dakota Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as well as any person who "supervises, or serves as an officer, director, or managing partner of a person liable under this section," an individual "who is an employee of or associated with a person liable under this section and who materially aids the conduct giving rise to the liability," as well as every "person that is a broker-dealer, agent, investment adviser, or investment adviser representative that materially aids the conduct giving rise to the liability," is jointly and severally liable with and to the same extent

as the seller, unless that person or individual "did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist." N.D.C.C. § 10-04-17(6).

1077.   When issued, the Token Futures were securities within the meaning of the North Dakota Securities Act. *Id.* § 10-04-02 (19). On information and belief, BitMEX offered and sold the Token Futures to members of the Class in North Dakota and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the North Dakota Securities Act, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under North Dakota law. *Id.* § 10-04-04.

1078.   On information and belief, BitMEX offered and sold the Token Futures and acted as a broker-dealer or agent in North Dakota, including without limitation through solicitations directed by BitMEX to North Dakota and received in North Dakota.

1079.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1080.   Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the North Dakota Securities Act through BitMEX's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1081.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1082.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND FIFTH CAUSE OF ACTION**
**(OHIO STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Ohio Rev. Code Ann. § 1707.43**
**(BitMEX)**

</div>

1083.   Plaintiff realleges the allegations above.

1084.   This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Ohio.

1085.   The Ohio Securities Act forbids the sale of unregistered securities. Ohio Rev. Code Ann. § 1707.09 (A)(1). Any person who sells a security in violation of Section 9(A)(1) is liable to the purchaser "in an action at law in any court of competent jurisdiction" for "the full amount paid by the purchaser and for all taxable costs." Id. § 1707.43(A).

1086.   When issued, the Token Futures were securities within the meaning of the Ohio Securities Act. Id. § 1707.01(B). On information and belief, BitMEX sold the Token Futures to members of the Class in Ohio. The Token Futures were neither registered under, nor subject to exemption from registration under the Ohio Securities Act. Id. § 1707.09.

1087.   The Token Futures were sold in Ohio, including without limitation through solicitations directed by BitMEX to Ohio and received in Ohio.

1088.   Accordingly, BitMEX has violated the Ohio Securities Act through BitMEX's sale of unregistered securities.

1089.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1090.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDRED AND SIXTH CAUSE OF ACTION**
**(OHIO STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Dealer**
**Ohio Rev. Code Ann. § 1707.43**
**(BitMEX)**

1091.   Plaintiff realleges the allegations above.

1092.   This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Ohio.

1093.   The Ohio Securities Act forbids any person from transacting business as a dealer unless he is registered or exempt from registration under Ohio law. Ohio Rev. Code Ann. § 1707.14. Any person who sells a security in violation of Section 14 is "liable to the purchaser "in an action at law in any court of competent jurisdiction" for " the full amount paid by the purchaser and for all taxable costs. Id. § 1707.43(A).

1094.   When issued, the Token Futures were securities within the meaning of the Ohio Securities Act. *Id.* § 1707.01(B). On information and belief, BitMEX transacted business as a dealer when it sold the Token Futures to members of the Class in Ohio. *Id.* §§ 1707 E (1).

1095.   On information and belief, BitMEX transacted business as a dealer in Ohio, including without limitation through solicitations directed by BitMEX to Ohio and received in Ohio.

1096.   BitMEX was not registered as a dealer in Ohio, nor was it subject to any exemption from registration.

1097.   Accordingly, BitMEX has violated the Ohio Securities Act by transacting business as an unregistered dealer in the sale of securities.

1098.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1099.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND SEVENTH CAUSE OF ACTION**
**(OHIO STATE LAW – ADDITIONAL LIABILITY)**
**Joint and Several Liability**
**Ohio Rev. Code Ann. § 1707.43**
**(Individual Defendants)**

</div>

1100.   Plaintiff realleges the allegations above.

1101.   This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Ohio.

1102.   Every person that has "participated in or aided the seller in any way in making" the sale or contract for sale, are "jointly and severally liable" to the purchaser. Ohio Rev. Code Ann. § 1707.43.

1103.   When issued, the Token Futures were securities within the meaning of the Ohio Securities Act. *Id.* § 1707.01(B). On information and belief, BitMEX sold the Token Futures to members of the Class in Ohio and acted as the dealer for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Ohio Securities Act, and BitMEX was not registered or exempt from registration as a dealer under Ohio law. *Id.* §§ 1707.09, 1707.14.

1104.  BitMEX sold the Token Futures and acted as a dealer in Ohio, including without limitation through solicitations directed by BitMEX to Ohio and received in Ohio.

1105.  Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered dealer as described herein.

1106.  Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Ohio Securities Act through BitMEX's sale of unregistered securities and operation as an unregistered dealer.

1107.  Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1108.  Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDRED AND EIGHTH CAUSE OF ACTION**
**(OKLAHOMA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Okla. Sta. Ann. tit. 71§ 1-509(C)**
**(BitMEX)**

1109.  Plaintiff realleges the allegations above.

1110.  This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Oklahoma.

1111.  The Oklahoma Securities Act forbids the offer or sale of unregistered securities. Okla. Sta. Ann. tit. 71 § 1-301. Any person who offers or sells a security in violation of Section

301 is liable to the "purchaser may maintain an action at law or in equity to recover the consideration paid for the security, and interest at the legal rate of interest per year from the date of the purchase, less the amount of any income received on the security, plus costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages" "*Id.* § 1-509 (B)(1).

1112.   When issued, the Token Futures were securities within the meaning of the Oklahoma Securities Act. *Id.* § 1-102 (32). On information and belief, BitMEX offered or sold the Token Futures to members of the Class in Oklahoma. The Token Futures were neither registered under, nor subject to exemption from registration under the Oklahoma Securities Act. *Id.* § 1-301.

1113.   Upon information and belief, the Token Futures were offered or sold in Oklahoma, including without limitation through solicitations directed by BitMEX to Oklahoma and received in Oklahoma.

1114.   Accordingly, BitMEX has violated the Oklahoma Securities Act through BitMEX's sale of unregistered securities.

1115.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1116.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND NINTH CAUSE OF ACTION
### (OKLAHOMA STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### Okla. Sta. Ann. tit. 71§ 1-509 (D)
### (BitMEX)

1117.   Plaintiff realleges the allegations above.

1118.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Oklahoma.

1119.   The Oklahoma Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Oklahoma law. Okla. Sta. Ann. tit. 71 §§ 1-401-2. Any person who offers or sells a security in violation of Sections 401 and 402 is liable to the customer, if purchaser, who "may maintain an action at law or in equity for recovery of actual damages…" in " the amount that would be recoverable upon a tender, less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest per year from the date of purchase, costs, and reasonable attorneys' fees determined by the court." *Id.* §§ 1-509 (D).

1120.   When issued, the Token Futures were securities within the meaning of the Oklahoma Securities Act. *Id.* § 1-102. On information and belief, BitMEX transacted business as a broker-dealer or agent when it offered or sold the Token Futures to members of the Class in Oklahoma. *Id.* §§ 1-102(4),(2).

1121.   On information and belief, BitMEX transacted business as a broker-dealer or agent in Oklahoma, including without limitation through solicitations directed by BitMEX to Oklahoma and received in Oklahoma.

1122.   BitMEX was not registered as a broker-dealer or agent in Oklahoma, nor was it subject to any exemption from registration.

1123.   Accordingly, BitMEX has violated the Oklahoma Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1124.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1125.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND TENTH CAUSE OF ACTION**
**(OKLAHOMA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Okla. Sta. Ann. tit. 71§ 1-509 (G)**
**(Individual Defendants)**

</div>

1126.   Plaintiff realleges the allegations above.

1127.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Oklahoma.

1128.   Every person who directly or indirectly controls an entity liable under the Oklahoma Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "managing partner, executive officer, or director" of such seller, "including an individual having similar status or performing similar functions," every employee of or associated with such a seller who materially aids in the sale" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. Okla. Sta. Ann. tit. 71§ 1-509(G).

1129.   When issued, the Token Futures were securities within the meaning of the Oklahoma Securities Act. *Id.* § 1-102. On information and belief, BitMEX offered and sold the Token Futures to members of the Class in Oklahoma and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor

<div align="center">209</div>

subject to exemption from registration under the Oklahoma Securities Act, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Oklahoma law. *Id.* § 1-401-02.

1130.   On information and belief, BitMEX offered and sold the Token Futures and acted as a broker-dealer or agent in Oklahoma, including without limitation through solicitations directed by BitMEX to Oklahoma and received in Oklahoma.

1131.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1132.   Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Oklahoma Securities Act through BitMEX's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1133.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1134.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE HUNDRED AND ELEVENTH CAUSE OF ACTION
### (OREGON STATE LAW – PRIMARY LIABILITY)
### Unregistered Offer and Sale of Securities
### O.R.S. § 59:115
### (BitMEX)

1135.   Plaintiff realleges the allegations above.

1136.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Oregon.

1137.   The Oregon Securities Act forbids the offer or sale of unregistered securities. O.R.S. § 59:055. Any person who offers or sells a security in violation of Section 55 "is liable to the purchaser," who may recover "the consideration paid for the security, and interest from the date of payment equal to the greater of the rate of interest specified in ORS 82.010 for judgements for the payment of money or the rate provided in the security if the security in an interest bearing obligation, less any amount received on the security, or if the purchaser no longer owns the security, damages." Id. §§ 59.115 (2)(a)-(b).

1138.   When issued, the Token Futures were securities within the meaning of the Oregon Securities Act. Id. § 59.015 (19). On information and belief, BitMEX offered or sold the Token Futures to members of the Class in Oregon. The Token Futures were neither registered under, nor subject to exemption from registration under the Oregon Securities Act. Id. § 59.055 .

1139.   Upon information and belief, the Token Futures were offered or sold in Oregon, including without limitation through solicitations directed by BitMEX to Oregon and received in Oregon.

1140.   Accordingly, BitMEX has violated the Oregon Securities Act through BitMEX's sale of unregistered securities.

1141.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1142.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE HUNDRED AND TWELFTH CAUSE OF ACTION
### (OREGON STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### O.R.S. § 59:115
### (BitMEX)

1143.   Plaintiff realleges the allegations above.

1144.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Oregon.

1145.   The Oregon Securities Act forbids any person from transacting business as a broker-dealer or salesperson unless he is registered under Oregon law. O.R.S. § 59:165. Any person who offers or sells a security in violation of Section 165 is "liable to the purchaser" who may recover "the consideration paid for the security, and interest from the date of payment equal to the greater of the rate of interest specified in ORS 82.010 for judgements for the payment of money or the rate provided in the security if the security in an interest bearing obligation, less any amount received on the security, or if the purchaser no longer owns the security, damages." Id. § 59.115 (2).

1146.   When issued, the Token Futures were securities within the meaning of the Oregon Securities Act. Id. § 59.015 (19). On information and belief, BitMEX transacted business as a broker-dealer or salesperson when it offered or sold the Token Futures to members of the Class in Oregon. Id. § 59.015 (1),(18).

1147.  On information and belief, BitMEX transacted business as a broker-dealer or salesperson in Oregon, including without limitation through solicitations directed by BitMEX to Oregon and received in Oregon.

1148.  BitMEX was not registered as a broker-dealer or salesperson in Oregon, nor was it subject to any exemption from registration.

1149.  Accordingly, BitMEX has violated the Oregon Securities Act by transacting business as an unregistered broker-dealer or salesperson in the sale of securities.

1150.  Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1151.  Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE HUNDRED AND THIRTEENTH CAUSE OF ACTION
### (OREGON STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**O.R.S. § 59:115 (3)**
**(Individual Defendants)**

1152.  Plaintiff realleges the allegations above.

1153.  This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Oregon.

1154.  Every person who directly or indirectly controls an entity liable under the Oregon Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or salesperson in the sale of those securities, as well as every "partner, limited liability company manager, including a member who is a manager, officer or director of such seller", "every person occupying a similar status or performing similar functions," and "every

213

person who participated or materially aids in the sale" is liable for unlawfully selling unregistered securities, unless that nonseller "sustains the burden of proof that the nonseller did not know, and, in the exercise of reasonable care could not have known, of the existence of facts on which the liability is based." O.R.S. § 59:115 (3).

1155.   When issued, the Token Futures were securities within the meaning of the Oregon Securities Act. *Id.* § O.R.S.§ 59.015 (19). On information and belief, BitMEX offered and sold the Token Futures to members of the Class in Oregon and acted as the broker-dealer or salesperson for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Oregon Securities Act, and BitMEX was not registered as a broker-dealer or salesperson under Oregon law. *Id.* § 59.165.

1156.   BitMEX offered and sold the Token Futures and acted as a broker-dealer or salesperson in Oregon, including without limitation through solicitations directed by BitMEX to Oregon and received in Oregon.

1157.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or salesperson as described herein.

1158.   Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Oregon Securities Act through BitMEX's offer or sale of unregistered securities and operation as an unregistered broker-dealer or salesperson.

1159.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1160.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDRED AND FOURTEENTH CAUSE OF ACTION**
**(PENNSYLVANIA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**70 Pa. Stat. Ann. § 1-502**
**(BitMEX)**

1161.   Plaintiff realleges the allegations above.

1162.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Pennsylvania.

1163.   The Pennsylvania Securities Act forbids the offer or sale of unregistered securities. 70 Pa. Stat. Ann. § 1-201. Any person who offers or sells a security in violation of Section 1-201 is "liable to the person purchasing the security offered or sold in violation of section 201 from him who may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, less the amount of any income or distributions, in cash or in kind, received on the security, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 1-502.

1164.   When issued, the Token Futures were securities within the meaning of the Pennsylvania Securities Act. *Id.* § 1-102(t). On information and belief, BitMEX offered or sold the Token Futures to members of the Class in Pennsylvania. The Token Futures were neither registered under, nor subject to exemption from registration under the Pennsylvania Securities Act. *Id.* § 1-202.

1165.   Upon information and belief, the Token Futures were offered or sold in Pennsylvania, including without limitation through solicitations directed by BitMEX to Pennsylvania and received in Pennsylvania.

1166.   Accordingly, BitMEX has violated the Pennsylvania Securities Act through BitMEX's sale of unregistered securities.

1167.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1168.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND FIFTEENTH CAUSE OF ACTION
### (PENNSYLVANIA STATE LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Broker-Dealer**
**70 Pa. Stat. Ann. § 1-501(a)**
**(BitMEX)**

1169.   Plaintiff realleges the allegations above.

1170.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Pennsylvania.

1171.   The Pennsylvania Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Pennsylvania law. 70 Pa. Stat. Ann. § 1-301(a). Any person who offers or sells a security in violation of Section 1-301(a) is "liable to the person purchasing the security from him, who may sue either at law or in equity to recover the consideration paid for the security together with interest at the legal rate from the date of payment, less the amount of any income or distributions, in cash or in kind, received on the security, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 1-501(a).

1172.  When issued, the Token Futures were securities within the meaning of the Pennsylvania Securities Act. *Id.* § 1-102(t). On information and belief, BitMEX transacted business as a broker-dealer or agent when it offered or sold the Token Futures to members of the Class in Pennsylvania. *Id.* § 1-102(c) ("Agent"), (e) ("Broker-dealer").

1173.  On information and belief, BitMEX transacted business as a broker-dealer or agent in Pennsylvania, including without limitation through solicitations directed by BitMEX to Pennsylvania and received in Pennsylvania.

1174.  BitMEX was not registered as a broker-dealer or agent in Pennsylvania, nor was it subject to any exemption from registration.

1175.  Accordingly, BitMEX has violated the Pennsylvania Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1176.  Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1177.  Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<u>**ONE HUNDRED AND SIXTEENTH CAUSE OF ACTION**</u>
<u>**(PENNSYLVANIA STATE LAW – ADDITIONAL LIABILITY)**</u>
**Control Person Liability**
**70 Pa. Stat. Ann. § 1-503**
**(Individual Defendants)**

1178.  Plaintiff realleges the allegations above.

1179.  This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Pennsylvania.

1180.  Every affiliate of an entity liable under the Pennsylvania Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent

217

in the sale of those securities, as well as every "partner, principal executive officer or director of such person" and "every person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. 70 Pa. Stat. Ann. § 1-503(a).

1181.  When issued, the Token Futures were securities within the meaning of the Pennsylvania Securities Act. *Id.* § 1-102. On information and belief, BitMEX offered and sold the Token Futures to members of the Class in Pennsylvania and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Pennsylvania Securities Act, *id.* § 1-202, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Pennsylvania law. *Id.* §§ 1-301, 1-302.

1182.   On information and belief, BitMEX offered and sold the Token Futures and acted as a broker-dealer or agent in Pennsylvania, including without limitation through solicitations directed by BitMEX to Pennsylvania and received in Pennsylvania.

1183.  Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1184.   Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Pennsylvania Securities Act through BitMEX's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1185.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1186.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND SEVENTEENTH CAUSE OF ACTION
### (PUERTO RICO STATE LAW – PRIMARY LIABILITY)
**Unregistered Offer and Sale of Securities**
**10 L.P.R.A. § 890**
**(BitMEX)**

1187.   Plaintiff realleges the allegations above.

1188.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Puerto Rico.

1189.   The Puerto Rico Securities Act forbids the offer or sale of unregistered securities. 10 L.P.R.A. § 871. Any person who offers or sells a security in violation of Section 871 is "liable to the person who buys the security, who may file suit to recover the price paid for the security, in addition to the interest at the rate applicable to judicial awards … starting on the date in which the payment, costs and reasonable Attorney's fees were made less the sum of any income received on, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 890.

1190.   When issued, the Token Futures were securities within the meaning of the Puerto Rico Securities Act. *Id.* § 881. On information and belief, BitMEX offered or sold the Token Futures to members of the Class in Puerto Rico. The Token Futures were neither registered under, nor subject to exemption from registration under the Puerto Rico Securities Act. *Id.* § 882.

1191.   Upon information and belief, the Token Futures were offered or sold in Puerto Rico, including without limitation through solicitations directed by BitMEX to Puerto Rico and received in Puerto Rico.

1192.   Accordingly, BitMEX has violated the Puerto Rico Securities Act through BitMEX's sale of unregistered securities.

1193.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1194.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND EIGHTEENTH CAUSE OF ACTION
### (PUERTO RICO STATE LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Broker-Dealer**
**10 L.P.R.A. § 890**
**(BitMEX)**

1195.   Plaintiff realleges the allegations above.

1196.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Puerto Rico.

1197.   The Puerto Rico Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered under Puerto Rico law. 10 L.P.R.A. § 861(a). Any person who offers or sells a security in violation of Section 861(a) is "liable to the person who buys the security, who may file suit to recover the price paid for the security, in addition to the interest at the rate applicable to judicial awards … starting on the date in which the payment, costs and reasonable Attorney's fees were made less the sum of any income received on, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 890.

1198.   When issued, the Token Futures were securities within the meaning of the Puerto Rico Securities Act. *Id.* § 881. On information and belief, BitMEX transacted business as a broker-dealer or agent when it offered or sold the Token Futures to members of the Class in Puerto Rico. *Id.*

1199.   On information and belief, BitMEX transacted business as a broker-dealer or agent in Puerto Rico, including without limitation through solicitations directed by BitMEX to Puerto Rico and received in Puerto Rico.

1200.   BitMEX was not registered as a broker-dealer or agent in Puerto Rico.

1201.   Accordingly, BitMEX has violated the Puerto Rico Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1202.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1203.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDRED AND NINETEENTH CAUSE OF ACTION**
**(PUERTO RICO STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**10 L.P.R.A. § 890**
**(Individual Defendants)**

1204.   Plaintiff realleges the allegations above.

1205.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Puerto Rico.

1206.   Every person who directly or indirectly controls an entity liable under the Puerto Rico Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer,

or director of such a seller," and "every person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. 10 L.P.R.A. § 890(b).

1207.  When issued, the Token Futures were securities within the meaning of the Puerto Rico Securities Act. *Id.* § 881. On information and belief, BitMEX offered and sold the Token Futures to members of the Class in Puerto Rico and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Puerto Rico Securities Act, and BitMEX was not registered as a broker-dealer or agent under Puerto Rico law. *Id.* § 861(a).

1208.  On information and belief, BitMEX offered and sold the Token Futures and acted as a broker-dealer or agent in Puerto Rico, including without limitation through solicitations directed by BitMEX to Puerto Rico and received in Puerto Rico.

1209. Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1210.   Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Puerto Rico Securities Act through BitMEX's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1211.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1212.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND TWENTIETH CAUSE OF ACTION**
**(RHODE ISLAND STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**7 R.I. Gen. Laws Ann. § 7-11-605**
**(BitMEX)**

</div>

1213.   Plaintiff realleges the allegations above.

1214.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Rhode Island.

1215.   The Rhode Island Securities Act forbids the offer or sale of unregistered securities. 7 R.I. Gen. Laws Ann. § 7-11-301. Any person who offers or sells a security in violation of Section 7-11-301 is "liable to the purchaser of the security from that person" and "[u]pon tender of the security, the purchaser may recover the consideration paid for the security and interest at the legal rate of this state from the date of payment, costs, and reasonable attorney's fees as determined by the court, less the amount of income received on the security," or if the "purchaser no longer owns the security, the purchaser may recover damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, plus interest at the legal rate of this state from the date of disposition of the security, costs and reasonable attorney's fees as determined by the court." *Id.* § 7-11-605.

<div align="center">223</div>

1216.   When issued, the Token Futures were securities within the meaning of the Rhode Island Securities Act. *Id.* § 7-11-101(22). On information and belief, BitMEX offered or sold the Token Futures to members of the Class in Rhode Island. The Token Futures were neither registered under, nor subject to exemption from registration under the Rhode Island Securities Act. *Id.* § 7-11-401.

1217.   Upon information and belief, the Token Futures were offered or sold in Rhode Island, including without limitation through solicitations directed by BitMEX to Rhode Island and received in Rhode Island.

1218.   Accordingly, BitMEX has violated the Rhode Island Securities Act through BitMEX's sale of unregistered securities.

1219.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1220.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDRED AND TWENTY-FIRST CAUSE OF ACTION**
**(RHODE ISLAND STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**7 R.I. Gen. Laws Ann. § 7-11-605**
**(BitMEX)**

1221.   Plaintiff realleges the allegations above.

1222.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Rhode Island.

1223.   The Rhode Island Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Rhode Island law. 7 R.I. Gen. Laws Ann. § 7-11-201(a). Any person who offers or sells a security in violation of

Section 7-11-201(a) is "liable to the purchaser of the security from that person" and "[u]pon tender of the security, the purchaser may recover the consideration paid for the security and interest at the legal rate of this state from the date of payment, costs, and reasonable attorney's fees as determined by the court, less the amount of income received on the security," or if the "purchaser no longer owns the security, the purchaser may recover damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, plus interest at the legal rate of this state from the date of disposition of the security, costs and reasonable attorney's fees as determined by the court." *Id.* § 7-11-605(a).

1224.   When issued, the Token Futures were securities within the meaning of the Rhode Island Securities Act. *Id.* § 7-11-101(22). On information and belief, BitMEX transacted business as a broker-dealer or agent when it offered or sold the Token Futures to members of the Class in Rhode Island. *Id.* § 7-11-101(1).

1225.   On information and belief, BitMEX transacted business as a broker-dealer or agent in Rhode Island, including without limitation through solicitations directed by BitMEX to Rhode Island and received in Rhode Island.

1226.   BitMEX was not registered as a broker-dealer or agent in Rhode Island, nor was it subject to any exemption from registration.

1227.   Accordingly, BitMEX has violated the Rhode Island Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1228.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1229.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDRED AND TWENTY-SECOND CAUSE OF ACTION**
**(RHODE ISLAND STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**R.I. Gen. Laws Ann. § 7-11-605(d)**
**(Individual Defendants)**

1230.   Plaintiff realleges the allegations above.

1231.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Rhode Island.

1232.   Every person who directly or indirectly controls an entity liable under the Rhode Island Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "a partner, officer, or director of the person liable" and "a person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. R.I. Gen. Laws Ann. § 7-11-605(d).

1233.   When issued, the Token Futures were securities within the meaning of the Rhode Island Securities Act. *Id.* § 7-11-101(22). On information and belief, BitMEX offered and sold the Token Futures to members of the Class in Rhode Island and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Rhode Island Securities Act, *id.* § 7-11-401, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Rhode Island law. *Id.* § 7-11-202.

1234.   On information and belief, BitMEX offered and sold the Token Futures and acted as a broker-dealer or agent in Rhode Island, including without limitation through solicitations directed by BitMEX to Rhode Island and received in Rhode Island.

1235.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1236.   Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Rhode Island Securities Act through BitMEX's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1237.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1238.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<u>**ONE HUNDRED AND TWENTY-THIRD CAUSE OF ACTION**</u>
<u>**(SOUTH CAROLINA STATE LAW – PRIMARY LIABILITY)**</u>
**Unregistered Sale of Securities**
**S.C. Code Ann. § 35-1-509**
**(BitMEX)**

1239.   Plaintiff realleges the allegations above.

1240.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in South Carolina.

1241.   The South Carolina Securities Act forbids the offer or sale of unregistered securities. S.C. Code Ann. § 35-1-301. Any person who sells a security in violation of Section 35-1-301 is liable to the purchaser who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined by the court" or for "actual damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorneys' fees determined by the court." *Id.* § 35-1-509(b).

1242.   When issued, the Token Futures were securities within the meaning of the South Carolina Securities Act. *Id.* § 35-1-102(29). On information and belief, BitMEX sold the Token Futures to members of the Class in South Carolina. The Token Futures were neither registered under, nor subject to exemption from registration under the South Carolina Securities Act. *Id.* § 35-1-201.

1243.   Upon information and belief, the Token Futures were sold in South Carolina, including without limitation through solicitations directed by BitMEX to South Carolina and received in South Carolina.

1244.   Accordingly, BitMEX has violated the South Carolina Securities Act through BitMEX's sale of unregistered securities.

1245.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1246.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND TWENTY-FOURTH CAUSE OF ACTION**
**(SOUTH CAROLINA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**S.C. Code Ann. § 35-1-509**
**(BitMEX)**

</div>

1247.   Plaintiff realleges the allegations above.

1248.   This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in South Carolina.

1249.   The South Carolina Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under South Carolina law. S.C. Code Ann. § 35-1-401(a). Any person who sells a security in violation of Section 35-1-401(a) is liable to the purchaser who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined by the court" or for "actual damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorneys' fees determined by the court." *Id.* §§ 35-1-509(d), 35-1-509(b).

1250.   When issued, the Token Futures were securities within the meaning of the South Carolina Securities Act. *Id.* § 35-1-102(29). On information and belief, BitMEX transacted business as a broker-dealer or agent when it sold the Token Futures to members of the Class in South Carolina. *Id.* §§ 35-1-102(2) ("Agent"), 35-1-102(4) ("Broker-dealer").

1251.   On information and belief, BitMEX transacted business as a broker-dealer or agent in South Carolina, including without limitation through solicitations directed by BitMEX to South Carolina and received in South Carolina.

1252.   BitMEX was not registered as a broker-dealer or agent in South Carolina, nor was it subject to any exemption from registration.

1253.   Accordingly, BitMEX has violated the South Carolina Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1254.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1255.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE HUNDRED AND TWENTY-FIFTH CAUSE OF ACTION
## (SOUTH CAROLINA STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### S.C. Code Ann. § 31-1-509
### (Individual Defendants)

1256.   Plaintiff realleges the allegations above.

1257.   This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in South Carolina.

1258.   Every person who directly or indirectly controls an entity liable under the South Carolina Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as an individual "who is a managing partner, executive officer, or director of a person liable, … including an individual having a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not

230

know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. S.C. Code. Ann. § 31-1-509(g).

1259.   When issued, the Token Futures were securities within the meaning of the South Carolina Securities Act. *Id.* § 35-1-102(29). On information and belief, BitMEX sold the Token Futures to members of the Class in South Carolina and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the South Carolina Securities Act, *id.* § 35-1-201, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under South Carolina law. *Id.* § 35-1-401.

1260.   On information and belief, BitMEX sold the Token Futures and acted as a broker-dealer or agent in South Carolina, including without limitation through solicitations directed by BitMEX to South Carolina and received in South Carolina.

1261.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1262.   Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the South Carolina Securities Act through BitMEX's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1263.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1264.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND TWENTY-SIXTH CAUSE OF ACTION**
**(SOUTH DAKOTA STATE LAW – PRIMARY LIABILITY)**
**Sale of Unregistered Securities**
**S.D. Codified Laws § 47-31B-509(b)**
**(BitMEX)**

</div>

1265.   Plaintiff realleges the allegations above.

1266.   This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in South Dakota.

1267.   The South Dakota Securities Act forbids the sale of unregistered securities. S.D. Codified Laws § 47-31B-301. Any person who sells a security in violation of Section 47-31B-301 is liable for "the consideration paid for the security, less the amount of any income received on the security, and interest at Category D, § 54-3-16 from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages." *Id.* § 47-31B-509(b).

1268.   When issued, the Token Futures were securities within the meaning of the South Dakota Securities Act. *Id.* § 47-31B-102(28). On information and belief, BitMEX sold the Token Futures to members of the Class in South Dakota. The Token Futures were neither registered under, nor subject to exemption from registration under the South Dakota Securities Act. *Id.* §§ 47-31B-201-47-31B-203.

1269.  Upon information and belief, the Token Futures were sold in South Dakota, including without limitation through solicitations directed by BitMEX to South Dakota and received in South Dakota.

1270.  Accordingly, BitMEX has violated the South Dakota Securities Act through BitMEX's sale of unregistered securities.

1271.  Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1272.  Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND TWENTY-SEVENTH CAUSE OF ACTION**
**(SOUTH DAKOTA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**S.D. Codified Laws § 47-31B-509(d)**
**(BitMEX)**

</div>

1273.  Plaintiff realleges the allegations above.

1274.  This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in South Dakota.

1275.  The South Dakota Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under South Dakota law. S.D. Codified Laws § 47-31B-401(a).

1276.  . Any person who sells a security in violation of Section 47-31B-401(a) is liable for "the consideration paid for the security, less the amount of any income received on the security, and interest at Category D, § 54-3-16 from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages." *Id.* § 47-31B-509(b),(d).

1277.   When issued, the Token Futures were securities within the meaning of the South Dakota Securities Act. *Id.* § 47-31B-102(28). On information and belief, BitMEX transacted business as a broker-dealer or agent when it sold the Token Futures to members of the Class in South Dakota. *Id.* § 47-31B-102(2),(4).

1278.   On information and belief, BitMEX transacted business as a broker-dealer or agent in South Dakota, including without limitation through solicitations directed by BitMEX to South Dakota and received in South Dakota.

1279.   BitMEX was not registered as a broker-dealer or agent in South Dakota, nor was it subject to any exemption from registration.

1280.   Accordingly, BitMEX has violated the South Dakota Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1281.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1282.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND TWENTY-EIGHTH CAUSE OF ACTION**
**(SOUTH DAKOTA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**S.D. Codified Laws § 47-31B-509**
**(Individual Defendants)**

</div>

1283.   Plaintiff realleges the allegations above.

1284.   This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in South Dakota.

1285.   Every person who directly or indirectly controls an entity liable under the South Dakota Securities Act for unlawfully selling unregistered securities or for operating as an

unregistered broker-dealer or agent in the sale of those securities, as well as an "individual who is a managing partner, executive officer, or director … employee of or associated with" an entity so liable is "liable jointly and severally with and to the same extent as" such a person. S.D. Codified Laws § 47-31B-509.

1286.   When issued, the Token Futures were securities within the meaning of the South Dakota Securities Act. *Id.* § 47-31B-102(28). On information and belief, BitMEX sold the Token Futures to members of the Class in South Dakota and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the South Dakota Securities Act, and BitMEX was not registered as a broker-dealer or agent under South Dakota law. *Id.* §§ 47-31B-301, 47-31B-401(a).

1287.   On information and belief, BitMEX sold the Token Futures and acted as a broker-dealer or agent in South Dakota, including without limitation through solicitations directed by BitMEX to South Dakota and received in South Dakota.

1288.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1289.   Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the South Dakota Securities Act through BitMEX's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1290.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1291.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<u>**ONE HUNDRED AND TWENTY-NINTH CAUSE OF ACTION**</u>
<u>**(TENNESSEE STATE LAW – PRIMARY LIABILITY)**</u>
**Unregistered Sale of Securities**
**Tenn. Code Ann. § 48-1-122**
**(BitMEX)**

1292.    Plaintiff realleges the allegations above.

1293.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Tennessee.

1294.    The Tennessee Securities Act forbids the sale of unregistered securities. Tenn. Code Ann. § 48-1-104(a). Any person who sells a security in violation of Section 104(a) is "liable to the person purchasing the security from the seller to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, less the amount of any income received on the security, upon the tender of the security, or, if the purchaser no longer owns the security, the amount that would be recoverable upon a tender, less the value of the security when the purchaser disposed of it and interest at the legal rate from the date of disposition." *Id.* § 48-1-122(a).

1295.    When issued, the Token Futures were securities within the meaning of the Tennessee Securities Act. *Id.* § 48-1-102(20). On information and belief, BitMEX sold the Token Futures to members of the Class in Tennessee. The Token Futures were neither registered under, nor subject to exemption from registration under the Tennessee Securities Act. *Id.* § 48-1-103.

1296.   Upon information and belief, the Token Futures were sold in Tennessee, including without limitation through solicitations directed by BitMEX to Tennessee and received in Tennessee.

1297.   Accordingly, BitMEX has violated the Tennessee Securities Act through BitMEX's sale of unregistered securities.

1298.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1299.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND THIRTIETH CAUSE OF ACTION**
**(TENNESSEE STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Tenn. Code Ann. § 48-1-122**
**(BitMEX)**

</div>

1300.   Plaintiff realleges the allegations above.

1301.   This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Tennessee.

1302.   The Tennessee Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Tennessee law. Tenn. Code Ann. § 48-1-109. Any person who sells a security in violation of Section 109 is "liable to the person purchasing the security from the seller to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, less the amount of any income received on the security, upon the tender of the security, or, if the purchaser no longer owns the security, the amount that would be recoverable upon a tender, less the value of the

security when the purchaser disposed of it and interest at the legal rate from the date of disposition." *Id.* § 48-1-122(a).

1303.   When issued, the Token Futures were securities within the meaning of the Tennessee Securities Act. *Id.* § 48-1-102(20). On information and belief, BitMEX transacted business as a broker-dealer or agent when it sold the Token Futures to members of the Class in Tennessee. *Id.* § 48-1-102(3),(4).

1304.   On information and belief, BitMEX transacted business as a broker-dealer or agent in Tennessee, including without limitation through solicitations directed by BitMEX to Tennessee and received in Tennessee.

1305.   BitMEX was not registered as a broker-dealer or agent in Tennessee, nor was it subject to any exemption from registration.

1306.   Accordingly, BitMEX has violated the Tennessee Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1307.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1308.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE HUNDRED AND THIRTY-FIRST CAUSE OF ACTION
### (TENNESSEE STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**Tenn. Code Ann. § 48-1-122(g)**
**(Individual Defendants)**

1309.   Plaintiff realleges the allegations above.

1310.  This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Tennessee.

1311.  Every person who directly or indirectly controls an entity liable under the Tennessee Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, principal executive officer, or director of such person, every person occupying a similar status or performing similar functions, every employee of such person who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation" is "liable jointly and severally with and to the same extent as such person, unless the person who would be liable under this subsection (g) proves that the person who would be liable did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 48-1-122(g).

1312.  When issued, the Token Futures were securities within the meaning of the Tennessee Securities Act. *Id.* § 48-1-102(20). On information and belief, BitMEX sold the Token Futures to members of the Class in Tennessee and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Tennessee Securities Act, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Tennessee law. *Id.* §§ 48-1-104(a), 48-1-109.

1313.  On information and belief, BitMEX sold the Token Futures and acted as a broker-dealer or agent in Tennessee, including without limitation through solicitations directed by BitMEX to Tennessee and received in Tennessee.

1314.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1315.   Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Tennessee Securities Act through BitMEX's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1316.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1317.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<u>ONE HUNDRED AND THIRTY-SECOND CAUSE OF ACTION</u>
<u>(TEXAS STATE LAW – PRIMARY LIABILITY)</u>
**Unregistered Offer and Sale of Securities**
**Texas Civ. St. Art. § 581-33 A**
**(BitMEX)**

1318.   Plaintiff realleges the allegations above.

1319.   This Cause of Action is brought on behalf of Plaintiff and Class members to whom Token Futures were offered or sold in Texas.

1320.   The Texas Blue Sky Law – Securities forbids the offer or sale of unregistered securities. Texas Civ. St. Art. § 581-7. Any person who offers or sells a security in violation of Section 581-7 is "is liable to the person buying the security from him, who may sue either at law

or in equity for rescission or for damages if the buyer no longer owns the security." *Id.* § 581-33 A. Damages are defined as "(a) the consideration the buyer paid for the security plus interest thereon at the legal rate from the date of payment by the buyer, less (b) the greater of: (i) the value of the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security; or (ii) the actual consideration received for the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security." *Id.* § 581-33 D(3).

1321.   When issued, the Token Futures were securities within the meaning of the Texas Blue Sky Law – Securities. *Id.* § 581-4 A. BitMEX offered or sold the Token Futures to Plaintiff and members of the Class in Texas. The Token Futures were neither registered under, nor subject to exemption from registration under the Texas Blue Sky Law – Securities. *Id.* § 581-6.

1322.   The Token Futures were offered or sold in Texas, including without limitation through solicitations directed by BitMEX to Texas and received in Texas.

1323.   Accordingly, BitMEX has violated the Texas Blue Sky Law – Securities through BitMEX's sale of unregistered securities.

1324.   Plaintiff and Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1325.   Plaintiff and Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDRED AND THIRTY-THIRD CAUSE OF ACTION**
**(TEXAS STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Dealer**
**Texas Civ. St. Art. § 581-33 A**
**(BitMEX)**

1326.    Plaintiff realleges the allegations above.

1327.    This Cause of Action is brought on behalf of Plaintiff and Class members to whom Token Futures were offered or sold in Texas.

1328.    The Texas Blue Sky Law – Securities forbids any person from transacting business as a dealer or agent unless he is registered or exempt from registration under Texas law. Texas Civ. St. Art. § 581-12. Any person who offers or sells a security in violation of Sections 581-12 "is liable to the person buying the security from him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security." *Id.* § 581-33 A. Damages are defined as "(a) the consideration the buyer paid for the security plus interest thereon at the legal rate from the date of payment by the buyer, less (b) the greater of: (i) the value of the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security; or (ii) the actual consideration received for the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security." *Id.* § 581-33 D(3).

1329.    When issued, the Token Futures were securities within the meaning of the Texas Blue Sky Law – Securities. *Id.* § 581-4 A. BitMEX transacted business as a dealer or agent when it offered or sold the Token Futures to Plaintiff and members of the Class in Texas. *Id.* §§ 581-4 C, 581-4 D.

1330.    BitMEX transacted business as a dealer or agent in Texas, including without limitation through solicitations directed by BitMEX to Texas and received in Texas.

1331.    BitMEX was not registered as a dealer or agent in Texas, nor was it subject to any exemption from registration.

1332.   Accordingly, BitMEX has violated the Texas Blue Sky Law – Securities by transacting business as an unregistered dealer or agent in the sale of securities.

1333.   Plaintiff and Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1334.   Plaintiff and Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND THIRTY-FOURTH CAUSE OF ACTION**
**(TEXAS STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Texas Civ. St. Art. § 581-33 F**
**(Individual Defendants)**

</div>

1335.   Plaintiff realleges the allegations above.

1336.   This Cause of Action is brought on behalf of Plaintiff and Class members to whom Token Futures were offered or sold in Texas.

1337.   Every person who directly or indirectly controls an entity liable under the Texas Blue Sky Law – Securities for unlawfully selling unregistered securities or for operating as an unregistered dealer or agent in the sale of those securities, is liable jointly and severally with and to the same extent as the seller, unless the individual sustains the burden of proof that the individual did not know and, in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. Texas Civ. St. Art. § 581-33 F.

1338.   When issued, the Token Futures were securities within the meaning of the Texas Blue Sky Law – Securities. *Id.* § 581-4 A. BitMEX offered and sold the Token Futures to Plaintiff and members of the Class in Texas and acted as the dealer or agent for the sale and purchase of those securities. *Id.* §§ 581-4 C, 581-4 D. The Token Futures were neither registered under, nor

<div align="center">243</div>

subject to exemption from registration under the Texas Blue Sky Law – Securities, and BitMEX was not registered or exempt from registration as a dealer or agent under Texas law. *Id.* §§ 581-5, 581-6.

1339.   BitMEX offered and sold the Token Futures and acted as a dealer or agent in Texas, including without limitation through solicitations directed by BitMEX to Texas and received in Texas.

1340.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered dealer or agent as described herein.

1341.   Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Texas Blue Sky Law – Securities through BitMEX's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1342.   Plaintiff and Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1343.   Plaintiff and Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDRED AND THIRTY-FIFTH CAUSE OF ACTION**
**(UTAH STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Utah Code § 61-1-22**
**(BitMEX)**

1344.   Plaintiff realleges the allegations above.

1345.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Utah.

1346.   The Utah Securities Act forbids the offer or sale of unregistered securities. Utah Code Ann. § 61-1-7. Any person who offers or sells a security in violation of Section 61-1-7 is liable to the buyer for "the consideration paid for the security, together with interest at 12% per year from the date of payment, costs, and reasonable attorney fees, less the amount of income received on the security, upon the tender of the security or for damages if the person no longer owns the security." *Id.* § 61-1-22(b).

1347.   When issued, the Token Futures were securities within the meaning of the Utah Securities Act. *Id.* § 61-1-13(ee). On information and belief, BitMEX offered or sold the Token Futures to members of the Class in Utah. The Token Futures were neither registered under, nor subject to exemption from registration under the Utah Securities Act. *Id.* § 61-14.

1348.   Upon information and belief, the Token Futures were offered or sold in Utah, including without limitation through solicitations directed by BitMEX to Utah and received in Utah.

1349.   Accordingly, BitMEX has violated the Utah Securities Act through BitMEX's sale of unregistered securities.

1350.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1351.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND THIRTY-SIXTH CAUSE OF ACTION
### (UTAH STATE LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Broker-Dealer**
**Utah Code § 61-1-22**
**(BitMEX)**

1352.   Plaintiff realleges the allegations above.

1353.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Utah.

1354.   The Utah Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Utah law. Utah Code § 61-1-3(1). Any person who offers or sells a security in violation of Section 61-1-3(1)is "liable to the buyer for "the consideration paid for the security, together with interest at 12% per year from the date of payment, costs, and reasonable attorney fees, less the amount of income received on the security, upon the tender of the security or for damages if the person no longer owns the security." *Id.* § 61-1-22(b).

1355.   When issued, the Token Futures were securities within the meaning of the Utah Securities Act. *Id.* § 61-1-13(ee). On information and belief, BitMEX transacted business as a broker-dealer or agent when it offered or sold the Token Futures to members of the Class in Utah. *Id.* § 61-1-13(b),(c).

1356.   On information and belief, BitMEX transacted business as a broker-dealer or agent in Utah, including without limitation through solicitations directed by BitMEX to Utah and received in Utah.

1357.   BitMEX was not registered as a broker-dealer or agent in Utah, nor was it subject to any exemption from registration.

1358.   Accordingly, BitMEX has violated the Utah Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1359.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1360.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND THIRTY-SEVENTH CAUSE OF ACTION**
**(UTAH STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Utah Code Ann. § 61-1-22**
**(Individual Defendants)**

</div>

1361.   Plaintiff realleges the allegations above.

1362.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Utah.

1363.   Every person who directly or indirectly controls an entity liable under the Utah Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer, or director of such a seller or buyer, every person occupying a similar status or performing similar functions, every employee of such a seller or buyer who materially aids in the sale or purchase, and every broker-dealer or agent who materially aids in the sale or purchase" are liable jointly and severally "with and to the same extent as the seller or purchaser, unless the nonseller or nonpurchaser who is so liable sustains the burden of proof that the nonseller or nonpurchaser did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Utah Code Ann. § 61-1-22.

1364. When issued, the Token Futures were securities within the meaning of the Utah Securities Act. *Id.* § 61-1-13(ee). On information and belief, BitMEX offered and sold the Token Futures to members of the Class in Utah and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Utah Securities Act, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Utah law. *Id.* §§ 61-1-3, 61-1-7.

1365. On information and belief, BitMEX offered and sold the Token Futures and acted as a broker-dealer or agent in Utah, including without limitation through solicitations directed by BitMEX to Utah and received in Utah.

1366. Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1367. Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Utah Securities Act through BitMEX's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1368. Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1369.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND THIRTY-EIGHTH CAUSE OF ACTION**
**(VERMONT STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Vt. Stat. Ann. tit. 9, § 5509**
**(BitMEX)**

</div>

1370.   Plaintiff realleges the allegations above.

1371.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Vermont.

1372.   The Vermont Securities Act forbids the offer or sale of unregistered securities. Vt. Stat. Ann. tit. 9, § 5309. Any person who offers or sells a security in violation of Section 5309 is liable for "the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or for actual damages." *Id.* § 5509.

1373.   When issued, the Token Futures were securities within the meaning of the Vermont Securities Act. *Id.* § 5102(28). On information and belief, BitMEX offered or sold the Token Futures to members of the Class in Vermont. The Token Futures were neither registered under, nor subject to exemption from registration under the Vermont Securities Act. *Id.* §§ 5201-5203.

1374.   Upon information and belief, the Token Futures were offered or sold in Vermont, including without limitation through solicitations directed by BitMEX to Vermont and received in Vermont.

1375.   Accordingly, BitMEX has violated the Vermont Securities Act through BitMEX's sale of unregistered securities.

<div align="center">249</div>

1376.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1377.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND THIRTY-NINTH CAUSE OF ACTION**
**(VERMONT STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Vt. Stat. Ann. tit. 9, § 5509**
**(BitMEX)**

</div>

1378.   Plaintiff realleges the allegations above.

1379.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Vermont.

1380.   The Vermont Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Vermont law. Vt. Stat. Ann. tit. 9, § 5401. Any person who offers or sells a security in violation of Section 5401 is liable for "the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or for actual damages." *Id.* § 5509 (b),(d).

1381.   When issued, the Token Futures were securities within the meaning of the Vermont Securities Act. *Id.* § 5102(28). On information and belief, BitMEX transacted business as a broker-dealer or agent when it offered or sold the Token Futures to members of the Class in Vermont. *Id.* § 5102(1),(3).

<div align="center">250</div>

1382.   On information and belief, BitMEX transacted business as a broker-dealer or agent in Vermont, including without limitation through solicitations directed by BitMEX to Vermont and received in Vermont.

1383.   BitMEX was not registered as a broker-dealer or agent in Vermont, nor was it subject to any exemption from registration.

1384.   Accordingly, BitMEX has violated the Vermont Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1385.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1386.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE HUNDRED AND FORTIETH CAUSE OF ACTION
## (VERMONT STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### Vt. Stat. Ann. tit. 9, § 5509
### (Individual Defendants)

1387.   Plaintiff realleges the allegations above.

1388.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Vermont.

1389.   Every person who directly or indirectly controls an entity liable under the Vermont Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "an individual who is a managing partner, executive officer, or director of a person liable under subsections (b) through (f) of this section, including an individual having a similar status or performing similar functions," is jointly and severally liable with the entity "unless the individual sustains the burden of proof that the

251

individual did not know and, in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist." Vt. Stat. Ann. tit. 9, § 5509(g).

1390.   When issued, the Token Futures were securities within the meaning of the Vermont Securities Act. *Id.* § 5102(28). On information and belief, BitMEX offered and sold the Token Futures to members of the Class in Vermont and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Vermont Securities Act, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Vermont law. *Id.* §§ 5309, 5401.

1391.   On information and belief, BitMEX offered and sold the Token Futures and acted as a broker-dealer or agent in Vermont, including without limitation through solicitations directed by BitMEX to Vermont and received in Vermont.

1392.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1393.   Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Vermont Securities Act through BitMEX's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1394.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1395.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE HUNDRED AND FORTY-FIRST CAUSE OF ACTION
### (VIRGINIA STATE LAW – PRIMARY LIABILITY)
**Unregistered Sale of Securities**
**Va. Code Ann. § 13.1-522 A**
**(BitMEX)**

1396.   Plaintiff realleges the allegations above.

1397.   This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Virginia.

1398.   The Virginia Securities Act forbids the offer or sale of unregistered securities. Va. Code Ann. § 13.1-507. Any person who sells a security in violation of Section 13.1-507 "shall be liable to the person purchasing such security from him who may sue either at law or in equity to recover the consideration paid for such security, together with interest thereon at the annual rate of six percent, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of such security, or for the substantial equivalent in damages if he no longer owns the security." *Id.* § 13.1-522 A.

1399.   When issued, the Token Futures were securities within the meaning of the Virginia Securities Act. *Id.* § 13.1-501 A. On information and belief, BitMEX sold the Token Futures to members of the Class in Virginia. The Token Futures were neither registered under, nor subject to exemption from registration under the Virginia Securities Act. *Id.* § 13.1-514 A.

1400.   Upon information and belief, the Token Futures were sold in Virginia, including without limitation through solicitations directed by BitMEX to Virginia and received in Virginia.

1401.   Accordingly, BitMEX has violated the Virginia Securities Act through BitMEX's sale of unregistered securities.

1402.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1403.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND FORTY-SECOND CAUSE OF ACTION**
**(VIRGINIA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Va. Code Ann. § 13.1-522 A**
**(BitMEX)**

</div>

1404.   Plaintiff realleges the allegations above.

1405.   This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Virginia.

1406.   The Virginia Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Virginia law. Va. Code Ann. § 13.1-504 A. Any person who sells a security in violation of Section 13.1-504 A "shall be liable to the person purchasing such security from him who may sue either at law or in equity to recover the consideration paid for such security, together with interest thereon at the annual rate of six percent, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of such security, or for the substantial equivalent in damages if he no longer owns the security." *Id.* § 13.1-522 A.

1407.   When issued, the Token Futures were securities within the meaning of the Virginia Securities Act. *Id.* § 13.1-501 A. On information and belief, BitMEX transacted business as a broker-dealer or agent when it sold the Token Futures to members of the Class in Virginia. *Id.*

<div align="center">254</div>

1408.   On information and belief, BitMEX transacted business as a broker-dealer or agent in Virginia, including without limitation through solicitations directed by BitMEX to Virginia and received in Virginia.

1409.   BitMEX was not registered as a broker-dealer or agent in Virginia, nor was it subject to any exemption from registration.

1410.   Accordingly, BitMEX has violated the Virginia Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1411.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1412.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND FORTY-THIRD CAUSE OF ACTION
### (VIRGINIA STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**Va. Code Ann. § 13.1-522 C**
**(Individual Defendants)**

1413.   Plaintiff realleges the allegations above.

1414.   This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Virginia.

1415.   Every person who directly or indirectly controls an entity liable under the Virginia Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer, or director of such a person, every person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known,

of the existence of the facts by reason of which liability is alleged to exist. Va. Code Ann. § 13.1-522 C.

1416.   When issued, the Token Futures were securities within the meaning of the Virginia Securities Act. *Id.* § 13.1-501 A. On information and belief, BitMEX sold the Token Futures to members of the Class in Virginia and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Virginia Securities Act, and BitMEX was not registered as a broker-dealer or agent under Virginia law. *Id.* §§ 13.1-514, 13.1-514.1.

1417.   On information and belief, BitMEX sold the Token Futures and acted as a broker-dealer or agent in Virginia, including without limitation through solicitations directed by BitMEX to Virginia and received in Virginia.

1418.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1419.   Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Virginia Securities Act through BitMEX's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1420.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1421.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND FORTY-FOURTH CAUSE OF ACTION
### (WASHINGTON STATE LAW – PRIMARY LIABILITY)
**Unregistered Offer and Sale of Securities**
**Wash. Rev. Code § 21.20.430(1)**
**(BitMEX)**

1422.   Plaintiff realleges the allegations above.

1423.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Washington.

1424.   The Securities Act of Washington forbids the offer or sale of unregistered securities. Wash. Rev. Code § 21.20.140. Any person who offers or sells a security in violation of Section 21.20.140 is "liable to the person buying the security from him or her, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at eight percent per annum from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he or she no longer owns the security. " *Id.* § 21.20.430(1).

1425.   When issued, the Token Futures were securities within the meaning of the Securities Act of Washington. *Id.* § 21.20.005(17). On information and belief, BitMEX offered or sold the Token Futures to members of the Class in Washington. The Token Futures were neither registered under, nor subject to exemption from registration under the Securities Act of Washington. *Id.* § 21.20.310.

1426.   Upon information and belief, the Token Futures were offered or sold in Washington, including without limitation through solicitations directed by BitMEX to Washington and received in Washington.

1427.   Accordingly, BitMEX has violated the Securities Act of Washington through BitMEX's sale of unregistered securities.

1428.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1429.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDRED AND FORTY-FIFTH CAUSE OF ACTION**
**(WASHINGTON STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Wash. Rev. Code Ann. § 21.20.430**
**(Individual Defendants)**

1430.   Plaintiff realleges the allegations above.

1431.   This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Washington.

1432.   Every person who directly or indirectly controls an entity liable under the Securities Act of Washington for unlawfully selling unregistered securities, as well as "every partner, officer or director of such a seller, every person occupying a similar status or performing similar functions … are also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 21.20.430(3).

1433.  When issued, the Token Futures were securities within the meaning of the Washington Securities Act. *Id.* § 21.20.005(17). On information and belief, BitMEX sold the Token Futures to members of the Class in Washington. The Token Futures were neither registered under, nor subject to exemption from registration under the Washington Securities Act.

1434.  On information and belief, BitMEX sold the Token Futures in Washington, including without limitation through solicitations directed by BitMEX to Washington and received in Washington.

1435.  Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities.

1436.  Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Washington Securities Act through BitMEX's sale of unregistered securities.

1437.  Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1438.  Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE HUNDRED AND FORTY-SIXTH CAUSE OF ACTION
### (WEST VIRGINIA STATE LAW – PRIMARY LIABILITY)
### Unregistered Offer or Sale of Securities
### W. Va. Code Ann. § 32-4-410(a)
### (BitMEX)

1439.   Plaintiff realleges the allegations above.

1440.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in West Virginia.

1441.   The West Virginia Uniform Securities Act forbids the offer or sale of unregistered securities. W. Va. Code Ann. § 32-3-301. Any person who offers or sells a security in violation of Section 32-3-301 is "liable to the person buying the security from him, who may assert a claim in a civil action to recover the consideration paid for the security, together with interest at nine percent per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at nine percent per year from the date of disposition." *Id.* § 32-4-410(a).

1442.   When issued, the Token Futures were securities within the meaning of the West Virginia Uniform Securities Act. *Id.* § 32-4-401(n). On information and belief, BitMEX offered or sold the Token Futures to members of the Class in West Virginia. The Token Futures were neither registered under, nor subject to exemption from registration under the West Virginia Uniform Securities Act. *Id.* § 32-4-402.

1443.   Upon information and belief, the Token Futures were offered or sold in West Virginia, including without limitation through solicitations directed by BitMEX to West Virginia and received in West Virginia.

260

1444.   Accordingly, BitMEX has violated the West Virginia Uniform Securities Act through BitMEX's sale of unregistered securities.

1445.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1446.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND FORTY-SEVENTH CAUSE OF ACTION**
**(WEST VIRGINIA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**W. Va. Code Ann. § 32-2-201**
**(BitMEX)**

</div>

1447.   Plaintiff realleges the allegations above.

1448.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in West Virginia.

1449.   The West Virginia Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered under West Virginia law. *Id.* § 32-2-201. Any person who offers or sells a security in violation of Section 32-2-201 is "liable to the person buying the security from him, who may assert a claim in a civil action to recover the consideration paid for the security, together with interest at nine percent per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at nine percent per year from the date of disposition." *Id.* § 32-4-410(a).

1450.   When issued, the Token Futures were securities within the meaning of the West Virginia Uniform Securities Act. *Id.* § 32-4-401(n). On information and belief, BitMEX transacted business as a broker-dealer or agent when it offered or sold the Token Futures to members of the Class in West Virginia. *Id.* §§ 32-4-401(b), 32-4-401(c).

1451.   On information and belief, BitMEX transacted business as a broker-dealer or agent in West Virginia, including without limitation through solicitations directed by BitMEX to West Virginia and received in West Virginia.

1452.   BitMEX was not registered as a broker-dealer or agent in West Virginia.

1453.   Accordingly, BitMEX has violated the West Virginia Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1454.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1455.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE HUNDRED AND FORTY-EIGHTH CAUSE OF ACTION
## (WEST VIRGINIA STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**W. Va. Code Ann. § 32-4-410**
**(Individual Defendants)**

1456.   Plaintiff realleges the allegations above.

1457.   This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in West Virginia.

1458.   Every person who directly or indirectly controls an entity liable under the West Virginia Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner,

officer or director of such a seller, every person occupying a similar status or performing similar functions … are also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 32-4-410(b).

1459.  When issued, the Token Futures were securities within the meaning of the West Virginia Uniform Securities Act. *Id.* § 32-4-401(n). On information and belief, BitMEX offered and sold the Token Futures to members of the Class in West Virginia and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the West Virginia Uniform Securities Act, and BitMEX was not registered as a broker-dealer or agent under West Virginia law. *Id.* § 32-2-201.

1460.  On information and belief, BitMEX offered and sold the Token Futures and acted as a broker-dealer or agent in West Virginia, including without limitation through solicitations directed by BitMEX to West Virginia and received in West Virginia.

1461.  Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1462.    Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the West Virginia Uniform Securities Act through BitMEX's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1463.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1464.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND FORTY-NINTH CAUSE OF ACTION
### (WISCONSIN STATE LAW – PRIMARY LIABILITY)
#### Unregistered Sale of Securities
#### Wis. Stat. § 551.509
#### (BitMEX)

1465.    Plaintiff realleges the allegations above.

1466.    This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in the state of Wisconsin.

1467.    The Wisconsin Uniform Securities Law forbids the sale of unregistered securities. Wis. Stat. § 551.301. Any person who sells a security in violation of Section 301 is liable to the purchaser for the "consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate under s. 138.04 from the date of the purchase, costs, and reasonable attorney fees determined by the court, upon the tender of the security, or for actual damages as provided in par. (c)." *Id.* § 551.509(2)(a). Actual damages are defined as "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate under s. 138.04 from the date of the purchase, costs, and reasonable attorney fees determined by the court." *Id.* § 551.509(2)(c).

1468.   When issued, the Token Futures were securities within the meaning of the Wisconsin Uniform Securities Law. *Id.* § 551.102(28). On information and belief, BitMEX sold the Token Futures to members of the Class in the state of Wisconsin. The Token Futures were neither registered under, nor subject to exemption from registration under the Wisconsin Uniform Securities Law. *Id.* § 551.301.

1469.   On information and belief, the Token Futures were offered or sold in the state of Wisconsin, including without limitation through solicitations directed by BitMEX to the state of Wisconsin and received in the state of Wisconsin.

1470.   Accordingly, BitMEX has violated the Wisconsin Uniform Securities Law through BitMEX's sale of unregistered securities.

1471.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1472.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDRED AND FIFTIETH CAUSE OF ACTION**
**(WISCONSIN STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Wis. Stat. § 551.509**
**(BitMEX)**

1473.   Plaintiff realleges the allegations above.

1474.   This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in the state of Wisconsin.

1475.   The Wisconsin Uniform Securities Law forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Wisconsin law. Wis. Stat. §§ 551.401(1), 551.402(1). Any "person acting as a broker-dealer or

agent that sells … a security in violation" of Sections 401 or 402 is "is liable to the customer …

[who] if a purchaser, may maintain an action for recovery of actual damages as specified in sub.

(2)(a) to (c)" (*Id.* § 551.509(4)) which in turn provide that a purchaser may "recover the

consideration paid for the security, less the amount of any income received on the security, and

interest at the legal rate under s. 138.04 from the date of the purchase, costs, and reasonable

attorney fees determined by the court, upon the tender of the security, or for actual damages as

provided in par. (c)." *Id.* § 551.509(2)(a). Actual damages are defined as "the amount that would

be recoverable upon a tender less the value of the security when the purchaser disposed of it, and

interest at the legal rate under s. 138.04 from the date of the purchase, costs, and reasonable

attorney fees determined by the court." *Id.* 551.509(2)(c).

1476.   When issued, the Token Futures were securities within the meaning of the

Wisconsin Uniform Securities Law. *Id.* § 551.102(28). BitMEX transacted business as a broker-

dealer or agent when it sold the Token Futures to members of the Class in the state of Wisconsin.

*Id.* § 551.102(2), (4).

1477.   On information and belief, BitMEX transacted business as a broker-dealer or agent

in the state of Wisconsin, including without limitation through solicitations directed by BitMEX

to the state of Wisconsin and received in the state of Wisconsin.

1478.   BitMEX was not registered as a broker-dealer or agent in the state of Wisconsin,

nor was it subject to any exemption from registration.

1479.   Accordingly, BitMEX has violated the Wisconsin Uniform Securities Law by

transacting business as an unregistered broker-dealer or agent in the sale of securities.

1480.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1481.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND FIFTY-FIRST CAUSE OF ACTION
### (WISCONSIN STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**Wis. Stat. Ann. § 551.509**
**(Individual Defendants)**

1482.   Plaintiff realleges the allegations above.

1483.   This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in the state of Wisconsin.

1484.   Every person who directly or indirectly controls an entity liable under the Wisconsin Uniform Securities Law for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "managing partner, executive officer, or director of a person liable under subs. (2) to (6), including an individual having a similar status or performing similar functions," is jointly and severally liable "unless the individual sustains the burden of proof that the individual did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist." Wis. Stat. Ann. § 551.509(7)(d).

1485.   When issued, the Token Futures were securities within the meaning of the Wisconsin Uniform Securities Law. *Id.* § 551.102(28). On information and belief, BitMEX sold the Token Futures to members of the Class in the state of Wisconsin and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Wisconsin Uniform Securities Law,

and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Wisconsin law. *Id.* §§ 551.301, 551.401(1), 551.402(1).

1486.   On information and belief, BitMEX sold the Token Futures and acted as a broker-dealer or agent in the state of Wisconsin, including without limitation through solicitations directed by BitMEX to the state of Wisconsin and received in the state of Wisconsin.

1487.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1488.   Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Wisconsin Uniform Securities Law through BitMEX's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1489.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1490.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND FIFTY-SECOND CAUSE OF ACTION
### (WYOMING STATE LAW – PRIMARY LIABILITY)
**Unregistered Sale of Securities**
**Wyo. Stat. Ann. § 17-4-509(b)**
**(BitMEX)**

1491.   Plaintiff realleges the allegations above.

1492.   This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Wyoming.

1493.   The Wyoming Uniform Securities Act forbids the offer or sale of unregistered securities. Wyo. Stat. Ann. § 17-4-301. Any person who sells a security in violation of Section 17-4-301 is liable to the purchaser, who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at six percent (6%) per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security." *Id.* § 17-4-509(b)(i). If the purchaser no longer owns the security, then he may seek actual damages, which are "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at six percent (6%) per year from the date of the purchase, costs and reasonable attorneys' fees determined by the court." *Id.* § 17-4-509(b)(iii).

1494.   When issued, the Token Futures were securities within the meaning of the Wyoming Uniform Securities Act. *Id.* § 17-4-102(a)(xxviii). On information and belief, BitMEX offered or sold the Token Futures to members of the Class in Wyoming. The Token Futures were neither registered under, nor subject to exemption from registration under the Wyoming Uniform Securities Act. *Id.* § 17-4-201 - 204.

1495.   Upon information and belief, the Token Futures were offered or sold in Wyoming, including without limitation through solicitations directed by BitMEX to Wyoming and received in Wyoming.

1496.   Accordingly, BitMEX has violated the Wyoming Uniform Securities Act through BitMEX's sale of unregistered securities.

1497.   Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1498.   Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND FIFTY-THIRD CAUSE OF ACTION
### (WYOMING STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### Wyo. Stat. Ann. § 17-4-509(d)
### (BitMEX)

1499.   Plaintiff realleges the allegations above.

1500.   This Cause of Action is brought on behalf of Class members to whom Token Futures were sold in Wyoming.

1501.   The Wyoming Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Wyoming law. *Id.* §§ 17-4-401, 17-4-402. Any person acting as a broker-dealer or agent who sells a security in violation of Sections 17-4-401(a) or 17-4-402(a) is liable to the customer. *Id.* § 17-4-509(d). The "customer, if a purchaser may maintain an action for recovery of actual damages as specified in paragraphs (b)(i) through (b)(iii) of this section." *Id*. Pursuant to § 17-4-509(b)(i) the purchaser "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at six percent (6%) per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security." *See Id.* § 17-4-509(d) (citing to § 17-4-509(b)(i) for recovery). If the purchaser no longer owns the security, then pursuant to § 17-4-509(b)(iii), the purchaser may seek actual damages, which are "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at six percent (6%) per year from the date of the purchase,

costs and reasonable attorneys' fees determined by the court." *Id.* § 17-4-509(d) (citing to § 17-4-509(b)(iii) for recovery).

1502.    When issued, the Token Futures were securities within the meaning of the Wyoming Uniform Securities Act. *Id.* § 17-4-102(a)(xxviii). On information and belief, BitMEX transacted business as a broker-dealer or agent when it sold the Token Futures to members of the Class in Wyoming. *Id.* § 17-4-102(a)(ii) and (iv).

1503.    On information and belief, BitMEX transacted business as a broker-dealer or agent in Wyoming, including without limitation through solicitations directed by BitMEX to Wyoming and received in Wyoming.

1504.    BitMEX was not registered as a broker-dealer or agent in Wyoming, nor was it subject to any exemption from registration.

1505.    Accordingly, BitMEX has violated the Wyoming Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1506.    Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1507.    Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDRED AND FIFTH FOURTH CAUSE OF ACTION**
**(WYOMING STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Wyo. Stat. Ann. § 17-4-509(g)**
**(Individual Defendants)**

1508.    Plaintiff realleges the allegations above.

1509.    This Cause of Action is brought on behalf of Class members to whom Token Futures were offered or sold in Wyoming.

271

1510.   Every person who directly or indirectly controls a person liable under the Wyoming Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every managing partner, executive officer, or director of such a seller, including every person having a similar status or performing similar functions … is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which liability is alleged to exist. *Id.* §§ 17-4-509(g)(i)-(iv).

1511.   When issued, the Token Futures were securities within the meaning of the Wyoming Uniform Securities Act. *Id.* § 17-4-102(a)(xxviii). On information and belief, BitMEX sold the Token Futures to members of the Class in Wyoming and acted as the broker-dealer or agent for the sale and purchase of those securities. The Token Futures were neither registered under, nor subject to exemption from registration under the Wyoming Uniform Securities Act, and BitMEX was not registered or exempt from registration as a broker-dealer or agent under Wyoming law. *Id.* §§ 17-4-401(a), 17-4-402(a).

1512.   On information and belief, BitMEX sold the Token Futures and acted as a broker-dealer or agent in Wyoming, including without limitation through solicitations directed by BitMEX to Wyoming and received in Wyoming.

1513.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of BitMEX and its employees, and to cause BitMEX to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of

unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1514. Accordingly, the Individual Defendants, who directly or indirectly controlled BitMEX, have violated the Wyoming Uniform Securities Act through BitMEX's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1515. Class members who own the Token Futures have made or will make any necessary tender and seek all remedies available at law or in equity for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1516. Class members who no longer own the Token Futures seek damages for any Token Futures purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## **PRAYER FOR RELIEF**

1517. On behalf of themselves and the Class, Plaintiff requests relief as follows:

a. That the Court determines that this action may be maintained as a class action, that Plaintiff be named as Class Representatives of the Class, that the undersigned be named as Lead Class Counsel of the Class, and direct that notice of this action be given to Class members;

b. That the Court enter an order declaring that Defendants' actions, as set forth in the Second Amended Complaint, violate the federal and state laws set forth above;

c. That the Court award Plaintiff and the Class damages in an amount to be determined at trial;

d. That the Court issue appropriate equitable and any other relief against Defendants to which Plaintiff and the Class are entitled;

e. That the Court award Plaintiff and the Class pre- and post-judgment interest (including pursuant to statutory rates of interest set under State law);

f. That the Court award Plaintiff and the Class their reasonable attorneys' fees and costs of suit; and

g. That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

## **JURY TRIAL**

1518.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a

trial by jury for all claims.

Dated: January 15, 2021
      New York, New York

                        Respectfully submitted,

*/s/ Philippe Z. Selendy*  
Philippe Z. Selendy  
Jordan A. Goldstein  
Joshua Margolin  
Mitchell Nobel  
SELENDY & GAY, PLLC  
1290 Sixth Avenue, 17th Floor  
New York, NY 10104  
pselendy@selendygay.com  
jgoldstein@selendygay.com  
jmargolin@selendygay.com  
mnobel@selendygay.com

*/s/ Kyle W. Roche*  
Kyle W. Roche  
Edward Normand  
Velvel (Devin) Freedman (admitted *pro hac vice*)  
Joseph M. Delich  
Richard R. Cipolla  
ROCHE CYRULNIK  
  FREEDMAN LLP  
99 Park Avenue, 19th Floor  
New York, NY 10016  
kyle@rcfllp.com  
tnormand@rcfllp.com  
vel@rcfllp.com  
jdelich@rcfllp.com  
rcipolla@rcfllp.com

274